## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DONALD ALLEN, *et al.,* | § | CIVIL ACTION NO. 4:08-CV-03370 |
| *Plaintiffs* | § | |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| COIL TUBING SERVICES, L.L.C. | § | |
| *Defendant* | § | |

## PLAINTIFFS' MASTER BRIEF IN SUPPORT OF PLAINTIFFS'

## INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT

ABRAHAM, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND

Randall O. Sorrels
Texas Bar Number: 18855350
Southern District Bar Number: 11115
Clyde J. "Jay" Jackson, III
Texas Bar Number: 10502500
Southern District Bar Number: 1241
800 Commerce Street
Houston, Texas 77002
Telephone: (713) 222-7211
Telecopier: (713) 225-0827

Clark Woodson, III
Texas Bar Number: 00794880
Southern District Bar Number: 21481
601 E. Myrtle
Angleton, Texas 77515
Telephone: (979) 849-6080
Telecopier: (979) 849-7070

ATTORNEYS FOR PLAINTIFFS

## TABLE OF CONTENTS

I.  NATURE OF CASE AND SUMMARY OF ARGUMENT ................................... 1

II.  BACKGROUND AND STAGE OF PROCEEDING ........................................... 2

III.  ISSUE TO BE RULED UPON .................................................................... 3

IV.  LAW AND ARGUMENT .......................................................................... 3

  A.  Standard For Summary Judgment. ......................................................... 3

  B.  Fair Labor Standards Act. ...................................................................... 3

    1.  Duty to Pay Overtime. ...................................................................... 3

    2.  Burden of Proof: Clear and Convincing Evidence; Narrow Construction of
        Exemptions. ...................................................................................... 4

    3.  Exemptions Claimed. ......................................................................... 4

  C.  Application of the MCA Requires an Individualized Inquiry into the Specific
      Job Duties and Travel Facts of Each Plaintiff. ...................................... 4

  D.  The Categorization and Re-Categorization by CTS .................................. 9

    1.  Initially, all STIs received overtime, according to Ritter ................. 9

    2.  CTS has not conducted an adequate review of the propriety of its
        categorizations .................................................................................. 10

    3.  Since 2008, STIs in the Broussard District are paid overtime. ......... 11

  E.  The Executive Exemption Does Not Apply to Plaintiffs. ...................... 12

    1.  STIIs ................................................................................................. 15

    2.  Service Supervisors .......................................................................... 15

  F.  The MCA Does Not Apply to Any Plaintiff. ......................................... 16

    1.  Plaintiffs do not dispute that CTS is a motor private carrier. ......... 17

2.   CTS cannot prove that each plaintiff engaged in activities that directly affected the safe operation of CMVs in interstate transportation. ................ 18

3.   Plaintiffs are not exempt as "drivers." ......................................................... 18

   a.   Driving a pick-up truck, or any vehicle weighing less than 10,000 pounds, is non-exempt under the MCA. ................................................... 18

   b.   Plaintiffs were oil well service workers. ...................................................... 19

   c.   Plaintiffs drove CMVs in interstate rarely, if ever.  Thus, the *de minimis* exception applies. .................................................................................... 19

   d.   Plaintiffs are not "drivers" because there is no evidence of a reasonable expectation that each would be called upon to drive a CMV in interstate commerce. ................................................................................................. 21

      i.    Interstate driving is not integral to plaintiffs' jobs. ................................. 22

      ii.   Indiscriminately Assigned ........................................................................ 23

      iii.  The four involved districts handled only a small percentage of interstate jobs. ......................................................................................... 24

      iv.   CTS has presented no documents to show applicants or employees were informed or acknowledged that they might drive CMVs in interstate commerce at any time. .......................................................................... 26

      v.    Because CTS' operations were divided among six separate districts, the number and locations of jobs for another district, like Rock Springs, Wyoming, does not create a reasonable expectation that an ST in a different district would drive a CMV interstate. ................................... 28

      vi.   Defendant's employment advertisements show that applicants are applying to a specific district for an oil field service job. ...................... 29

      vii.  Summary ................................................................................................... 30

   e.   Under *Songer v. Dillon Res., Inc.*, the MCA does not apply when the workers' continuing duties do not affect interstate safety. ......................... 30

4.   Plaintiffs were not "loaders" affecting the safe operation of motor vehicles in interstate commerce. .................................................................................. 33

a.   According to the documents, at most only two of the bellwether plaintiffs loaded a CMV that traveled interstate. ........................................... 35

b.   Plaintiffs did not exercise discretion when loading. ................................... 37

c.   CTS regularly uses third-party vendors to load. ........................................ 38

d.   Job descriptions for the STs and SS do not mention "loading." ................ 38

e.   An employee whose loading functions were *de minimis* does not come under the MCA. ......................................................................................... 39

f.   "Reasonable expectation" does not apply to loaders. ................................ 40

g.   The Angleton, Alice, and Bridgeport Districts had less than 2% interstate jobs during the relevant time period.  The Broussard District prohibited plaintiffs from using the forklifts to load trucks. ....................................... 41

h.   Conclusion. ................................................................................................ 41

G.   Coverage under the MCA is determined on a workweek-by-workweek basis for any employee who is exempt. .......................................................................... 42

1.   A workweek-by-workweek analysis is necessary when workers have different shifting job assignments and duties. ................................................. 42

2.   When safety-affecting activities are rare or infrequent, the MCA should only be applied during those time periods when it occurred. ................................ 43

V.   CONCLUSION AND RELIEF SOUGHT ........................................................ 44

# TABLE OF AUTHORITIES

## Cases

*A.H. Phillips, Inc. v. Walling,* 324 U.S. 490 (1945) ............................................................ 9

*Aaron v. City of Wichita,* 54 F.3d 652 (10th Cir. 1995). ...................................................... 4

*Albanil v. Coast 2 Coast, Inc.*, No. H-08-486, 2008 U.S. Dist. LEXIS 93035 (S.D. Tex. Nov. 17, 2008) ........................................................................................................... 20

*Ale v. Tennessee Valley Authority*, 269F.3d 680 (6th Cir. 2001) ...................................... 6

*Billingslea v. Southern Freight, Inc.,* 2010 WL 1233385 (N.D. Ga. March 29, 2010) ...... 5

*Bohn v. Park City Group. Inc.*, 94 F.3d 1457 (10th Cir. 1996) .......................................... 6

*Cash v. Conn Appliances, Inc.*, 2 F. Supp. 2d 884 (E.D. Tex. 1997) ................................ 6

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ................................................................ 3

*Chao v. Gary Bauerly, LLC,* 2005 WL 1656915 (D. Minn. July 14, 2005) ..................... 25

*Coleman v. Jiffy June Farms, Inc.,* 324 F. Supp. 664 (S.D. Ala. 1970) .......................... 20

*Corning Glass Works v. Brennan,* 417 U.S. 188 (1974) .................................................. 4

*Dalheim v. KDFW-TV*, 918 F.2d 1220 (5th Cir. 1990) ................................................. 6, 8

*Dauphin v. Chestnut Ridge Transportation,* 544 F. Supp. 2d 266 (S.D.N.Y. 2008) .... 5, 22

*Dell 'Orfano v. Ikon Office Solutions, Inc.,* 2006 WL 2523113 (M.D. Ga. 2006) .......... 19

*Dole v. Circle 'A' Constr., Inc.,* 738 F. Supp. 1313 (D. Idaho 1990) ............................. 17

*Dole v. Circle "A" Const., Inc.,* 738 F. Supp. 1313 (D. Idaho 1990) ............................. 20

*Elliot v. Ernstes & Sons Trucking,* 2006 WL 2849705 (S.D. Ind. Oct. 3, 2006) .............. 5

*Garcia v. Fleetwood Limousine,* 511 F. Supp. 2d 1233 (M.D. Fla. 2007) ...................... 25

*Garcia v. Pace Suburban Serv.,* 955 F. Supp. 75 (N.D. Ill. 1996) ............................. 22, 27

*Goldberg v. Faber Indus., Inc.,* 291 F.2d 232 (7th Cir.1961) ...................................... 5, 18

*Harshman v. Well Serv., Inc.,* 248 F. Supp. 953 (D.C. Pa. 1964). ................................... 6

*Hays v. City of Pauls Valley,* 74 F.3d 1002 (10th Cir. 1996) ........................................... 4

*Hoffman v. First Student, Inc.,* No. 06-1882, 2009 WL 1783536 (D. Md. June 23, 2009)4, 21, 22, 42

*Hopkins v. Texas Mast Climbers, L.L.C.*, WL 3435033 (S.D. Tex. Dec. 14, 2005) ......... 40

*Kee v. City of Rowlett,* 247 F.3d 206 (5th Cir. 2001) ...................................................... 3

*Kimball v. Goodyear Tire and Rubber Co.,* 504 F. Supp. 544 (E.D. Tex. 1980) ....... 20, 23

*King v. Asset Appraisal Servs., Inc.,* 470 F. Supp. 2d 1025 (D. Neb. 2006). .................. 19

*Kohl v. Woodlands Fire Department*, 440 F. Supp. 2d 626 (S.D. Tex. 2006) ................... 8

*Levinson v. Spector Motor Service,* 330 U.S. 649 (1947) ............................................ 7, 34

*Major v. Chons Bros. Inc.,* 53 P.3d 781 (Colo.App. 2002) .............................................. 5

*Masson v. Ecolab, Inc.,* 2005 U.S. Dist. LEXIS 18022 (S.D.N.Y. Aug. 18, 2005) .......... 42

*Morris v. McComb,* 332 U.S. 422, 433 (1947) ...................................................... 21, 22, 25

*Morrison v. Quality Transports Servs.*, Inc., 474 F. Supp. 2d 1303 (S.D. Fla. 2007) ...... 24

*Pyramid Motor Freight Corp., Inc. v. Ispass,* 330 U.S. 695 (1947) ............................. 5, 20

*Reich v. Am. Driver Serv., Inc.,* 33 F.3d 1153, 1156 (9th Cir. 1994) ............................. 22

*Reich v. Homier Distrib. Co.,* 362 F. Supp. 2d 1009 (N.D. Ind. 2005) ........................... 35

*Roberts v. National Autotech, Inc*., 192 F. Supp.2d 672 (N.D. Tex. 2002) ...................... 6

*Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394 (6th Cir. 2004) ..................................... 8

*Shockley v. City of Newport News,* 997 F.2d 18 (4th Cir. 1993)........................................4
*Songer v. Dillon Res., Inc.,* 618 F.3d 467 (5th Cir. 2010)..................................30, 31
*Stricker v. Eastern Off Road Equip., Inc.,* 935 F. Supp. 650 (D. Md. 1996) ....................4
*Talton v. I.H. Caffey Distrib. Co.,* 1:02-CV-1048, 2004 U.S. Dist. LEXIS 6894
      (M.D.N.C. Mar. 11, 2004) ........................................................................20
*Troutt v. Stavola Bros., Inc.* 107 F. 3d 1104, 1108 (4th Cir. 1997)………………………………5
*Tyler v. Union Oil Co. of Calif.,* 304 F.3d 379 (5th Cir. 2002)........................................8
*United States v. Am. Trucking Ass'ns.,* 310 U.S. 534 (1940)......................................16
*United States v. Am. Trucking Ass'ns.,* 310 U.S. 534 (1940) ..................................6, 16
*Veliz v. Cintas Corp.,* No. C 03-1180 RS, 2008 U.S. Dist. LEXIS 95153 (N.D. Cal. Nov.
      13, 2008) ..............................................................................................18
*Villegas v. Dependable Constr. Servs., Inc.,* 2008 WL 5137321 (S.D. Tex. 2008)......8, 20
*Wirtz v. C & P Shoe Corp.,* 336 F.2d 21 (1964)........................................................20
*Wirtz v. Tyler Pipe and Foundry Co.,* 369 F.2d 927 (5th Cir. 1966) ........................19, 20
*Yaklin v. W-H Energy Servs., Inc.,* No. 2:07-CV-00422 (S.D. Tex. Nov. 2, 2007)...passim
*Yellow Transit Freight Lines, Inc. v. Balven*, 320 F.2d 495 (8th Cir. 1963)......................7

**Statutes**
29 C.F.R. § 541.100(a) (2010) ....................................................................................13
29 C.F.R. § 541.102 ..................................................................................................13
29 C.F.R. § 541.103 ..................................................................................................13
29 C.F.R. § 541.105 ..................................................................................................13
29 C.F.R. § 541.2 ........................................................................................................8
29 C.F.R. § 541.201(b) ................................................................................................6
29 C.F.R. § 782.2(a) (2010) ..............................................................6, 16, 17, 18
29 C.F.R. § 782.2(b)(2) ..........................................................................................6, 17
29 C.F.R. § 782.2(b)(3) ..............................................................................20, 39, 43
29 C.F.R. § 782.2(b)(4) ..............................................................................32, 42, 43
29 C.F.R. § 782.2(d) ..................................................................................................19
29 C.F.R. § 782.2(f) ..................................................................................................18
29 C.F.R. § 782.3(b) ..........................................................................................18, 19
29 C.F.R. § 782.5 ......................................................................................................38
29 C.F.R. § 782.5(a) ..................................................................................................34
29 C.F.R. § 782.5(c) ..................................................................................................34
29 C.F.R.§ 782.2(b)(2) ..............................................................................................19
29 U.S.C. § 207(a) (2006) ....................................................................................1, 4
29 U.S.C. § 213 ....................................................................................................1, 4, 16
29 U.S.C. § 213(a)(1) ..................................................................................................1
29 U.S.C. § 213(b)(1) ..........................................................................................1, 4, 16
29 U.S.C. § 213(b)(6) ..................................................................................................1
29 U.S.C. § 213(f) ......................................................................................................1
49 U.S.C. § 13102(15) ..............................................................................................18
49 U.S.C. § 31132 ..............................................................................................18, 19
49 U.S.C. § 31502(b) (2006) ....................................................................................16

# I.       NATURE OF CASE AND SUMMARY OF ARGUMENT

Plaintiffs are oil field service laborers who worked in various job positions for defendant Coil Tubing Services, L.L.C. ("CTS").  The character of plaintiffs' activities was oil well service.  Some were in Louisiana, some were in Texas.  Most worked offshore for significant periods of time, all had shifting job duties, and all performed numerous continuing job duties that did not affect the safety of the operation of a commercial motor vehicle ("CMV") in interstate commerce.  In fact, six of the 14 bellwether plaintiffs did not have a commercial driver's license ("CDL") during the relevant time period.  All regularly worked more than 40 hours per week.

Plaintiffs filed this suit because CTS failed to pay them overtime wages, in violation of the Fair Labor Standards Act ("FLSA").  Under the FLSA, all workers are entitled to overtime pay when they exceed 40 hours in a workweek,[1] unless the employer proves an exemption.[2]

During this suit, CTS has alleged that multiple exemptions apply, such as the seaman's exemption,[3] the foreign country exemption,[4] the executive exemption,[5] and the motor carrier exemption.[6]  But the facts simply do not support its claims that an exemption applies to each worker, as the law requires.[7]  Thus, CTS has failed to meet its burden to prove that it is exempt from its legal duty to pay overtime wages.

---

[1] Fair Labor Standards Act, 29 U.S.C. § 207(a) (2006).
[2] EX. 1: FACT SHEET #23: OVERTIME PAY REQUIREMENTS OF THE FLSA (2008), http://www. dol.gov/whd/regs/ compliance/whdfs23.pdf.
[3] 29 U.S.C. § 213(b)(6) (2006).
[4] 29 U.S.C. § 213(f).
[5] 29 U.S.C. § 213(a)(1).
[6] 29 U.S.C. § 213(b)(1).
[7] Legal authority demonstrating that the claimed exemptions must be analyzed for each worker, rather than on an "enterprise" basis as CTS claims, is found at Section IV(C), below.

## II.   BACKGROUND AND STAGE OF PROCEEDING

CTS, an oil well service company, divides its business into six districts.   The plaintiffs in this case worked in four of those districts:  Angleton, Texas; Alice, Texas; Bridgeport, Texas; and Broussard, Louisiana.[8]  Each has a District Manager,[9] each is a profit center,[10] and there is no central dispatch for the company.[11]

*Yaklin v. W-H Energy Services, Inc., et al.*[12] was an identical suit brought in 2007 by employees of CTS in the Alice District in the Corpus Christi Division of the Southern District of Texas before Honorable Janis Graham Jack.[13]  They sued CTS and W-H Energy Services, Inc. because of the failure to pay overtime. Judge Jack denied defendant's motion for summary judgment, and the case was resolved.

On November 13, 2008, 11 employees of CTS initiated this suit.  Over the ensuing two years, many additional employees have joined the case, and some have been dismissed, so there are currently 174 plaintiffs seeking their overtime benefits.

To efficiently manage this case, which is not a collective action, on November 24, 2009 the Court created a "bellwether group" of employees.  Under this approach, the parties would conduct discovery and the Court will consider the claims of a sample group of employees.  Presently, there are 14 bellwether plaintiffs.[14]  In discovery thus far, over

---

[8] Bossier City, Louisiana; and Rock Springs, Wyoming are the other districts of CTS, and are not involved in this case.
[9] Letchworth Dep. 36:6–14, Apr. 14, 2010.
[10] Letchworth Dep. 26:25–27:5.
[11] Washington Dep. 81:10–21, Apr. 21, 2010.
[12] No. 2:07-CV-00422 (S.D. Tex. Nov. 2, 2007).
[13] Ex. 2: Order, *Yaklin v. W-H Energy Servs., Inc.,* No. 2:07-CV-00422 (S.D. Tex. Oct. 22, 2008).
[14] The bellwether plaintiffs are: Byron Allen, Donald Allen, Presley Branham, William Broussard, Alfredo Cantu, Adam Crews, Sr., Gary Henderson, Jesus Hernandez, Jr., Billy Newman, Cody Patin, Jose Pena, Mahmoud Sheikh, Steven Tankersley, and Donald Woodard.

400,000 documents have been produced.

During the period from November 13, 2005 through November 13, 2008,[15] plaintiffs among the bellwether group worked in numerous positions with a variety of job titles for CTS, such as Equipment Operator, Service Technician I ("STI"), Service Technician II ("STII"), and Service Supervisor ("SS").

## III.   ISSUE TO BE RULED UPON

The issue to be ruled upon in plaintiffs' motions for summary judgment accompanying this Master Brief is whether defendant has met its burden to prove that there is an exemption from the overtime requirement of the FLSA for each plaintiff.

## IV.   LAW AND ARGUMENT

**A.   Standard For Summary Judgment.**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[16]

**B.   Fair Labor Standards Act.**

**1.   Duty to Pay Overtime.**

According to the FLSA, an employee who works more than 40 hours in a workweek is entitled to overtime pay at a rate of not less than one and one-half times his

---

[15] The "relevant time period" for discovery purposes.

[16] *Kee v. City of Rowlett,* 247 F.3d 206, 210 (5th Cir. 2001) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

regular rate of pay.[17]   Employers can only avoid their obligation to pay overtime if the worker falls within an exemption provided by the FLSA.[18]

### 2.   Burden of Proof: Clear and Convincing Evidence; Narrow Construction of Exemptions.

"Because an employee's exempt status is an affirmative defense to a claim for non-payment at an overtime rate, the employer bears the burden of proving the exemption by clear and convincing evidence."[19]   Furthermore "[a]n employee must fit 'plainly and unmistakenly within the exemption's terms,' and FLSA exemptions are to be narrowly construed."[20]

### 3.   Exemptions Claimed.

During this suit, CTS has alleged four different exemptions to its obligation to pay overtime.   But the evidence does not show that any plaintiff falls under any exemption. CTS has now abandoned its allegations of the foreign country exemption and the seaman's exemption.   Yet, CTS still claims that the executive exemption applies to "certain" employees, and also that the Motor Carrier Act exemption ("MCA") applies.[21]   The facts prove otherwise.

### C.   Application of the MCA Requires an Individualized Inquiry into the Specific Job Duties and Travel Facts of Each Plaintiff.

In overtime cases involving multiple employees, overwhelmingly courts have

---

[17] 29 U.S.C. § 207(a) (2006).
[18] 29 U.S.C. § 213 (2006).
[19] *Hoffman v. First Student, Inc.,* No. 06-1882, 2009 WL 1783536, at *6 (D. Md. June 23, 2009) (citing *Stricker v. Eastern Off Road Equip., Inc.,* 935 F. Supp. 650, 654 (D. Md. 1996)); *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97 (1974); *Shockley v. City of Newport News,* 997 F.2d 18, 21 (4th Cir. 1993).
[20] *Hays v. City of Pauls Valley,* 74 F.3d 1002, 1006 (10th Cir. 1996) (citing *Aaron v. City of Wichita,* 54 F.3d 652, 657 (10th Cir. 1995).
[21] 29 U.S.C. § 213(b)(1).

required employers to prove that *each individual plaintiff* fits within each claimed exemption. "Because the motor carrier exemption 'depends upon the activities of the individual employees,' a defendant generally must present evidence as to the character of the activities of each plaintiff in order to determine whether he or she is subject to the exemption."[22]

In *Troutt v. Stavola Brothers, Inc.*, the court stated, "what [defendant] ignores is that the Supreme Court has been equally clear that when there is a factual question as to whether a particular employee is within one of these covered classifications that question is decided in the judicial process and on an *individual* basis. Thus, in *Pyramid*, . . . the Supreme Court remanded the case for the district court to determine whether 'the activities of *each* respondent . . . come within the Commission's definition of the work of a 'loader.'"[23]   Similarly, in *Elliot v. Ernstes & Sons Trucking* the court wrote, "This analysis is conducted not on an enterprise level, but employee by employee."[24]

CTS understands that the MCA is analyzed and applied on an individual basis.  In *Yaklin,* CTS specifically argued that, *as a matter of law*, the applicability of the MCA turns on the travel facts of each individual plaintiff.[25]  CTS told the court in *Yaklin*:

> To determine whether an employee fits within any particular exemption is fact intensive and requires a detailed analysis of the actual duties performed by each

---

[22] *Dauphin v. Chestnut Ridge Transportation,* 544 F. Supp. 2d 266, 274 (S.D.N.Y. 2008) (citing *Goldberg v. Faber Indus., Inc.,* 291 F.2d 232, 235 (7th Cir.1961)); *Billingslea v. Southern Freight, Inc.,* 2010 WL 1233385, at *6 (N.D. Ga. March 29, 2010); ("[W]hat is controlling is the character of the activities involved in the performance of his job"); *Major v. Chons Bros. Inc.,* 53 P.3d 781, 784 (Colo.App. 2002) (arguing that a critical criterion in determining an exemption must focus on the nature of the "individual employee's job activities").

[23] 107 F. 3d 1104, 1108 (4th Cir. 1997)(citing *Pyramid* 330 U.S. at 706–07).

[24] 2006 WL 2849705, at *4 (S.D. Ind. Oct. 3, 2006).

[25] Ex. 3: Defs. W-H Energy Services, Inc.'s and Coil Tubing Services, LLC's Opposition to Pls. Mot. for Notice to Potential Class Members ("*Yaklin* Motion"), *Yaklin v. W-H Energy Servs., Inc,* No. 2:07-CV-00422 (S.D. Tex. Apr. 22, 2008) (emphasis added).

individual.[26]

Determining whether the motor carrier exemption applies to the individual Plaintiffs will require evidence regarding the specific duties and travel facts of each individual. For example, the Court will have to inquire whether *each individual* drove, loaded, and/or helped drive vehicles that meet the 10,000-pound gross vehicle weight rating required (after August 2005) in order to qualify for the exemption; whether each individual carried goods in interstate commerce that were used in furtherance of Defendant's enterprise and whether they traveled across state lines.[27]

In "Defendant's Briefing on Applicable FLSA Exemptions"[28] in this suit, CTS stated again that the MCA is determined on an individualized basis for each plaintiff:

For the exemption to apply in this case, CTS must qualify as a motor private carrier and the subject employees must have engaged in activities that directly affected the safe operation of motor vehicles in interstate transportation[29] . . . . In determining whether a *specific employee* falls within an exempt class, neither the title of the position or name given to the duties is controlling.[30] Instead, the character of the duties involved in the performance of the job are determinative.[31]

Furthermore, CTS has cited *Harshman v. Well Service, Inc.*[32] in "Defendant's Briefing on Applicable FLSA Exemptions."[33] The *Harshman* court applied the MCA to each individual plaintiff, stating that the "*test to be applied here is whether each plaintiff, during the relevant time periods, performed duties which substantially affected the safety*

---

[26] *Yaklin* Motion at 10 (citing 29 C.F.R. § 541.201(b); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1226 (5th Cir. 1990) ("the inquiry into exempt status under § 13(a)(I) remains intensely factbound and case specific"); *Roberts v. Nat'l Autotech, Inc.*, 192 F. Supp.2d 672, 676-77 (N.D. Tex. 2002); *Cash v. Conn Appliances, Inc.*, 2 F. Supp. 2d 884, 897 (E.D. Tex. 1997) (noting that the proposed class is not similarly situated when the issues are personal to the individual members); *Ale v. Tennessee Valley Authority*, 269F.3d 680, 689 (6th Cir. 2001) (determination of an exemption requires an examination of the specific duties performed); *Bohn v. Park City Group. Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996).

[27] *Yaklin* Motion at 11–12.

[28] Rec. 68, Def.'s Briefing on Applicable FLSA Exemptions at 3, *Allen et al., v. Coil Tubing Servs., L.L.C.*, No. 4:08-CV-03370 (S.D. Tex. Nov. 20, 2009).

[29] 29 C.F.R. § 782.2(a) (citing *United States v. Am. Trucking Ass'ns.*, 310 U.S. 534, 553 (1940))

[30] 29 C.F.R. § 782.2(b)(2) (citing *Pyramid*, 330 U.S. at 707) (emphasis added).

[31] 29 C.F.R. § 782.2(b)(2).

[32] 248 F. Supp. 953 (D.C. Pa. 1964).

[33] Rec. 68, Def.'s Briefing on Applicable FLSA Exemptions at 8, *Allen et al., v. Coil Tubing Servs., L.L.C.*, No. 4:08-CV-03370 (S.D. Tex. Nov. 20, 2009).

of operation of defendant's pump trucks in interstate commerce."[34]

Despite this, CTS now claims that an "enterprise theory" should apply to exempt all plaintiffs under the MCA.  However, CTS' enterprise theory falls short of a complete analysis of the MCA exemption to plaintiffs in this lawsuit.  The application of the MCA in this lawsuit on an individual basis is necessary because plaintiffs were required to perform several shifting job assignments and engage in numerous other duties on a regular basis, for up to months at a time, that did not affect the safety of the operation of a CMV in interstate commerce.  As a result, the most specific federal regulation that addresses the application of the MCA to plaintiffs, if at all, is 29 C.F.R § 782.2(b)(4).  This regulation shows when and how the MCA applies to an employee who may be defined as a "driver" or a "loader" under the regulations.  It states in part:

> *Where the same employee of a carrier is shifted from one job to another periodically or on occasion*, the application of the exemption to him in a particular workweek is tested by application of the above principles to the job or jobs in which he is employed *in that workweek*.

This regulation clearly addresses the specific duties of the individual employee on a workweek-by-workweek basis.  Completely absent is any mention that the employer's "enterprise" determines the application of the MCA exemption.  Additionally, nowhere in "Defendant's Briefing on Applicable FLSA Exemptions" does CTS cite any authority that its proposed enterprise theory was applied to a group of employees who, like plaintiffs, were required to perform several shifting job assignments and who completed numerous other duties that did not affect the safety of operation of a CMV in interstate commerce for

---

[34] *Harshman,* 248 F. Supp. at 958 (citing *Levinson v. Spector Motor Service,* 330 U.S. 649, 685–694 (dissenting opinion of Mr. Justice Rutledge); *Yellow Transit Freight Lines, Inc. v. Balven*, 320 F.2d 495 (8th Cir. 1963) (emphasis added).

long periods of time.

Ed Burchfield ("Burchfield"), District Manager of the Angleton District, testified about the job of service technicians ("STs"): *"it's going to vary from week-to-week depending on what [the employee] did,"* and *"it'll vary from person-to-person because they're not all doing the same thing at the same time."*[35] Jason McLeod ("McLeod"), Senior Supervisor in the Angleton District, confirmed that not all STs do the same things as one another.[36] Depending on a variety of factors, an ST may not perform loading activities.[37] Thus, the testimony of Burchfield and McLeod demonstrates the necessity to analyze the MCA on an individual and workweek-by-workweek basis.

Generally, FLSA exemptions require an individualized analysis, and that includes the executive exemption.[38] Honorable Keith P. Ellison in the Houston Division of the Southern District of Texas ruled, "[t]he actual day-to-day job activities of the employee are relevant to determining whether the employee is exempt under the FLSA, not the labels the employee or the employer place on those duties.[39] Judge Ellison also stated that the MCA depends *"on the class of work involved in the employee's job."*[40] In his ruling, Judge Ellison explicitly analyzed the applicability of each exemption claimed (including the executive exemption and the MCA) based upon the facts of each individual plaintiff. Judge Ellison observed, "[t]o extend an exemption to other than those plainly

---

[35] Burchfield Dep. 155:21–156:2, Mar. 10, 2010.
[36] McLeod Dep. 47:6–22, July 23, 2010.
[37] McLeod Dep. 49:12–18.
[38] *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1226 (5th Cir. 1990).
[39] *Villegas v. Dependable Constr. Servs., Inc.,* 2008 WL 5137321, at *6 (S.D. Tex. 2008) (citing *Tyler v. Union Oil Co. of Calif.*, 304 F.3d 379, 404 (5th Cir. 2002); *Kohl v. Woodlands Fire Department*, 440 F. Supp. 2d 626, 637 (S.D. Tex. 2006); *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 400 (6th Cir. 2004); 29 C.F.R. § 541.2).
[40] *Villegas v. Dependable Construction Servs., Inc.*, 2008 WL 5137321, at *22.

and unmistakably within its terms and spirit is to abuse the interpretive process and to frustrate the announced will of the people."[41]

## D.   The Categorization and Re-Categorization by CTS.

The often conflicting testimony of senior CTS executives shows that there is no reasoned legal basis for CTS' decision not to provide overtime for the STI, STII, and SS positions.   In fact, Glen Jerome Ritter ("Ritter"),[42] founding member and former President of CTS, testified that CTS' overtime practices are "mostly accidental."[43]

### 1.   Initially, all STIs received overtime, according to Ritter.

Ritter testified that from the inception of CTS, and for several years afterwards,[44] STIs were paid overtime.[45]   But Ritter did not know when, or more importantly why, CTS stopped paying overtime to STIs.

The testimony of David Hebert ("Hebert"), another one of CTS' founding members, General Manager from 2001–2007, and Vice President of Operations from 2007–2010, differed.   He said that the founding members (Ritter, Brian Payne, and himself) collectively decided that the STI, STII, and SS positions would not receive overtime.[46]   They based this decision solely on what they thought other companies were doing[47] and subsequently followed their business plan.[48]

---

[41] *Id.,* at *26 (citing *A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493 (1945)).

[42] Ritter served as President of CTS since 1998. In 2001, W-H Energy Services, Inc. bought CTS.  In 2008, Smith International bought W-H Energy Services, Inc.  Ritter is currently the President of Production Services for Smith International.

[43] Ritter Dep. 75:20–76:5, Aug, 19, 2010.

[44] Ritter Dep. 50:19–51:19.

[45] Ritter Dep. 51:22–24.

[46] Hebert Dep. 28:24–29:7, Nov. 9, 2010.

[47] That this was erroneous is demonstrated by the testimony of Joey Perez, CTS' designated witness, who was paid overtime when he was an oil field service worker for Halliburton.  Perez Dep. 13:7–21, 106:20–22, Feb. 8, 2011.

## 2. CTS has not conducted an adequate review of the propriety of its categorizations.

Ritter's testimony reveals that from 2005 until the present,[49] CTS, along with its owners W-H Energy Services, Inc. and Smith International, have not conducted an adequate investigation to determine if its payment practices for the STI, STII, and SS positions are in compliance with the FLSA.[50]  Ritter stated that, from 2005–2008, he had the authority to categorize an employee for the purposes of overtime pay.[51]  However, Ritter and Hebert both testified that they do not have the experience necessary to decide if a job position should receive overtime.[52]  Hebert performed no investigation, other than looking at a wage scale document and considering similar business practices, when determining whether a position should initially be categorized to receive overtime.[53]  Ritter, from 1998 until August 19, 2010, has not made any effort, either by research or consultation, to actually review CTS' job positions, such as the STI, STII, and SS, to determine whether they should receive overtime.[54]  Ritter is also not aware if anyone has the ongoing responsibility to review the STI, STII, and SS positions to determine if they should be re-categorized to receive overtime.[55]  When Tiffany Letchworth ("Letchworth") was hired in 2006 as the Human Resources Manager, she did not have the authority to re-categorize employees to receive overtime.[56]  Though Letchworth looked at

---

[48] Hebert Dep. 29:24–30:8, 30:1–31:4.
[49] The "present" date of Ritter's deposition was Aug. 19, 2010.
[50] Ritter Dep. 69:22–70:18.
[51] Ritter Dep. 6:3–20.
[52] Ritter Dep. 25:15–26:8; Hebert Dep. 38:17–25.
[53] Hebert Dep. 42:13–24, 39:6–16.
[54] Ritter Dep. 11:25–12:14.
[55] Ritter Dep. 26:9–27:9.
[56] Ritter Dep. 5:4–25.

written job descriptions,[57] neither she[58] nor anyone else[59] audited what duties workers actually performed in the field.  Letchworth relied on the job descriptions, which were based upon Hebert's opinions, to determine what duties were performed in the field.[60] Hebert confirmed that there has not been a field audit to evaluate what workers actually do in the field.[61]  Ritter also stated that no audits have been done to determine whether STIs or STIIs from the Alice, Angleton, Broussard, and Bridgeport Districts performed any out-of-state land jobs, or if so, the frequency of them, from 2005-2008.[62]

3.   Since 2008, STIs in the Broussard District are paid overtime.

Ironically, since 2008 STIs in the Broussard District receive overtime.[63]  Although there is some discrepancy as to when re-categorization occurred, several CTS executives testified that STIs in the Broussard District now receive overtime pay.[64]  Ritter said he decided that STIs in Broussard should start receiving overtime approximately two years ago.[65]  Ritter could only recall one factor that led to his decision:  "[CTS] had a lawsuit."[66] Ritter is not aware of any reason why all STIs, not merely those in the Broussard District, do not receive overtime pay.[67]  Hebert, however, testified that, in the early 2000s, STIs in

---

[57] Letchworth Dep. 66:12–18.
[58] Letchworth Dep. 147:12–18.
[59] Hebert Dep. 168:4–9.
[60] Letchworth 78:21–80:8.
[61] Hebert 168:4–9.
[62] Ritter Dep. 68:20–69:6.
[63] Ritter Dep. 12:15–25.
[64] Hebert Dep. 33:10–34:16; Ritter Dep. 12:15–25; Letchworth Dep. 65:25–66:7.
[65] Ritter Dep. 12:15–25.
[66] Ritter Dep. 13:4–11.  Ritter was unable to remember which lawsuit initiated his decision, whether it was the *Yaklin* case in Corpus Christi or the present suit.  However, Letchworth states that the *Yaklin* suit provoked a review of offshore workers' exemption status and offshore STIs started receiving overtime in the summer of 2008. Letchworth Dep. 66:3–9, 67:25–68:9.
[67] Ritter Dep. 53:5–9.

the Broussard District were re-categorized to receive overtime,[68] though he was not involved in that decision,[69] nor did he say when it stopped.  Letchworth, who joined CTS in 2006, testified that "offshore" STIs started receiving overtime in the summer of 2008.[70]

As this shows, STIs in the Broussard District currently receive overtime, though the President and the Vice President of Operations for CTS could not explain why.  Hebert and Ritter state they either were not involved in the decision, or do not know why only STIs in the Broussard District (as opposed to all STIs) receive overtime.[71]  Letchworth said she supplied Ritter with information with which to make a decision.[72]  Despite CTS' protestations of ignorance, its re-categorization of STIs in Broussard reveals that CTS realizes that the STIs in Broussard do not perform enough safety-affecting activities, like loading or driving, or have enough interstate travel, to be exempt under the MCA.

## E.    The Executive Exemption Does Not Apply to Plaintiffs.

CTS has alleged that the executive exemption excuses its obligation to pay overtime to "certain" unnamed employees. [73]  Section 13(a)(1) of the FLSA provides an executive exemption for a manager:

a) whose salary is at least $455 per week;

---

[68] Hebert Dep. 32:1–11.

[69] Hebert 32:1–33:1.

[70] Letchworth Dep. 66:3–9.  Even that testimony is confused, since all STIs in the Broussard District receive overtime regardless of whether the STIs work offshore.  The additional irony is that the Broussard District may have a higher rate of interstate land jobs than the Angleton District.

[71] Hebert 32:1–33:3; Ritter Dep. 53:5–9.

[72] Letchworth 66:3–15.  Letchworth testified that when reviewing the offshore workers, she supplied Ritter with job descriptions, wage history, the average number of hours traveling to and from a customer location and average number of hours worked on a job location.  Letchworth Dep. 66:3–21, 67:1–13.

[73] In Defendant's Supplemental Brief on Applicable FLSA Exemptions (Rec. 73), filed at the Court's direction, CTS alleges that, "[i]n this case, the Executive Exemption applies to CTS's Service Supervisors." *Allen et al., v. Coil Tubing Servs., L.L.C.*, No. 4:08-CV-033270, at 11 (S.D. Tex. Nov. 20, 2009). As a result, it appears that CTS has finally renounced its claim that the executive exemption applies to STIs and STIIs.

b) has the primary duty of management[74] of an enterprise or a customarily recognized department or subdivision;

c) customarily and regularly directs the work of two or more other full-time employees; and

d) has the authority to hire or fire other employees, or at least whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight.[75]

Managing a "customarily recognized department or subdivision" is distinguished from leading a "collection of employees assigned from time to time to a specific job or series of jobs and a unit with a permanent status and function. A customarily recognized department or subdivision must have permanent status and a continuing function."[76] A recognized department or subdivision may move from place to place and the subordinate personnel may change, as long as the "unit" has a continuing function.[77]

Factors to be considered in determining whether an employee's recommendations as to hiring, firing, advancement, promotion or any other change in status are given "particular weight" include "whether it is part of the employee's job duties to make such recommendations and the frequency with which such recommendations are made, requested, or relied upon."[78] The recommendations must pertain to the employees whom

---

[74] "Management" includes, but is not limited to activities such as: (1) "interviewing, selecting, and training of employees"; (2) "setting and adjusting their rates of pay and hours of work"; (3) "directing the work of employees"; (4) "appraising employees' productivity and efficiency for the purposes of recommending promotions or other changes in status"; (5) "handling employee complaints and grievances"; (6) "disciplining employees"; (7) "planning the work"; (8) "determining the techniques to be used"; (9) "apportioning the work among the employees"; (10) "determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought"; (11) "providing for the safety and security of the employees or property"; (12) "planning and controlling the budget"; and (13) "monitoring or implementing legal compliance measures." 29 C.F.R. § 541.102.
[75] 29 C.F.R. § 541.100(a).
[76] 29 C.F.R. § 541.103.
[77] 29 C.F.R. § 541.103(c)-(d).
[78] 29 C.F.R. § 541.105.

the executive regularly directs, so this does not include occasional suggestions.[79]  Here, the job descriptions of the STI,[80] STII,[81] and SS[82] make no mention of hiring, firing, or making such recommendations.

Each of CTS' six districts is managed by a District Manager.  When a customer calls the district with a job, a Service Coordinator ("SC") takes the call, and determines how many crew members and which personnel to assign,[83] based in part upon the experience of the workers[84] and the request of the customer.[85]  The number of personnel assigned to jobs varies, but often will include an STI, STII, and SS.[86]  So the crews of which plaintiffs were a part were transient collections of employees assigned from time to time to specific jobs or series of jobs.  Randy Comeaux ("Comeaux"), former District Manager for the Broussard District[87] and the current regional Louisiana Operations Manager, and Danny Ramirez ("Ramirez"), Operations Manager in the Angleton District, testified that the crews which go out to job sites are not always the same.[88]  The personnel in a particular crew can change from job to job.[89]  Thus, the crews were mere collections of employees assigned to complete specific jobs, and plaintiffs were not assigned to a customarily recognized department or subdivision.  As such, the executive exemption does not apply to the members of a crew or the SS, its working leader.

---

[79] *Id.*
[80] Ex.4: STI Job Description CTS 012160
[81] Ex.4: STII Job Description CTS 012163.
[82] Ex.4: SS Job Description CTS 012170.
[83] McCleod Dep. 19:19–21:2.
[84] Dorsey Dep. 39:6–9, Feb. 22, 2011; Burchfield Dep. 167:3–22.
[85] Dorsey Dep. 39:10–22.
[86] Ramirez Dep. 27:17–28:1, Apr. 21, 2010.
[87] Comeaux held this position from approximately 2005–2007.
[88] Comeaux Dep. 88:4–6, July 23, 2010; Ramirez Dep. 47:15–48:5.
[89] Comeaux Dep. 88:18–20.

### 1.    STIIs

The primary duties of an STII are to work on well fluids and flow; they do not involve management activities.  Comeaux confirmed that STIIs (like STIs) do not have the authority to hire or fire employees.[90]  In addition, Ritter testified that he hoped that no one below the District Manager level had authority to enter into contracts or leases.[91]  Accordingly, STIIs are not covered by the executive exemption because their primary duties do not involve management activities.

### 2.    Service Supervisors

The SSs serve as crew leaders of the group of laborers[92] sent to well sites by the SCs,[93] for the purpose of servicing well fluids and flow.  Though they do some paperwork, they are hard-working employees who use their hands to perform manual labor,[94] who get dirty,[95] and who do physical tasks both at the well site and at the shop.[96]  The details of the numerous assignments they periodically undertake are described in the motion for summary judgment of Gary Henderson ("Henderson"), but they include rigging up and down, cleaning up at the well site, and washing trucks at the shop.

The executive exemption does not apply them because they do not manage an enterprise or a customarily recognized department or subdivision.  The crews they lead

---

[90] Comeaux Dep. 122:17–20.
[91] Ritter Dep. 34:6–9.
[92] Burchfield Dep. 59:7–9.
[93] Ramirez Dep. 47:5–49:21.
[94] "Manual" labor requires the physical act of lifting up equipment that may get you dirty, according to Gortmaker. Gortmaker Dep. 64:8-18, Mar. 3, 2011.
[95] Ramirez Dep. 34:9–35:22; McCleod Dep. 13:9–11.
[96] Burchfield Dep. 59:13–17; Washington Dep. 30:22–31:4.

do not stay intact; instead, they change from job to job.[97]  Certainly, a crew is not a unit with a continuing function.  Second, they do not hire and fire others because that responsibility belongs to the District Manager, a higher position.[98]  Third, they make no meaningful economic decisions for each district.[99]  Clearly, the evidence shows that STIIs and SSs do not have the primary duty of management or the job responsibilities contemplated by Section 13(a)(1) of the FLSA.

## F.      The MCA Does Not Apply to Any Plaintiff.

Under limited circumstances, the MCA provides an exemption from the overtime provisions of the FLSA.[100]  Section 213(b)(1) of the FLSA exempts "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49." Section 31502 of Title 49 states that the Secretary of Transportation may prescribe requirements for "a motor private carrier, when needed to promote safety of operation."[101]  There are two prongs to the exemption.  Together, 49 U.S.C. § 31502(b) and 29 C.F.R. § 782.2(a) provide that "[t]he exemption of an employee from the hours provision of the [FLSA] under section 13(b)(1) depends both on

[1] the class to which his employer belongs [*i.e.,* whether the employer qualifies as a 'motor carrier' or 'motor private carrier'] and on

[2] the class of work involved in the employee's job."[102]

---

[97] Burchfield Dep. 59:21–25.
[98] Wise Dep. 64:9–13, 70:1–3, Mar. 3, 2011.
[99] Ritter Dep. 34:6–9.
[100] 29 U.S.C. § 213(b)(1) (2006).
[101] 49 U.S.C. § 31502(b) (2006).
[102] 29 C.F.R. § 782.2(a) (2010) (citing *United States v. Am. Trucking Ass'ns.,* 310 U.S. 534, 553 (1940)).

This second prong itself has two parts:  29 C.F.R. § 782.2(a) provides that the exemption "extends to those classes of employees and only those who:

1)    Are employed by carriers . . . , and

2)    engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways . . . in interstate or foreign commerce within the meaning of the Motor Carrier Act."

Likewise, according to 29 C.F.R. § 782.2(b)(2), to be considered exempt, a "driver" or a "loader" must:

1)    "directly affect[] the safety of operation of motor vehicles on the public highways in transportation,"

2)    "in interstate or foreign commerce."

Thus, for the exemption to apply, CTS has the burden to prove *both* that each plaintiff engaged in activities that directly affected the safety of operation of motor vehicles, *and* that they traveled in interstate commerce.  When deciding whether a specific employee falls within an exempt class, the character of the duties involved in the performance of the job is determinative.[103]

### 1.    Plaintiffs do not dispute that CTS is a motor private carrier.

The mere fact that an employer is regulated by the Department of Transportation (the first prong) does not mean that every employee is exempt.[104]   Otherwise, receptionists, custodians, and file clerks for trucking companies would be deprived of their overtime, even though they do not affect the safety of interstate CMV

---

[103] 29 C.F.R. § 782.2(b)(2).
[104] *Dole v. Circle 'A' Constr., Inc.,* 738 F. Supp. 1313, 1315 (D. Idaho 1990).

transportation.[105]  In addition, for those who drive, this "does not mean that an employee of a carrier who drives a motor vehicle is exempted as a 'driver' by virtue of that fact alone.  He is not exempt if his job never involves transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act."[106]

### 2.  CTS cannot prove that each plaintiff engaged in activities that directly affected the safe operation of CMVs in interstate transportation.

To demonstrate that the MCA applies to *any* employee, CTS must prove that his job involved the requisite "class of work."[107]  For instance, in *Goldberg v. Faber Industries, Inc.*,[108] even though some drivers had interstate routes, the MCA did not apply to other employees who traveled intrastate.  Here, CTS must prove that each plaintiff 1) directly affected the safe operation of CMVs, which 2) traveled interstate.

### 3.  Plaintiffs are not exempt as "drivers."

#### a.  Driving a pick-up truck, or any vehicle weighing less than 10,000 pounds, is non-exempt under the MCA.

Driving a vehicle weighing less than 10,000 pounds (such as a pick-up) does not exempt an employee under the MCA.[109]  Effective August 2005,[110] a CMV is defined as a

---

[105] 29 C.F.R. § 782.2(f).

[106] 29 C.F.R. § 782.3(b).

[107] 29 C.F.R. § 782.2(a).

[108] 291 F.2d 232, 234 (7th Cir. 1961).

[109] 49 U.S.C. § 13102(15).

[110] On August 10, 2005, the U.S. Congress enacted transportation reauthorization legislation entitled the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU").  This legislation amended the MCA's definition of motor private carriers to cover only *commercial* motor vehicle transportation rather than motor vehicle transportation in general, which consequently altered the classification of employees who are exempt under the FLSA's motor carrier exemption.  The definition of "commercial motor vehicle" includes only four types of vehicles, one of which is a vehicle that has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds.  § 4142 of SAFETEA-LU; 49 U.S.C. § 31132 (2006); *see also Veliz v. Cintas Corp.*, No. C 03-1180 RS, 2008 U.S. Dist. LEXIS 95153, at *11–12 (N.D. Cal. Nov. 13, 2008).

vehicle with a weight of at least 10,001 pounds.[111]

> ### b.      Plaintiffs were oil well service workers.

The provisions of the CFR apply to a "driver" or a "loader" of motor vehicles in interstate commerce.[112]   Here, the character of plaintiffs' activities and their continuing duties were to provide service for the fluid and flow of wells; they are not "drivers" under the MCA.[113]   They were hired to service wells, and spent an overwhelming percentage of their energy, time, skill, and duties working at well sites in the field and offshore, or performing manual work in the shop.[114]   Driving was not the essential character of their jobs, and in fact six of the 14 bellwether plaintiffs could not drive a CMV since they did not possess a CDL.[115]   For the others, "[t]his does not mean that an employee of a carrier who drives a motor vehicle is exempted as a 'driver' by virtue of that fact alone."[116]

> ### c.      Plaintiffs drove CMVs in interstate rarely, if ever.   Thus, the *de minimis* exception applies.

The individual facts show that each plaintiff drove a CMV in interstate commerce from zero times up to a few over several years, at most.   The CFR states:

> [W]here the continuing duties of the employee's job have no substantial direct effect on such safety of operation or *where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis,* the exemption will not apply to him in any workweek so long as there is no change in his duties . . . .   If in particular workweeks other duties are

---

[111] 49 U.S.C. § 31132(1); *see also Dell 'Orfano v. Ikon Office Solutions, Inc.,* 2006 WL 2523113, at *2 (M.D. Ga. 2006); *see also King v. Asset Appraisal Servs., Inc.,* 470 F. Supp. 2d 1025, 1030–31 (D. Neb. 2006).

[112] *See* 29 C.F.R.§ 782.2(b)(2).

[113] *See Wirtz v. Tyler Pipe and Foundry Co.,* 369 F.2d 927, 927 (5th Cir. 1966).

[114] The numerous activities involved in servicing oil wells and shop work will be discussed in greater detail in Section IV(F)(3)(e), below.

[115] For the jobs of both STIs and STIIs, it is possible to service wells without driving (William Broussard is an example, as shown in his motion for summary judgment); but it is not possible to drive without servicing wells.

[116] 29 C.F.R. § 782.3(b); "Safety of operation" is defined as "the safety of operation of motor vehicles in the transportation of passengers or property in interstate or foreign commerce, and that alone," by 29 C.F.R. § 782.2(d).

> assigned to him which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job.[117]

Therefore, for employees who seldom made interstate trips, their "safety-affecting" activities are only *de minimis*.[118]

On several occasions,[119] the Fifth Circuit has employed the *de minimis* analysis which the Supreme Court applied in *Pyramid*.[120]  In *Wirtz v. C & P Shoe Corp.*, one employee stated that "he drove once or twice a month, another had driven three times in approximately two years, and the third made the trip about 'twice or so' while the regular driver was out of state because of family trouble."[121]  The *de minimis* exception applied to these three workers.[122]  Additionally, in *Coleman v. Jiffy June Farms, Inc.,* the Fifth Circuit affirmed the District Court's finding in that, where fewer than 0.23 percent of deliveries were interstate deliveries, the MCA did not apply.[123]

In the Southern District of Texas, Honorable Gray Miller,[124] Honorable Keith P. Ellison,[125] and Honorable Janis Jack have recently considered the *de minimis* rule.  In

---

[117] 29 C.F.R. § 782.2(b)(3) (2010) (emphasis added).

[118] *See Talton v. I.H. Caffey Distrib. Co.,* 1:02-CV-1048, 2004 U.S. Dist. LEXIS 6894, at *15 (M.D.N.C. Mar. 11, 2004) (stating that a single trip across state lines "falls squarely within the *de minimis* exception to interstate activities"); *Dole v. Circle "A" Const., Inc.,* 738 F. Supp. 1313, 1322 (D. Idaho 1990) (a driver is not exempt under the MCA merely because he takes one or two interstate trips); *Kimball v. Goodyear Tire and Rubber Co.,* 504 F. Supp. 544, 548 (E.D. Tex. 1980) (denying MCA where only 0.17% of trips were interstate); *Coleman v. Jiffy June Farms, Inc.,* 324 F. Supp. 664, 670 (S.D. Ala. 1970), *aff'd,* 458 F.2d 1139 (5th Cir. 1971) (where only 0.23% of driver employee's deliveries were interstate, the MCA did not apply).

[119] *See, e.g.*, *Wirtz v. Tyler Pipe and Foundry Co*., 369 F.2d 927 (5th Cir. 1966), and cases cited in the paragraph.

[120] *Pyramid Motor Freight Corp., Inc. v. Ispass*, 330 U.S. 695 (1947).

[121] 336 F.2d 21, 29 n.9 (5th Cir. 1964).

[122] *Id.* at 29.

[123] 324 F. Supp. 664, 670 (S.D. Ala. 1970), *aff'd* 458 F.2d 1139 (5th Cir. 1972).

[124] *Albanil v. Coast 2 Coast, Inc.,* No. H-08-486, 2008 U.S. Dist. LEXIS 93035, at *23 (S.D. Tex. Nov. 17, 2008).

[125] *Villegas v. Dependable Constr. Servs., Inc.,* 2008 WL 5137321, at *24 (S.D. Tex. 2008); describing *Wirtz v. C & P Shoe Corp*., 336 F.2d 21, 29–30, Judge Ellison commented "that three employees who drove occasionally, *but not*

*Yaklin*, Judge Jack observed that a plaintiff who "drove across state lines only twice during the four years he was employed by defendants suggests that this activity was 'de minimus.'"[126]

The court in *Dauphin v. Chestnut Ridge Transp., Inc.*, ruled that "for the motor carrier exemption from the FLSA to apply, defendants here must establish that the activities of the *individual* plaintiffs involved interstate travel of a character that *was more than de minimis* or that interstate travel was a 'natural, integral and . . . inseparable part' of the position plaintiffs held."[127]  Following *Dauphin,* the court in *Hoffman v. First Student, Inc.* found that the defendant had not proved that plaintiffs' involvement in interstate commerce was more than *de minimis*.[128]  There, the employees were bus drivers who averaged fewer than two interstate trips per year.[129]

As this demonstrates, several courts have applied the *de minimis* exception.  Here, the few occasions some plaintiffs drove out of state is a *de minimis* amount, and therefore the MCA cannot apply to them.

> **d.  Plaintiffs are not "drivers" because there is no evidence of a reasonable expectation that each would be called upon to drive a CMV in interstate commerce.**

Judge Gray Miller wrote, "The Department [] has authority . . . only if the

---

as their primary job, fell within the *Pyramid* rule (*Villegas,* at *20 (emphasis supplied)); dote that Judge Ellison thought the Fifth Circuit "moved away" from the *de minimis* test for drivers who rarely made interstate deliveries (*Villegas*, at *21).

[126] Order at 10, *Yaklin v. W-H Energy Servs., Inc.,* No. 2:07-CV-00422 (Oct. 22, 2008).

[127] 544 F. Supp. 2d 266, 275 (emphasis added) (citing *Morris v. McComb,* 332 U.S. 422, 433 (1947)).

[128] Therefore, genuine disputes of material fact existed as to whether the MCA applied to any particular plaintiff for any particular work week.  No. 06-1882, 2009 WL 1783536, at *7 (D. Md. June 23, 2009).

[129] *Id.* at *6.

character of the employee's activities involves safety at more than a de minimis level."[130]

Since that is not the case here, CTS has attempted to argue that its oil field service workers nevertheless might "reasonably expect" to be sent on an interstate land job. The Secretary of Transportation does not have jurisdiction over everyone who drives; jurisdiction extends only to those who reasonably could be expected to drive interstate. And a "reasonable expectation" means more than a "remote possibility."[131]

### i.   Interstate driving is not integral to plaintiffs' jobs.

The Supreme Court in *Morris v. McComb* ruled that, for the MCA to apply, driving must be a "natural, integral and . . . inseparable part" of the employee's duties.[132]  In *Dauphin,* the court found that the employer did not present sufficient evidence establishing "the character of the activities of *each* plaintiff."[133]  Following *Morris,* the *Dauphin* court wrote:

> [I]n the normal operation of business, these strictly *interstate* commerce trips were distributed generally throughout the year and their performance was shared indiscriminately by the drivers and was *mingled with the performance of other like driving services* rendered by them otherwise than in interstate commerce.  These trips were thus a *natural, integral, and apparently inseparable* part of the common carrier service of the petitioner and his drivers.[134]

The individual facts here prove that interstate driving is not a natural, integral and apparently inseparable part of plaintiffs' jobs, especially since some plaintiffs serviced wells for years without a CDL, and all rarely traveled out of state.  In addition, for those

---

[130] *Id.* at *23–24.
[131] *Garcia v. Pace Suburban Serv.,* 955 F. Supp. 75, 77 (N.D. Ill. 1996) (citing *Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1156 and n.4) (9th Cir. 1994)).
[132] 322 U.S. 422, 433 (1947).
[133] 544 F. Supp. 2d 266, 275 (S.D.N.Y. 2008) (emphasis added).
[134] *Id.* (citing *Morris v. McComb,* 332 U.S. 422, 433 (1947) (emphasis added)).

who drove to interstate land jobs, the time spent driving was a tiny fraction of the total labor they provided each year.[135]   Judge Jack also noted that, "while Defendants assert that Plaintiff 'was required to be available to travel interstate at any given time as part of his routine job duties,' they have presented no evidence to that effect."[136]   Thus, Judge Jack found that the defendants failed to demonstrate as a matter of law that plaintiff qualified as a "driver" as contemplated by the MCA.[137]

### ii.   Indiscriminately Assigned

Courts that have held a "reasonable expectation" existed to drive interstate have considered whether routes or jobs were "indiscriminately assigned."[138]

In *Kimball,* Goodyear argued that all of its drivers were subject to the MCA even though 99.83% of its trips were wholly within Texas.[139]   The court, however, was not convinced that the employees had a reasonable expectation that they would drive interstate.   The court noted that Goodyear could "unilaterally assign any driver to any route at any time, but this was not its practice" since Goodyear assigned routes based on seniority, not randomly.[140]   Further, 29 out of 39 drivers made no interstate trips.[141]

In *Morrison v. Quality Transports Servs., Inc.* the court rejected the employer's contention that plaintiffs were reasonably expected to drive routes in interstate commerce

---

[135] Cantu Dep: 37:7–17, Mar. 5, 2010; Gortmaker Dep. 46:10–51:15; Wise Dep. 40:6–44:17.
[136] Ex. 2: Order at 10, *Yaklin v. W-H Energy Servs., Inc.,* No. 2:07-CV-00422 (Oct. 22, 2008).
[137] Ex. 2: Order at 10, *Yaklin v. W-H Energy Servs., Inc.,* No. 2:07-CV-00422 (Oct. 22, 2008).
[138] As quoted above, the court in *Dauphin* found that, though the employer claimed that interstate travel was shared indiscriminately among all drivers and was mingled with the performance of driving services rendered by them other than in interstate commerce, the record did not establish how runs were assigned and whether they were shared among all drivers.  *Dauphin*, 544 F. Supp. at 275.
[139] *Kimball v. Goodyear Tire and Rubber Co*., 504 F. Supp. 544, 547 (E.D. Tex. 1980).
[140] *Id.* at 546.
[141] *Id.* at 547.

in part because there was no evidence that plaintiffs were randomly assigned.[142]

At CTS, personnel are not assigned to jobs indiscriminately.  Instead, Burchfield testified that crews are assigned to a particular job based upon their experience.[143] Plaintiff Gary Henderson ("Henderson") agreed.[144]  While a SC for the Angleton District from approximately 2004-2006, Henderson assigned jobs to personnel.  He testified that jobs are not indiscriminately assigned.[145]  Instead, Henderson stated that Burchfield directed him to assign jobs to employees based on client request and prior working relationship between a particular crew and the client.[146]  Henderson also honored an employee's refusal of a job and re-assigned him accordingly.[147]  Finally, defendant's declarant Hudson Wise ("Wise"), an SC, testified that he worked directly with CTS customers to fill their service orders.[148]  He stated that, "based on the scope of the service requested, [he] decide[d] which equipment and personnel are needed to complete the job."[149]  Wise's deposition testimony proves that jobs are not assigned indiscriminately; rather they are based upon many factors, such as experience and customer requests.[150]

In sum, the testimony is uniform that jobs were not assigned indiscriminately, but instead were based in part upon experience and customer request.

### iii. The four involved districts handled only a small percentage of interstate jobs.

---

[142] *Morrison v. Quality Transports Servs*., Inc., 474 F. Supp. 2d 1303, 1311 (S.D. Fla. 2007).

[143] Burchfield Dep. 167:17–22; Notably, Joe Dorsey, a witness designated by CTS who is an SC in the Bridgeport District, agreed that he has assigned crews based upon experience or customer request. Dorsey Dep. 39:6–20.

[144] Ex. 75: Henderson Decl. ¶ 7.

[145] Ex. 75: Henderson Decl. ¶ 7–¶10.

[146] Ex. 75: Henderson Decl. ¶ 8 and ¶ 9.

[147] Ex. 75: Henderson Decl. ¶ 10.

[148] Ex. 30: Wise Decl. ¶ 26.

[149] Ex. 30: Wise Decl. ¶ 26.

[150] Wise Dep. 57:1–13, 106:11–18.

The possibility of the plaintiffs handling an out-of-state land job was, at most, remote. Where drivers were subject to interstate routes and potentially subject to the MCA, one of the factors that the Supreme Court has evaluated is "the proportion of interstate-to-intrastate employee activity . . . ."[151] In this context, courts in *Garcia v. Fleetwood Limousine, Inc.* and *Chao v. Gary Bauerly, LLC,* held that a "reasonable expectation" means "more than a remote possibility."[152] In *Fleetwood*, a driver's one-to-two dozen airport trips (which could involve the interstate transportation of passengers) during six years did not create a "reasonable expectation" that he would drive interstate.

Here, the fact that only a portion of the plaintiffs drove interstate, and then only a few times each (as shown in plaintiffs' individual motions for summary judgment), conforms to the small percentage of interstate land jobs serviced by each district:

- Angleton      1.7%[153]

- Alice          0.3%[154]

- Broussard    4.7%[155]

---

[151] *Garcia v. Fleetwood Limousine,* 511 F. Supp. 2d 1233, 1240 (M.D. Fla. 2007) (citing *Morris v. McComb,* 332 U.S. 422, 433–35 (1947)).

[152] *Garcia v. Fleetwood Limousine, Inc.,* 511 F. Supp. 2d 1233, 1240 (M.D. Fla. 2007); *Chao v. Gary Bauerly, LLC,* 2005 WL 1656915, at *5 (D. Minn. July 14, 2005).

[153] This percentage was determined by plaintiffs' review of the Monthly Personnel Utilization Reports ("MPUs"); CTS' 30(b)(6) interrogatory answers, that were based upon load-out tickets, listed each job and its location, which plaintiffs calculated to show 1.9% interstate trips.

[154] This percentage was determined by plaintiffs' review of load-out tickets; CTS' 30(b)(6) interrogatory answers, that were based upon service order tickets, listed each job and its location, which plaintiffs calculated to show 0.87% interstate jobs.

[155] Broussard's percentage is based upon CTS' 30(b)(6) interrogatory answers. For Broussard, determining a percentage based upon "number of jobs" grossly overstates the actual interstate work performed by STs there. That is because Broussard has a high percentage of offshore jobs (70% according to Comeaux), and offshore jobs typically last far longer than land jobs (two to three weeks for offshore jobs compared to a few days to a week for typical land jobs). *See* Comeaux Dep. 64:21–65:4 (stating an offshore job may last up to two weeks); Broussard Dep. 69:21–25 (stating that the longest offshore job he worked lasted 23 consecutive days).

- Bridgeport    0.7%[156]

Thus, compared to intrastate land jobs or offshore work, interstate land jobs constituted a tiny fraction of the activity of each district.

Further, as several witnesses have testified, the average length of a land job was three or four days,[157] 12 to 16 hours a day,[158] and the crew typically remained assigned to the job until it was completed.[159]  So, while an ST was at a customer's well performing non-safety-affecting duties until the job's completion, he was not "likely to be called upon" to drive a CMV in interstate commerce.  Additionally, CTS used third-party vendors to deliver its equipment for offshore jobs.[160]  Coupled with the very small chance of servicing an out-of-state land job, this shows why there was merely a remote possibility that a worker might drive a CMV interstate.  As Henderson, an SC who assigned jobs in the Angleton District, said:  "The crews in the Angleton District were overwhelmingly likely to be assigned to land jobs within Texas, rather [than] some other state."[161]

> iv.  **CTS has presented no documents to show applicants or employees were informed or acknowledged that they might drive CMVs in interstate commerce at any time.**

There is no evidence that any plaintiff signed an acknowledgement upon hire that he might drive a CMV interstate.  In several other cases where drivers were subject to being assigned interstate trips at any time, and where as a result the MCA applied, the

---

[156] This percentage was determined by plaintiffs' review of load-out tickets; CTS' 30(b)(6) interrogatory answers, that were based upon load-out tickets, listed each job and its location, which plaintiffs calculated to show 1.2% interstate jobs.

[157] Escobedo Dep. 103:23–25, Feb. 8, 2011; *see e.g.,* Ex. 50: Crews Decl. ¶ 8, Ex. 54: Cantu Decl. ¶ 8.

[158] Escobedo Dep. 89:13–14; Perez Dep. 38:7–22.

[159] Ex. 75: Henderson Decl. ¶ 17.

[160] Ramirez Dep. 20:16–19; Washington Dep. 74:7–13.

[161] Ex. 75: Henderson Decl. ¶ 11.

documents differ substantially from the case at bar.  For instance, in *Garcia v. Pace Suburban Bus Serv.*, unlike here, the employer proved that, upon hire, plaintiff signed a form acknowledging he may be subject to driving interstate routes.[162]  And in *Chao v. First Class Coach Co.,* there was also evidence of an agreement between the employer and its drivers at the time of hire that they were expected to be available to drive all routes offered by the company, including the interstate routes.[163]

Newly hired employees with CTS do not sign acknowledgement forms indicating that they have been informed of the possibility of driving interstate.[164]  Ramirez does not know of any document that informs a prospective STI or STII that he might be called upon to drive across state lines.[165] Sam Washington, an SC in the Angleton District, claims that he has been sitting in on 90% of the interviews with Burchfield for the past four or five years, yet he has not seen any document given to an applicant telling him that he would be going across state lines.[166]

In addition, CTS has produced no evidence of new-hire checklists, interview guidelines, or policies and procedures manifesting a company policy to inform applicants during their initial interview, or thereafter, that they might be expected to drive interstate.[167]  There is simply no documentary proof that each newly hired ST was informed that he might drive interstate.

---

[162] 955 F. Supp. 75, 77 (N.D. Ill. 1996).
[163] *Id.*
[164] Burchfield Dep. 147:9–11.  By comparison, they do sign forms regarding the company's Information Security Acceptable Use Policy and acknowledging receipt of Corporate Code of Business Conduct and Ethics, and the Orientation package.  (Ex. 5: Sample Acknowledgement Forms)
[165] Ramirez Dep. 136:23–137:3, 139:8–11.
[166] Washington Dep. 90:13–21, 92:1–4.
[167] Ex. 6: Plaintiffs' Letter to Defense Counsel, dated September 2, 2010 at ¶ 1.

> **v.    Because CTS' operations were divided among six separate districts, the number and locations of jobs for another district, like Rock Springs, Wyoming, does not create a reasonable expectation that an ST in a different district would drive a CMV interstate.**

Each of CTS' districts serviced different types of jobs, depending on its geographic location.  For example in the Broussard District, the number of offshore jobs far outnumbered the number of land-based jobs.[168]  By contrast, the Alice and Bridgeport Districts mostly handled land-based jobs.[169]

Each district is its own profit center.  And Burchfield explained that bonuses of District Managers are based on the performance/profitability of each district.[170]  That is why the Angleton District rarely performed work in Louisiana:  normally the Broussard District would service that job.[171]  Also, the customer usually paid for the costs of transportation of the crew to a well.[172]  So, normally it was more economical for the district in whose territory a well was located to service that job.[173]  Only on the rare occasions when a district did not have equipment available would another district cover a job within that district's territory.[174]  When that occurred, transportation costs might have to be borne CTS rather than the customer.  Thus, because each district attempted to maximize its own profitability,[175] and because servicing out-of-territory jobs increased

---

[168] Comeaux estimated that the Broussard District did about 70% offshore work and 30% land work. Comeaux Dep. 21:18–22:15; Dorsey testified that the Broussard District had 85% offshore jobs.  Dorsey Dep. 27:15–29:1.
[169] Hebert also testified that both Alice and Bridgeport are "land-specific" districts.  Hebert Dep. 48:13–22.
[170] Burchfield Dep. 49:15–17.
[171] Burchfield Dep. 34:2–7.
[172] Burchfield Dep. 22:6–8, Comeaux Dep. 64:12–20.
[173] Ramirez Dep. 123:23–125:2.
[174] Ramirez Dep. 123:23–125:6.
[175] Burchfield Dep. 20:12–15, 49:1–17.

the transportation costs to either the customer or CTS,[176] the vast majority of jobs were handled by the district where the job was located.[177]   According to Henderson's testimony, the Broussard District "took care of their base, and they were pretty prudent about catching their own land-based work out of their own state."[178]  Further, Henderson was told by Burchfield that they [the Broussard District] didn't want our [Angleton] district to get the revenue if there [was] a job that [came] up . . . [s]o they would catch all the work."[179]

CTS claims that there are no "territories."  But Burchfield described the "territory" of the Angleton District, clearly specifying boundaries within Texas,[180] as the map on CTS' website indicates.[181]  Henrik Larsen ("Larsen"), CTS' former business development manager and creator of the website, confirmed that when a well is located in the area of a district, the closest district would cover the job.[182]  So, the reasonable expectation for employees is that they would service jobs in their own territory.

>    **vi.**   **Defendant's employment advertisements show that applicants are applying to a specific district for an oil field service job.**

The Angleton District repeatedly advertised to obtain applicants for employment,[183] seeking oil field service workers rather than truck drivers.  The advertisements instruct applicants to apply at the Angleton District, not through some

---

[176] Burchfield Dep. 22:1–13.
[177] Burchfield Dep. 27:3–28:18.
[178] Henderson Dep. 59:5–9.
[179] Henderson Dep. 59:11–17.
[180] Burchfield Dep. 36:20–37:8.
[181] Ex. 7: Print out of CTS' website at http://www.coiltubingservices.com/sales.
[182] Larsen Dep. 93:22–94:13, July 22, 2010.  Larsen testified that a customer, by looking at the map, would likely call the district that is closest to where the well is located. Larsen Dep. 31:12–22, 32:21–24, 69:25–70:14.
[183] Ex. 8: CTS' Employment Advertisements.

centralized employment office at CTS' headquarters.  They nowhere state that the job requires interstate driving (though they do inform the applicant that he can expect to work in the shop, in the field, and offshore).  Thus, the reasonable expectation they created does not include driving a CMV interstate.

### vii.    Summary

CTS has filed to prove that plaintiffs had a "reasonable expectation" that they would drive a CMV interstate.  The evidence shows that:  1) interstate driving was not an integral part of their jobs; 2) jobs were assigned based upon experience and customer request, not indiscriminately; 3) the districts cover very few interstate land jobs; 4) no documents inform service technicians that they would drive interstate; and 5) the job advertisements did not mention interstate driving.  Accordingly, plaintiffs had no reasonable expectation that they would drive interstate; it was only a remote possibility, at most.

### e.    Under *Songer v. Dillon Res., Inc.*, the MCA does not apply when the workers' continuing duties do not affect interstate safety.

The Fifth Circuit's recent opinion in *Songer v. Dillon Res., Inc.*[184] supports plaintiffs' position that, if plaintiffs' continuing duties did not involve safety-affecting activities, they do not fall within the MCA.

In *Songer,* the Fifth Circuit focused upon the character of the plaintiffs' duties.[185] The plaintiffs there were all drivers.  Accordingly, the Fifth Circuit observed:  "Plaintiffs cannot and do not claim that the drivers were *required to perform other duties* that would

---

[184] 618 F.3d 467, 475 (5th Cir. 2010).
[185] *Id.* at 473–476.

not affect the safety of motor vehicles in transport—for example, the drivers did not load or unload trucks."[186]  In sharp contrast, this is *exactly* the situation here because plaintiffs continuing duties were those of oil field service workers, not drivers.  Although the timing and type of task varied for each individual plaintiff, all had shifting job assignments.  They were all "required to perform other duties" that did not affect the safety of operation of CMVs in interstate commerce, such as when they worked in the shop, in the field, and offshore.  *Songer* thus recognizes that performing "other duties" restricts the application of the MCA.

Additionally, in *Songer* the Fifth Circuit relied upon subsection (3) of 29 C.F.R. § 782.2(b) when finding that the full-duty commercial truck drivers were exempt from overtime.[187]  The Fifth Circuit said that the *Songer* plaintiffs were hired only as truck drivers.  Significantly, the very next part of the regulation, namely subsection (4),[188] is more applicable to plaintiffs because it is the only one that addresses shifting job assignments and the sporadic involvement in safety-affecting activities.  As shown by the testimony of Burchfield, the MPUs,[189] and the employment advertisements, plaintiffs were

---

[186] *Id.* (emphasis added).

[187] *Id.* at 475.

[188] "Where the same employee of a carrier is shifted from one job to another periodically or on occasion, the application of the exemption to him in a particular workweek is tested by application of the above principles to the job or jobs in which he is employed in that workweek.  Similarly, in the case of an employee of a private carrier whose job does not require him to engage regularly in exempt safety-affecting activities described in paragraph (b)(1) of this section and whose engagement in such activities occurs sporadically or occasionally as the result of his work assignments at a particular time, the exemption will apply to him only in those workweeks when he engages in such activities.  Also, because the jurisdiction of the Secretary of Transportation over private carriers is limited to carriers or property (see paragraph (b)(1) of this section) a driver, driver's helper, loader, or mechanic employed by a private carrier is not within the exemption in any workweek when his safety-affecting activities relate only to the transportation of passengers and not to the transportation of property."

[189] Ex. 9: Nguyen Decl. ¶ 4; Ex. 10: MPUs (a sample of MPUs provided in electronic form and a full set of MPUs provided in the Court's courtesy copy).  Plaintiffs have created an "MPU Summary Chart" for each bellwether plaintiff in the Angleton District to assist the Court in reading the MPUs.  Each plaintiff's MPU Summary Chart is filed with their respective motion.

"shifted from one job to another, periodically and on occasion" that did not involve the safety of the operation of a CMV in interstate commerce. In this connection, one of the "above principles" referred to in subsection (4)[190] is the "likely to be called upon" principle found in the preceding subsection (3).[191] Since plaintiffs did not affect the safety of the operation of a CMV in interstate commerce for sometimes months in a row,[192] the "likely to be called upon" principle is inapplicable to them. Otherwise, the unsupported, conclusory claim by CTS that each plaintiff was "likely to be called upon" to drive a CMV in interstate commerce has the unjust consequence of exempting plaintiffs from overtime even when they were offshore, on extended in-state land jobs, or performing non-safety-affecting duties at the shop. 29 C.F.R. § 782.2(b)(4) addresses and eliminates such an unjust result.

Unlike the truck drivers in *Songer*, here the overwhelming majority of plaintiffs' activities did not affect the safe operation of a CMV in interstate commerce. Numerous defense witnesses[193] have confirmed that plaintiffs' continuing duties at a well included:

- Pulling hoses;

- Running suction and discharge lines;

- Feeding pumps fluid to pump into reel and into well; and

- Making sure the blow-out preventers ("BOPs") are open to accept

---

[190] "Where the same employee of a carrier is shifted from one job to another periodically or on occasion, the application of the exemption to him in a particular workweek is tested by application of the ***above principles*** to the job or jobs in which he is employed in that workweek." (Emphasis added.)

[191] "As a general rule, if the bona fide duties of a job performed by the employee are such that he is (. . . ***likely to be***) ***called upon*** in the ordinary course of his work to perform . . . safety-affectivity activities . . . ." (Emphasis added.)

[192] Ex.10: MPUs for the Angleton District.

[193] Escobedo Dep. 145:16–150:25; Perez Dep. 72:15–78:24; Vasquez Dep. 18:3–21:25, Feb. 15, 2011.

pipe.[194]

These activities do not affect the safety of interstate transportation.

Likewise, many defense witnesses[195] testified that work in the shop includes:

- Cleaning the shop, break room, and restrooms;

- Sweeping and mopping the shop, break room, restrooms, and parking lot;

- Painting oilfield service equipment and parking lot concrete stoppers;

- Washing pick up trucks, coil tubing units, nitrogen pumps, and fluid pumps;

- Mowing, edging and maintaining the physical property of the yard.[196]

None of these affects the safety of a CMV in interstate commerce. Plaintiffs' duties shifted among these assignments and offshore work, unlike the truck drivers in *Songer*.

### 4. Plaintiffs were not "loaders" affecting the safe operation of motor vehicles in interstate commerce.

Employers of "loaders," workers who exercise discretion when loading CMVs that are sent in interstate commerce, can be exempt from the obligation to pay overtime.

"Loaders" are employees whose "sole duties are to load and unload motor

---

[194] Other regular duties at a well include: rig up; take out wooden pads for outriggers; hammer wings on iron and hammer joints; lift swivels and make connections; run iron; run suction and discharge lines; bolt and flange BOP to well heads; open and close valves manually below the BOP stack; tighten quick connect connecting the injector to the BOP by hand or a man-lift or by climbing the stack; rig up fluid pumps; fill everything from well head back with fluid until there is discharge; start pressure testing to check for leaks, everything from the choke back should contain pressure; rig up spool; rig up as much iron to BOPs while on ground, then lift the line with the crane; stab coil tubing in BOP stack while securing injector; operate control cabinets.

[195] Hebert Dep. 158:16–159:7, 157:1–158:8; Escobedo Dep. 73:1–76:17; Dorsey Dep. 76:14–78:13, *see* Ex.11: Dorsey Dep. Ex. 91; Perez Dep. 79:5–82:11; Vasquez Dep. 27:22–30:8.

[196] Other duties performed in the shop include: recording inventory of RDI friction reducer, hydraulic fluids, transmission oil, and motor oil; perform maintenance on oil field service equipment such as the fluid pump, nitrogen pump, and the coil tubing reel; and test oil field service equipment such as the fluid and nitrogen pump.

vehicles and transfer freight between motor vehicles and between vehicles and the warehouse."[197]  A "loader," as defined by the regulations, is:

> [A]n employee of a carrier . . . (other than a driver or driver's helper as defined §§ 782.3 and 782.4) whose duties include, among other things, the proper loading of his employer's motor vehicles so that they may be safely operated on the highways of the country.  A "loader" may be called by another name . . . and his duties will usually also include unloading and the transfer of freight between the vehicles and the warehouse, but he engages, as a "loader," in work directly affecting "safety of operation" *so long as he has responsibility, when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load* or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized.[198]

In addition, federal regulations provide that:

> [A]n employee who has no responsibility for the proper loading of a motor vehicle is not within the exemption as a "loader" *merely because he furnishes physical assistance* when necessary in loading heavy pieces of freight, or because he deposits pieces of freight in the vehicle for someone else to distribute and secure in place, or even because he does the physical work of arranging pieces of freight in the vehicle where another employee tells him exactly what to do in each instance and he is *given no share in the exercise of discretion* as to the manner in which the loading is done.[199]

Thus, the regulations clearly set forth two requirements the employer must prove for an employee to be considered a "loader":

> 1)   the employee must exercise judgment and discretion when planning and building a balanced load, not merely provide physical labor; and
>
> 2)   the load itself must be sent in interstate transportation.

Accordingly, even if CTS could show that some plaintiffs occasionally *actually* loaded

---

[197] *Levinson v. Specter Motor Serv.*, 330 U.S. 649, 652 n.2 (1947) (citing an ICC ruling).
[198] 29 C.F.R. § 782.5(a) (2010) (emphasis added).
[199] 29 C.F.R. § 782.5(c) (emphasis added).

items onto a CMV that subsequently went across state lines, the CFR additionally requires proof that plaintiffs exercised discretion or judgment over the loading.  Similarly, even if CTS could show that plaintiffs exercised discretion when building a load, it would still have to prove that the load itself was driven across state lines.

Courts have recognized that "determining whether [plaintiff] . . . qualifies as a loader (and is therefore exempt from the FLSA) will require a highly individualized, fact-specific inquiry."[200]  The *Reich* court further noted that "[e]xtensive discovery will be necessary to ascertain whether each [plaintiff] was ever responsible for loading, and if so, (1) how often; (2) for how long; and (3) how much of that loading required the exercise of discretion."[201]

### a.  According to the documents, at most only two of the bellwether plaintiffs loaded a CMV that traveled interstate.

After an extensive discovery period, CTS has presented no evidence that any plaintiff exercised discretion when loading.  In addition, at most, the records suggest that only two of the bellwether plaintiffs loaded a CMV that traveled interstate.  Plaintiffs have reviewed the many documents produced by CTS, but have not found any documents which show that 12 of 14 bellwether plaintiffs performed any loading activity for interstate trips.[202]

There are four forms which might suggest that two bellwether plaintiffs, Crews[203]

---

[200] *Reich v. Homier Distrib. Co.,* 362 F. Supp. 2d 1009, 1013 (N.D. Ind. 2005).
[201] *Id.*
[202] Ex. 9: Nguyen Decl. ¶ 5.
[203] *See* Ex. 51: Material Loading/Shipping Instructions CTS 198860 and CTS 200073.

and Henderson,[204] loaded two CMVs that traveled interstate.  Their names appear in the "Load By" box on the forms.  However, this information may not mean that they loaded because of how forms were completed at Angleton: at least seven forms[205] have Burchfield's name in the box, and one has Washington's name, yet no one has testified that they loaded the trucks.[206]

Most plaintiffs testified that they never loaded CMVs that traveled interstate.[207] Instead, plaintiffs testified that it was the shop personnel who loaded the nitrogen tanks and the coil units onto the trucks.[208]  Patin testified that he was not aware of anyone other than the "shop hands" who loaded equipment onto the company trucks.[209]  Crews also testified that it was "[S]hop [S]upport" who loaded on the trucks the items that were necessary for work in the field.[210]  Additionally, Mario Hernandez, testified that he, as Shop Support in the Angleton District, "did all the loading, about 99.9 percent of the loading."[211]  Washington also testified that Shop Support loads materials.[212]  Plaintiff Billy Newman ("Newman"), an ST who worked at the Broussard District, stated that Paul Hebert, Maintenance Manager for the Broussard District, "made it a policy that field people can't run the forklift."[213]  Newman further stated that the "shop people" would run

[204] See Ex. 66: Material Loading/Shipping Instructions CTS 380253 and CTS 380239.

[205] See Ex. 12: Material Loading/Shipping Instructions CTS 380241, CTS 380281, CTS 380282, CTS 380364, CTS 380365, CTS 380369, and CTS 380372.

[206] See Ex. 12: Material Loading/Shipping Instructions CTS 380212.

[207] See e.g., Patin Dep. 48:23–49:9; Crews Dep. 102:3–10, 101:7–12; Tankersley Dep. 33:15-20; defendant's erroneous claim that because plaintiffs looked over trucks before driving they are "loaders" is addressed in plaintiffs' individual motions for summary judgment.

[208] Patin Dep. 49:17–22; Crews Dep. 102:3–4; Tankersley Dep. 32:29–21.

[209] Patin Dep. 63:23–64:1.

[210] Crews Dep. 75:13–15, Feb. 25, 2010.

[211] Hernandez Dep. 22:20–21, Apr. 19, 2010.

[212] Washington Dep. 45:10–46:3.

[213] Newman Dep. 47:7–10

the forklift[214] that is used to load the 1,000-pound reels, which are the primary pieces of equipment used to clean a well bore.[215]  Comeaux issued a directive that STs are not allowed to operate forklifts because CTS "want[ed] specific personnel, shop personnel, operating forklifts."[216]  Comeaux further testified that, for offshore jobs, a "CTS shop employee" would load the flatbed trucks which were attached to tractor-trailers.[217]  No loading of the coil tubing unit was required for onshore work.[218]  Similarly, the other trucks were not loaded.[219]

> ### b.  Plaintiffs did not exercise discretion when loading.

McLeod testified that STIs do not exercise discretion when loading a truck.[220]  Burchfield also testified that there is no discretion in loading.[221]  For instance, Burchfield explained that the equipment, such as the coil tubing unit, "goes in a certain place and has to be pinned.  It only fits a certain way."[222]  Thus, any person who loaded a coil tubing reel would not have been able to exercise discretion because the equipment only fits onto the trailer in a specific place.  Likewise, the nitrogen must be loaded in a specific way.  Burchfield testified that there is a set, written procedure mandating how employees must load the nitrogen, and they are not told to use their own judgment when loading it.[223]

In *Yaklin*, CTS similarly argued that Yaklin was a "loader" under the MCA.

---

[214] Newman Dep. 47:12-13.
[215] Ramirez Dep. 66:24–67:10.
[216] Comeaux Dep. 73:13–25.
[217] Comeaux Dep. 70:20–71:1.
[218] Comeaux Dep. 71:22–72:4.
[219] Comeaux Dep. 71:2–21.
[220] McLeod Dep. 61:21–25.
[221] Burchfield Dep. 81:18–22.
[222] Burchfield Dep. 80:4–19.
[223] Burchfield Dep. 85:13–23.

However, Judge Jack denied CTS' motion for summary judgment because "[d]efendants have not presented any evidence that Plaintiff exercised 'judgment and discretion in planning and building a balanced load.'"[224]  Specifically, Judge Jack noted there was "no evidence regarding whether or not he had any discretion over how this task was accomplished, or merely followed the instructions of his superiors."[225]

### c.    CTS regularly uses third-party vendors to load.

McLeod stated that CTS uses third-party vendors to load heavy equipment.[226] Other CTS executives have also testified that they use third-party vendors to load the coil tubing reels onto the trailers.  Ramirez identified Barbee Crane Services as a third-party vendor CTS has used to place coil tubing reels on its trucks or trailers.[227]  Washington additionally testified that CTS has used a company named Maxim to load heavy coil tubing reels.[228]  For offshore jobs, CTS' managers testified that in Angleton,[229] as in Broussard,[230] third-party vendors transport the equipment to the docks, where it is then shipped to the rigs.  In Broussard, land jobs were loaded by shop support.[231]  But Comeaux testified that it was "third-party trucking [companies] that would typically do [the loading] if it was offshore, so [loading] would be their responsibility."[232]

### d.    Job descriptions for the STs and SS do not mention "loading."

The STI, STII, and SS job descriptions list numerous specific duties for servicing

---

[224] Order at 11, *Yaklin v. W-H Energy Servs., Inc.,* No. 2:07-CV-00422 (Oct. 22, 2008) (citing 29 C.F.R. § 782.5).
[225] Order at 11, *Yaklin.*
[226] McLeod Dep. 62:8–11.
[227] Ramirez Dep. 25:1–6.
[228] Washington Dep. 21:9–21.
[229] Washington Dep. 74:7–13; Ramirez Dep. 20:16–22.
[230] Comeaux Dep. 125:2–4.
[231] Comeaux Dep. 67:25–71:1.
[232] Comeaux Dep. 125:2–4.

wells and working in the shop.  But none contains the term "loading."[233]  This absence is significant because CTS uses the word "loading" specifically in the job description of the "Senior Truck Driver."[234]  Thus, CTS understands the term "loading" (as well as the position of "truck driver"), and loading is one of the duties assigned to the "Senior Truck Driver," not the STIs, STIIs, and SSs.

> ### e.    An employee whose loading functions were *de minimis* does not come under the MCA.

As quoted above, the CFR states that "where [an employee's] safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to him in any workweek so long as there is no change in his duties."[235]

In *Pyramid Motor Freight Corp. v. Ispass,*[236] the Supreme Court held that loaders might be exempt from the FLSA if their activities consisted of work defined by ICC ruling as that of a "loader," and as affecting the safety of operation of motor vehicles in interstate commerce.  Remanding for additional fact-finding, the Court elaborated:

> The District Court shall give particular attention to whether or not the activities of the respective respondents included that kind of "loading" which is held by the Commission to affect safety of operation.  In contrast to the loading activities in the *Levinson* case, the mere handling of freight at a terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may form so trivial, casual or occasional a part of an employee's activities, or his activities may relate only to such articles or to such limited handling of them, that his activities will not come within the kind of "loading" which is described by the Commission and which, in its opinion, affects safety of operation.[237]

---

[233] *See* Ex. 4: Job Descriptions of STI, STII, and SS.
[234] *See* Ex. 4: Job Description of "Senior Truck Driver."  None of the plaintiffs in this suit had the job of "Senior Truck Driver."
[235] 29 C.F.R. § 782.2(b)(3) (emphasis added).
[236] 330 U.S. 695, 706 (1947).
[237] *Id.* at 707–08.

"The Fifth Circuit has characterized *Pyramid* as establishing a *de minimis* rule," as Magistrate Judge Stephen Wm. Smith observed in a case involving loading.[238]  "An employee is subject to the overtime provisions of the FLSA if his work affecting highway safety is only 'trivial, casual, occasional and insubstantial.' *Wirtz v. Tyler Pipe and Foundry Co.*, 369 F.2d 927, 930 (5th Cir. 1966); *Mitchell v. Meco Steel Supply Co.*, 183 F. Supp. 777, 779 (S.D. Tex. 1956) (while employee's duties from time to time included assisting with the loading and unloading of trucks, his connection with such activities was so casual and inconsequential as to not bring him within the exception to the FLSA)."[239] Judge Smith applied the Fifth's Circuit's *de minimis* rule with respect to loading activities[240] in *Hopkins*, where he found that the employer did not prove that the plaintiff was exempt under the MCA.[241]   Judge Smith inquired whether reloading was a "substantial part of [plaintiff's] job duties,"[242] whether plaintiff exercised any discretion on the occasions when plaintiff did load a truck, to what extent he was supervised when loading,[243] and whether the "loading or driving activities [plaintiff] performed were only *de minimis* under the standard established in *Pyramid*."[244]   Here, to the extent any plaintiff assisted with loading, it was *de minimis.*

### f.    "Reasonable expectation" does not apply to loaders.

There is virtually no record which proves that any plaintiff exercised judgment and

---

[238] Mem. and Order at 7, *Hopkins v. Texas Mast Climbers, L.L.C.*, WL 3435033 (S.D. Tex. Dec. 14, 2005) (No. H-04-1884).
[239] *Id.*
[240] *Id.* at 11.
[241] *Id.*
[242] *Id.*
[243] *Id.*
[244] *Id.*

discretion to build a balanced load on a CMV that traveled interstate.  In response, CTS has claimed that all STs may be subject to loading at any time.  But in contrast to the "reasonable expectation" claim for drivers, there is no case law holding that if an employee "reasonably expected" that he might load a CMV that subsequently crosses state lines, he is subject to the MCA.

> **g.** **The Angleton, Alice, and Bridgeport Districts had less than 2% interstate jobs during the relevant time period.  The Broussard District prohibited plaintiffs from using the forklifts to load trucks.**

These figures produced at Section IV(F)(3)(d)(iii), above, reveal that, of all of the jobs serviced by the Angleton District, only a tiny fraction, 1.7%, were interstate land jobs.  For the Bridgeport District, it was 0.7 %, and the Alice District only had 0.3% interstate land jobs.  Accordingly, there is only a remote possibility that a CMV loaded by any employee in these districts would cross state lines.  The interstate trips for Broussard were slightly higher, but there Comeaux testified that STs there were prohibited from using forklifts,[245] and that instead specific Shop Support personnel would load with them.[246]

> **h.** **Conclusion**

There is no record that 12 of 14 bellwether plaintiffs loaded any CMVs that subsequently traveled across a state line.  Further, CTS has produced no evidence that plaintiffs exercised the type of supervision, responsibility, judgment, or discretion in building a load that is contemplated by the federal regulations.  Finally, even if CTS offers

---

[245] Comeaux Dep. 73:18–21.
[246] Comeaux Dep. 73:23–25.

evidence that some plaintiffs occasionally assisted with loading, those activities come under the *de minimis* exception to the MCA.

**G.    Coverage under the MCA is determined on a workweek-by-workweek basis for any employee who is exempt.**

**1.    A workweek-by-workweek analysis is necessary when workers have different shifting job assignments and duties.**

Plaintiffs' duties regularly shifted from one day to the next and also varied from one another.[247]  When an employee has shifting job responsibilities, some of which affect the safety of interstate transportation, 29 C.F.R. § 782.2(b)(4) addresses how the MCA applies:

> *Where the same employee of a carrier is shifted from one job to another periodically or on occasion*, the application of the exemption to him in a particular workweek is tested by application of the above principles to the job or jobs in which he is employed *in that workweek*.[248]

Case law confirms that the MCA must be determined on a workweek-by-workweek basis.[249]

Plaintiffs' duties regularly shifted from one job to another, and for virtually all work-weeks they had duties that did not affect interstate CMV safety.  When plaintiffs were working in the shop, at a land job, or offshore, they were not affecting the safety of

---

[247] For instance, the MPU for May 2008 reveals that, on May 1, 2008 Cantu was on a land job in Fulshear, TX; Crews was working offshore; and Tankersley and Woodard were on a land job in Texas.  And then on May 2, 2008, Cantu was on a new land job in Fulshear, TX; Crews was still offshore; Tankersley was on a land job in Franklin, TX; and Woodard was on a land job in Texas as well.  (Ex. 10: MPU CTS 138373.)

[248] 29 C.F.R. § 782.2(b)(4) (emphasis added).

[249] *See Masson v. Ecolab, Inc.,* 2005 U.S. Dist. LEXIS 18022, at *19 (S.D.N.Y. Aug. 18, 2005) ("[T]he only way to determine the overtime compensation owed to an employee is to examine the job duties of the employee for each week of employment."); *see also Hoffman v. First Student, Inc.* 2009 WL 1783536, at *6 (D. Md. June 23, 2009) (concluding genuine disputes of material fact preclude a determination as a matter of law whether the FLSA motor carrier exemption applies to any plaintiff "for any particular work week").

in interstate transportation.[250]   Thus, CTS is not exempted by the MCA.   But, even if the

MCA applied, the MPUs of the Angleton District plainly show the location of each

employee, so it would be simple to apply an exemption, if at all, on a week-by-week

basis.

> **2.      When safety-affecting activities are rare or infrequent, the MCA should only be applied during those time periods when it occurred.**

When an employee's safety-affecting activities are rare or infrequent, 29 C.F.R. §§

782.2(b)(3) and (4) indicate that the MCA will only apply to him during those infrequent

occasions.   The "general rule" of subsection (3) applies the exemption in all workweeks

when a worker's "continuing duties" directly affect safety.[251]   Subsection (3) further

states:

> If in particular workweeks other duties are assigned to him which result, in those workweeks, in his performance of activities directly affecting the safety of operation of motor vehicles in interstate commerce on the public highways, the exemption will be applicable to him those workweeks, *but not in the workweeks when he continues to perform the duties of the non-safety-affecting job.*[252]

Subsection (4) also provides:

> Similarly, in the case of an employee of a private carrier whose job does not require him to engage regularly in exempt safety-affecting activities described in paragraph (b)(1) of this section and whose engagement in such activities *occurs sporadically or occasionally* as the result of his work assignments at a particular time, the exemption will apply to him *only in those workweeks* when he engages in such activities.[253]

---

[250] Escobedo Dep. 85:6–94:5.
[251] 29 C.F.R. § 782.2(b)(3).
[252] *Id.* (emphasis added.)
[253] 29 C.F.R. § 782.2(b)(4) (emphasis added); *see also Masson v. Ecolab, Inc.,* 2005 U.S. Dist. LEXIS 18022, at *19.

These regulations show that CTS must prove: (1) what each employee's "continuing duties" entailed; and (2) when he performed safety-affecting activities, if at all.   An individualized assessment is thus necessary to apply the workweek-by-workweek rule.

Here, plaintiffs' continuing duties were those of well service workers.   For instance, an ST in the Angleton District might: (1) work in the shop; (2) work in the field on land; (3) work at offshore locations; and (4) drive oilfield service equipment.   Three of these four duties do not involve the safe operation of a CMV across state lines.   The fourth assignment, *viz.* driving oil field equipment to location, does not necessarily or usually involve interstate transportation.   Importantly, an ST may drive a short distance and then perform work in the field for days or sometimes a week or longer.[254]   Hebert, for instance, testified that land jobs usually take one day to three days, while some may last more than a week.[255]   Thus, driving was a small fraction of the total time a laborer spends servicing a well and an even tinier part of the annual duties he performs for CTS.[256]

Because the record demonstrates that plaintiffs did not operate a CMV in interstate commerce more than a *de minimis* amount, they are not subject to the MCA.   However, even if they were, the CFR and the evidence establish that it should be applied on a workweek-by-workweek basis to determine when and if they actually operated or loaded a CMV that subsequently crossed state lines.

## V.   CONCLUSION AND RELIEF SOUGHT

Defendant has failed to meet the heavy burden imposed upon it by law when it

---

[254] Escobedo Dep. 82:12–83:9, 144:7–12.
[255] Hebert Dep. 91:22–92:16.
[256] Escobedo Dep. 43:17–20.

seeks to avoid paying overtime to its employees.  When it asserts an exemption to the FLSA, CTS must prove by "clear and convincing evidence" that each plaintiff "plainly and unmistakenly" is covered by a proposed exemption.  Here, defendant has not established that the executive exemption or the MCA applies to any plaintiff, and as their individual motions for summary judgment demonstrate, the exemptions do not apply.  Accordingly, plaintiffs request the Court to grant their motions for summary judgment.

Respectfully submitted,

ABRAHAM, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND

_____
Clyde J. "Jay" Jackson, III
Attorney-in-Charge for Plaintiffs
State Bar Number:  10502500
Southern District Bar Number: 1241
800 Commerce Street
Houston, Texas  77002
Telephone:  (713) 222-7211
Telecopier:  (713) 225-0827
E-mail: jjackson@abrahamwatkins.com