UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DONALD ALLEN, JAVIER BAUTISTA,
ADAM D. CREWS, SR., ODELL GODFREY,                    Civil Action No.
JEROME JOHNSON, MARK S. LAFLEUR                       08-03370
STEPHEN TANKERSLY, ROBERT L. SMITH,                  cc 09-3500
DUSTIN SNELL, MICHAEL SPEARS, AND
DONALD WOODARD                                        Judge Nancy Atlas

                         Plaintiffs

v.

COIL TUBING SERVICES, L.L.C.

                         Defendant

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT ON FLSA EXEMPTIONS**
**(ALICE, ANGLETON, AND BRIDGEPORT)**

## <u>TABLE OF CONTENTS</u>

I.    NATURE AND STAGE OF THE PROCEEDING .................................................. 1

II.   STATEMENT OF ISSUES TO BE RULED UPON ................................................ 2

    A.    Whether Defendant is Entitled to Judgment as a Matter of Law
          on the MCA Exemption From the FLSA's Overtime Requirements. .......... 2

    B.    Whether Defendant is Entitled to Judgment as a Matter of Law on the
          Administrative, Executive, Profession, and/or Highly Compensated
          Employee Exemptions  From the FLSA's Overtime Requirements. ........... 2

    C.    Summary Judgment Standard. .................................................................... 2

III.  SUMMARY OF THE ARGUMENT ...................................................................... 3

    A.    Motor Carrier Act Exemption. .................................................................... 3

    B.    Administrative Exemption. .......................................................................... 4

    C.    Executive Exemption. .................................................................................. 5

    D.    Highly Compensated Employee Exemption. ............................................... 5

    E.    Professional Exemption. .............................................................................. 5

IV.   UNDISPUTED FACTS RELIED ON BY DEFENDANT ....................................... 6

V.    LAW AND ARGUMENT ....................................................................................... 20

    A.    Defendant is entitled to judgment as a matter of law on Field Service
          Employees' claims for overtime wages under the FLSA because they
          qualify for the Motor Carrier Act exemption. ........................................... 20

          1.    CTS is a motor private carrier ....................................................... 22

          2.    Field Service Employees engaged in activities that directly
                affected the safe operation of motor vehicles in interstate
                transportation ................................................................................. 25

                a)    Field Service Employees were at all times actually
                        engaged in or were subject to being called on to drive
                        CTS equipment and property across state lines, thereby
                        affecting the safe operation of motor vehicles in interstate
                        travel. ................................................................................ 27

i

        b)     Field Service Employees performed the functions of a loader, thereby substantially affecting the safe operation of motor vehicles in interstate travel. .....................37

    3.     Field Service Employees who were subject to being called on to drive CTS property across state lines in non-commercial motor vehicles are properly classified as exempt. ........................... 40

B.    Plaintiff Henderson, as a Service Coordinator, qualified for the Administrative exemption. ......................................................................... 41

    1.     The Legal Test for an Exempt Administrative Employee............... 41

        a)     Plaintiff Henderson Satisfies the Salary-Basis Test...............41

        b)     Plaintiff Henderson Satisfies the Primary Duty and Responsibilities Test ................................................................42

        c)     Plaintiff Henderson Routinely Exercised Independent Judgment and Discretion...........................................................44

C.    Plaintiff Henderson, as an SS, Qualifies for the Executive Exemption....... 45

        a)     Plaintiff Henderson Was an Exempt Highly Compensated Employee. ................................................................................46

D.    Plaintiff Sheikh, as a Field Engineer I, Qualifies for the Professional Exemption.................................................................................................. 47

E.    The Statute of Limitations on Plaintiffs' Claims under the FLSA Should be Limited to Two Years. ................................................................................ 48

F.    Plaintiffs Are Not Entitled To Liquidated Damages. ................................ 49

VI.  CONCLUSION ....................................................................................................... 50

# TABLE OF AUTHORITIES

## Cases

*Allen v. McWane, Inc.*, 593 F.3d 449, 452 (5th Cir. 2010) .............................................................3

*Barefoot v. Mid-America Dairymen, Inc.*, 1994 WL 57686, at *2 (5th Cir. 1994) ......................22

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ..............2, 3

*Collins v. Heritage Wine Cellars, Ltd.*, 2008 WL 5423550, at *19-20, (N.D. Ill. 2008) .............43

*Cox v. Brookshire Grocery, Inc.* 919 F.2d 354, 357 (5th Cir. 1990) ...............................................53

*Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) ........................................................45

*Elliot v. Dave Ernstes & Sons Trucking*, 2006 WL 2849705, *4 (S.D. Ind. 2006).......................30

*Garza v. Smith Intern., Inc.*, 2011 WL 835820, *5 (S.D. Tex. March 7, 2011)...............28, 31, 51

*Gonzalez*, C.A. No. C-08-cv-311 .......................................................................................51, 53

*Harshman v. Well Service, Inc.*, 248 F. Supp. 953 (D.C. Pa. 1964)...............................39, 51, 53

*Hernandez v. Brink's, Incorp.*, 2009 WL 113406, at *6 (S.D. Fla. 2009) .....................................43

*Johnson v. HIX Wrecker Svc.,* Inc.,  2009 WL 1748104 (S.D. Ind. June 18, 2009)...............30, 31

*Levinson v. Spector Motor Serv..* 330 U.S. 649, 678, 67 S.Ct. 931, 91 L.Ed. 1158) (1947) .passim

*Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000) ...................45

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) .....................3

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) ......................................................52

*Morris v. McComb,* 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1947) ..........................................23

*Pyramid Motor Freight Corp. v. Ispass,*
    330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184 (1947) ..............................................23, 24, 30

*Smith v. City of Jackson*, 954 F.2d. 296, 299 (5th Cir. 1992)........................................................46

*Songer v. Dillon Resources Inc.*, 618 F.3d 467, 472 (5th Cir. 2010)...............................22, 30, 51

*Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 47 (1943) ..........................................................23

*Starrett v. Bruce*, 391 F.2d 320 (C.A.Okl. 1968) ........................................................................30

1595889.1/006625.000031

*Tidd v. Adecco USA, Inc.*, 2008 WL 4286512 *3-4 (D. Mass. 2008)..........................................43

*Troutt v. Stavola Bros., Inc.*, 107 F.3d 1104, 1107 (4th Cir.1997).......................................40, 41

*United States v. American Trucking Ass'ns.*, 310 U.S. 534, 553 (1940).............................23, 41

*Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 904 (6th Cir. 2002)............................39, 40

## **Statutes**

29 U.S.C. § 207(a)(1)....................................................................................................21

29 U.S.C. § 255(a) ...................................................................................................32, 48

29 U.S.C. § 260............................................................................................................49

29 U.S.C. §213 (b)(1)............................................................................. 3, 21, 29, 41

49 U.S.C. § 13102(15) ................................................................................................23

49 U.S.C. § 31502(b)(1)...............................................................................................21

1595889.1/006625.000031

## Other Authorities

Field Operations Handbook, at §24e01(b) ..................................................................32

## Rules

*Fed. R. Civ. P.* 56(c).................................................................................................2

## Regulations

29 C.F.R. §  782.7(b)(l) ...........................................................................................28

29 C.F.R. § 541.100(a)(1) ...................................................................................5, 46

29 C.F.R. § 541.200(a)(1) ...................................................................................4, 42

29 C.F.R. § 541.201(b)..............................................................................................43

29 C.F.R. § 541.202 ...........................................................................................42, 44

29 C.F.R. § 541.203(c) .......................................................................................43, 44

29 C.F.R. § 541.300(a)(1) ...................................................................................6, 47

29 C.F.R. § 541.600 ..................................................................................................41

29 C.F.R. § 541.601 .........................................................................................5, 46, 47

29 C.F.R. § 541.700 ..................................................................................................42

29 C.F.R. § 782.1(a) .................................................................................................21

29 C.F.R. § 782.2(a) .....................................................................................21, 22, 26

29 C.F.R. § 782.3.................................................................................................27, 28

29 C.F.R. § 782.5(a).........................................................................................37, 38, 40

Pursuant to Federal Rule of Civil Procedure 56, Defendant Coil Tubing Services, L.L.C. (hereinafter "Defendant" or "CTS") hereby submits its Memorandum in Support of its Motion for Summary Judgment on FLSA Exemptions (Alice, Angleton, and Bridgeport) to demonstrate that there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law as to each Plaintiff's claim.

## I.     NATURE AND STAGE OF THE PROCEEDING

On November 13, 2008, 11 individual plaintiffs joined together and filed their Complaint alleging violations of the Fair Labor Standards Act ("FLSA") for CTS' alleged failure to pay overtime wages.[1]   Since then, Plaintiffs have sought and been granted leave to file numerous Amended Complaints.[2]   There are currently 175 individuals joined as plaintiffs in the captioned matter ("Plaintiffs").[3]

Plaintiffs are comprised of current and former CTS employees employed at CTS districts located in Broussard, Louisiana and Angleton, Alice, and Bridgeport, Texas.   To assist with the management of this litigation, the Court ordered the parties to conduct discovery on a cross-section of Plaintiffs.   [Rec. Doc. 70].   Byron Allen, William Broussard, Alfredo Cantu, Adam Crews, Gary Henderson, Jesus Hernandez, Billy Newman, Cody Patin, Jose Pena, Mahmoud Sheikh, Stephen Tankersley, Donald Woodward, Donald Allen, and Presley Branham are members of the first bellwether

---

[1] Rec. Doc. 1.
[2] Though Plaintiffs were granted leave to file a Fourteenth Amended Complaint, the last Complaint filed by Plaintiffs was their Thirteenth Amended Complaint.  [Rec. Doc. 169].
[3] A total of 185 individuals have joined as a Plaintiff in this lawsuit.  However, during the course of litigation, ten (10) individuals have confessed judgment in favor of CTS and have voluntarily dismissed their FLSA claims, including Mark Biggs (Bridgeport), William Griffin, Mario Hernandez, Randy Huffman, and Terry Strickland (Angleton), and all Plaintiffs who were employed at the Rock Springs District - Stanley Rech, Matthew Reeves, Jason Robicheaux, Harold Roussell, and Howard Short. [Rec. Docs. 87, 105, 157, and 161].

1

group (hereinafter "Bellwether Plaintiffs").[4]  Defendant's Motion for Summary Judgment focuses on the application of various exemptions to certain job categories of CTS employees employed by CTS at its Alice, Angleton, and Bridgeport districts.[5]

Defendant is entitled to judgment as a matter of law on each Plaintiff's claim for unpaid overtime wages under the FLSA because they were properly classified as exempt under 29 U.S.C. §213(b)(1) or 29 U.S.C. §213(a)(1) of the FLSA.

## II.   STATEMENT OF ISSUES TO BE RULED UPON

**A.    Whether Defendant is Entitled to Judgment as a Matter of Law on the MCA Exemption From the FLSA's Overtime Requirements.**

**B.    Whether Defendant is Entitled to Judgment as a Matter of Law on the Administrative, Executive, Profession, and/or Highly Compensated Employee Exemptions  From the FLSA's Overtime Requirements.**

**C.    Summary Judgment Standard.**

The principal purpose of Federal Rule of Civil Procedure 56 is to "isolate and dispose" of factually unsupported claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact. . . ."  *Fed. R. Civ. P.* 56(c); *Celotex*, 477 U.S. at 322.  There is no "genuine issue" when the record, taken as a whole, could not lead a rational trier of fact to find for the nonmovant.  *Matsushita Elec.*

---

[4] Bellwether Plaintiffs are comprised of an Equipment Operator ("EO"), Service Technician Is ("STIs") and Service Technician IIs ("STIIs"); a Service Coordinator and Service Supervisor ("SS"); and a Field Engineer I (also referred to as a Field Engineer Trainee).  Additionally, some Plaintiffs joined in this action, but not part of the first Bellwether group, were employed by Defendant as Service Supervisor Trainees (SSTs).

[5] CTS limits the arguments to these Districts for organizational purposes only and maintains that the proper perspective from which to measure the application of the MCA exemption is on a company-wide or "enterprise" basis.  Because some of the issues differ slightly, the claims of Plaintiffs William Broussard and Billy Newman are addressed in Defendant's Memorandum in Support of its Motion for Summary Judgment on FLSA Exemptions (Broussard).

2

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The moving party has the burden of demonstrating that there are no genuine issues of material fact.  *Allen v. McWane, Inc.*, 593 F.3d 449, 452 (5th Cir. 2010).  Further, when considering a motion for summary judgment, the Court must "view the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor."  *Id.* (citation omitted).  Under this standard, Defendant is entitled to judgment as a matter of law in its favor, dismissing Plaintiffs' claims, in their entirety, with prejudice.

## III.  <u>SUMMARY OF THE ARGUMENT</u>

All EOs, STIs, STIIs, SSTs, SSs, and Field Engineer Is[6] ("Field Service Employees") were properly classified by CTS as exempt employees under the Motor Carrier Act ("MCA") exemption from the overtime provisions of the FLSA.  *See* 29 U.S.C. §213 (b)(1).  Plaintiff Mahmoud Sheikh, a Field Engineer I, was properly classified as an exempt employee under both the MCA and Professional exemptions.  Service Coordinators[7] were properly classified as exempt employees under the administrative exemption.  Finally, SSs were properly classified as exempt employees under the MCA, Executive, and/or highly compensated employee exemptions.

### A.  **Motor Carrier Act Exemption.**

The application of the MCA exemption requires an affirmative answer to two questions:

(1) whether CTS is a motor private carrier; and

---

[6] Field Engineer Is were not required to hold a commercial driver's license or operate 18-wheel tractor-trailers.

[7] The Rock Springs District employs "Service Operations Managers" instead of "Service Coordinators." Appendix 22 (Robison Dec., at ¶ 7), at p. 923-24.

3

(2) whether the employees over whom the exemption is asserted engage in safety-affecting activities in the transport of CTS property in interstate commerce.

The record shows that the answer to both of these questions is a resounding "yes." CTS is unquestionably a motor private carrier.  Further, the Field Service Employees perform duties as drivers, driver's helpers, and/or loaders of motor vehicles that actually traveled or were subject to traveling across state lines in the furtherance of CTS' commercial enterprise, thus engaging in activities that substantially affected the safe operation of motor vehicles in interstate transportation.[8]  Accordingly, CTS Field Service Employees and Plaintiff Mahmoud Sheikh, employed as a Field Engineer I, are exempt from the FLSA's overtime obligations under the MCA exemption.

### B.      Administrative Exemption.

The job duties of a Service Coordinator qualify for the Administrative exemption. Service Coordinators are paid on a salary basis in excess of the $455.00 weekly salary requirement imposed by 29 C.F.R. § 541.200(a)(1) for this exemption.[9]   A Service Coordinator's primary duties consist of office or non-manual work directly related to the general business operations of CTS.   In fulfilling his primary job duties, a Service Coordinator exercises independent judgment and discretion over matters of significance to CTS.   Indeed, the administrative nature of the Service Coordinator's primary duties, conclusively establishes that the Service Coordinators, including Plaintiff Henderson, were properly classified as exempt employees.

---

[8] Defendant contends that Service Coordinators were properly classified as exempt employees under the administrative and/or highly compensated employee exemptions.
[9] Appendix 41, (Declaration of Tiffany Letchworth, at ¶ 19), at p 1633.

C.      **Executive Exemption.**

SSs, including Plaintiff Henderson from May 15, 2006, to March 13, 2007, qualify for the Executive exemption.[10]   In addition to meeting the salary and salary-basis requirements of 29 C.F.R. § 541.100(a)(1), the Service Supervisor's primary duty is to manage the field operations of CTS.   In doing so, Service Supervisors customarily and regularly direct the work of two or more full-time CTS employees.[11]   Further, SSs have the authority to make recommendations regarding the hiring, firing, advancement, and promotion of other employees and their opinions on such matters are given significant weight.[12]   Accordingly, pursuant to 29 C.F.R. § 541.100, SSs, including Plaintiff Henderson, were properly classified as exempt employees.

D.      **Highly Compensated Employee Exemption.**

Pursuant to of 29 C.F.R. § 541.601, SSs with total annual compensation of at least $100,000.00 are exempt as highly compensated employees because they customarily and regularly perform one or more of the exempt duties or responsibilities of an executive employee.   Accordingly, pursuant to 29 C.F.R. § 541.601, Plaintiff Henderson, whose compensation exceeded $100,000.00 and regularly and customarily performed at least one of the duties of an executive employee as an SS, was properly classified as exempt employee during his tenure as an SS.

E.      **Professional Exemption.**

---

[10] Plaintiff Henderson was employed as a Service Coordinator through May 15, 2006.   Appendix 41, (Declaration of Letchworth, at ¶ 10).

[11] Appendix 35, (Declaration of Ed Burchfield, at ¶ 7), at p. 1398; Appendix 6 (Henderson Deposition), at pp. 200-204 and pp. 207-210; Appendix 12, (Declaration of Hudson Wise, at ¶ 24), at p. 459; Appendix 7, (Letchworth Deposition), pp. 241-243 and pp. 267-270 (Deposition Exhibit 26).

[12] Appendix 35, (Declaration of Ed Burchfield, at ¶ 7), at p. 1398.

5

Finally, Plaintiff Sheikh qualifies for the Professional exemption.  Plaintiff Sheik is the only Field Engineer Trainee in this lawsuit.  Plaintiff Sheik's annual salary exceeds the $455.00 per week salary-basis requirement of 29 C.F.R. § 541.300(a)(1).[13]  Further, Plaintiff Sheik's primary duty was to observe the use of the coil tubing equipment in the field, record his observations, input the data he collected into the Cerebrus program, and author a field report so that the life of the coil tubing unit could be determined.[14]  Plaintiff Sheik's position required advanced knowledge in the field of petroleum engineering, which he gained by taking the requisite classes and obtaining a Bachelor of Science degree with a major in petroleum engineering and minor in mathematics from University of Louisiana-Lafayette.[15]  Accordingly, Plaintiff Sheikh was properly classified as an exempt professional employee.

Because Plaintiffs were properly classified as exempt employees, any Plaintiff in same job classifications as the Bellwether Plaintiffs addressed herein should also be dismissed.

## IV.  UNDISPUTED FACTS RELIED ON BY DEFENDANT[16]

1.     The relevant time period in this case is November 13, 2005, to November 13, 2008 (hereinafter this time frame will be referred to as the "Relevant Period").

---

[13] Appendix 41, (Declaration of Tiffany Letchworth, at ¶ 19), at p 1633; Appendix 10 (Deposition of Mahmoud Sheik), at. p. 361.

[14] Appendix 10 (Sheikh Deposition), at pp. 352-353, Appendix 7 (Letchworth Deposition), at p. 255.

[15] Appendix 10 (Sheikh Deposition), at pp. 350-351and 355 (Depo. Exhibit – Job Description for Field Engineer I).

[16] Defendant submits this listing of undisputed facts for purposes of its Motions for Summary Judgment only and reserves the right to challenge facts in future proceedings if necessary.  Further, in an attempt to reduce the number of pages of documentary evidence to be filed with the Court, Defendant submits excerpts and samplings of those documents that evidence the safety-affecting duties and interstate travel of CTS Field Service Employees, including Plaintiffs.  Should the Court desire additional documentary evidence, Defendant will supply such evidence.

2.      Bellwether Plaintiff Byron Allen began his employment with CTS on April 4, 2005, as an Equipment Operator at the Broussard District.   On December 25, 2005, Allen was promoted to an STI and transferred to the Bridgeport District.  On February 19, 2007, Allen's employment with CTS was terminated.[17]

3.      Bellwether Plaintiff Donald Allen began his employment with CTS on February 15, 2006, as an STI in the Angleton District.  On December 27, 2007, Allen's employment with CTS was terminated.[18]

4.      Bellwether Plaintiff Presley Branham began his employment with CTS on April 24, 2006, as an STI in the Angleton District.   On December 10, 2007, Branham was promoted to an STII.[19]

5.      Bellwether Plaintiff William Broussard began his employment with CTS on February 1, 2007 as an ST-I in the Broussard District.   On June 24, 2007, his employment with CTS was terminated due to legal problems.   CTS rehired Broussard on July 16, 2007, as an ST-I and then promoted him to an ST-II on January 7, 2008.  On June 11, 2008, CTS again terminated Broussard for failing a drug screening.  On July 18, 2008, CTS again rehired Broussard as an ST-II.   On February 3, 2009, CTS again terminated Broussard's for refusing a drug screening.

6.      Bellwether Plaintiff Alfredo Cantu began his employment with CTS on July 26, 2004, as an Equipment Operator in the Angleton District.  On February 20, 2005, Cantu was promoted to STI.  On March 5, 2006, Cantu was promoted to an STII.[20]

---

[17] Appendix 41, at p. 1629. (Declaration of Tiffany Letchworth, at ¶4).
[18] Appendix 41, at p. 1629. (Declaration of Tiffany Letchworth, at ¶5).
[19] Appendix 41, at p. 1629. (Declaration of Tiffany Letchworth, at ¶6).

7.      Bellwether Plaintiff Adam Crews began is employment with CTS on April 21, 2005, as an STI in the Angleton District.  On May 18, 2006, Crews was promoted to an STII. On March 3, 2009, Crews' employment with CTS was terminated.[21]

8.      Bellwether Plaintiff Gary Henderson began his employment with CTS on November 25, 2002, as a Service Supervisor in the Angleton District.   On January 10, 2005, Henderson was promoted to Service Coordinator.  On May 15, 2006, Henderson was demoted to SS.   On March 15, 2007, Henderson's employment with CTS was terminated.[22]

9.      Bellwether Plaintiff Jesus Hernandez has been employed by CTS since July 19, 2006, as an STII in the Alice District.[23]

10.     Bellwether Plaintiff Billy Newman began his employment with CTS on July 22, 2005, as an STI in the Broussard District.   On July 11, 2007, Newman was promoted to an STII.  On June 25, 2009, Newman's employment with CTS was terminated.[24]

11.     Bellwether Plaintiff Cody Patin began his employment with CTS on September 22, 2008, as an STI in the Angleton District.   On March 3, 2009, Patin's employment with CTS was terminated.[25]

12.     Bellwether Plaintiff Jose Pena began his employment with CTS on September 19, 2007, as an STII in the Alice District.[26]

---

[20] Appendix 41, at p. 1630. (Declaration of Tiffany Letchworth, at ¶8).
[21] Appendix 41, at p. 1630. (Declaration of Tiffany Letchworth, at ¶9).
[22] Appendix 41, at p. 1630. (Declaration of Tiffany Letchworth, at ¶10).
[23] Appendix 41, at p. 1630. (Declaration of Tiffany Letchworth, at ¶11).
[24] Appendix 41, at p. 1630. (Declaration of Tiffany Letchworth, at ¶12).
[25] Appendix 41, at p. 1630. (Declaration of Tiffany Letchworth, at ¶13).

13.  Bellwether Plaintiff Mahmoud Sheik began his employment with CTS on May 12, 2008, as a Field Engineer I (also known as a Field Engineer Trainee) in the Angleton District.   On March 3, 2009, Sheikh's employment with CTS was terminated.[27]

14.  Bellwether Plaintiff Steven Tankersely began his employment with CTS on December 25, 2006, as an STI in the Angleton District.   On September 2, 2008, Tankersley's employment with CTS was terminated.[28]

15.  Bellwether Plaintiff Donald Woodard began his employment with CTS on January 28, 2008, as an STI.   On March 9, 2009, Woodard's employment with CTS was terminated.[29]

16.  As part of its operations, CTS owns certain chemicals, tools, and coil tubing equipment, including coil tubing reels, fluid pumps, $N_2$ pumps, $N_2$ transports, friction reducers, and cranes, which it transports via public highway to its customers at the customer's well site.[30]

17.  The Field Service Employees[31] are tasked with the duty to transport the property owned by CTS (i.e., the equipment, tools, chemicals, and protective gear) over

---

[26] Appendix 41, at p. 1630. (Declaration of Tiffany Letchworth, at ¶14).
[27] Appendix 41, at p. 1631. (Declaration of Tiffany Letchworth, at ¶15).
[28] Appendix 41, at p. 1631. (Declaration of Tiffany Letchworth, at ¶16).
[29] Appendix 41, at p. 1631. (Declaration of Tiffany Letchworth, at ¶17).
[30] Appendix 19, at p. 731 (Declaration of Houston Frazier, at ¶ 4;  *See also* Appendix 14, (Declaration of Louvy LeJeune, at ¶¶ 5-6), at pp. 527-616.  Attached to the LeJeune Declaration as Exhibit B are sample photographs of the various pieces equipment owned and operated by CTS.
[31] The term "Field Service Employees" is used throughout this Memorandum to refer to Equipment Operators ("EO"), Service Technician I (STI), Service Technician II (STII), Service Supervisor Trainee (SST), and Service Supervisor (SS); those job categories are the ones that transport CTS property to the job location to perform the work needed by the customers.  Byron Allen served as an EO during the Relevant Period.  However, according to his testimony, he obtained a CDL around mid-November of 2005, and thus could have been called upon to operate CTS equipment in interstate commerce for the entire Relevant Period.  Appendix 1 (Byron Allen Deposition), at pp. 2A and 4A.

9

public highways in furtherance of CTS' commercial enterprise of providing well-service operations on its customer's oil and gas wells.[32]   For land and barge jobs, the necessary coil tubing equipment, chemicals, and tools are loaded onto a trailer and transported to the well site by Field Service Employees.[33]   Coil reels frequently need to be changed out on the trailer beds, and chemicals and tools needed for every job are loaded as well.[34]

18.   The job descriptions of STI, STII, SS, and SST all require that the individual serving in that capacity "mobilize" equipment to location by "driving" coil tubing units, pump trucks, $N_2$ trucks, transports, or pickup trucks.[35]

19.   Approximately 7% of all of the land jobs during the relevant time period required one or more service crews to mobilize coil tubing equipment across state lines.[36] Approximately 5.28% of the land jobs serviced by CTS during the relevant time period were performed in states in which CTS does not have a service district.[37] Approximately 11.84% of the offshore jobs serviced by CTS during the relevant

---

[32] Appendix 1 (Byron Allen Deposition) at pp. 2, 13, and 17; Appendix 2 (Donald Allen Deposition), at pp. 59, 65, 68 and Appendix 3 (Donald Allen Deposition), at pp. 72, 79; Appendix 3 (Branham Deposition), at p. 107; Appendix 4 (Cantu Deposition), at pp. 154, 156-157 and Appendix 5 (Cantu Deposition), at p. 161; Appendix 6 (Hernandez Deposition), at pp. 222-225; Appendix 7 (Letchworth Deposition), at pp. 248-250, and 258-270 (Deposition Exhibits 23-26); Appendix 8 (Pena Deposition), at pp. 293-295; Appendix 10 (Tankersley Deposition), at p. 361.
[33] Appendix 35, (Declaration of Ed Burchfield, at 18, 20), at p.1401; Appendix 29, (Declaration of Barry Boudreaux, at ¶14); Appendix 17 (Declaration of Rey Reyna, at ¶15), at p. 644; and Appendix 22 (Declaration of Russell Robison, at ¶12), at p. 925.
[34] Appendix 11 (Washington Deposition), at p. 385.
[35] Appendix 7 (Letchworth Deposition), at pp. 248-250, and 258-270 (Deposition Exhibits 23-26); Appendix 11 (Washington Deposition), at pp. 384A-384B.
[36] Appendix 19, (Declaration of Houston Frazier, at ¶ 12), at p. 732.
[37] *Id.*

time period were performed in states in which CTS does not have a service district.[38]

20.  Only the Angleton and Broussard Districts service offshore jobs.  At the Angleton District, no Field Service Employee is assigned exclusively to offshore jobs.[39]

21.  If a CTS district needs to borrow or pickup equipment from another district, Field Service Employees may be called upon to transport the equipment between the districts.[40]

22.  Field Service Employees are expected to and are called upon to drive commercial motor vehicles including the 18-wheel tractor-trailers, fluid pump trucks, $N_2$ pumps, $N_2$ transports, and crane trucks as a primary and essential job duty.[41]

23.  In the Alice, Bridgeport, Angleton, and Rock Springs Districts, all Field Service Employees are required to have a Commercial Driver's License ("CDL") or CDL permit in order to work as an STI, STII, SST, or SS.[42]

24.  If an individual is hired to be a service technician, but does not hold a CDL when he was hired, he is told that he will need to obtain a CDL in order to keep his job

---

[38] *Id.*
[39] Appendix 35, (Declaration of Ed Burchfield, at ¶ 15), at p. 1400.
[40] Appendix 7 (Letchworth Deposition), at p. 240; Appendix 5 (Cantu Deposition), at pp. 170-172.
[41] Appendix 35, (Declaration of Ed Burchfield, at ¶ 22), at p. 1402; Appendix 29, (Declaration of Barry Boudreaux, at ¶12), at p. 1189; Appendix 17, (Declaration of Rey Reyna, at ¶13), at p. 643; and Appendix 22, (Declaration of Russell Robison, at ¶10), at p. 924; Appendix 5 (Cantu Deposition), at p. 166; Appendix 1 (Byron Allen Deposition), at pp. 2, 23-27, and 28-35; Appendix 5 (Crews Deposition), at p. 185, 188; Appendix 6 (Hernandez Deposition), at pp. 230-233; Appendix 2 (Donald Allen Deposition), at pp. 63-64 and 70-71, 76, and Appendix 3 (Donald Allen Deposition) at pp. 85-89, 90; Appendix 4 (Branham Deposition), at p. 120-132; Appendix 8 (Pena Deposition), at. pp. 291-292.
[42] Appendix 7 (Letchworth Deposition), at pp. 248-250, and 258-270 (Deposition Exhibits 23-26); Appendix 35, (Declaration of Ed Burchfield, at ¶22), at p. 1400; Appendix 29, (Declaration of Barry Boudreaux, at ¶18), at p.1190; Appendix 17, (Declaration of Rey Reyna, at ¶19); and Appendix 22, (Declaration of Russell Robison, at 16), at p. 926; Appendix 1 (Byron Allen Deposition), at p. 4; Appendix 7 (Hernandez Deposition), at p. 235.   Of course, of the thousands of employees CTS has employed over time, an insignificant number of Field Service Employees may have not yet obtained a CDL, or may have lost his CDL due to expiration or punishment for illegal activity.  Appendix 41, Letchworth Declaration, at ¶ 24.

and CTS will assist him in obtaining a CDL.[43]  Bellwether Plaintiffs Byron Allen, Alfredo Cantu, Adam Crews, Jesus Hernandez, Jose Pena, Stephen Tankersley, Donald Allen, and Presley Branham each held a CDL during the Relevant Period.[44]  Bellwether Plaintiff Cody Patin was taking classes to obtain his CDL, but his employment was terminated before he was able to finish the classes.[45]  Bellwether Plaintiff Donald Woodard (who obtained a CDL while employed by CTS) held a Class B license, which allowed him to operate vehicles in excess of 10,001 lbs, but not those weighing in excess of 26,000 lbs.[46]  Plaintiff Gary Henderson allowed his CDL to lapse during his tenure as a Service Coordinator.[47]

25.    The U.S. Department of Transportation ("DOT") has classified CTS as an interstate motor carrier engaging in transport of oilfield equipment.[48]  From 2005 to 2008, CTS operated under USDOT #692518.[49]  CTS has registered its commercial motor vehicles with the DOT.[50]

26.    During the Relevant Period, CTS had service districts located only in Louisiana, Texas, and Wyoming.[51]  However, CTS offers its well services irrespective of the

---

[43] Appendix 11 (Woodard Deposition), at pp. 388-389, Appendix 8 (Patin Deposition), at p. 285.
[44] Appendix 1 (Byron Allen Deposostion), at p. 5; Appendix 2 (Byron Allen Deposition), at p. 57; Appendix 4 (Cantu Deposition), at p. 151; Appendix 5 (Crews Deposition), p. 175; Appendix 7 (Hernandez Deposition), at p. 235; Appendix 8 (Pena Deposition), at p. 302A; Appendix 10 (Tankersley Deposition), at p. 357; Appendix 3 (Donald Allen Deposition), at p. 84; Appendix 3 (Branham Deposition), at p. 117.
[45] Appendix 41, at p. 1630, (Declaration of Tiffany Letchworth, at ¶ 10), at pp. 1725-1727 (Appendix 43, Exhibit I – New Hire form); Appendix 7, (Patin Deposition), at p. 285.
[46] Appendix 11 (Woodard Deposition), at pp. 398-399, 419.
[47] Appendix 6 (Henderson Deposition), at p. 206.
[48] Appendix 14, (Declaration of Louvy LeJeune, at ¶ 4 and Exhibit A attached thereto), at pp. 519, 523-26.
[49] Appendix 14, (Declaration of Louvy LeJeune at ¶ 4), at p. 519.
[50] Appendix 14, (Declaration of Louvy LeJeune at ¶ 12), at p. 520.
[51] Appendix 19, (Declaration of Houston Frazier, at ¶ 8), at p. 731.

12

location of the well.[52] During the Relevant Period, CTS provided coil tubing services in Texas, Louisiana, Oklahoma, Colorado, Utah, Wyoming, New Mexico, Alabama, Mississippi, Pennsylvania, Florida and Nevada.[53]   Individual CTS service districts are not assigned to any specific geographic service areas.[54]

27.   During the Relevant Period, because the Bridgeport District anticipated frequently having to transport property to Oklahoma, it purchased apportionment licenses or "cab cards" for its 18-wheelers to operate in Oklahoma.[55]   Likewise, the Angleton District purchased apportionment licenses or "cab cards" so that it could regularly operate its 18-wheelers in Louisiana.[56]

28.   All CTS districts routinely record their fuel and mileage data so that CTS may file quarterly International Fuel Tax Agreement ("IFTA") Reports with the Louisiana Department of Revenue.[57]   The IFTA Reports contain the mileage driven in each state by CTS Field Service Employees in 18-wheel tractor trailers.[58]   For 2006, the IFTA Reports show that CTS Field Service Employees drove thousands of miles in Mississippi, Alabama, New Mexico, and Oklahoma, four states in which CTS has never established a District Office.[59]   For 2007, the IFTA Reports show that CTS Field Service Employees drove thousands of miles in Mississippi, New

---

[52] *Id.*, at ¶ 9.
[53] *Id.*, at ¶ 10; Appendix 12, at p. 435 (Plaintiffs' Second Supplemental Response to Request for Admission No. 14).
[54] Appendix 19, (Declaration of Houston Frazier, at ¶13), at p. 732; Appendix 8 (Ritter Deposition), at pp. 314-315; Appendix 4 (Burchfield Deposition), at p. 149 (pp.25-27).
[55] Appendix 29, (Declaration of Barry Boudreaux, at ¶ 53), at p. 1199.
[56] Appendix 35, (Declaration of Ed Burchfield, at ¶ 69), at p. 731.
[57] Appendix 19, (Declaration of Houston Frazier, at ¶ 6), at p. 731; Appendix 64, (Declaration of Tammy Labit, at ¶¶3, 5), at pp. 894-95.
[58] Appendix 22, (Declaration of Tammy Labit, at ¶¶ 4, 6), at p. 895.
[59] Appendix 22, (Declaration of Tammy Labit, at ¶ 9), at p. 895.

13

Mexico, Utah, Colorado, Oklahoma, and Alabama, six states in which CTS has never established a District Office.[60] For 2008, the IFTA Reports show that CTS Field Service Employees drove thousands of miles in New Mexico, Alabama, Utah, Mississippi, Colorado, Oklahoma, and Idaho, seven states in which CTS has never established a District Office.[61]

29. Once a service job is accepted by the Service Coordinator, he prepares a Load Out Ticket (or a Service Order Ticket in the case of the Alice District) to initiate the process of filling the job order.[62] The Service Coordinator makes the initial determination as to which equipment and Field Service Employees to assign to a job based on equipment and personnel availability.[63] The Service Coordinator denotes the crew and equipment assigned to a job on the Load Out Ticket.[64]

30. A CTS field service crew (for land and offshore jobs) typically consists of two or more STIs, STIIs and/or SSTs and of one or more SS(s).[65]

31. The Service Coordinator gives the Load Out or Service Order Ticket to the SS.[66]

32. For offshore jobs, CTS may transport or CTS may use a third-party trucking company to transport the coil tubing equipment, chemicals, and tools needed for

---

[60] Appendix 22, (Declaration of Tammy Labit, at ¶ 10), at p. 896.
[61] Appendix 22, (Declaration of Tammy Labit, at ¶ 11), at p. 896.
[62] Appendix 19, (Declaration of Houston Frazier, at ¶ 15), at p. 732, Appendix 7 (Letchworth Deposition), at pp. 244 and 27-274 (Deposition. Exhibit 30).
[63] Appendix 35, (Declaration of Ed Burchfield, at ¶ 8) p.1399; Appendix 6 (Henderson Deposition), at pp. 200-202 and 207-210).
[64] Appendix 19, (Declaration of Houston Frazier, at ¶ 15), at p. 732.
[65] The Service Coordinator determines how many and what combination of crew members are needed on a job. Appendix 35, (Declaration of Ed Burchfield, at ¶37), at p. 1405; Appendix 19, (Declaration of Randy Comeaux, at ¶14), at p. 737; Appendix 17, (Declaration of Rey Reyna, at ¶ 14), at p. 644; Appendix 22, (Declaration of Russ Robison, at ¶11), at p. 924; Appendix 29, (Declaration of Barry Boudreaux, at ¶13), at p. 1189; *see also* Appendix 6 (Henderson Deposition), at p. 205; Appendix 12, (Declaration of Hudson Wise, at ¶¶ 21-23), at p. 458.
[66] Appendix 19, (Declaration of Houston Frazier, at ¶ 15), at p. 732.

14

the job.  However, each member of the offshore service crew is expected to assist with the loading and securing of the coil tubing equipment and tools needed onto the CTS or third-party trucks before departing the shop.  For offshore jobs, the service crew generally loads skids with CTS equipment, which are then loaded by CTS or third-party personnel onto an 18-wheelers.  The 18-wheelers loaded with the skids are then transported to a dock by a CTS or third-party driver.[67]  Once the equipment is loaded, the offshore service crew travels to the load out dock in a CTS pickup truck.  The offshore service crew is expected to travel to wherever the load out dock is located.  This is true even if it requires the offshore crew members to travel across state lines.[68]

33.     For land jobs, each member of a field service crew is expected to load and secure the coil tubing equipment, chemicals, fuel, and tools needed for a service job onto CTS trailers and trucks before departing the shop.[69]

34.     Generally, the SSs operate a larger pickup truck such as a F-350 modified with a diesel fuel auxiliary tank affixed to the bed.[70]  The rest of the field service crew

---

[67] Appendix 19, (Comeaux  Declaration, at ¶ 17), at pp. 737-38.
[68] Appendix 19, (Comeaux  Declaration, at ¶ 28), at p. 739.
[69] Appendix 35, (Declaration of Ed Burchfield, at ¶¶ 16, 18), at pp. 1400-01; Appendix 11 (Washington Deposition), at pp. 385A-385B.
[70] Appendix 35, (Declaration of Ed Burchfield, at ¶ 70); Appendix 22, (Declaration of Russell Robison at ¶ 26), at p. 928; Appendix 29, (Declaration of Barry Boudreaux at ¶ at 54), at p. 1199; Appendix 17, (Declaration of Rey Reyna at ¶ 49), at p. 651; and Appendix 19, (Declaration of Comeaux at ¶ 33), at p. 741-A.  The pickup trucks modified with the auxiliary tank have a GCWR and gross combination weight greater than 10,001 lbs. and are vehicles that CTS registers with the DOT.  Appendix 14, (Declaration of Louvy LeJeune, at ¶¶8-11), at pp. 519-20.

15

(i.e. STIs, STIIs, SSTs, etc.) operate the 18-wheel tractor-trailer they are assigned to drive.[71]

35.     SSs are expected to ensure that the 90-gallon auxiliary tanks are filled with diesel fuel before leaving the shop so that there is sufficient fuel to operate the equipment in the field.[72]

36.     The equipment Field Service Employees transport consists of pieces of heavy machinery that are loaded onto trailers with a fork lift or crane.  A single piece of equipment weighs more than 10,001 lbs.[73]

37.     For land and offshore assignments, pursuant to DOT regulations and CTS requirements, before leaving the shop, when arriving to the job site, before leaving the job site, and when arriving back at the shop, the operator of a CTS vehicle must perform a DOT inspection to ensure that the load is secure and the vehicle is fit for safe operation on the highways.[74]  The DOT inspection requires verification that, among other things, the truck's lights are working properly, the load is secure, the tires are properly inflated, etc.[75]

---

[71] *Id.*  The pickup trucks modified with the auxiliary tank have a GCWR and gross combination weight greater than 10,001 lbs. and are vehicles that CTS registers with the DOT.  Appendix 14, (Declaration of Louvy LeJeune, at ¶¶ 5, 7, 10), at p 519; Appendix 19, (Declaration of Houston Frazier, at ¶ 4), at p. 731.

[72] Appendix 35, (Declaration of Ed Burchfield, at ¶ 23), at p. 1402; Appendix V (Henderson Deposition), at p. 202.

[73] Appendix 14, (Declaration of Louvy  LeJuene, at ¶ 6).

[74] Appendix 13, (Declaration of Raleigh Parker, ¶ 5); Appendix 12, (Declaration of Mark Biggs, at ¶¶ 20-21); Appendix 5 (Cantu Deposition), at pp. 160-161, Appendix 1 (Byron Allen Deposition), at pp. 3, 15, 17; Appendix 5 (Crews Deposition), at pp. 183-184; Appendix 6 (Hernandez Deposition), at pp. 220, 227 and Appendix 7 (Hernandez Deposition), at p. 237; Appendix 10 (Tankersley Deposition), at p. 362, 370; Appendix 3 (Donald Allen), at p. 73; Appendix 3 (Branham Depo), at p. 118 and Appendix 4 (Branham Deposition), at p. 119 and 135-136; Appendix 8 (Patin Deposition), at p. 287; Appendix 8 (Pena Deposition), at pp. 298-299.

[75] Appendix 13, (Declaration of Raleigh Parker, ¶ 5), at p. 470.

16

38.    Sometimes Field Service Employees are called upon to load an $N_2$ transport with liquid nitrogen, a chemical requiring hazardous material placarding under DOT regulations.[76]

39.    Typically, the Service Coordinator or SS completes and signs a document called a "Material Loading and Shipping Instruction" (or "Shipping Document"), which reflects the individual(s) who loaded the vehicles and which vehicles were loaded for a job.[77]

40.    Once in the field, the Field Service Employees use the equipment, chemicals, and tools brought to the well site to service the customer's wells.  Field Service Employees are required to backload the equipment they unloaded and used into the vehicles before returning to the shop.[78]

41.    Sometimes a Field Engineer may be assigned to a service crew.[79]  Field Engineer Is are employed to monitor the pressure of coil tubing units.[80]  The primary duty of a Field Engineer I is to observe the use of the coil tubing equipment in the field, record his observations, input the data he collected into the Cerebrus program, and author a field report so that the life of the coil tubing unit could be determined.[81]

---

[76] Appendix 35, (Declaration of Ed Burchfield, at ¶ 22), at p. 1402.
[77] Appendix 19, (Declaration of Houston Frazier, at ¶ 15), at p. 732; Appendix 35, (Declaration of Ed Burchfield, at ¶ 49), at p.1406; Appendix 29, (Declaration of Boudreaux at ¶ 37); Appendix 17, (Declaration of Reyna at ¶ 36); and Appendix 19, (Declaration of Comeaux at ¶ 24).
[78] Appendix 5 (Crews Deposition), at p. 189; and Appendix 10 (Tankersley Deposition), at p. 365.
[79] Appendix 35, (Declaration of Ed Burchfield, at ¶ 28), at p. 1403.
[80] *Id*. at, ¶ 33.
[81] Appendix 10 (Sheikh Deposition), at pp. 352-353, Appendix 7 (Letchworth Deposition), at p. 255.

1595889.1/006625.000031

42.     The Field Engineer I position requires advanced knowledge in the field of petroleum engineering.[82] Before working for CTS, Plaintiff Sheik obtained a Bachelor of Science degree with a major in petroleum engineering and minor in mathematics from University of Louisiana Lafayette.[83] In order to carry out their job duties, Field Engineer Is are expected to travel with personal protective gear and well-monitoring tools and equipment to the customer well sites in a CTS pickup truck.[84] Field Engineer Is are required to drive to the customer well site regardless of where it is located or if it requires the Field Engineer I to travel interstate.[85]

43.     When the Angleton, Bridgeport, and Broussard District Managers interview applicants and hire new Field Service Employees, they explain to them that they may be required to drive interstate to do their jobs.[86] Further, when the Alice District Manager interviews applicants and hires new Field Service Employees, he explains to them that the Alice District assists, when needed, its sister districts in Texas as well as those districts outside of Texas.[87]

44.     Throughout the Relevant Period, all Service Coordinators, Service Supervisors, Service Technicians, and Field Engineer Is were paid on a salary basis that exceeded $455.00/week.[88] All Service Coordinators, Service Supervisors, Service

---

[82] Appendix 10 (Sheikh Deposition), at p. 351and 355 (Depo. Exhibit – Job Description for Field Engineer I).
[83] Appendix 10 (Sheikh Deposition), at p. 350-351.
[84] *Id*. at, ¶ 30.
[85] *Id*. at, ¶ 29; Appendix 34, (Declaration of Travis Gortmaker, at ¶¶ 5, 6).
[86] Appendix 35, (Declaration of Burchfield at ¶ 71); Appendix 29, (Declaration of Boudreaux at ¶ 55), at p. 1199; Appendix 19, (Declaration of Comeaux at ¶ 33), at p. 741-A.
[87] Appendix 17, (Declaration of Reyna Declaration at ¶ 50), at p. 651.
[88] Appendix 41, (Declaration of Tiffany Letchworth, at ¶ 19), at p 1633.

18

Technicians, and Field Engineer Is received their full salary without reduction based on quality or quantity of their work.[89]

45.   A Service Coordinator's primary duties were to field service calls from customers and assign available equipment and personnel based on the scope of the service job.[90]   In filling customer service orders, the Service Coordinator decides what equipment and personnel are needed to complete a job.[91]   The Service Coordinator assigns the requisite crew members and equipment to the job and prepares the job packet that details the scope of the job.[92]   In the event the requisite crew and equipment are not available at the Service Coordinator's district, the Service Coordinator may decide to refer the job to another CTS district.[93]

46.   Plaintiff Henderson was employed as a Service Supervisor from May 15, 2006, through March 13, 2007.[94]

47.   In 2006, Gary Henderson's annual compensation, including his base salary, allowances, bonuses, and per diems totaled $117,636.53.[95]   During the less than 3 months Gary Henderson worked for CTS in 2007, his compensation, inclusive of base salary, allowances, bonuses, and per diems totaled $25,609.98.   Henderson's total compensation for 2007 annualized to over $100,000.[96]

---

[89] *Id.*
[90] Appendix 6 (Henderson Deposition), at pp. 197-199; Appendix 12, (Declaration of Hudson Wise, at ¶ 26), at p. 459; Appendix 7 (Letchworth Deposition), at pp. 267-270 (Deposition Exhibit 26); Appendix 8, (McLeod Deposition), at pp. 278-280, pp. 281-282.
[91] Appendix 12, (Declaration of Hudson Wise, at ¶ 26), at p. 459; Appendix 8 (McLeod Deposition), at pp. 278-279.
[92] *Id.*
[93] Appendix 12, (Declaration of Hudson Wise, at ¶ 27), at p. 459.
[94] Appendix 41, (Declaration of Tiffany Letchworth, at ¶ 18), at p. 1633.
[95] *Id.*, at ¶18, at p. 1633.
[96] *Id.*, at ¶ 18, at p. 1633.

48. A primary duty of SSs, including Gary Henderson, is to direct the work of two or more full-time CTS employees in the field.[97]   SSs have the authority to make recommendations regarding the hiring, firing, advancement, and promotion of other employees.[98]

49. Because the District Managers rarely observe employees while they are working in the field (including offshore jobs when applicable), when making decisions regarding hiring, termination, promotion, demotion, discipline, and/or advancement, the District Managers rely on and give significant weight to the suggestions, observations, recommendations, and assessments of the Service Supervisors who observe the work in the field first-hand.[99]   Because the SSs are their only avenues to evaluating the job performance of employees who work primarily in the field, before completing a job performance review for a field service employee, District Managers consult with the SS to get their feedback on the employee's performance and recommendations as to promotions and pay increases.[100]

## V.   LAW AND ARGUMENT

   A.   **Defendant is entitled to judgment as a matter of law on Field Service Employees' claims for overtime wages under the FLSA because they qualify for the Motor Carrier Act exemption.**

---

[97] Appendix 6 (Henderson Deposition), at p. 205; Appendix 12, (Declaration of Hudson Wise, at ¶¶ 21-23), at p. 458; and Appendix 7 (Letchworth Deposition), at 248 and pp. 267-270 (Depo. Exhibit 26); Appendix 1 (Byron Allen Deposition), at pp. 8-10; Appendix 5 (Crews Deposition), at pp. 190-191; Appendix 3 (Donald Allen), at p. 81, Appendix 8 (Pena Deposition), at. pp. 296, 302.

[98] Appendix 35, (Declaration of Ed Burchfield, at ¶ 7), at p. 1398; Appendix 6 (Henderson Deposition), at pp. 200-204 and pp. 207-210; Appendix 12, (Declaration of Hudson Wise, at ¶ 24), at p. 459; Appendix 7, (Letchworth Deposition), pp. 241-243 and pp. 267-270 (Deposition Exhibit 26).

[99] Appendix 35, (Declaration of Ed Burchfield, at ¶ 7), at p. 1398.

[100] *Id.*

The FLSA establishes a general rule that requires employers to compensate any employee "at a rate not less than one and one-half times the regular rate at which he is employed" for the time worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). 29 U.S.C. § 213(b)(1) provides an exemption from the § 207(a)(1) maximum hours/overtime provisions of the FLSA.  29 U.S.C. § 213(b)(1) exempts an "employee with whom the Secretary of Transportation has <u>power</u> to establish qualifications and maximum hours of service pursuant to the provisions of section 204 of the Motor Carrier Act of 1935."  29 C.F.R. § 782.1(a) (emphasis added); *see also* 29 U.S.C. § 213(b)(1); 49 U.S.C. § 31502(b)(1).[101]   The application of the MCA exemption to an employee "depends both on the class to which his employer belongs and the class of work involved in the employee's job."  29 C.F.R. § 782.2(a).

The Secretary has the power to establish maximum hours and qualifications of service to those classes of employees who:

> (1) Are employed by carriers whose transportation of passengers or property by motor vehicle is subject to the jurisdiction under section 204 of the Motor Carrier Act . . . and (2) engage in activities of a character directly affecting the safety and operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

29 C.F.R. § 782.2(a).

It is well established that "[t]he Secretary . . . need only possess the power to regulate the employees at issue; it need not actually exercise that power for the [MCA] exemption to apply."  *Songer v. Dillon Resources Inc.*, 618 F.3d 467, 472 (5th Cir. 2010)

---

[101] Section 204 of the Motor Carrier Act is codified at 49 U.S.C. § 31502.

(*quoting Barefoot v. Mid-America Dairymen, Inc.*, 1994 WL 57686, at *2 (5th Cir. 1994) (per curiam) (*citing Levinson v. Spector Motor Serv.*. 330 U.S. 649, 678, 67 S.Ct. 931, 91 L.Ed. 1158) (1947))); *see also Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 47 (1943).

In determining whether the MCA exemption applies, the first inquiry is whether the employee "[is] employed by carriers whose transportation of property by motor vehicle is subject to" the jurisdiction of the Secretary of Transportation. 29 C.F.R. § 782.2(a)(1).[102] The next inquiry is whether the affected employees "engage in activities that directly affect the operational safety of motor vehicles in the transport of property in interstate commerce" as defined by the MCA. 29 C.F.R. § 782.2(a)(2) (*citing United States v. American Trucking Ass'ns*., 310 U.S. 534, 553 (1940)). For instance, drivers, driver's helpers, and loaders are among the classes of workers that affect safety. 29 C.F.R. § 782.2(b)(1) (citing *Pyramid Motor Freight Corp. v. Ispass,* 330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184 (1947); *Levinson v. Spector Motor Service,* 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158 (1947); *Morris v. McComb,* 332 U.S. 442, 68 S.Ct. 115, 92 L.Ed. 59 (1947). In determining whether a specific employee falls within an exempt class, neither the title of the position or name given to the duties is controlling. 29 C.F.R. § 782.2(b)(2) (citing *Pyramid*, 330 U.S. at 707). Instead, the character of the duties involved in the performance of the job are determinative. 29 C.F.R. § 782.2(b)(2).

### 1.    CTS is a motor private carrier

A "motor private carrier" is defined as:

---

[102] Here, Bellwether Plaintiffs admit that CTS is actually regulated by the U.S. Department of Transportation and actually regulated by the Secretary of Transportation as an interstate motor carrier. *See* Appendix 29, (Plaintiffs' Supplemental Response to Request for Admission No. 3 and Second Supplemental Response to Request for Admission No. 6).

22

a person, other than a motor carrier, transporting property by motor vehicle when—

(A) the transportation is as provided in section 13501 of this title;[103]

(B) the person is the owner, lessee, or bailee of the property being transported; and

(C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise. 49 U.S.C. § 13102(15).

CTS indisputably qualifies as a "motor private carrier." As established by the record, CTS transports CTS-owned property across state lines in furtherance of CTS' commercial enterprise of providing coil tubing services to its customers.[104] Indeed, Plaintiffs admit CTS satisfies this first prong of the MCA exemption test.[105] Field Service Employees are tasked with the duty to transport the property owned by CTS to service oil and gas wells for CTS customers in 18-wheel tractor-trailers.[106] SSs generally operate a CTS pickup truck, such as a F-350, with permanently affixed 90-gallon

---

[103] Section 13501 provides, in pertinent part, that the [Secretary has] jurisdiction over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier between a place in a State and a place in another State.

[104] See Facts Nos. 19, 26-28, Appendix 19, (Declaration of Houston Frazier, at ¶¶ 6, 8-10, 12-13), at pp. 731-732; Appendix 12, at p. 435 (Plaintiffs' Second Supplemental Response to Request for Admission No. 14); Appendix 8 (Ritter Deposition), at pp. 314-315; Appendix 4 (Burchfield Deposition), at p. 149 (pp.25-27); Appendix 22, (Declaration of Tammy Labit, at ¶¶ 4, 6, 9-11), at p. 895.

[105] Appendix 12, at p. 425 (Plaintiffs' Response to Interrogatory No. 3) and 426 (Plaintiffs' Response to Interrogatory No. 6); Appendix 12, at pp. 430-435 (Second Supplemental Response to Requests for Admission Nos. 7-12). In an abundance of caution and because Defendant bears the burden of proof on this issue, Defendant discusses the evidence establishing it as motor private carrier in detail here in the event Plaintiffs challenge that conclusion despite their admission.

[106] See Fact Nos. 17-18, 34, 36; Appendix 1 (Byron Allen Deposition) at pp. 2, 13, and 17; Appendix 2 (Donald Allen Deposition), at pp. 59, 65, 68 and Appendix 3 (Donald Allen Deposition), at pp. 72, 79; Appendix 3 (Branham Deposition), at p. 107; Appendix 4 (Cantu Deposition), at pp. 154, 156-157 and Appendix 5 (Cantu Deposition), at p. 161; Appendix 6 (Hernandez Deposition), at pp. 222-225; Appendix 7 (Letchworth Deposition), at pp. 248-250, and 258-270 (Deposition Exhibits 23-26); Appendix 8 (Pena Deposition), at pp. 293-295; Appendix 10 (Tankersley Deposition), at p. 361; Appendix 35, (Declaration of Ed Burchfield, at 18, 20), at p.1401; Appendix 29, (Declaration of Barry Boudreaux, at ¶14); (Declaration of Appendix 17, Reyna, at ¶15), at p. 644; and Appendix 22 (Declaration of Russell Robison, at ¶12), at p. 925; Appendix 11 (Washington Deposition), at p. 385. Appendix 14, (Declaration of Louvy LeJeune, at ¶¶ 5-7, 10), at p 519; Appendix 19, (Declaration of Houston Frazier, at ¶ 4), at p. 731.

auxiliary tanks to mobilize tools, auxiliary fuel to run the well-servicing equipment, and/or other necessary equipment to a job site.[107]   Finally, the Field Engineer I assigned to a service job transports CTS-issued personal protective gear and well pressure-reading equipment and tools to the customer well sites in a CTS pickup truck.   Thus, CTS routinely transports CTS-owned property in motor vehicles in furtherance of CTS' commercial enterprise of providing oil and gas well services to its customers.   Indeed, this field service is the primary way CTS generates revenue.

The undisputed facts also establish that CTS transports its property <u>interstate</u> in furtherance of its commercial enterprise.[108]   It is undisputed that during the Relevant Period, CTS has provided coil tubing services in Texas, Louisiana, Oklahoma, Colorado, Utah, Wyoming, New Mexico, Alabama, Mississippi, Pennsylvania, Florida, and Nevada.[109]   From 2006-2008, CTS Field Service Employees drove CTS 18-wheelers carrying CTS-owned oilfield equipment thousands of miles in New Mexico, Alabama, Utah, Mississippi, Colorado, Oklahoma, and Idaho, seven states in which CTS has never established a District Office. [110]   This evidence alone is sufficient to establish that CTS is indeed a motor private carrier.

If the above were not enough, other undisputed facts in this case further evidence that CTS is a motor private carrier engaged in interstate commerce.   For instance, the

---

[107] *See* Facts Nos. 34-35; The pickup trucks modified with the auxiliary tank have a gross combination weight and GCWR greater than 10,001 lbs.   *See* Appendix 14, (Declaration of Louvy LeJuene, at ¶ 8), at p. 519.

[108] *See* generally Facts Nos. 19, 26-28.   *See also* Appendix 12, (Declaration of Joey Perez, at ¶¶ 15-16), at p. 443; Appendix 12, (Declaration of Juan Vasquez, at ¶ 14), at p. 447; Appendix 12, (Declaration of Doug Burroughs, at ¶¶ 14, 16), at pp. 466-67; Appendix 12, (Declaration of Joe Dorsey, at ¶¶ 13-14), at p. 451; Appendix 12, (Declaration of Luis Escobedo, at ¶¶ 4, 14-16), at pp. 438-39; Appendix 12, (Declaration of Mark Biggs, at ¶¶ 13-19), at pp. 462-63.

[109] *See* Fact No. 26; Appendix 12, at Plaintiff's Second Supplemental Response to Request for Admission No. 14.

[110] *See* Fact No. 28; Appendix 22, (Declaration of Tammy Labit at ¶¶ 9-11), at pp. 895-96.

24

U.S. Department of Transportation ("DOT") has classified CTS as a commercial motor carrier engaging in interstate operation carrying oilfield equipment and each CTS district has registered its commercial motor vehicles with the DOT.[111]   During the relevant period, each CTS district had mechanisms in place to quickly and lawfully be able to operate its commercial motor vehicles in states other than the one in which they are registered.[112]   Finally, CTS Districts routinely record their fuel and mileage data so that CTS may file quarterly IFTA Reports with the Louisiana Department of Revenue.[113] CTS undertakes this additional work and expense because CTS' business model is that it will fulfill any coil tubing service job regardless of where the well is located.[114]

It cannot be disputed that CTS holds itself out to be an interstate business, solicits coil tubing service jobs in states in which it does not have a service district, and actually services jobs in states in which it does not have a service district or that requires one or more field service crews to travel across state lines.[115]   Accordingly, CTS is a motor private carrier, satisfying the first prong of the MCA exemption test.

### 2. Field Service Employees engaged in activities that directly affected the safe operation of motor vehicles in interstate transportation.

Since CTS is unquestionably a motor private carrier, it must simply establish that the employees over whom it asserts the exemption substantially affect the safe operation

---

[111] *See* Fact No. 25; Appendix 14, (Declaration of Louvy LeJeune at ¶¶ 4, 12).

[112] *See* Fact No. 27; Appendix 29, (Declaration of Barry Boudreaux, at ¶ 53), at p. 1199; Appendix 35, (Declaration of Ed Burchfield, at ¶ 69), at p. 731.

[113] Appendix 22, (Declaration of Tiffany Labit at ¶ 4), at p. 894-96.

[114] Appendix.19, (Declaration of Houston Frazier at ¶ 7), at p. 731.

[115] Fact Nos. 19, 26-28.  Indeed, this is precisely why CTS has specific policies devoted to the safe operations of motor vehicles, including a policy regarding stopping on the highway.  Appendix 13, Declaration of Raleigh Parker, at Exhibit A, at CTS12062-12063.  Further, sometimes the Field Service Employees are required to work on the vehicles while in transport.  Appendix 5 (Cantu Deposition), at pp. 168-169.

of motor vehicles in interstate commerce.  To establish that fact, the pertinent inquiry "is whether an employee performs *any duties which substantially affect the safety of operation, rather than whether the duties affecting the safety are substantial*."  *Levinson*, 330 U.S. at 656 (citations omitted)(emphasis supplied).

"'As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is (or ... is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities of the character described in paragraph (b)(2) of this section' -i.e. 'activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce' – 'he comes within the exemption in all workweeks when he is employed at such job.' " *Garza v. Smith Intern., Inc.*, 2011 WL 835820, *5 (S.D. Tex. March 7, 2011) (*quoting* § 782.2.(b)(3)) (emphasis in the original). " '[T]he rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting safety of operation.' " *Id.*

As already stated, Field Service Employees, including Bellwether Plaintiffs, are employed to transport CTS property (specialized oilfield equipment, chemicals, fuel, protective gear, etc.) to customer well sites in the field.[116]  Once a service job is accepted by a CTS district, the assigned CTS field service crew (1) loads the equipment,

---

[116] *See* Fact Nos. 17, 22.

chemicals, and requisite tools onto one or more CTS vehicles;[117] (2) ensures that the load is secure and that the vehicle is fit for driving;[118] (3) drives the vehicle(s) over public highways to the customer's well site;[119] (4) operates the equipment in the field,[120] (5) backloads the equipment and tools onto the CTS vehicle(s);[121] (6) again ensures that the load is secure and that the vehicle is fit for driving;[122] and (7) drives back to the CTS facility.   Accordingly, Field Service Employees' job duties qualify them as drivers, driver's helpers, and/or loaders.   Further, in order to carry out their job duties, Field Engineer Is are expected to travel with personal protective gear and well monitoring tools and equipment to the customer well sites in a CTS pickup truck.[123]   Accordingly, the Field Engineer Is' job duties qualify them as drivers.

> a) **Field Service Employees were at all times actually engaged in or were subject to being called on to drive CTS equipment and property across state lines, thereby affecting the safe operation of motor vehicles in interstate travel.[124]**

A "driver" as defined for purposes of the MCA is "an individual who drives a motor vehicle in transportation . . . in interstate or foreign commerce." 29 C.F.R. § 782.3. "This definition does not require that the individual be engaged in such work at all times; it is recognized that even full-duty drivers devote some of their working time to activities

---

[117] *See* Fact Nos. 33, 36.
[118] *See* Fact No. 37.
[119] *See* Fact Nos. 17, 34.
[120] *See* Fact Nos. 35, 40.
[121] *See* Fact No. 41.
[122] *See* Fact No. 37.
[123] *See* Fact No. 42.
[124] CTS acknowledges that certain plaintiffs, including Plaintiffs Broussard and Newman, who worked out of the Broussard District were primarily assigned to perform offshore jobs.  CTS has addresses their claims in Defendant's Memorandum in Support of its Motion for Summary Judgment on FLSA Exemptions (Broussard).

other than such driving." 29 C.F.R. § 782.3.  The definition includes relief drivers and those who help with loading, unloading, and similar work.  *Id.*

It is difficult to conceive of a job duty that has a more significant or substantial effect on highway safety than a driver.[125]  Accordingly, courts have consistently held that drivers in interstate commerce affect the safe operation of motor vehicles.  "Highway transportation by motor vehicle from one State to another, in the course of which the vehicles cross the state line, clearly constitutes interstate commerce under both [the FLSA and MCA].  Employees of a carrier so engaged, whose duties directly affect the safety of operation of such vehicles, are within the exemption. . ."  29 C.F.R. § 782.7(b)(l).  *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 708 (1947) ("It is obvious that one who drives a vehicle in interstate commerce directly affects the safety of such operations as long as he is driving.").

With respect to whether drivers affect the operational safety of motor vehicles "in transport of property in interstate commerce," it is the <u>possibility</u> of being called on to travel interstate as part of one's ongoing job duties that is determinative of FLSA exemption.  *Songer*, 618 F.3d at 473-476 (emphasis supplied); *see also Starrett v. Bruce*, 391 F.2d 320 (C.A.Okl. 1968), at 323 (holding that driver working for employer who held itself out to the general public as being available for interstate business but had derived no income from interstate business was exempt from the FLSA based on possibility of driver being required to travel interstate); *Elliot v. Dave Ernstes & Sons*

---

[125] Indeed, this is precisely why CTS has specific policies devoted to the safe operations of motor vehicles, including a policy regarding stopping on the highway.  Appendix 13, Declaration of Raleigh Parker, at Exhibit A, at CTS12062-12063, (Appendix 13, pp. 492-93).  Further, sometimes the Field Service Employees are required to work on the vehicles while in transport.  Appendix 5 (Cantu Deposition), at pp. 168-169.

*Trucking*, 2006 WL 2849705, \*4 (S.D. Ind. 2006); *Johnson v. HIX Wrecker Svc.,* Inc.,
2009 WL 1748104 (S.D. Ind. June 18, 2009); *Garza*, 2011 WL 835820 at \*11
("[W]hether the MCA exception applies depends on whether an employee '<u>can be
reasonably expected to perform interstate transport</u>'. . .").  Stated simply, it is not the
Plaintiff's actual individual experience during their employment that is determinative; the
issue is what was reasonably expected.  Thus, Courts have found employees who
themselves <u>never drove interstate</u> to be exempt under 29 U.S.C. §213(b)(1); *See Johnson*
and *Garza*, *supra*.

      CTS Field Service Employees are exempt drivers.  Plaintiffs admit that driving is a
necessary job duty of CTS Field Service Employees.[126]  Further, as established by the
undisputed facts, a primary and integral job duty of CTS Field Service Employees is to
transport CTS property to and from customer well sites.[127]  Further, all CTS Field Service
Employees are expected to transport, i.e. "mobilize," CTS equipment, chemicals, and
tools by driving coil tubing units, pump trucks, N2 transports, crane trucks, or pickup
trucks to the customer's well wherever it may be located.[128]  A Service Supervisor
typically drives a pickup truck, followed by the rest of the Field Service Employees in the

---

[126] Appendix 6, (Hernandez Deposition), at p. 226, Appendix 4 (Cantu Deposition), at pp. 153-154 and Appendix 5 (Cantu Deposition), at p. 162.
[127] *See* Fact Nos. 16-18.
[128] *See* Fact No. 128.  Appendix 1 (Byron Allen Deposition), at p. 13, Appendix 4 (Cantu Deposition), at pp. 155-156, Appendix 5 (Crews Deposition), at pp. 178-181, Appendix 10 (Tankersley Deposition), at pp. 358, 360, 362, 375-376, and 379.  Indeed, generally when the Angleton, Bridgeport, and Broussard District Managers interview applicants and hire new Field Service Employees, they explain to them that they may be required to drive interstate to do their jobs. Appendix 35, (Declaration of Burchfield at ¶ 71), at p. 1412-A; Appendix 29, (Declaration of Boudreaux at ¶ 55), at p.1199; Appendix 19, (Declaration of Comeaux at ¶ 34), at p. 741-A.  Further, when the Alice District Manager interviews applicants and hires new Field Service Employees, he explains to them that the Alice District assists, when needed, its sister districts in Texas as well as those districts outside of Texas. Appendix 17, (Declaration of Reyna at ¶ 50), at p. 651.

18-wheel tractor-trailers.[129]  The vehicles operated by the Field Service Employees are commercial motor vehicles, most of which require the operator hold a CDL.  Indeed, Field Service Employees are required to obtain a CDL or CDL permit in order to work as a CTS service technician.[130]  Further, pursuant to DOT regulations and CTS requirements, before leaving the shop (and again before leaving the job site) the crew performs pre-trip inspections to ensure that each vehicle's load is secure and that the vehicle is otherwise fit for safe operation on the public highways.[131] Indeed, before operating a CTS vehicle on the highway, CTS Field Service Employees are expected to perform a DOT inspection and complete a DOT inspection report in order to ensure safe operation of the vehicle.[132] Accordingly, the Field Service Employees, are employed in positions that affect the operational safety of motor vehicles on public highways in interstate commerce.

Finally, the record in this case establishes that CTS' Field Engineer Is and Field Service Employees, including Bellwether Plaintiffs, are "drivers" in interstate

---

[129] *See* Fact No. 34.

[130] Here, Bellwether Plaintiffs Byron Allen, Alfredo Cantu, Adam Crews, Jesus Hernandez, Jose Pena, Stephen Tankersley, Donald Allen, and Presley Branham held a CDL during the relevant time period.  Further, CTS was assisting Bellwether Plaintiffs Cody Patin with obtaining a CDL and Donald Woodard, who obtained a CDL while employed by CTS, held a Class B license, which allowed him to operate smaller commercial motor vehicles.  *See* Fact No. 24.

[131] *See* Fact No. 37; Appendix 2 (Donald Allen Deposition), at pp. 60, 63, Appendix 3 (Branham Deposition), at p. 106; Appendix 8 (Pena Deposition), at pp. 291-292.

[132] Appendix 13, (Declaration of Raleigh Parker, at ¶5); and sample DOT Inspection Report attached thereto as Exhibit B; Appendix 1 (Byron Allen Deposition), at pp 3, 15, 17; Appendix 3 (Branham Deposition), at p. 118 and Appendix 4 (Branham Deposition) at pp. 119, 135-136; Appendix 5 (Cantu Deposition), pp. 160-161; Appendix 5 (Crews Deposition), at. pp. 183-184; Appendix 6 (Hernandez Deposition), at p. 227 and Section VII (Hernandez Deposition), at p. 237; Appendix 10 (Tankersley Deposition), at pp. 362, 370; Appendix 8 (Patin Deposition), at p. 287; Appendix 8 (Pena Deposition), at pp. 298-299.

commerce.[133]   Field Service Employees are expected to transport CTS property across

state lines.[134]   The undisputed facts establish that CTS has actually serviced a number of

jobs that required its Field Service Employees to transport CTS property across state

lines.   Indeed, a total of approximately 7% of all of the land jobs and over 11% of the

offshore jobs during the relevant time period required one or more service crews to

mobilize coil tubing equipment across state lines.   Moreover, 5.28% of the land jobs

serviced by CTS during the relevant time period were performed in states in which CTS

does not have a service district.[135]   Necessarily, to service such a job, the assigned Field

Service Employees are required to transport CTS property interstate.   Since interstate

jobs are assigned indiscriminately, any single CTS Field Service Employee, including

Plaintiffs, could have been assigned to such a job and required to drive interstate.

Finally, if one district needs to borrow or pickup equipment from another district, Field

Service Employees may be called upon to transport the equipment between the

districts.[136]   Accordingly, there were numerous business purposes for which Plaintiffs

could have been called upon to travel interstate carrying CTS property, and this

possibility alone renders Plaintiffs exempt from overtime pay under the MCA exemption.

---

[133] Plaintiffs Donald Allen, Branham, Cantu, Crews, and Hernandez admit that they have been called upon to service jobs requiring that they travel across one or more state lines.  Appendix 1 (Byron Allen Deposition), at pp. 2, 23-27, 28-35; Appendix 5 (Crews Deposition), at pp. 185, 188; Appendix 6 (Hernandez Deposition), at pp. 232-233; Appendix 4 (Branham Deposition), at pp. 120-129, 131-134, 142; Appendix 2 (Donald Allen Deposition), at pp. 63-64, 70-71, 76, and Appendix 3 (Donald Allen Deposition), at pp. 85-90, 93-104; Appendix 11 (Woodard Deposition), at pp. 389-390, 402; Appendix 8 (Pena Deposition), at pp. 302, 305-308.  Further, Plaintiff Hernandez admits that some of his Alice co-workers have been known to drive to Louisiana.  Appendix 6 (Hernandez Deposition), at pp. 230-231.

[134] *See* Fact No. 17.

[135] *See* Fact No. 19.

[136] *See* Fact No. 21.  Appendix 5 (Cantu Deposition), at pp. 170-172.  An example of this is reflected in the driver's logs of Alfred Cantu.  On February 21, 2008, Bellwether Plaintiff Cantu was called upon to make a roundtrip between Angleton, Texas and Broussard, Louisiana, in DOT regulated vehicle 5-9301 with trailer 5-9209. Appendix 35, (Declaration of Ed Burchfield, at ¶ 12), at Exhibit CTS13924.

31

The record firmly establishes the "possibility" of interstate travel required to invoke successfully the MCA exemption. By way of further illustration, Defendant submits the following illustrative list of certain interstate operations during the Relevant Period, which establish that, during the Relevant Period, CTS serviced at least one interstate job every quarter.[137]

### 2005[138]

On or about October 30, 2005, the Broussard District serviced a land job in Woodville, Texas.[139]

On or about December 5, 2005, the Broussard District serviced a land job in Chunchula, Alabama.[140]

### 2006

On or about January 19, 2006, the Broussard District serviced a land job in Victoria, Texas.[141]

On or about April 11, 2006, the Broussard District serviced a land job in Chunchula, Alabama.

On or about May 17, 2006, the Broussard District serviced a land job in Chunchula, Alabama.

In June 2006, the Bridgeport District serviced a job in Washington, Pennsylvania.[142]

---

[137] Appendix 17, pp. 653-655; Appendix 19, pp. 743-757; Appendix 23, pp. 930-969; Appendix 24, pp. 970-1009; and Appendix 25, pp. 1010-1049; Appendix 26, pp. 1050-1089; Appendix 27; pp. 1090-1123; Appendix 30, pp. 1201-1219; Appendix 35, pp. 1414-1423; Appendix 36, pp. 1424-1463; Appendix 37; pp. 1464-1478. This frequency clearly satisfies the DOL's "four-month rule" set forth in its Field Operations Handbook, at §24e01(b), which states employees are exempt for a four-month period beginning with the time they are called, or could have been called to engage in the carrier's interstate activity.

[138] The FLSA provides a period of 2 years "after the cause of action accrued" in which to file a Complaint for overtime wages or liquidated damages. 29 U.S.C. § 255(a). The FLSA limitations period is extended to 3 years for violations that are willful. 29 U.S.C. § 255(a). However, here, there is no evidence that would prove any alleged violations by Defendant of the FLSA were willful. Despite the lack of "willfulness," Defendant submits evidence from November 13, 2005 though November 13, 2006, as illustrative of its interstate operations.

[139] Appendix 19, (Declaration of Randy Comeaux, at ¶ 30), at pp. 741, 741-A.

[140] *Id.*

[141] *Id.*

32

On or about July 18, 2006, the Angleton District serviced a job near Carthage, Texas[143]  Although the customer's well site for both jobs was located in Texas, the field service crew was required to travel for 13 miles in Louisiana, as recorded on the mileage logs filled out by the drivers of the service vehicles.[144]

On or about August 7, 2006, the Bridgeport District serviced a job in Chickasha, Oklahoma.[145]

On or about October 14, 2006, the Bridgeport District serviced a job in Hughes County, Oklahoma.[146]

On or about December 13, 2006, the Angleton District serviced a land job near Opelousas, Louisiana.[147]  A few days later, the same crew who serviced the job in Opelousas, traveled to Masters Creek/Glenmora, Louisiana to service another job before returning to Angleton.[148]

In December 2006, the Alice District loaned equipment and personnel to the Broussard District to service a land job located in St. Claire County, Alabama.[149]

## 2007

In January 2007, the Alice District again loaned equipment and personnel to the Broussard District to service a land job located in St. Claire County, Alabama.[150]

---

[142] Appendix 29, (Declaration of Barry Boudreaux, at ¶37), at p. 1193.  The crew was comprised of 8 members including Plaintiffs Joshua Manuel and Jeremy Bouher and Bellwether Plaintiff Byron Allen.  Bellwether Plaintiff Byron Allen operated truck no. 7-9307 during the drive back from Pennsylvania.

[143] The crew assigned to the July 20, 2006, job includes Plaintiffs Reynaldo Saenz, Christopher Keenom, and Clarence Thomas, and Bellwether Plaintiff Donald Allen. Appendix 35, (Declaration of Burchfield  at ¶ 51), at p. 1406.

[144] Appendix 35, (Declaration of Ed Burchfield, at ¶ 51), at p.1407.

[145] Bellwether Plaintiff Byron Allen was a member of the service crew.  *See* Appendix 29, (Declaration of Boudreaux at ¶ 41), and Exhibit D thereto, at pp. 1194, 1240-1270.

[146] Appendix 29, (Declaration of Barry Boudreaux, at ¶ 42), at p.1194.

[147] Appendix 35, (Declaration of Ed Burchfield, at ¶ 52), at p.1407.  The crew assigned includes Bellwether Plaintiff Presley Branham and Plaintiffs Reynoldo Saenz, Harold Sparks, Israel Molina, and Mark Lefleur.

[148] Appendix 35, (Declaration of Ed Burchfield, at ¶53), at p. 1407.

[149] Appendix 17, (Declaration of Rey Reyna, at ¶39), at p. 648.

[150] Appendix 17, (Declaration of Rey Reyna, at ¶40), at p. 648.

On or about January 10, 2007, the Angleton District serviced a job in Clear Marais, Louisiana.[151]   Within the same week, a separate crew from Angleton serviced a job in Kinder, Louisiana and a third crew serviced a job in Port Barre, Louisiana.[152]   Just three months later, on or about April 8 and 9, 2007, the Angleton District serviced a job in Berwick, Louisiana.[153]

On or about May 20, 2007, the Angleton District serviced a job in Leesville, Louisiana.[154]

On August 3, 2007, an Angleton crew traveled to Logansport, Louisiana to service a job.[155]

In September 2007, the Bridgeport District serviced a job in Mississippi.[156]

On or about September 20, 2007, the Angleton District serviced a job in Kaplan, Louisiana.[157]

On or about October 11, 2007, the Angleton District serviced a job that required travel to Cameron, Louisiana.[158]

On or about December 11, 2007, the Angleton District serviced a job in Leesville, Louisiana.[159]

**2008**

On or about April 2, 2008, the Alice District serviced a job in Calcasieu Parish, Louisiana.[160]

---

[151] Appendix 35, (Declaration of Ed Burchfield, at ¶54), at p. 1408.  The crew assigned includes Plaintiffs Reynaldo Saenz, Adam Crews, Alfredo Cantu, Robert Smith, and Blake Brown.

[152] Appendix 35, (Declaration of Ed Burchfield, at ¶55), at p. 1408.  The crew assigned includes Plaintiffs Christopher Keenom, Leo Jasso, and Devin Bruce.

[153] Appendix 35, (Declaration of Ed Burchfield, at ¶57), at p. 1409.  The crew assigned includes Plaintiffs Rolando Ramirez, Harold Sparks, Jose Flores, Leo Jasso, Mark Broussard, Jesse Gonzalez, Adam Crews, and Antonio Gonzalez.

[154] Appendix 35, (Declaration of Ed Burchfield, at ¶58), at p. 1409.  The crew assigned includes Plaintiffs Reynaldo Saenz, Mark Broussard, Jerome Johnson, Blake Brown, Mark Lafleur, and Bellwether Plaintiffs Donald Allen and Adam Crews.

[155] Appendix 35, (Declaration of Ed Burchfield, at ¶59), at p. 1409.  The crew assigned includes Plaintiffs Juan Lopez, Harold Sparks, Xavier Liguez, Leo Jasso, Mark Lefleur, and Jose Flores.

[156] Appendix 29, (Declaration of Barry Boudreaux, at ¶43), at p. 1495 .  The crew assigned includes Plaintiffs Rogelio Reyes, W. Balderee, Jeffrey Hacker and Bradley Holland.

[157] Appendix 35, (Declaration of Ed Burchfield, at ¶ 60), at p. 1410.  The crew assigned includes Plaintiffs Marcus Tottenham, Leo Jasso, Robert Smith, Charles Morgan, and Blake Brown.  .

[158] Appendix 35, (Declaration of Ed Burchfield, at ¶ 61), at p. 1410.  The crew assigned includes Plaintiffs Rolando Ramirez, Michael Fletcher, Marcus Tottenham, Antonio Gonzalez, and Bellwether Plaintiff Donald Allen.

[159] Appendix 35, (Declaration of Ed Burchfield, at ¶ 62), at p.1410.  The crew assigned includes Plaintiffs Franklin Lucy, Charles Morgan, Rolando Ramirez, Jose Flores and Harold Sparks.

On or about April 7, 2008, the Bridgeport District serviced a job in Oklahoma.[161]

In April 2008, Plaintiffs Steve Castro, Michael Serrata, and Roel "R. D." Galvan traveled to Utah and Rock Springs, Wyoming.[162]

On or about May 1, 2008, the Alice District serviced a job in St. Mary Parish, Louisiana.[163]

On or about March 26, 2008, the Angleton District serviced a job in Vinton, LA.[164]

On or about May 20, 2008, the Angleton District serviced a job in Carthage, Texas, which required the crew to travel for approximately 13 miles in the state of Louisiana, as reflected on the mileage logs recorded by the driver of the service vehicles.[165]

On or about June 19, 2008, the Bridgeport District serviced a job in Oklahoma.[166]

On or about June 26, 2008, the Bridgeport District serviced a job in Oklahoma.[167]

On or about July 7, 2008, the Alice District serviced a job in Pineville, Louisiana.[168]

On or about July 15, 2008, the Alice and Bridgeport Districts together serviced a job in Oklahoma.[169]

On or about July 21, 2008, the Alice District serviced a job in Jefferson Davis Parish, Louisiana.[170]

---

[160] The crew assigned includes Plaintiffs Cosme Ramirez, and Jamie Bazan. Appendix 17, (Declaration of Reyna at ¶41 and Exhibit E thereto), at pp. 648, 693-718.

[161] Appendix 29, (Declaration of Barry Boudreaux, at ¶49), at p.p. 1197-98. The crew assigned includes Plaintiffs Bradley Holland, David Henson, Jerry Pike and Mark Biggs.

[162] Appendix 17, (Declaration of Rey Reyna, at ¶42).

[163] Appendix 17, (Declaration of Rey Reyna, at ¶43). The crew assigned includes Plaintiffs Mark Saenz, Trevor Benjamin, and Alejos Curiel.

[164] Appendix 35, (Declaration of Ed Burchfield, at ¶63), at pp. 1410-11. The crew assigned includes Plaintiffs Anthony Dean, Franklin Lucy, Brenton Slusser, Odell Godfrey, and Bellwether Plaintiff Adam Crews.

[165] Appendix 35, (Declaration of Ed Burchfield, at ¶64), at p. 1411. The crew assigned includes Plaintiffs Reynaldo Saenz, John Thomas, Robert Smith, Alfredo Medrano, Nicholas Flores, and Bellwether Plaintiff Adam Crews.

[166] Appendix 29, (Declaration of Barry Boudreaux, at ¶45), at p. 1196. The crew assigned includes Plaintiffs Goodwin Balderee, Tony Boykin, Donald Whitt and Deon Sharp.

[167] Appendix 29, (Declaration of Barry Boudreaux, at ¶46), at p. 1196. The crew assigned includes Plaintiffs Lewis Gamble, Donald Whitt, Eric Ortiz, and Deon Sharp.

[168] Appendix 17, (Declaration of Rey Reyna, at ¶44), at p 649. The crew assigned includes Plaintiffs R. D. Galvan, and Michael Serrata.

[169] Appendix 29, (Declaration of Barry Boudreaux, at ¶47), at pp. 196-97; Appendix 17 (Declaration of Rey Reyna, at ¶45), at p. 650. The crew assigned includes Bellwether Plaintiff Jose Pena and Plaintiffs Eddie Gonzalez, Nicholas Flores, Jesus Hernandez, and Cosme Ramirez.

On or about July 21, 2008, the Bridgeport District serviced a job in Oklahoma.[171]

On or about August 8, 2008, the Bridgeport District serviced a job in Oklahoma.[172]

On or about August 22, 2008, the Angleton District serviced a job requiring travel to Fourchon, Louisiana.[173]

On or about September 18, 2008, the Bridgeport District serviced a job in Oklahoma.[174]

On or about October 15, 2008, the Alice District serviced a job in Cleveland, Oklahoma.[175]

On or about October 19, 2008, less than one month before Plaintiffs initiated this lawsuit, the Angleton District serviced a job in Caddo Parish, Louisiana and a job in Dequincy, Louisiana.  Two separate crews were assigned to these two jobs.[176]

As demonstrated by the record evidence, CTS had far more than a hypothetical expectation that its Field Service Employees would transport via motor vehicle CTS property interstate.  The above interstate activity, as well as the Declarations of Joey Perez, Luis Escabedo, Juan Vasquez, Doug Burroughs, Joe Dorsey, Hudson Wise, and Travis Gortmaker, which show CTS interstate activity, and the additional interstate jobs not mentioned above, but found in the Load Out Tickets attached to the Declarations of Ed Burchfield, Barry Boudreaux, Rey Reyna, Russell Robison, and Randy Comeaux,

---

[170] Appendix 17, (Declaration of Rey Reyna, at ¶46), at pp. 1197-98.

[171] Appendix 29, (Declaration of Barry Boudreaux, at ¶48), at p. 1197.  The crew assigned includes Plaintiffs Mark Biggs, Donald Whitt, and Bruce Talley.

[172] Appendix 29, (Declaration of Barry Boudreaux, at ¶49), at pp. 1197-98.  The crew assigned includes Plaintiffs Mark Biggs, Bradley Holland, David Henson, and Jerry Pike.

[173] Appendix 35, (Declaration of Ed Burchfield, at ¶65), at p. 1411.  The crew assigned includes Plaintiffs Mark Broussard, Christopher Keenom, Kurt Sptizenberger and Bellwether Plaintiffs Alfredo Cantu, Donald Woodard, and Steve Tankersley.

[174] Appendix 29, (Declaration of Barry Boudreaux, at ¶52), at pp. 1198-99.  The crew assigned includes Plaintiffs Mark Biggs, Matt Lynn, and Tony Davis.

[175] Appendix 17, (Declaration of Rey Reyna, at ¶47), at p. 651.  The crew was comprised of Plaintiff Trevor Benjamin, Plaintiff Cosme Ramirez, and Richard Goldman.

[176] Appendix 35, (Declaration of Ed Burchfield, at ¶¶ 66-67), at p. 1411-12.  The crew assigned to the Caddo Parish job includes Plaintiffs Nahum Moscot, Jerome Johnson, Brian Springer, Paul Henderson, Marcus Tottenham, Keith Haynie and Bellwether Plaintiffs Presley Branham, Donald Woodard, and Cody Patin.  The crew assigned to the Dequincy job includes Plaintiffs Reynaldo Saenz, John Thomas, Leo Jasso, Robert Smith, Juan Tobar, Xavier Liguez, and Mark Lafleur.

unequivocally establish that any one of CTS' Field Service Employees could reasonably be expected to drive a CTS 18-wheeler carrying CTS property across a state line.  Thus, the MCA exemption applies to those individuals and precludes their claims to overtime.[177]

><b>b)</b>    <b>Field Service Employees performed the functions of a loader, thereby substantially affecting the safe operation of motor vehicles in interstate travel.</b>

The Secretary of Transportation's authority extends to "employee[s] of a motor private carrier whose duties include loading and unloading motor vehicles 'so that they may be safely operated on the highways of the country,' " commonly known as "loaders."  *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 904 (6th Cir. 2002) (*quoting* 29 C.F.R. § 782.5(a), *and citing Levinson,* 330 U.S. at 673).   An employee qualifies as a loader if he "has responsibility when ... motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or *securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate ... commerce will not be jeopardized*."  *Id.* (*quoting* 29 C.F.R. § 782.5(a))(emphasis supplied).  To qualify as a loader, an employee "need not devote all or even the majority of their time to safety-affecting activities"-rather, "it is enough that a loader devote a substantial part of his time

---

[177] In *Harshman v. Well Service, Inc.*, 248 F. Supp. 953 (D.C. Pa. 1964), the district court found that employees performing precisely the types of duties Field Service Employees were required to perform to be barred from recovery of overtime pay under the FLSA.  The defendant employer in *Harshman* was engaged in the business of servicing and repairing oil and gas wells.  *Id.* at 954.  Indispensable to the primary service defendant provided to its customers was heavy equipment transported by plaintiff employees to the job sites.  *Id.* at 955.  The Court found that the duties the employees performed, including transporting, loading, unloading, and reloading portable job equipment, were duties that substantially affected the safety of operation of motor vehicles. *Id.* at 959.  Thus, this issue has been decided in favor of employers like CTS before and should apply here to eliminate Plaintiffs' claims for overtime.

to activities affecting the safety of operation." *Troutt v. Stavola Bros., Inc.*, 107 F.3d 1104, 1107 (4th Cir.1997) (citing *Levinson*, 330 U.S. at 674, 681).

CTS Field Service Employees fall within a class of employees exempted under the MCA exemption, because each was a "loader" as defined by 29 C.F.R. § 782.5, and thus are not entitled to overtime pay.  Each member of a field service crew is expected to load the coil tubing equipment, chemicals (such as liquid nitrogen and friction reducer), fuel, and tools needed for a service job onto CTS trailers and trucks before departing the shop.[178]  When transporting hazardous materials, the Field Service Employees are also required to ensure the appropriate hazardous materials placards are displayed.[179]  CTS' loading procedures and guidelines are promulgated in CTS' Safety Manual.[180]  CTS provides a copy of this manual to all employees who are expected to load and/or operate CTS vehicles.[181]  Service Technicians do not have the authority to delegate their job duties to their subordinates.  Plaintiffs Jose Pena and Billy Newman deny that they ever delegated their job duties.[182]  Finally, CTS requires its Field Service employees to inspect their vehicles before they drive and <u>secure</u> the load they are carrying.

According to David Hebert, CTS created "Material Loading and Shipping Instructions" to capture information regarding the individual(s) who loaded or shipped equipment from the CTS shops.[183]  A number of the "Material Loading and Shipping

---

[178] *See* Fact No. 33.
[179] Appendix 4 (Cantu Deposition), at pp. 151-152; Appendix 5 (Crews Deposition), at p. 182; Appendix 6 (Hernandez Deposition), at p. 222; Appendix 10 (Tankersley Deposition), at p. 361; Appendix 8 (Patin Deposition), at p. 287.
[180] Appendix 13, (Declaration of Raleigh Parker, at ¶4 and Appendix 13, Exhibit A CTS Safety Manual).
[181] *Id.*, at ¶4.
[182] Appendix 8 (Pena Deposition), at p. 310; Appendix 6 (Newman Deposition), at p. 217.
[183] Appendix 5 (Hebert Deposition), at p. 195 (p. 140).

38

Instructions" reflect that Plaintiff Henderson loaded a CTS or third-party vehicle before it left the shop on several occasions.[184]   Field Service Employees' loading activities is also evidenced by some of the Plaintiffs' DOT driver's logs.[185]

By loading, and perhaps as importantly, securing the specialized equipment, hazardous chemicals, and tools onto the tractor-trailers, undeniably, Plaintiffs' activities when performing this work "affect[ed] safety of operation" of a motor vehicle in interstate commerce.   *See Troutt v. Stavola Bros., Inc.*, 107 F.3d 1104, 1107 (4th Cir. 1997) (*quoting United States v. American Trucking Ass'ns*, 310 U.S. 534, 553 (1940)). Plaintiffs' repeated, self-serving testimony that they disregarded their job duties and never loaded a vehicle with any property belonging to CTS is insufficient to defeat summary judgment.   To find otherwise would have the result of rewarding Plaintiffs for insubordination.[186]   Regardless, even assuming *arguendo* that Plaintiffs did refuse to perform their required loading duties before they left the shop, it is undisputed that Field Service Employees had to backload the equipment they unloaded and used before returning from the job site.[187]   Further, Plaintiffs admit that they routinely performed safety inspections to ensure that the load was secure before departing the shop and again

---

[184] *See* Fact No. 39.
[185] Appendix 35, (Declaration of Ed Burchfield, at Exhibit D), at pp. 1594-98.  As reflected by document labeled CTS17954, Jeff Grizzle noted that he "loaded trucks at Angleton" before he traveled to the docks in Cameron, LA. Further, as reflected by CTS13843, Plaintiff Blake Brown noted "Load check" on his September 26, 2008, driver's logs.
[186] Further, Plaintiffs' contention that they did not load is nonsensical.  Once they used the tools and equipment they transported to the field to perform their service duties, they necessarily had to return the tools and equipment to the trucks and trailers.
[187] Appendix 4 (Cantu Deposition), at pp. 157-158 and Appendix 5 (Cantu Deposition), at pp. 161-164.

before departing the job location.[188]   The securing of a load alone is enough to bring an

employee under the classification of a "loader."   *See* 29 C.F.R. § 782.5.   Therefore, even

if a Plaintiff was not subject to interstate driving, the Field Service Employees undeniably

loaded commercial motor vehicles that were subject to crossing state lines.   Accordingly,

Field Service Employees are loaders with duties that affect the safety of operation and

exempt from the FLSA overtime requirements.   Accordingly, Field Service Employees'

overtime claims fail as a matter of law.

> **3.     Field Service Employees who were subject to being called on to drive CTS property across state lines in non-commercial motor vehicles are properly classified as exempt.**

For the reasons stated in Defendant's Memorandum in Support of its Motion for

Summary Judgment on Broussard Plaintiffs (Defendant's Secondary Motion), and which

are fully incorporated herein by reference, to the extent the Court finds that any Plaintiff

was not expected to operate commercial motor vehicles during the relevant time period,

those Plaintiffs do not have a viable overtime wage claim, if at all, until at least June 6,

2008, when the SAFETEA-LU TCA was enacted.   Furthermore, to the extent the Court

finds that any Plaintiff was expected to operate both commercial and non-commercial

motor vehicles, those Plaintiffs were properly classified as exempt employees under the

MCA exemption during the entirety of the Relevant Period.   *Tidd v. Adecco USA, Inc.*,

2008 WL 4286512 *3-4 (D. Mass. 2008); *Collins v. Heritage Wine Cellars, Ltd.*, 2008

---

[188] Appendix 5 (Cantu Deposition), at p. 159; Appendix 1 (Byron Allen Deposition), at pp. 11-15, 18-20, Appendix 2 (Byron Allen Deposition) at 47; Appendix 5 (Crews Deposition), at pp. 183-184, 192; Appendix 6 (Hernandez Deposition), at pp. 226A, 226B, 227; Appendix 3 (Branham Deposition), at pp. 108-109, 118 and Appendix 4 (Branham Deposition), at pp. 119, 137-141; Appendix 8 (Pena Deposition), at pp. 298-299; Appendix 3 (Donald Allen Deposition), at pp. 82-84; Appendix 10 (Tankersley Deposition), at pp. 363-364; Appendix 11 (Woodard Deposition), at pp. 392-397, 420-421.

WL 5423550, at *19-20, (N.D. Ill. 2008); and *Hernandez v. Brink's, Incorp.*, 2009 WL 113406, at *6 (S.D. Fla. 2009).

**B.    Plaintiff Henderson, as a Service Coordinator, qualified for the Administrative exemption.**

### 1.    The Legal Test for an Exempt Administrative Employee

Section 213(a)(1) of the FLSA provides an overtime pay exemption for any employee employed in a bona fide administrative capacity, as that term is defined in the relevant federal regulations. *See* 29 U.S.C. §213(a)(1). In order to demonstrate that the Service Supervisor and Service Supervisor Trainee positions with CTS were exempt, administrative positions as contemplated by the FLSA, CTS must make three affirmative showings: (1) the employee was paid on a salary basis of at least $455.00 per week; (2) the employee's primary duty consisted of office or non-manual work directly related to the general business operations of CTS; and (3) the employee's duties required the exercise of discretion and independent judgment with regard to matters of significance.

### a)    Plaintiff Henderson Satisfies the Salary-Basis Test

To be exempt under the administrative exemption, the employee must be compensated on a salary or fee basis (as defined in the regulations) at a rate not less than $455 per week. *See* 29 C.F.R. § 541.600, 602. As a general rule, "[a]n employee will be considered to be paid on a 'salary basis' which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602.

41

Plaintiff Henderson was a salaried employee receiving compensation at a rate greater than $455 per week.[189]    Further, Plaintiff Henderson received his full salary without reduction based on the quality or quantity of his work.[190]

### b)    Plaintiff Henderson Satisfies the Primary Duty and Responsibilities Test

In addition to being paid on a salary basis, an exempt administrative employee must have a "primary duty" that consists of the performance of "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," which includes "the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. §§ 541.200; *see Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331 (5th Cir. 2000).  The exercise of independent judgment and discretion involves the consideration and evaluation of possible courses of conduct and taking action or making a decision after the various possibilities have been considered. *See Lott*, 203 F.3d at 331; 29 C.F.R. § 541.202.

Under the pertinent regulations, the term "primary duty" "means the principal, main, major or most important duty that the employee performs," with the major emphasis on the character of the employee's job as a whole.  29 C.F.R. § 541.700. Though the amount of time spent performing exempt work is not the only test for determining an employee's primary duty, generally employees who spend more than 50 percent of their time performing exempt work will satisfy the primary duty requirement. 29 C.F.R. § 541.700(b).  An employee's primary duty "will usually be what [he] does

---

[189] *See* Fact No. 44.
[190] *Id.*

that is of principal value to the employer, not the collateral tasks that [he] may also perform, even if they consume more than half of [his] time." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990).

As a Service Coordinator, Plaintiff Henderson's primary duties consisted of office or non-manual work directly related to the general business operations of CTS, which included work requiring the exercise of discretion and independent judgment. Specifically, Plaintiff Henderson's primary duties were to field service calls from customers and assign available equipment and personnel based on the scope of the service job.[191]   Even if Plaintiff Henderson might have occasionally performed non-exempt duties, it is well settled that employee's primary duties should be determined by comparing the employee's exempt duties with other duties.  *Smith v. City of Jackson*, 954 F.2d 296, 299 (5th Cir. 1992).

The DOL regulations state that "[w]ork directly related to management or general business operations" includes work in such functional areas as filling customer orders. 29 C.F.R. § 541.201(b).   Indeed, the regulations specifically embrace as bona fide administrative employees, i.e., exempt employees, individuals who lead a team of other employees assigned to complete major projects for the employer such as selling or closing all or part of the business.   29 C.F.R. § 541.203(c).   The summary judgment evidence in this case conclusively establishes that the job duties of Service Coordinators, including Plaintiff Henderson, meet the criteria set forth in the FLSA and the U.S. Department of Labor's regulations to qualify an employee for the administrative

---

[191] *See* Fact No. 45.

1595889.1/006625.000031

exemption.[192]   Further, Plaintiff Henderson's own testimony confirms that his principal duties were non-manual in nature and directly advanced CTS' business directives through the functional areas of filling customer orders.   Consequently, Plaintiff Henderson's function satisfies the duties test for the administrative exemption.

> **c)   Plaintiff Henderson Routinely Exercised Independent Judgment and Discretion**

Whether an employee exercises independent judgment and discretion turns on several factors outlined in 29 C.F.R. § 541.202(b):

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact.

* * *

In filling customer service orders, a Service Coordinator routinely considers and evaluates alternative courses of conduct and takes action and makes decisions after considering various possibilities.   For instance, the Service Coordinator decides what equipment and personnel are needed to complete a job, assigns the requisite crew members and equipment to the job, and prepares the job packet that details the scope of the job.[193] In the event the requisite crew and equipment are not available at the Service

---

[192] *Id.*
[193] *See* Fact No. 45.

44

Coordinator's district, the Service Coordinator may make the decision to refer the job to another district.[194]

Plaintiff Henderson's own deposition testimony proves he routinely considered and evaluated alternative courses of conduct and took action and made decisions after considering various possibilities.[195]   Further, as a Service Coordinator, Plaintiff Henderson was expected to assign the equipment and personnel to carry out jobs based on his own determination of the needs of the job and the resources of the district.[196]

Because Service Coordinators, including Gary Henderson, meet the test for the administrative exemption, CTS is entitled to judgment as a matter of law on Plaintiff Henderson's claims for unpaid overtime during the period he was employed as a Service Coordinator.

### C.   Plaintiff Henderson, as an SS, Qualifies for the Executive Exemption.

As already established, Plaintiff Henderson meets the salary-basis and salary threshold requirements of the executive exemption.[197]   A CTS SS's primary duty is to manage the field operations of CTS.   Indeed, the SS's is the highest ranking CTS employee in the field.   As such, they are to provide instructions to the service technicians and answer and questions the service technicians might have.[198]  Further, as established, a service crew routinely consists of two or more STIs and/or STIIs.[199]   Therefore, SSs

---

[194] *See* Fact No. 45.
[195] *See* Fact No. 45.
[196] *See* Fact No. 45.
[197] *See* Fact No. 45.
[198]  Appendix 41, (Declaration of Letchworth at ¶ 18, Appendix 44-45, Exhibit O, at CTS12111, Employee Handbook) at pp. 1618, 1775.
[199] *See* Fact No. 30.

customarily and regularly direct the work of two or more full-time CTS employees.[200] Further, SSs have the authority to make recommendations regarding the hiring, firing, advancement, and promotion of other employees.[201] Indeed, with respect to advancement or disciplinary decisions, District Managers rely on and give significant weight to the suggestions, observations, recommendations, and assessments of the SSs who observe the work in the field first-hand.[202] District Managers consult with the SSs to get their feedback on the employee's performance and recommendations as to promotions and pay increases.[203] Further, if a Service Technician engages in gross misconduct in the field, the SS may terminate that service technician's employment immediately.[204] Accordingly, pursuant to 29 C.F.R. § 541.100, SSs, including Plaintiff Henderson, were properly classified as exempt employees.

### a)   Plaintiff Henderson Was an Exempt Highly Compensated Employee.

Employees with total annual compensation of at least $100,000.00 are exempt as highly compensated employees if they customarily and regularly perform one or more of the exempt duties or responsibilities of an executive employee.  29 C.F.R. § 541.601. Plaintiff Henderson received annual compensation in excess of $100,000.00 as an SS.[205] Further, as an SS, Plaintiff Henderson customarily and regularly directed the work of two or more employees.[206]   Accordingly, pursuant to 29 C.F.R. § 541.601, Plaintiff

---

[200] *See* Fact No. 48.
[201] *See* Fact No. 49.
[202] *See* Fact No. 49.
[203] *Id.*
[204] Appendix 7 (Letchworth Deposition), at p. 243.
[205] *See* Fact No. 47.
[206] *See* Fact No. 48.

Henderson was properly classified as a highly compensated exempt employee during his tenure as an SS.  Accordingly, pursuant to 29 C.F.R. § 541.601, Plaintiff Henderson was properly classified as an exempt employee.

### D. Plaintiff Sheikh, as a Field Engineer I, Qualifies for the Professional Exemption.[207]

The applicable test for whether an employee qualifies as a professional is set forth in 29 C.F.R. § 541.300(a):

> (a) The term "employee employed in a bona fide professional capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week…; and
>
> (2) Whose primary duty is the performance of work:
>
> (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction…
>
> * * *

It is undisputed that Plaintiff Sheikh was paid on a salary basis of $455 per week.[208]  Further, in order to carry out his job duties, Plaintiff Sheikh's primary duty was to observe the use of the coil tubing equipment in the field, record his observations, input the data he collected into the Cerebrus program, and author a field report so that the life of the coil tubing unit could be determined.[209]  Plaintiff Sheikh's position required

---

[207] Plaintiff Sheikh also qualifies as a driver as he could not perform his job duties without driving.  Indeed, Plaintiff Sheikh is required to travel into the field with CTS property to monitor coil tubing units while they are operational. This is true whether the assignment requires the Field Engineer to drive across state lines.  Indeed, Plaintiff Sheikh traveled to Louisiana on at least one occasion during his employment with CTS.  Appendix 9 (Schmidt Deposition), at pp. 317-318 and 347-348 (Exhibit - fuel purchase summary).  Accordingly, Plaintiff Sheikh, as a Field Engineer I, was a "driver" and an exempt employee under the MCA exemption.

[208] *See* Fact No. 44.

[209] Appendix 10, (Sheikh Deposition), at pp. 352-353.

advanced knowledge in the field of petroleum engineering, which he gained by taking the requisite classes and obtaining a Bachelor of Science degree with a major in petroleum engineering and minor in mathematics from University of Louisiana Lafayette.[210] Accordingly, Plaintiff Sheikh was properly classified as an exempt employee.

### E. The Statute of Limitations on Plaintiffs' Claims under the FLSA Should be Limited to Two Years.

In the event this Court finds that any Plaintiff was not properly classified as an exempt employee, the statute of limitations of his claims should be limited to two years.[211]   The FLSA provides a period of 2 years "after the cause of action accrued" in which to file a Complaint for overtime wages or liquidated damages.  29 U.S.C. § 255(a). The FLSA limitations period is extended an additional year for violations that are willful. 29 U.S.C. § 255(a).   There is no evidence that would prove any alleged violations by Defendant of the FLSA were willful.   Indeed, case law and the DOL opinions suggest that Defendant properly asserted the MCA exemptions at issue in this case.  *Harshman*, 248 F. Supp. 953, *Songer*, 618 F.3d 467, *Gonzalez*, C.A. No. C-08-cv-311; *Garza*, 2011 WL 835820.

A violation of the FLSA is considered willful if the defendant either knew its conduct violated the FLSA or showed reckless disregard for whether its actions complied with the Act.  *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 133 (1988).  Thus, even if an employer acts unreasonably (but not recklessly) in determining its obligations under

---

[210] Appendix 10 (Sheikh Deposition), at pp. 350-351.
[211] According to an earlier opinion in this case, each Plaintiff "commenced" his action on the date he signed a consent form.  Defendant reserves the right to challenge preclusion of claims based on limitations arguments to the extent necessary after ruling on exemption issues.

the FLSA, its actions will not be deemed willful in nature.  *Id*. at 135.  Plaintiffs have no

evidence of reckless conduct by CTS in determining exempt status.  Therefore, Plaintiffs

simply cannot meet their burden of proving that any violation of the FLSA by Defendant

was willful.[212]  Thus, a 2-year limitations period should be applied to all Plaintiffs' claims

in this matter.

###    F.    Plaintiffs Are Not Entitled To Liquidated Damages.

Under Section 16 of the FLSA, liquidated damages must be awarded to the

plaintiff unless the employer presents a proper defense to the otherwise mandatory award.

Under Section 11 of the Portal-to-Portal Act, 29 U.S.C. § 260, a judge is empowered to

exercise discretion to eliminate the employer's liability for liquidated damages if the

employer shows that the action or omission giving rise to such action was in good faith

and that he had reasonable grounds for believing that his act or omission was not a

violation of the FLSA.  29 U.S.C. § 260.

Defendant's classification of the Plaintiffs as exempt pursuant to the exemptions

described herein was made in good faith and Defendant had reasonable grounds for

believing that this classification did not violate the FLSA.  The classification of the

operators employed by Defendant's sister company as exempt was endorsed by the

Southern District of Texas in *Gonzalez,* C.A. No. C-08-cv-311.  *See* Docket No. 77,

Memorandum and Recommendation.  Furthermore, *Harshman*, *supra*, established

precedent that the MCA exemption applies to oilfield service operators more than 40

---

[212] As for the Plaintiffs who were employed as Service Coordinators, if they are able to establish that they were not properly classified as administrative employees, Plaintiffs do not have any evidence to suggest that CTS knew its conduct violated the FLSA or showed reckless disregard for whether its actions complied with the Act.

years ago, which provides a reasonable basis for CTS classifying its Field Service Employees as exempt from overtime.   Finally, to date, 10 Plaintiffs confessed judgment in favor of CTS on their FLSA claims because they agreed that Defendant correctly classified them as exempt employees.   Thus, because Defendant had a reasonable basis for classifying its Field Service Employees as exempt, this Court should find as a matter of law that Plaintiffs are not entitled to liquidated damages.   *See Cox v. Brookshire Grocery, Inc.* 919 F.2d 354, 357 (5th Cir. 1990).

## VI.   <u>CONCLUSION</u>

For the reasons stated herein, Defendant respectfully submits that it is entitled to judgment as a matter of law and requests that the Court grant its motion for summary judgment and enter an order dismissing Plaintiffs' FLSA overtime wage claims in their entirety with prejudice and at Plaintiffs' cost.

1595889.1/006625.000031

Respectfully submitted,


/s/ Christopher E. Moore

Christopher E. Moore, Esq. (Attorney-in-Charge)
TX State Bar No.  24052778
SDTX Admission No.  713063
Christine M. White, Esq.
TX Bar No. 24068713
SDTX Admission No.  712655
Andrew P. Burnside, Esq.
TX State Bar No. 24061200
SDTX Admission No. 924772
Erin R. Wedge, Esq.
SDTX Admission No. 1002780
Coats | Rose
One Canal Place
365 Canal Street, Suite 800
New Orleans, Louisiana  70130
Telephone:  (504) 299-3070
Facsimile:  (504) 299-3071

Attorneys for Defendant Coil Tubing Services, L.L.C.

51

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Memorandum in Support of Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment on FLSA Exemptions (Alice, Angleton, and Bridgeport) has been served on the following counsel of record via the Court's Electronic Filing/Notification System:

Clark Woodson, III, Esq.
601 E. Myrtle
Angleton, TX  77515
Facsimile: (979) 849-7070
E-mail: clark@woodsonlaborlaw.com

Randall Owen Sorrels, Esq.
Clyde J. Jackson, III, Esq.
Abraham, Watkins, Nichols, Sorrels,
    Agosto & Friend
800 Commerce Street
Houston, TX 77002
Facsimile: (713) 225-0827
Electronic Mail:
rsorrels@abrahamwatkins.com
jjackson@abrahamwatkins.com

This 28th day of March, 2011.

/s/ Christopher E. Moore

1595889.1/006625.000031