## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DONALD ALLEN, *et al.,* | § | CIVIL ACTION NO. 4:08-CV-03370 |
|      *Plaintiffs* | § | |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| COIL TUBING SERVICES, L.L.C. | § | |
|      *Defendant* | § | |

---

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT ON FLSA EXEMPTIONS
## (ALICE, ANGLETON, AND BRIDGEPORT)

---

**ABRAHAM, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND**

Randall O. Sorrels
Texas Bar Number: 18855350
Southern District Bar Number: 11115
Clyde J. "Jay" Jackson, III
Texas Bar Number: 10502500
Southern District Bar Number: 1241
800 Commerce Street
Houston, Texas 77002
Telephone: (713) 222-7211
Telecopier: (713) 225-0827

Clark Woodson, III
Texas Bar Number: 00794880
Southern District Bar Number: 21481
601 E. Myrtle
Angleton, Texas 77515
Telephone: (979) 849-6080
Telecopier: (979) 849-7070

ATTORNEYS FOR PLAINTIFFS

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 1

II.     NATURE OF CASE AND STAGE OF PROCEEDING ......................................... 1

III.    ISSUES TO BE RULED UPON AND STANDARD OF REVIEW ...................... 2

IV.     SHORT SUMMARY OF ARGUMENT ..................................................... 5

V.      CONTROVERTED FACTS ..................................................................... 6

   A.   CTS' Wrongly Labeled "Undisputed Facts." ........................................... 6

   B.   Other Factual Claims by CTS that are Controverted ........................... 22

   C.   Erroneous Impressions CTS Created of the Record .............................. 28

VI.     DRIVERS' HELPERS ......................................................................... 34

VII.    GARY HENDERSON ........................................................................ 35

VIII.   MAHMOUD SHEIKH ...................................................................... 36

IX.     LAW AND ARGUMENT .................................................................... 38

   A.   Interstate Safety of Operation of a CMV. ........................................... 38

   B.   Reasonable Expectation. ................................................................... 40

   C.   Individual Analysis. ......................................................................... 41

   D.   Workweek-by-Workweek. ................................................................. 43

   E.   Loading. .......................................................................................... 45

   F.   Damages. .......................................................................................... 46

   G.   SAFETEA-LU TCA. ......................................................................... 47

   H.   Cases Cited By Defendant. ............................................................... 47

X.      CONCLUSION ................................................................................ 50

# TABLE OF AUTHORITIES

## Cases

*A.H. Phillips, Inc. v. Walling*, 324 U.S. 490 (1948) .............................................................. 3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................ 4

*Barrentine v. Arkansas-Best Freight System, Inc*., 450 U.S. 728 (1981) ............................ 3

*Collins v. Heritage Wine Cellars, Ltd.,* 589 F.3d 895 (7th Cir. 2009) ............................... 50

*Crooker v. Sexton Motors, Inc*., 469 F.2d 206 (1st Cir. 1972) ........................................... 44

*Dalheim v. KDFW-TV,* 918 F.2d 1220 (5th Cir. 1990) ................................................ 26, 27

*Dauphin v. Chestnut Ridge Transp., Inc*., 544 F. Supp. 2d 266 (S.D.N.Y. 2008) ............ 17

*Dole v. Mr. W Fireworks, Inc*., 889 F.2d 543 (5th Cir. 1989)................................................ 3

*Dole v. Petroleum Treaters, Inc.,* 876 F.2d 518 (5th Cir. 1989) .......................................... 3

*Donovan v. Sabine Irrigation Co., Inc*., 695 F.2d 190 (5th Cir. 1983) ............................... 4

*Foster v. Allied Signal*, 293 F.3d 1187 (10th Cir. 2002) ...................................................... 4

*Galindo v. Precision American Corp*., 754 F.2d 1212 (5th Cir. 1985) ............................... 21

*Garcia v. Pace Suburban Bus Serv*., 955 F. Supp. 75 (N.D. Ill. 1996) ....................... 40, 48

*Gardner v. Wilkinson*, 643 F.2d 1135 (5th Cir. 1981) .......................................................... 4

*Garza v. Smith Int'l, Inc.,* No. C-10-100, 2011 U.S. Dist. LEXIS 22869
   (S.D. Tex. Mar. 7, 2011) ................................................................................................. 47

*Gilmer v. Alameda-Contra Costa Transit Dist.,* No. C 08-05186, 2010 U.S. Dist. LEXIS
   3405 (N.D. Cal. Jan. 15, 2010) ........................................................................................ 8

*Gonzalez v. Smith Int'l, Inc.,* No. C-08-311 (S.D. Tex. Jan. 29, 2010)............................... 47

*Harshman v. Well Serv., Inc.,* 248 F. Supp. 953 (W.D. Pa. 1965) ............................... 42, 47

*Hays v. City of Pauls Valley*, 74 F. 3d 1002 (10th Cir. 1996) ............................................. 3

*Hernandez v. Brink's, Inc*., No. 08-20717-CIV, 2009 U.S. Dist. LEXIS 2726
   (S.D. Fla. Jan. 15, 2009) ................................................................................... 44, 48, 49

*Johnson v. HIX Wrecker Serv., Inc.*, 1:08-cv-50-WTL-JMS, 2009 U.S. Dist. LEXIS
   51298 (S.D. Ind. June 18, 2009) ................................................................................... 40

*Kennett-Murray Corp. v. Bone,* 622 F.2d 887 (5th Cir. 1980) ........................................... 11

*Khan v. IBI Armored Servs., Inc.,* 474 F. Supp. 2d 448 (E.D.N.Y. 2007) ........................ 11

*Levinson v. Spector Motor Serv.,* 330 U.S. 649 (1947) ..................................................... 39

*Lopez v. United Parcel Service*, No. C 08-05396 SI, 2010 WL 728205 (N.D. Cal. 2010). 4

*Marshall v. Thiele,* No. 76-38, 1978 U.S. Dist. LEXIS 14504
   (M.D. Pa. Nov. 7, 1978) ............................................................................................ 34, 46

*Masson v. Ecolab, Inc*., No. 04 Civ 4488, 2005 U.S. Dist. LEXIS 18022
   (S.D.N.Y. Aug. 18, 2005) ............................................................................................. 45

*McCumber v. Eye Care Center of America, Inc.,* No. 09-1000, U.S. Dist. LEXIS 42647
   (M.D. La. Apr. 20, 2011) ............................................................................................... 46

*McGee v. Corporate Express Delivery Systems*, No. 01 C 1245, 2003 U.S. Dist. LEXIS
   20855 (N.D. Ill. Nov. 26, 2003) ................................................................................... 45

*Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233 (11th Cir. 2008) .......................... 27

*Morris v. McComb,* 332 U.S. 422 (1947) ......................................................................... 17

*Opelika  Royal Crown Bottling Co., v. Goldberg,* 299 F.2d 37 (5th Cir. 1962) .............. 34

*Phillips v. Lesco Logistics, L.L.C.*, No. H-06-3297, U.S. Dist. LEXIS 40696
   (S.D. Tex. June 5, 2007) ............................................................................................... 21

*Pyramid Motor Freight Corp. v. Ispass,* 330 U.S. 695 (1947) ......................................... 34

*Riverwood Int'l Corp. v. Employers Ins. of Wausau*, 420 F.3d 378 (5th Cir. 2005) .......... 4

*S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489 (5th Cir. 1996) ..................................... 20

*Sarviss v. General Dynamics Info. Tech., Inc.,* 663 F. Supp. 2d 883 (C.D. Cal. 2009) .... 36

*Shockley v. City of Newport News Police Dept.,* 997 F.2d 18 (4th Cir. 1993) ................... 4

*Songer v. Dillon Res., Inc.,* 618 F.3d 467 (5th Cir. 2010) ........................................... 19, 47

*Tidd v. Adecco USA, Inc.,* No. 07-11214, 2008 WL 4286512 (D. Mass. Sept. 17, 2008) 50

*Troutt v. Stavola Bros., Inc.,* 107 F.3d 1104 (4th Cir. 1997) ........................................... 34

*Walling v. Youngerman-Reynolds Hardwood Company,* 325 U.S. 419 (1945) ................. 3

*Wirtz v. C & P Shoe Corp.,* 336 F.2d 21 (5th Cir. 1964) ........................................... 34, 46

## Statutes

29 U.S.C. § 207 ........................................................................................................... 2

## Regulations

29 C.F.R. § 541.105 ...................................................................................................... 11

29 C.F.R. § 541.601(d) ................................................................................................. 36

29 C.F.R. § 541.705 ...................................................................................................... 38

29 C.F.R. § 782.2(b)(2) ................................................................................................. 39

29 C.F.R. § 782.2(b)(3) ......................................................................................... 40, 43, 44

29 C.F.R. § 782.2(b)(4) ......................................................................................... 41, 44, 48

29 C.F.R. § 782.3(b) ...................................................................................................... 39

29 C.F.R. § 782.4 .......................................................................................................... 34

29 C.F.R. § 782.5(a) ................................................................................................. 15, 34

29 C.F.R. § 782.5(c) ...................................................................................................... 45

29 C.F.R. § 782.7(b)(1) ............................................................................................. 39, 45

29 C.F.R. § 782.7(b)(2) ..................................................................................... 45

## I.      INTRODUCTION

A recent exhibit at the Houston Museum of Fine Arts featured Impressionist and Post-Impressionist art. From a distance, the exhibited paintings created beautiful images of landscapes and portraits. But upon stepping nearer, viewers could observe that the artists often applied broad, indistinct strokes of paint. And some artists of the era, like Vincent Van Gogh, even leave portions of the canvas blank. While painters of this brilliantly innovative period produced some of the world's favorite masterpieces, their approach works better for art than for law, particularly in motions for summary judgment. In the case at bar, defendant has tried to create the impression that an exemption to overtime applies. But close scrutiny reveals that the evidence does not clearly fit, that there are gaps in the proof, and worst of all, that defendant has at points misrepresented to the Court the nature of the record.

## II.      NATURE OF CASE AND STAGE OF PROCEEDING

Plaintiffs are 174 past or current employees of defendant Coil Tubing Services, L.L.C. ("CTS") who brought this case under the Fair Labor Standards Act ("FLSA") because CTS failed to pay them overtime. During this suit, the Court directed that the parties conduct discovery, and then file motions for summary judgment on the applicability of any claimed exemption, for a bellwether group of 14 plaintiffs.

Plaintiffs filed their "Master Brief"[1] and 13 motions for summary judgment[2] on March 28, 2011. The following day, CTS filed a motion for summary judgment pertaining

---

[1] *See* Rec. 217.
[2] *See* Rec. 218–230.

to the bellwether plaintiffs in its Broussard District (the "Secondary Motion"),[3] and another for the bellwether plaintiffs in the other districts (the "Primary Motion").[4] Because those motions also addressed the issues of liquidated damages and the statute of limitations, the Court allowed plaintiffs to respond.[5] Accordingly, plaintiffs filed their motion for summary judgment and responses concerning those two points on May 17, 2011.[6] This pleading responds to defendant's Primary Motion.

### III.     ISSUES TO BE RULED UPON AND STANDARD OF REVIEW

In CTS' Primary Motion, it requested a judgment that the statute of limitations should be limited to two years and that it should not be liable for liquidated damages. Those issues are addressed in Plaintiffs' Motion for Summary Judgment Regarding Liquidated Damages and Response to Defendant's Motions for Summary Judgment Regarding Liquidated Damages and the Statute of Limitations,[7] which demonstrates why defendant's request should be denied. In addition, CTS claimed in its Primary Motion that it is exempt from the obligation to pay overtime to the bellwether plaintiffs in the Alice, Angleton, and Bridgeport districts. For the reasons, law, and evidence set forth in this response, CTS' Primary Motion must be denied.

More than 70 years ago, Congress passed the FLSA.[8] It was "was designed to 'extend the frontiers of social progress' by 'insuring to all our able-bodied working men

---

[3] *See* Rec. 236, Def.'s Mot. For Summ. J. on FLSA Exemptions (Broussard).
[4] *See* Rec. 235, Def.'s Mot. For Summ. J. on FLSA Exemptions (Alice, Angleton, and Bridgeport).
[5] *See* Rec. 245, Court's Order entered on Apr. 28, 2011.
[6] *See* Rec. 246.
[7] *See* Rec. 246.
[8] The FLSA is codified at 29 U.S.C. § 207.

2

and women a fair day's pay for a fair day's work.'"[9] "The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'"[10]

A centerpiece of the FLSA is the obligation of an employer to pay overtime to employees who work more than 40 hours in a workweek. The overtime requirement has the "dual purpose" of increasing employment – certainly a critical goal in the current period of high unemployment[11] – and of compensating employees for the burden of working long hours.[12]

Accordingly, "[t]he exemptions . . . [to the overtime requirement] have been drawn narrowly under the FLSA to minimize the number of employees who lose the Act's protections."[13] They are "strictly construed,"[14] with the burden of proof upon the employer. And an "employee must fit 'plainly and unmistakenly within the exemption's terms . . . .'"[15]

Thus, some courts require the employer to prove an exemption by "clear and

---

[9] *Dole v. Petroleum Treaters, Inc.,* 876 F.2d 518, 523 (5th Cir. 1989) (citing *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1948)).

[10] *Barrentine v. Arkansas-Best Freight System, Inc*., 450 U.S. 728, 739 (1981).

[11] Ex. 125: Brett Arends & Dave Kansas, *Eighty Years After the Great Crash – 'Is It the '30s Again?'*, WALL ST. J., Oct. 18, 2009, *available at:*
*http://online.wsj.com/article_email/SB125581121032292239-lMyQjAxMTIxNTI1NTgyMTUxWj.html.*

[12] *Walling v. Youngerman-Reynolds Hardwood Company*, 325 U.S. 419, 423 (1945): "Thus by increasing the employer's labor costs by 50% at the end of the 40-hour week and by giving the employees a 50% premium for all excess hours, § 7 (a) achieves its dual purpose of inducing the employer to reduce the hours of work and to employ more men and of compensating the employees for the burden of a long workweek."

[13] *Dole*, 876 F.2d at 523.

[14] *Dole v. Mr. W Fireworks, Inc*., 889 F.2d 543, 546 (5th Cir. 1989).

[15] *Hays v. City of Pauls Valley*, 74 F. 3d 1002, 1006 (10th Cir. 1996); *cf. Dole v. Mr. W Fireworks, Inc*., 889 F.2d 543, 546 (5th Cir. 1989) (the Fifth Circuit "might not put the matter quite so strongly").

convincing evidence."[16] Although courts have had difficulty precisely defining "clear and convincing evidence," it is described "as requiring greater certainty than the preponderance of evidence standard although perhaps less than the reasonable doubt standard."[17] "Evidence is clear 'if it is certain, unambiguous, and plain to the understanding,' and it is convincing 'if it is reasonable and persuasive enough to cause the trier of facts to believe it.'"[18] "Clear and convincing evidence is 'not a quantum of proof, but rather a quality of proof.'"[19] This elevated burden is necessary because it is critical to enforce the Act, not only to compensate workers, but also to protect other employers who comply with the FLSA.[20]

When considering an exemption in the context of a motion for summary judgment, the court must "view the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor."[21] A judge must not usurp the role of the jury. Regarding witness testimony in particular, credibility determinations must be made by the jury.[22]

This standard is especially important in the case at bar. For instance, in its two motions for summary judgment, CTS cites Randy Comeaux at least 26 times. Like several

---

[16] *Shockley v. City of Newport News Police Dept.*, 997 F.2d 18, 21 (4th Cir. 1993).

[17] *Gardner v. Wilkinson*, 643 F.2d 1135, 1137 (5th Cir. 1981).

[18] *Foster v. Allied Signal*, 293 F.3d 1187, 1194 (10th Cir. 2002).

[19] *Id.*

[20] *Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190, 197 (5th Cir. 1983); in the context of the minimum wage requirement, the Fifth Circuit identified the "FLSA's twin purposes of compensating the injured employees, and of redressing a continuing public wrong by depriving a violator of any gains accruing to him through his violations, and protecting those employers who comply with the Act's wage requirements from having to compete unfavorably with those who do not."

[21] *Riverwood Int'l Corp. v. Employers Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005).

[22] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Lopez v. United Parcel Service*, No. C 08-05396 SI, 2010 WL 728205, at *2 (N.D. Cal. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

of CTS' other executives, this witness was extremely recalcitrant and disingenuous.[23] A jury must exercise extreme caution when evaluating any testimony he offers for CTS.

## IV.   SHORT SUMMARY OF ARGUMENT

Two key considerations require a denial of CTS' Primary Motion. First, factually, the backbone of its motion is the wrongly named Section IV entitled "Undisputed Facts." CTS admittedly relies[24] on these "facts," but its problem is that many are not undisputed – in reality, they are sharply disputed and sometimes blatantly wrong. Second, legally, CTS quotes opinions from several courts which find that the Motor Carrier Act ("MCA") provides an exemption to the overtime requirements of the FLSA. However, none has the critical facts presented in the case at bar, which include:  1) employees who spent huge periods of time working offshore, where they could not affect the safety of interstate motor transportation; and 2) employees who were periodically shifted from offshore work, to shop work, to onshore work upon private leases. Cases establishing the contours of the MCA prove that, here, plaintiffs did not have a "reasonable expectation" that they would be called upon to drive a commercial motor vehicle ("CMV") in interstate commerce; instead, their chances of driving a CMV interstate were a "remote possibility" at most, especially considering their shifting job assignments and the performance of other duties for prolonged periods that did not affect the safety of operation of CMVs in interstate commerce.

---

[23] Ex. 92: Comeaux Dep. 153:1–158:25.
[24] *See* Rec. 235, footnote 16 of CTS' Primary Motion.

## V.    CONTROVERTED FACTS

Section IV at page 6ff of CTS' Primary Motion contains a list of 49 purported "undisputed facts" upon which it relies. Many are disputed, and others are flatly wrong, as shown in Subsection A of this section. In addition, elsewhere CTS' motion is spotted with erroneous, unsupported, or disputed claims. Accordingly, Subsection B addresses factual claims CTS made in portions of its Primary Motion, other than Section IV, that are controverted. Finally, Subsection C lists other instances when CTS misrepresented the record.

One preliminary point: CTS is fond of the phrase "Field Service Employees," used 68 times in its two motions. This term is almost foreign to the facts of this case, uttered but once by CTS' executives in their 20 depositions,[25] and apparently never mentioned in the 400,000 documents CTS produced.[26] CTS' purpose is to create the impression that the positions of at least three different job titles with different duties in three distinct districts can be considered together, a subtle way to promote an "enterprise" theory even though the facts and law[27] do not support it.

### A.    CTS' Wrongly Labeled "Undisputed Facts."

CTS is wrong when it calls the following facts "undisputed."

**1.    Claim**:  In item 23 on page 11, CTS claims it is undisputed that in the "Alice, Bridgeport, Angleton, and Rock Springs Districts, all Field Service Employees are required to have a Commercial Driver's License ('CDL') or CDL permit in order to work as an STI, STII, SST, or SS." In addition, CTS

---

[25] This includes the depositions of Jerry Ritter, David Hebert, Ed Burchfield, Sam Washington, and Danny Ramirez.

[26] With this volume of documents, plaintiffs, plaintiffs hesitate to state without qualification that the phrase "Field Service Employees" does not appear in any of them; so plaintiffs state simply that they have not located a document containing any such nomenclature.

[27] *See* Section IX(C) on page 38, below; *see also* Rec. 217, Section IV(C) of Pls.' Master Brief at pp. 4–9.

claims that "Field Service Employees are required to obtain a CDL" at footnote 130, without limitation.

**Response**:

a.    Bellwether plaintiffs William Broussard ("Broussard"), Cody Patin ("Patin"), Gary Henderson ("Henderson"), Billy Newman ("Newman"), Mahmoud Sheikh ("Sheikh"), and Donald Woodard ("Woodard") never had a CDL during the relevant time period; Broussard and Newman not only served as STIs without a CDL, but they were promoted to STIIs without one; Henderson was demoted to SS, though he had let his CDL lapse years before, and he was never told he had to obtain another one; none of these plaintiffs was informed that he was required to have a CDL to work as a Service Tech I ("STI"), Service Tech II ("STII"), Service Supervisor Trainee ("SST"), or Service Supervisor ("SS");[28]

b.    None of the District Managers or Operations Managers declared that a CDL was required in order to work as an STI, STII, SST, or SS; in the declarations that CTS' managers signed, they merely stated that those "who may be called upon to drive" 18-wheelers had to possess CDLs;

c.    Tiffany Letchworth ("Letchworth"), Human Resources Manager for CTS, expressly testified that a CDL was not required for "offshore based positions;"[29]

d.    B. Allen testified he had to get a CDL to work in the newly-created Bridgeport District; he did not testify that every STI, STII, SST, or SS had to obtain a CDL;

e.    Bellwether plaintiff Jesus Hernandez ("Hernandez") testified only that he had to maintain a CDL; like B. Allen, he did not testify that every STI, STII, SST, or SS had to obtain a CDL;

f.    There is no proof that the undated job descriptions, which are expressly limited to "land districts," were ever enforced in the field, especially since Patin began in September 2008,[30] since Henderson

---

[28] Ex. 101: D. Allen Decl. ¶ 6; Ex. 103: Broussard Decl. ¶ 6; Ex. 105: Cantu Decl. ¶ 6; Ex. 110: Hernandez Decl. ¶ 6; Ex. 112: Newman Decl. ¶ 5; Ex. 114: Patin Decl. ¶ 6; Ex. 116: Pena Decl. ¶ 6; Ex. 120: Tankersley Decl. ¶ 6; Ex. 118: Sheikh Decl. ¶ 6.

[29] Ex. 94: Letchworth Dep. 107:1–5.

[30] *See* Rec. 218, Section II(A) of Pl. Cody Patin's Mot. For Summ. J. at p. 1.

7

was demoted in May 2006,[31] and since Woodard was hired in January 2008,[32] all without CDLs, after the job descriptions were apparently revised;[33]

 g. The Rock Springs District is irrelevant to this analysis, since no plaintiff presently in this suit was assigned to that district;

 h. Conclusion: CTS' actual practice disproves its claim that a CDL was required to work as an STI, STII, SST, or SS; with the evidence CTS has produced, the most it can honestly say is that this issue is controverted; it is manifestly not "undisputed."

**2.** **Claim**:  At item 21 on page 11, and at footnote 136 on page 31, CTS claims it is undisputed that plaintiffs "may be called upon" to transport equipment between districts.

 **Response**:

 a. CTS does not permit an employee without a CDL to drive a CMV;[34] thus, to the extent that CTS includes those bellwether plaintiffs without a CDL among those who "may" transport equipment, that statement is false; to the extent that they transport a vehicle that is not a CMV, it is merely irrelevant;

 b. In the Angleton District, Senior Truck Drivers transfer equipment;[35]

 c. While nearly any fact pattern "may" occur, a "remote possibility"[36] does not create a reasonable expectation; in CTS' present claim, of all of the bellwether plaintiffs and for the scores of years they collectively worked, CTS was only able to cite one instance of a plaintiff transferring equipment across state lines.

**3.** **Claim**:  In item 24 on page 11, CTS claims it is undisputed that when a Service Tech is hired who does not have a commercial driver's license ("CDL"), "he is told that he will need to obtain a CDL in order to keep his job."

---

[31] *See* Rec. 230, Section II(A) of Pl. Gary Henderson's Mot. For Summ. J. at p. 2.
[32] *See* Rec. 221, Section II(A) of Pl. Donald Woodard's Mot. For Summ. J. at p. 1.
[33] Ex. 94: Letchworth Dep. 77:24–78:5.
[34] Ex. 91: Burchfield Dep. 89:21–90:7; Ex. 94: Letchworth Dep. 103:25–104:4, 111:1–3; Ex. 95: Ramirez Dep. 103:22–104:4; Ex. 92: Comeaux Dep. 44:18–25.
[35] Ex. 91: Burchfield Dep. 140:19–141:16.
[36] *Gilmer v. Alameda-Contra Costa Transit Dist.,* No. C 08-05186, 2010 U.S. Dist. LEXIS 3405, at *32 (N.D. Cal. Jan. 15, 2010).

**Response**:  To show that this claim is undisputed, CTS attaches excerpts from the depositions of two plaintiffs: Woodard and Patin. Neither proves this assertion.

a.    In Woodard's deposition excerpt that CTS cited, he did not testify that he was told "when he was hired" that he would need to obtain a CDL for his job; rather, the excerpt recounts a *much later* conversation in which Woodard thanked Ed Burchfield ("Burchfield") after Woodard got his CDL; Woodard was hired in January 2008 without a CDL, and did not obtain a CDL until February 2009, about 13 months afterwards;[37] notably, Burchfield did not believe Woodard ever drove across state lines because Burchfield thought Woodard "was scared to drive;"[38]

b.    In the deposition excerpt of Patin that CTS cited, he never discussed the hiring process in general or any "need" to obtain a CDL; in fact, though he took some classes, Patin never possessed a CDL during his tenure with CTS;[39]

c.    It is not true that plaintiffs in the Angleton District were told that they had to obtain a CDL; Patin, who worked in the Angleton District, testified that he was not told "when [he was] hired" that he needed to obtain a CDL;[40]

d.    Broussard, mentioned by CTS in item 5 on page 7 of its Primary Motion, was hired as a STI without a CDL, was rehired and promoted without a CDL to STII, then terminated, and then rehired a third time as an STII, all without a CDL;[41]

e.    Like Broussard, Newman, mentioned by CTS in item 10 on page 8 of its Primary Motion, was hired by CTS as an STI without a CDL, and also like Broussard, was promoted to STII without a CDL;[42]

f.    During the relevant time period, Henderson worked as a Service Supervisor ("SS"), yet he did not hold a CDL; he was not told he had to obtain a CDL to keep his job;[43]

---

[37] *See* Def.'s App. 11 at pp. 388–389, Woodard Dep.

[38] Ex. 91: Burchfield Dep. 181:21–182:6.

[39] *See* Def.'s App. 8 at pp. 285, Patin Dep.

[40] Ex. 114: Patin Decl. ¶ 5.

[41] *See* Rec. 220, Section II(A) of Pl. William Broussard's Mot. For Summ. J. at p. 2.

[42] *See* Rec. 219, Section II(A) and (B) of Pl. Billy Newman's Mot. For Summ. J. at pp. 1–2.

[43] Ex. 108: Henderson Decl. ¶ 5.

g.   Further in item 24 on page 12, CTS asserts that Woodard held a Class B license; he did not obtain it until February 2009, three months after the relevant time period;[44]

h.   A final point: both Woodard and Patin worked in Angleton; accordingly, nothing they say can establish the practices in Alice or Bridgeport; so, this is an example of CTS' use of testimony from one district in an attempt to prove circumstances in an entirely different district.

**4.   Claim**:   In item 32 on page 13, CTS says it is undisputed that the crewmembers "assist with loading" for offshore jobs.

**Response**:  CTS' claim is wrong. The procedure in the Broussard District is that plaintiffs do not load for offshore jobs. In the Angleton District, Shop Support loaded. Finally, putting items on a pallet does not constitute "loading" for the purposes of the MCA.

a.   The evidence proving that plaintiffs do not load in the Broussard District is set forth in Plaintiffs' Response to Defendant's Motion for Summary Judgment on FLSA Exemptions (Broussard) at page 8;

b.   In the Angleton District, Shop Support did virtually all of the loading;[45]

c.   The Angleton District customarily used third-party vendors to transport equipment to the docks for offshore jobs;[46]

d.   The job description of the "Sr. Truck Driver" mentions that he may assist with "loading and unloading truck;"[47] yet, the job descriptions for the STI, STII, and SS positions do not use the term "load;" aware of that omission, Letchworth can only claim that it is included within the phrase of "mobilizing" the equipment;[48]

---

[44] *See* Rec. 221, Section II(C)(2)(a)(ii) of Pl. Donald Woodard's Mot. For Summ. J. at p. 4.
[45] *See* Rec. 217, Section IV(F)(4)(a) of Pls.' Master Brief at p. 36; *see also* Rec. 222, Section II(C)(2)(b) of Pl. Steven Tankersley's Mot. For Summ. J. at p. 7; Rec. 223, Section II(C)(2)(b) of Pl. Adam Crews' Mot. For Summ. J. at p. 9; Rec. 230, Section II(C)(2)(b) of Pl. Gary Henderson's Mot. For Summ. J. at p. 9.
[46] *See* Rec. 217, Section IV(F)(3)(d)(iii) of Pls.' Master Brief at p. 26.
[47] *See* Pls.' Ex. 4: Job Description of Sr. Truck Driver CTS 106678–79.
[48] Ex. 94: Letchworth Dep. 138:25–139:6.

e.  Under the case law set forth in *Khan v. IBI Armored Servs., Inc.,* putting cargo on a pallet does not make a worker a "loader" under the MCA;[49]

f.  One last comment: CTS claims that crewmembers travel to the dock in a pickup truck, sometimes across state lines; this fact is irrelevant to the MCA unless the crewmember is driving a CMV across state lines.

5.  **Claim**:   In item 48 on page 20, CTS says that it is undisputed that Henderson, as an SS, had authority to make employment recommendations.

**Response**:

a.  In the portion of his deposition that CTS cited, Henderson did not testify that he made recommendations about hiring, firing and advancement; in the declaration of Henderson, he testified that he did not have the authority to hire or fire any CTS employees, nor was he responsible for making any suggestion or recommendations as to the hiring, firing, advancement, promotion, or any change in status of other CTS employees;[50] Henderson's primary duty was to service wells;[51]

b.  To support its claim, CTS cited the declaration of Hudson Wise; however, Wise testified quite differently in his deposition;[52] there, he said that only the District Manager for Bridgeport hires;[53] he also said that, as a Service Coordinator ("SC"), he did not hire, and if he knew someone who was looking for a job he "could tell them to come put in the application, but it's between him and the district manager;"[54] in fact, the only time[55] he did that was for a friend in Angleton when Wise was working in Bridgeport; with respect to

---

[49] 474 F. Supp. 2d 448, 459 (E.D.N.Y. 2007).

[50] *See* Pls.' Ex. 75, Henderson Decl. ¶ 18.

[51] Ex. 108: Henderson Decl. ¶ 6.

[52] "'An opposing party's affidavit should be considered although it differs from or varies his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility.'" *Kennett-Murray Corp. v. Bone,* 622 F.2d 887, 893 (5th Cir. 1980) (citing 6 Moore's Federal Practice ¶ 56–15[4], p. 56–522 (2d Ed.)).

[53] Ex. 97: Wise Dep. 64:1–13.

[54] Ex. 97: Wise Dep. 64:9–13.

[55] "To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include . . . the frequency with which such suggestions and recommendations are made or requested . . . and the frequency with which the employee's suggestions and recommendations are relied upon.  Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs.  It does not include an occasional suggestion with regard to the change in status of a co-worker." 29 C.F.R. § 541.105.

Bridgeport, he has "not hired or fired or recommended anybody;"[56] further, Wise testified that he often filled out a certain form which went with the job packet; he does not know if the form is placed in the employee's personnel file, he has never observed a district manager to use the forms when evaluating an employee, and he does not know whether they are used when evaluating an employee;[57] lastly, he was never asked to sit down with upper management and discuss someone to be promoted;[58]

c.  CTS also sought support for its claim from three pages in the deposition of Letchworth; in those pages, she nowhere discusses hiring (everyone agrees that only the district manager hires[59]) but she does address promotions; significantly, in the next page after the excerpt CTS cited to the Court, Letchworth testified that the "district manager would make that recommendation . . . and then consult with the regional manager, who would have to give their authorization and then it would ultimately be signed by the President. That's company procedure;"[60] viewed with this understanding, her earlier testimony means that the SS can talk with management about a crewmember's performance at a well site, but likewise "[a]nyone can express their opinions, including the equipment operator, who's below the ST-I."[61]

d.  CTS further seeks evidence for its claim from the job description attached to Letchworth's deposition as Exhibit 26; however, it does not state that the SS hires, fires, or makes employment recommendations;

e.  CTS additionally cited two pages from the deposition of bellwether plaintiff Jose Pena ("Pena"), but they simply do not establish this point;

f.  To conclude: while the latter-day declarations drafted by counsel claim that Henderson, as a SS, had authority to make employment recommendations, that is sharply controverted by Henderson himself, as well as by the deposition testimony of Wise and Letchworth; the job description knows nothing of such duties;

---

[56] Ex. 97: Wise Dep. 64:22–65:2.
[57] Ex. 97: Wise Dep. 68:3–69:8.
[58] Ex. 97: Wise Dep. 71:10–18.
[59] *See* Rec. 217, Section IV(E)(2) of Pls.' Master Brief at p. 16; Ex. 91: Burchfield Dep. 143:13–15; Ex. 96: Ritter Dep. 32:3–16; Ex. 95: Ramirez Dep. 21:4–5; Ex. 98: Washington Dep. 20:2–4.
[60] Ex. 94: Letchworth Dep. 90:13–20.
[61] Ex. 94: Letchworth Dep. 88:22–89:2.

g.     CTS made a similar claim at footnote 12 on page 5 in Section III(C), where it cited ¶ 7 of Burchfield's declaration; however, Operations Manager Danny Ramirez ("Ramirez") testified like Letchworth that "Burchfield doesn't have the authority to hire and fire on his own. He seeks approval;"[62] and, Burchfield and Ramirez are the ones who discipline, according to Ramirez.[63]

**6.**    **Claim**:   At footnote 69 in item 33 on page 15, CTS claims to have demonstrated that it is undisputed crewmembers are "expected to load" for land jobs; also, in item 17 on page 10 at footnote 33, CTS' ambiguous sentence appears to claim that plaintiffs loaded.

**Response**:  The evidence offered from CTS at footnote 69 to establish that it is undisputed that crewmembers are "expected to load" comes from Burchfield's declaration and the deposition of Sam Washington ("Washington"), an SC in the Angleton District; at footnote 33, CTS cited the form declarations of its managers.  This is controverted by plaintiffs.

a.     The segment of the Washington's deposition cited by CTS simply does not say who is "expected to load," it merely indicates that all jobs require some loading;

b.     Burchfield's declaration says that the crewmembers load; but his testimony should be limited to the Angleton District, since he has demonstrated no familiarity with the other districts;

c.     CTS ignores the fact that Washington testified that shop support personnel will support the guys in the field by "[l]oading;"[64] (interestingly, while Washington claimed that "everyone" loaded, he only mentioned SCs; he never testified that, other than himself, he observed any crewmember load);

d.     Mario Hernandez testified that he, as Shop Support, performed loading 99% of the time at the Angleton District;[65]

e.     Woodard and Steven Tankersley ("Tankersley"), both from the Angleton District, testified that that they did not load;[66] furthermore,

---

[62] Ex. 95: Ramirez Dep. 21:14–15; Ex. 94: Letchworth Dep. 89:21–90:20.
[63] Ex. 95: Ramirez Dep. 21:6–7.
[64] Ex. 98: Washington Dep. 45:10–46:1.
[65] *See* Rec. 217, Section IV(F)(4)(a) of Pls.' Master Brief at p. 36.
[66] Ex. 123: Woodard Dep. 26:22–23; Ex: 119: Tankersley Dep. 33:15–20.

Patin, Adam Crews ("Crews"), Presley Branham ("Branham"), Donald Allen ("D. Allen"), and Henderson all testified that Shop Support loaded;[67]

f.     Tankersley testified that he did not load and that the truck was usually loaded when he was called to the yard;[68]

g.     CTS ignores the fact that Woodard, who worked in the Angleton District, testified that he did not load;[69]

h.     Pena, from the Alice District also testified that Shop Support loaded;[70]

i.     In its attempt to bolster its claim that plaintiffs loaded, CTS attached at footnote 180 on page 38 its "Safety Manual," which purportedly contain its "loading procedures;" but other than avoiding overloading electrical outlets, ladders, boats, scaffolds, and handling forklifts, there is virtually nothing in it about loading CMVs; in addition, it was not supplied to the bellwether plaintiffs,[71] so evidently they are not among those "expected to load;"

j.     Comeaux testified that a man is not loading if he is offshore;[72]

k.     Based upon the foregoing, it is ludicrous for CTS to claim that it is "undisputed" that the crewmembers loaded for land jobs.[73]

**7.     Claim**:  In item 19 on page 10, CTS claims that it is undisputed that various percentages of jobs during the relevant time period required employees to mobilize equipment "across state lines."

**Response**:  Certain percentages claimed by CTS are wrong, and they falsely suggest that plaintiffs loaded or transported equipment across state lines. Without question, these figures are set forth below disputed.

---

[67] Ex. 113: Patin Dep. 63:3–14; Ex. 106: Crews Dep. 75:13–15; Ex. 102: Branham Dep. 25:6–12; Ex: 100: D. Allen Dep. 35:19–23; Ex. 107: Henderson Dep. 69:17–24.
[68] Ex: 119: Tankersley Dep. 33:15–34:8.
[69] Ex. 123: Woodard Dep. 26:22–23.
[70] Ex. 115: Pena Dep. 27:6–29:16.
[71] Ex. 101: D. Allen Decl. ¶ 6; Ex. 103: Broussard Decl. ¶ 6; Ex. 105: Cantu Decl. ¶ 6; Ex. 110: Hernandez Decl. ¶ 6; Ex. 112: Newman Decl. ¶ 6: Ex. 114: Patin Decl. ¶ 6; Ex. 116: Pena Decl. ¶ 6; Ex. 120: Tankersley Decl. ¶ 6; Ex. 118: Sheikh Decl. ¶ 6.
[72] Ex. 92: Comeaux Dep. 67:22–23.
[73] Plaintiffs have adduced testimony to demonstrate that they do not load or transport for offshore jobs at Section IV(F)(4)(c) on page 38 in their Master Brief.

a.   However, even this figure is overstated since it includes the Rock Springs District, which is irrelevant because no plaintiff was assigned there; without that district's data, the percentage of land jobs across state lines is 2.2%;[74] the interstate land jobs for the Angleton District is 1.5%; the interstate land jobs for the Alice District is 0.33%; the interstate land jobs for the Bridgeport District is 0.6%; the interstate land jobs for the Broussard District is 5.6%;[75]

b.   The percentage of offshore jobs departing from another state is irrelevant because it does not show that plaintiffs loaded or drove a CMV across state lines; CTS speaks of "mobilizing" equipment; Letchworth includes within that term watching vehicles transport a load,[76] which is not covered by the MCA; nevertheless, even if it is intended to include driving, the statement concerning offshore jobs is not true; the testimony from Comeaux[77] demonstrates that, for offshore jobs in the Broussard District, crewmembers did not load or transport the equipment in CMVs; and Ramirez and Washington from the Angleton District also testified that the equipment for offshore jobs is loaded and often transported by third-party vendors.[78]

8.   **Claim**:   In item 40 on page 17, CTS claims it is undisputed that crewmembers "backload" equipment.

**Response**:   CTS attaches excerpts from the depositions of two plaintiffs as "proof" for this point. They do not say what CTS claims.

a.   In the one page CTS attached from the deposition of Crews, he states only that, once he arrived at the well site, he would run the hoses;[79]

b.   In the one page from the deposition of Tankersley which CTS cited, he discusses only items taken on the truck; there is no discussion of loading at the well site;[80]

c.   The significance of "backloading" is questionable, since loading for an intrastate trip is not covered by the MCA.[81]

---

[74] Ex. 122: Grizzle Decl. ¶ 7.
[75] Ex. 122: Grizzle Decl. ¶ 7.
[76] Ex. 94: Letchworth Dep. 119:13–120:15.
[77] *See* Rec. 217, Section IV(F)(4)(a) of Pls.' Master Brief at p. 37.
[78] *See* Rec. 217, Sections IV(F)(3)(d)(iii) and IV(F)(4)(c) of Pls.' Master Brief at pp. 26, 38.
[79] *See* Def.'s App. 5 at p. 189, Crews Dep.
[80] *See* Def.'s App. 10 at p. 365, Tankersley Dep.
[81] 29 C.F.R. § 782.5(a).

**9.**     **Claim**:  In item 22 on page 11, CTS claims it is undisputed that driving CMVs and 18-wheelers is "a primary and essential job duty" of EOs, STIs, STIIs, and SSs.[82]

**Response**:

a.     To support this claim, CTS points in part to ¶ 22 of the declaration of Burchfield; however, his declaration does not state that "a primary and essential job duty" of all EOs, STIs, STIIs, and SSs is to drive CMVs and 18-wheelers; instead, he states that "[a]ll employees who may be called upon to drive" CMVs must have a CDL and hazmat endorsement;

b.     CTS also tries to support this claim with the deposition of bellwether plaintiff Alfredo Cantu ("Cantu"); nowhere in the offered segment[83] is there any support for the notion that driving was "a primary duty;"

c.     Bellwether plaintiff Byron Allen ("B. Allen") likewise did not testify that driving was his "primary duty" in the deposition excerpt[84] offered by CTS;

d.     The excerpt that CTS attached from the deposition of Crews[85] did not substantiate its claim that driving is "a primary duty;"

e.     The excerpt that CTS attached from the deposition of D. Allen[86] did not substantiate its claim that driving is "a primary duty;"

f.     The excerpt that CTS attached from the deposition of Pena[87] did not substantiate its claim that driving is "a primary duty;"

g.     The excerpt that CTS attached from the deposition of Branham[88] did not substantiate its claim that driving is "a primary duty;"

---

[82] When defendant defined the concocted the term "Field Service Employees" in Par. III, p. 3 of its primary motion, it included the positions of SS and of Field Engineer I ("FEI"); however, at footnote 6, defendant conceded that the field engineer did not have a CDL, did not drive 18-wheelers, and presumably did not drive any CMV which required a CDL; moreover, defendant did not limit that expression to those in any particular district or exclude it from those in other districts.

[83] *See* Def.'s App. 5 at p. 166, Cantu Dep.

[84] *See* Def.'s App. 1 at pp. 2, 23–27, 28–35, B. Allen Dep.

[85] *See* Def.'s App. 5 at pp. 185, 188, Crews Dep.

[86] *See* Def.'s App. 2 at pp. 63–64, 70–71, 76 and App. 3 at pp. 85–89, 90, D. Allen Dep.

[87] *See* Def.'s App. 8 at pp. 291–92, Pena Dep.

[88] *See* Def.'s App. 4 at pp. 120–32, Branham Dep.

h.    Not cited by CTS was the testimony of Broussard, Patin, Henderson, Newman, and Woodard; each served as an STI, STII, or SS and never drove a CMV or 18-wheeler during the relevant time period; this evidence proves that driving was not "a primary duty" of their positions;

i.    The evidence adduced at V(A), point 2, above on page 17, further demonstrates that driving is not a primary and essential[89] job duty of plaintiffs, since plaintiffs could not drive a CMV without a license;

j.    Though Sheikh was an FEI, he spent 98% to 99% of his time doing the work of an STI or STII;[90] yet, he never had a CDL[91] and never drove a CMV;[92]

k.    Defense witness Travis Gortmaker ("Gortmaker"), like Sheikh, was an FEI; like Sheikh, he did much of the same work as an STI and STII;[93] also like Sheikh, he did not have a CDL;[94] in fact, he has never even ridden in an 18-wheeler across a state line;[95]

l.    The declarations of  D. Allen, Broussard, Cantu, Henderson, Hernandez, Newman, Patin, Pena, and Tankersley demonstrate that the primary duty of an STI, STII, and SS is to service the fluids and flow of oil and gas wells; that means to test the oil field equipment, pull hoses, and run iron;[96]

m.    CTS further points for support to the testimony[97] of Hernandez; though he said driving was a big factor for himself, he further testified that he might be on a job for "about three weeks"[98] at a time, a period when he would not be driving a CMV interstate;

---

[89] The standard is actually whether "interstate travel constitutes a 'natural, integral and . . . inseparable part' of the employees' duties . . . ."  *Dauphin v. Chestnut Ridge Transp., Inc*., 544 F. Supp. 2d 266, 274 (S.D.N.Y. 2008) (citing *Morris v. McComb*,  332 U.S. 422, 433 (1947).  Since an employee can be hired, rehired, and promoted to work as an STI and STII without the legal ability to drive a CMV, interstate driving is not a "natural, integral and . . . inseparable part" of his job.

[90] Ex. 117: Sheikh Dep. 30:24–31:3.

[91] Ex. 117: Sheikh Dep. 24:1–3.

[92] Ex. 118: Sheikh Decl. ¶ 7.

[93] Ex. 93: Gortmaker Dep. 31:11–20.

[94] Ex. 93: Gortmaker Dep. 13:1–2.

[95] Ex. 93: Gortmaker Dep. 13:3–6.

[96] Ex. 101: D. Allen Decl. ¶ 7; Ex. 103: Broussard Decl. ¶ 7; Ex. 105: Cantu Decl. ¶ 7; Ex. 108: Henderson Decl. ¶ 6; Ex. 110: Hernandez Decl. ¶ 7; Ex. 112: Newman Decl. ¶ 7: Ex. 114: Patin Decl. ¶ 7; Ex. 116: Pena Decl. ¶ 7; Ex. 120: Tankersley Decl. ¶ 7.

[97] *See* Def.'s App. 6 at pp. 230–33, Hernandez Dep.

[98] Ex. 109: Hernandez Dep. 49:4–6.

n.   Finally, CTS did not claim in this point, nor does the evidence support, that driving a CMV *interstate* is a primary duty of plaintiffs.

10.   **Claim**:  In footnote 31 of item 17 on page 9, CTS defines again the phrase "Field Service Employees;"[99] in this footnote, CTS claims that certain jobs "are the ones that transport CTS property to the job location," and CTS further claims that B. Allen was an EO who "could have been called upon to operate" in interstate commerce; for proof, CTS cites the deposition of B. Allen; it is unclear if CTS is attempting to claim at this point that these facts are "undisputed."

**Response**:

a.   The deposition excerpt of B. Allen discusses when he obtained a CDL; it certainly does not state who transports property to job sites;

b.   B. Allen joined in the plaintiffs' Master Brief,[100] and he filed his own motion for summary judgment;[101] these demonstrate that he was not reasonably expected to drive a CMV across state lines; obviously, the claim that he could have been called upon to drive interstate is controverted;

c.   Finally, B. Allen was not an EO during the relevant period, he was an STI.[102]

11.   **Claim**:  In item 29 on page 14, CTS claims SCs make crew assignments based upon "equipment and personnel availability." (CTS made a similar claim in item 45 on page 19.) This is a half-truth.

**Response**:

a.   Besides availability, another basis for crew assignments is customer request;[103]

b.   In addition, crews are assigned jobs based upon experience;[104]

---

[99] The definition is slightly different from its earlier definition on p. 3.
[100] *See* Rec. 217.
[101] *See* Rec. 226.
[102] *See* Rec. 226, Section II(A) of Pl. Byron Allen's Mot. For Summ. J. at pp. 1–2.
[103] *See* Rec. 217, Section IV(F)(3)(d)(ii) of Pls.' Master Brief at p. 24; *see also* Pls.' Ex. 75: Henderson Decl. ¶ 8; Rec. 247, Section IV(D)(1)(a)(ii) of Def.'s Resp. to Pls.' Master Brief at p. 18.
[104] *See* Rec. 217, Section IV(E) and (F)(3)(d)(ii) of Pls.' Master Brief at pp. 14, 24; *see also* Pls.' Ex. 75: Henderson Decl. ¶ 7.

    c.     Once on a job, a crewmember is not removed from that job prior to its completion and sent to another job;[105]

    d.     The key point is that jobs were not indiscriminately assigned.[106]

**12.**    **Claim**:  CTS claims in item 34 on pages 15 and 16 that the crewmembers operate 18-wheelers and the SS will "generally" drive Ford-350s.

    **Response**:

    a.     Repeatedly, it has been demonstrated that CTS does not always transport its equipment to all of its jobs, using instead third-party vendors on occasion,[107] and further that not all crewmembers drive equipment;[108]

    b.     Plaintiffs object to the declaration of LeJuene because it is conclusory as to the weight; he has not been established as an expert witness, and he has not provided the underlying factual basis to demonstrate a personal knowledge of the weight of the vehicles; likewise, he has failed to demonstrate his familiarity with the operations of various districts or the weight of equipment, as CTS claims at footnotes 73 and 107;

    c.     Burchfield, Henderson's boss, testified that the F-350 pickup weighs 10,000 lbs. or less;[109]

    d.     Comeaux testified that the pick-up trucks weigh less than 10,000 pounds.[110]

**13.**    **Claim**:  CTS claims at item 43 on page 18 it is undisputed that district managers explain to job applicants that "they may be required to drive interstate to do their jobs."

---

[105] *See* Pls.' Ex. 75: Henderson Decl. ¶ 17.
[106] Drivers were "assigned indiscriminately" in *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 475 (5th Cir. 2010).
[107] *See* Rec. 217, Section IV(F)(3)(d)(iii) of Pls.' Master Brief at p. 26; *see also* Rec. 219, Section II(C)(2)(b) of Pl. Billy Newman's Mot. For Summ. J. at p. 7; Rec. 220, Section II(C)(2)(b) of Pl. William Broussard's Mot. For Summ. J. at p. 6; Rec. 222, Section II(C)(2)(a)(iii) of. Pl. Steven Tankersley's Mot. For Summ. J. at p. 6; Rec. 223, Section II(C)(2)(b) of Pl. Adam Crews' Mot. For Summ. J. at p. 9; Rec. 230, Section II(C)(2)(a)(iv) of Pl. Gary Henderson's Mot. For Summ. J. at p. 7.
[108] Ex. 91: Burchfield Dep. 74:9–12.
[109] Ex. 91: Burchfield Dep. 74:17–20.
[110] Ex. 92: Comeaux Dep. 45:1–9.

**Response**: CTS' claim is nonsense. Plaintiffs have uniformly testified that they were not told when interviewing that they would drive interstate.

a.   Attached to plaintiffs' Master Brief and their individual motions are deposition excerpts and declarations in which they dispute that they were told that they would drive out-of-state;[111]

b.   At most, Burchfield testified in his deposition that the employees might "go" out-of-state, not that they would "drive" interstate;[112]

c.   Comeaux was asked in his deposition if he informed applicants that they might be required to drive vehicles out of state; his reply in July 2010 was: "I can't recall if I told them that or not."[113]

d.   CTS has now obtained a declaration from Burchfield which alters his critical testimony from "go" to "drive;" CTS has also obtained a declaration from Comeaux in which he claims that he tells new applicants that they might be required to drive interstate; implicitly, he is saying that he remembers saying this, contrary to his deposition testimony; case law questions the practice of obtaining declarations to create a fact issue where it did not otherwise exist;[114]

e.   Certainly, CTS had no interview guidelines or acknowledgement forms which could confirm CTS' claim that applicants were informed about the possibility of interstate driving;[115]

f.   Finally, CTS attached the Declaration of Reyna for support; Reyna, however, has only been the District Manager of the Alice District since June 2008, only five months before the end of the relevant time frame;[116] there is no evidence that he interviewed any of the bellwether plaintiffs;[117] and even had he done as defendant's motion claims, simply telling an applicant that the Alice District "assists"

---

[111] *See* Rec. 217, Section IV(F)(3)(d)(iv) of Pls.' Master Brief at p. 26; *see also* Pls.' Ex. 32: Patin Decl. ¶ 4; Pls.' Ex. 36: Newman Decl. ¶ 4; Pls.' Ex. 39: Broussard Decl. ¶ 4; Pls.' Ex. 42: Woodard Decl. ¶ 4; Pls.' Ex. 46: Tankersley Decl. ¶ 4; Pls.' Ex. 50: Crews Decl. ¶ 4; Pls.' Ex. 54: Cantu Decl. ¶ 4; Pls.' Ex. 58: Branham Decl. ¶ 4; Pls.' Ex. 62: B. Allen. Decl. ¶ 4; Pls.' Ex. 65: D. Allen Decl. ¶ 4; Pls.' Ex. 69: Hernandez Decl. ¶ 4; Pls.' Ex. 72: Pena Decl. ¶ 4.

[112] Ex. 91: Burchfield Dep. 147:3–148:18.

[113] Ex. 92: Comeaux Dep. 80:19–23.

[114] *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495–96 (5th Cir. 1996) (nonmovant not allowed to use affidavit to contradict deposition).

[115] *See* Rec. 217, Section IV(F)(3)(d)(iv) of Pls.' Master Brief at p. 27.

[116] *See* Def.' App. 17 at p. 651, Reyna Decl. ¶ 50.

[117] Hernandez and Pena, both from the Alice District, were interviewed by Rene Bilano and David Luera.  *See* Pls.' Ex. 69: Hernandez Decl. ¶ 4; Pls.' Ex. 72: Pena Decl. ¶ 4.

sister districts falls far short of creating a clear mutual understanding that plaintiffs will drive a CMV interstate.

14.   **Claim**:   CTS claimed that the employment of each of the following bellwether plaintiffs was "terminated:" B. Allen (item 2, page 7), Crews (item 7, page 8), Henderson (item 8, page 8), Newman (item 10, page 8), Patin (item 11, page 8), Sheikh (item 13, page 9), Tankersley (item 14, page 9), and Woodard (item 15, page 9).

   **Response**:  A worker whose employment was "terminated" may have been fired, laid off, or even resigned. None of the eight mentioned plaintiffs was fired. B. Allen, Henderson, Newman, and Tankersley resigned by their own decision.[118] Crews, Patin, Sheikh, and Woodard were laid off.[119]

15.   **Claim**:  In item 49 on page 20, CTS claims it is undisputed that the district manager consults with the SS about the job performance of employees.

   **Response**:

   a.   CTS cites ¶ 7 the Declaration of Burchfield; however that declaration merely contains conclusory allegations which have no evidentiary value;[120]

   b.   The conclusory allegations of Burchfield are contradicted by the deposition testimony of Wise, set forth in IV(A)(5), above;

   c.   The allegations of Burchfield are also contradicted by the Declaration of Henderson, attached as exhibit 75 to his individual motion for summary judgment;

   d.   Finally, CTS does not explain how Burchfield is unable to observe employees when they are working in the shop, which as the evidence

---

[118] *See* Pls.' Ex. 63, Employee Exit Form CTS 000113 of Pl. Byron Allen; Ex. 107: Henderson Dep. 23:14–24; Ex. 111: Newman Dep. 19:17–19; Pls.' Ex. 47, Employee Exit Form CTS 007134 of Pl. Steven Tankersley.

[119] Ex. 106: Crews Dep. 84:22–25; Ex. 113: Patin Dep. 11:7–8; Ex. 117: Sheikh Dep. 11:5–12; Ex. 123: Woodard Dep. 44:3–5.

[120] "[U]nsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient *to either support or defeat* a motion for summary judgment." *Galindo v. Precision American Corp*., 754 F.2d 1212, 1216 (5th Cir. 1985) (emphasis added); *see also Phillips v. Lesco Logistics, L.L.C.*, No. H-06-3297, U.S. Dist. LEXIS 40696, at *4 (S.D. Tex. June 5, 2007).

shows,[121] was a substantial amount of time, or to draw conclusions from customer requests and comments.[122]

## B.   Other Factual Claims by CTS that are Controverted

In portions of defendant's Primary Motion besides Section IV, it made numerous factual claims. Many are controverted, as plaintiffs show in this subsection.

1.   **Claim**:  With a broad brush, CTS claims at the bottom of page 30 (footnote 133) that the bellwether plaintiffs are "'drivers' in interstate commerce." This claim includes Sheikh, the only FEI among the bellwether plaintiffs.

**Response**:  Apparently, this claim by CTS relates to all bellwether plaintiffs except the two who work in the Broussard District. Yet, CTS only attached deposition excerpts from seven; and even those excerpts only reveal that on rare occasions they drove across state lines.

a.   Plaintiffs are not drivers[123] – they are well service technicians; at well sites, they are called upon to perform many tasks to service the fluids and flow of the wells, such as pulling hoses, running iron, and pressure testing (more detailed descriptions of their job duties are set forth in plaintiffs' declarations);[124] in addition, they also spent substantial time doing work in the shop, which had nothing to do with driving;[125]

---

[121] Ex. 122: Grizzle Decl. ¶ 4, 5.

[122] *See* Rec. 217, Section IV(F)(3)(d)(ii) of Pls.' Master Brief at p. 24; *see also* Pls.' Ex. 75: Henderson Decl. ¶ 8; Rec. 247, Section IV(D)(1)(a)(ii) of Def.'s Resp. to Pls.' Master Brief at p. 18.

[123] Defendant has a job position called "Sr. Truck Driver;" these employees help transport the equipment.  Ex. 94: Letchworth Dep. 224:13–225:3.

[124] *See* Pls.' Ex. 32: Patin Decl. ¶ 6; Pls.' Ex. 36: Newman Decl. ¶ 6; Pls.' Ex. 39: Broussard Decl. ¶ 6; Pls.' Ex. 42: Woodard Decl. ¶ 7; Pls.' Ex. 46: Tankersley Decl. ¶ 6; Pls.' Ex. 50: Crews Decl. ¶ 6; Pls.' Ex. 54: Cantu Decl. ¶6; Pls.' Ex. 58: Branham Decl. ¶ 6; Pls.' Ex. 62: B. Allen Decl. ¶ 6; Pls.' Ex. 65: D. Allen Decl. ¶ 6; Pls.' Ex. 69: Hernandez Decl. ¶ 6; Pls.' Ex. 72: Pena Decl. ¶ 6; Pls.' Ex. 75: Henderson Decl. ¶ 15.

[125] *See* Rec. 218, Section II(C)(2)(a)(ii) of Pl. Cody Patin's Mot. For Summ. J. at p. 4; Rec. 219, Section II(B) of Pl. Billy Newman's Mot. For Summ. J. at p. 2; Rec. 220, Section II(B) of Pl. William Broussard's Mot. For Summ. J. at p. 2; Rec. 221, Section II(B) of Pl. Donald Woodard's Mot. For Summ. J. at p. 2; Rec. 222, Section II(B) of Pl. Steven Tankersley's Mot. For Summ. J. at p. 2; Rec. 223, Section II(B) of Pl. Adam Crews' Mot. For Summ. J. at p. 2; Rec. 224, Section II(B) of Pl. Alfredo Cantu's Mot. For Summ. J. at p. 3; Rec. 225, Section II(B) of Pl. Presley Branham's Mot. For Summ. J. at p. 2; Rec. 226, Section II(B) of Pl. Byron Allen's Mot. For Summ. J at p. 2; Rec. 227, Section II(B) of Pl. Donald Allen's Mot. For Summ. J. at p. 2; Rec. 228, Section II(B) of Pl. Jesus Hernandez's Mot. For Summ. J. at p. 2; Rec. 229, Section II(B) of Pl. Jose Pena's Mot. For Summ. J. at p. 2; Rec. 230, Section II(B) of Pl. Gary Henderson's Mot. For Summ. J. at p. 2.

b.    As demonstrated repeatedly, four in Angleton had no CDL and could not drive a CMV: Henderson, Patin, Sheikh, and Woodard;[126] company policy prohibited anyone from driving who did not have a CDL;[127] so, this proves it is not necessary to drive in order to work successfully as a well service technician;

c.    CTS cited three excerpts from the deposition of B. Allen; in them, he explained that he once flew to Pennsylvania and came back in a motor vehicle; however, he did recall if he drove;[128] additionally, they show that his name is on a load-out ticket from a job in Oklahoma; in B. Allen's individual motion for summary judgment, he explained that he drove interstate once, maybe twice, during the relevant time frame;[129]

d.    CTS attached two pages from the deposition of Crews; there Crews testified that once in four years with CTS he drove the coil unit to a barge job in Louisiana; in Crews' individual motion for summary judgment, he mentions that the records suggest he drove on one other interstate trip;[130] this evidence therefore does not prove that Crews was an interstate driver;

e.    CTS also attached two pages from the deposition of Hernandez in which he vaguely recalled driving a CMV outside of Texas once to go to a site near the Louisiana border (no records document this); in his individual motion, he acknowledged this one trip when he potentially drove a CMV interstate during a tenure of 4 ½ years with CTS;[131] CTS also attached two other pages which establish that "rarely" would any co-workers go to Louisiana; primarily they stay in South Texas;[132]

f.    The deposition excerpts CTS cited from Branham indicate that he went interstate and drove on six occasions; in his individual motion for summary judgment, Branham explained that two of the trips

---

[126] *See* Rec. 230, Section II(C)(2)(a)(iii) of Pl. Gary Henderson's Mot. For Summ. J. at p. 6; Rec. 218, Section II(A) of Pl. Cody Patin's Mot. For Summ. J. at p. 2; Ex. 117: Sheikh Dep. 24:1–3; Rec. 221, Section II(C)(2)(a)(ii) of Pl. Donald Woodard's Mot. For Summ. J. at p. 4.

[127] Ex. 91: Burchfield Dep. 89:21–90:7; Ex. 94: Letchworth Dep. 103:25–104:4, 111:1–3; Ex. 95: Ramirez Dep. 103:22–104:4; Ex. 92: Comeaux Dep. 44:18–25.

[128] *See* Def.'s App. 1 at pp. 2, 23–27, 28–35, B. Allen Dep.

[129] *See* Rec. 226, Section II(C)(2)(a)(i) of Pl. Byron Allen's Mot. For Summ. J. at p. 4.

[130] *See* Def.'s App. 5 at pp. 185, 188, Crews Dep.

[131] *See* Rec. 228, Section II(C)(2)(a)(ii) of Pl. Jesus Hernandez's Mot. For Summ. J. at p. 4.

[132] *See* Def.'s App. 6 at pp. 232–233, Hernandez Dep.

occurred in 2006, one in 2007, and three in 2008;[133] these few trips were spread out over 32 months of the relevant time period when he serviced 157 wells,[134] including some offshore;[135]

g.   CTS attached five excerpts from the deposition of D. Allen; according to them there were two trips in a CMV;[136] in his individual motion, D. Allen mentioned that he only drove a CMV across state lines twice during 20 months of the relevant time period,[137] during which he also worked offshore;[138]

h.   CTS cites two excerpts comprising three pages from Woodard's deposition which show that he went to Louisiana as a passenger after he received his CDL;[139] moreover, as explained in his motion for summary judgment, Woodard never drove interstate, and only obtained a CDL in about his last month of employment (outside of the relevant time period);[140]

i.   In the two segments CTS attaches from the deposition of Pena, he testified that he drove an 18-wheeler to Oklahoma once, and within Oklahoma went to certain locations;[141] Pena's individual motion for summary judgment shows that this was his one interstate trip in both the relevant time period as well as his entire 3 ½ years working for CTS;[142]

j.   CTS attached no evidence at this point regarding any driving by Cantu, Henderson, Patin, Sheikh, and Tankersley;

k.   In sum, this evidence demonstrates that, of the 12 bellwether plaintiffs who were not in the Broussard District, all except Sheikh were well service technicians; none was a driver; almost half never drove a CMV out of state; and for the remainder, interstate driving was "rare," a remote possibility at most.

---

[133] *See* Rec. 225, Section II(C)(2)(a)(i) of Pl. Presley Branham's Mot. For Summ. J. at p. 5.
[134] *See* Rec. 225, Section II(C)(2)(a)(i) of Pl. Presley Branham's Mot. For Summ. J. at p. 5.
[135] Ex. 122: Grizzle Decl. ¶ 5.
[136] *See* Def.'s App. 2 at pp. 63–64, 70–71, 76; App. 3 at pp. 85–90, 93–104, D. Allen Dep.
[137] *See* Rec. 227, Section II(C)(2)(a)(ii) of Pl. Donald Allen's Mot. For Summ. J. at p. 4.
[138] Ex. 122: Grizzle Decl. ¶ 5
[139] *See* Def.'s App. 11 at pp. 389–90, 402, Woodard Dep.
[140] *See* Rec. 221, Section II(C)(2)(a)(ii) of Pl. Donald Woodard's Mot. For Summ. J. at p. 4.
[141] *See* Def.'s App. 8 at pp. 302, 305–08, Pena Dep.
[142] *See* Rec. 229, Section II(C)(2)(a)(ii) of Pl. Jose Pena's Mot. For Summ. J. at p. 4.

2.    **Claim**:  At footnote 126 on page 30, CTS makes the grossly misleading and untrue statement that "plaintiffs admit that driving is a necessary job duty. . . ."

**Response**:  Based upon only three excerpts from two employees, CTS tries to claim that "plaintiffs" (presumably, all bellwether plaintiffs) admit driving is a necessary duty. These excerpts do not represent the evidence of other plaintiffs, nor is the inference CTS attempts to draw valid.

a.    The excerpt from Hernandez only indicates that Hernandez drove the coil tubing unit 90% of the time *compared to other vehicles*;[143] it does not indicate how much of his time as an employee was spent behind the wheel compared to when he was performing his duties as a well service technician or when he worked in the shop; and even more precisely, he never said driving was "necessary" for his job; in addition, CTS failed to direct the Court to other testimony from Hernandez where he explained that he could be on a well up to three weeks;[144]

b.    In the three pages from Cantu's deposition, he said he drove a pick-up truck and 18-wheelers as part of his job when he was an STI; he said nothing about his activities in other job positions; nor did he "admit" it was "necessary;"

c.    In fact, driving a CMV is not "necessary" for an ss;[145]

d.    Driving also was not necessary for Patin, Woodard, and in the Broussard District, Broussard and Newman; a worker can do the job of an STI and STII without driving;

e.    To the extent CTS tries to explain away this misrepresentation by saying it applies to non-CMVs, then, in addition to being untrue, it is also irrelevant.

3.    **Claim**:  At footnote 115 on page 25, CTS broadly says that it seeks business where it does not have a service district.

**Response**:  CTS has not proved that each district seeks out-of-state business, and in fact the map of the territories of the Alice District and Angleton District suggest the opposite.[146]

---

[143] *See* Def.'s App. 6 at p. 226, Hernandez Dep.
[144] Ex. 109: Hernandez Dep. 49:4–6.
[145] Ex. 107: Henderson Dep. 25:7–11.

**4.** **Claim**: CTS makes several unsupported claims about Sheikh; one occurs on page 47 at footnote 209, where CTS says that his "primary duty" is to observe and input data about the coil tubing unit in the field; CTS made a similar allegation on page 6 at footnote 13.

**Response**:  For support, CTS cites two pages from Sheikh's deposition;[147] neither the phrase "primary duty" nor the concept is discussed; while he talked about the part of his job that involved updating logs, that was only a tiny portion of his work; in segments of Sheikh's deposition that CTS did not quote to the Court, Sheikh testified that he did the work of STIs in the field, doing "[e]verything that they were doing;"[148] he said "it didn't take that long for me to input the data, the logs into the program. That didn't take about 20 – 30 minutes;"[149] according to the evidence, "about 98 – 99 percent of the time"[150] he was doing the work of an STI or STII.[151]

**5.** **Claim**:  CTS claims at footnote 11 on page 5 that an SS "customarily and regularly direct[s] the work of two or more full-time" employees.

**Response**:

a.   To prove its claim, CTS first cited the declaration of Burchfield; initially, plaintiffs note that this is another conclusory allegation; in addition, Burchfield admitted in the same ¶ 7 of his declaration that he does not typically observe employees working in the field;

b.   CTS also points to two segments from Henderson's deposition; in neither does Henderson testify as claimed; which agrees with the deposition of Ramirez,[152] and part of the declaration of Wise when he calls himself a "crew leader" in the field; yet, that is only part of his shifting duties; when Henderson is working in the yard he does not customarily direct two or more employees;[153]

---

[146] *See* Pls.' Ex. 7: Printout of CTS' website.

[147] *See* Def.'s App. 10 at pp. 352–53, Sheikh Dep.

[148] Ex. 117: Sheikh Dep. 22:21–23:2.

[149] Ex. 117: Sheikh Dep. 23:15–18.

[150] Ex. 117: Sheikh Dep. 23:11–15, 30:24–31:3.

[151] It is not the name of the job, but the duties which matter; the Fifth Circuit in *Dalheim v. KDFW-TV* found that the trial court did not err because it "painstakingly catalogued the tasks" that the employees performed.  918 F.2d 1220, 1227 (5th Cir. 1990).  In this connection, it is obvious that defendant is simplistic and erroneous when it claims on page 6 of the Primary Motion that "any Plaintiff in the same job classifications . . . should also be dismissed." According to *Dalheim*, the employee's "exempt status . . . remains intensely factbound and case specific."  *Id*. at 1226.

[152] *See* Rec. 230, Section II(C)(1) of Pl. Gary Henderson's Mot. For Summ. J. at p. 5.

[153] Ex. 108: Henderson Decl. ¶ 6; *see also* Ex. 103: Henderson MPU Summary Chart..

c.   Nor does paragraph ¶ 24 from the declaration defense witness Wise support the claim that Henderson regularly directs two or more employees; nowhere does Wise state that he observed Henderson direct the work of any employee; in fact, in that paragraph, Wise did not state that any SS directed the work of two or more employees; elsewhere[154] CTS cited ¶ 22 of the declaration of Wise in which he made this conclusory allegation; but even there he did not say that he observed Henderson direct anyone;

d.   In a final effort to support its claim, CTS cites the deposition of Letchworth; like Wise, there is no evidence that she ever observed Henderson work; in fact, she never observed any work in the field;[155] and in the excerpt referenced by CTS, she did not testify that he directed two or more employees;

e.   At this point, it is good to bear in mind the Fifth Circuit's ruling in *Dalheim*: "To qualify for an executive exemption . . . an employee's primary duty must consist of the 'management of the enterprise' in which she is employed 'or a customarily recognized subdivision thereof.'  In addition, the employee must customarily and regularly direct the work of two or more employees. The district court found that management was not the producers' primary duty, and that producers do not customarily direct the work of two or more employees."[156]

6.   **Claim**:  In item 17 on page 9, CTS claims it is undisputed that STIs, STIIs, and SSs are "tasked" with the responsibility to transport property over public highways. (CTS makes a comparable claim at footnote 106.)

**Response**:   The evidence CTS cites falls short of this proof, consisting generally of testimony from plaintiffs that they rigged up or drove on occasion, and from Letchworth about job descriptions.

a.   In the deposition segment CTS cited from B. Allen, he testified that he went to Pennsylvania, that he drove some of the vehicles, that he rigged up, and that he operated on occasion the coil unit;

---

[154] *See* Rec. 235 at p. 20 n.97 of Def.'s Primary Motion.
[155] Ex. 94: Letchworth Dep. 147:12–18.
[156] *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1232 (5th Cir. 1990); *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1285 (11th Cir. 2008) ("[A]n employee who performs the same nonexempt, manual tasks as his co-workers is not an executive even though he is technically a supervisor).

b. In the deposition segments CTS cited of Pena and defense witness Washington, they said nothing whatsoever about crewmembers being tasked with transporting property;

c. Those plaintiffs who did not have a CDL[157] were not "tasked" with the responsibility of driving,[158] assuming that CTS means "to drive" when it says "to transport" (if it does not, the point is meaningless);

d. With regard to offshore work, CTS regularly used third-party vendors to drive the equipment to the docks;[159]

e. In the deposition segment CTS cited from Letchworth, she testified that certain job descriptions included the phrase "by driving," but, significantly, she was aware of no policy requiring the employees to be provided with the job descriptions and she did not know whether, in fact, they were actually provided to them;[160] in addition, the job descriptions themselves were created in 2006 or 2007 (well after the start of the relevant time period) and Letchworth did not know how long the prior job descriptions were in effect[161] and did not explain their contents;

f. Finally, this claim that CTS incorrectly says is undisputed only involves the MCA if the employee drives a CMV interstate, which item 17 does not address;[162] in this connection, at footnote 134, CTS wrongly tells the Court that this item 17 proves that the employees "transport CTS property across state lines," a fact not found here.

## C.   Erroneous Impressions CTS Created of the Record

As the Court has already seen, CTS has repeatedly misrepresented the record. In addition to the occasions previously discussed, set forth are some of the other instances where CTS claimed that the evidence proves a point when it does not. To preserve space, plaintiffs can only list them here without detailed discussion.

---

[157] *See* Rec. 235, Section IV, No. 24 of Def.'s Primary Motion at pp. 11–12.

[158] *See* Rec. 235, Section IV, No. 21 of Def.'s Primary Motion at p. 11.

[159] *See* Rec. 217, Sections IV(F)(3)(d)(iii) and IV(F)(4)(c) of Pls.' Master Brief at pp. 26, 38.

[160] Ex. 94: Letchworth Dep. 248:5–19.

[161] Based upon the testimony of Human Resources Manager Tiffany Letchworth ("Letchworth"), it appears that the job descriptions were revised in 2006 or 2007 (well into the "relevant time frame"); it is unclear whether the previous job descriptions contained any reference to CDLs at all; Ex. 94: Letchworth Dep. 77:24–78:8.

[162] *See* Rec. 217, Section IV(F) of Pls.' Master Brief at pp. 16–17.

1.   CTS claims on page 10 at footnote 34 that the coil tubing reels were "frequently" changed;

    a.   Though Washington claimed it might be changed in about two weeks, Burchfield, his boss, said "you could use a reel for a year;"[163]

    b.   More significantly, CTS does not state at footnote 34 who changes the reel, but the evidence shows that third party companies changed the large reels;[164] plaintiffs did not change the coil tubing reels.[165]

2.   At the same footnote 34, CTS mentioned that chemicals and tools had to be loaded; these items are very minor in size and weight, and do not affect the safety of operation of the vehicles; according to Burchfield, the total weight of the personal protective equipment and other tools would be 20 pounds or less;[166] the chemicals are essentially five-gallon buckets of lubricants;[167]

3.   In item 18 on page 9, CTS quotes from its job descriptions, which were edited after the start of the relevant time period; one thing is certain:  it is not necessary to drive a CMV to be an STI or STII.[168]

4.   In item 20 on page 11, CTS says no crewmember in Angleton works "exclusively on offshore jobs;" however, Burchfield testified that all STIs and STIIs work offshore;[169] thus, Woodard spent 30 consecutive days offshore, and his offshore jobs were a 87% percent of all jobs he worked during the relevant time period;[170] likewise in the relevant time period, other Angleton employees (mentioned here to correct the false impression CTS created by its reference to other employees) spent extended periods of time offshore and in the shop:[171]

| Worker | Offshore | Shop |
|---|---|---|
| Nodley Broussard | 291 days | 298 days |

---

[163] Ex. 91: Burchfield Dep. 169:1–9.
[164] Ex: 95: Ramirez Dep. 25:1–6; *see also* Pls.' Ex. 16: McLeod Dep. at p 62:8–11.
[165] Ex. 111: Newman Dep. 37:7–17; Ex. 115: Pena Dep. 22:11–24.
[166] Ex. 91: Burchfield Dep. 173:1–16.
[167] Ex. 98: Washington Dep. 16:17–17:2; Ex. 95: Ramirez Dep. 72:5–8.
[168] *See* Rec. 218, Section II(A) of. Pl. Cody Patin's Mot. For Summ. J. at p. 1; Rec. 219, Section II(A) and (B) of Pl. Billy Newman's Mot. For Summ. J. at p. 2; Rec. 220, Section II(A) of Pl. William Broussard's Mot. For Summ. J. at p. 2; Rec. 221, Sections II(A) and II(C)(2)(a)(ii) of Pl. Donald Woodard's Mot. For Summ. J. at pp. 1, 4.
[169] Ex. 91: Burchfield Dep. 148:8–15.
[170] Ex. 122: Grizzle Decl. ¶ 5.
[171] Ex. 122: Grizzle Decl. ¶ 4; *see also* Ex. 121: Wimberly Decl. ¶ 4.

| | | |
|---|---|---|
| Blake Brown | 78 days | 203 days |
| Devin Bruce | 39 days | 102 days |
| Anthony Dean | 144 days | 71 days |
| Michael Fletcher | 100 days | 143 days |
| Jose Flores | 127 days | 277 days |
| Nicholas Flores | 9 days | 171 days |
| Odell Godfrey | 46 days | 69 days |
| Antonio Gonzalez | 81 days | 302 days |
| Jeffery Grizzle | 216 days | 285 days |
| Keith Haynie | 37 days | 63 days |
| Leo Jasso | 79 days | 302 days |
| Jerome Johnson | 60 days | 200 days |
| Christopher Keenom | 155 days | 330 days |
| Mark LaFleur | 75 days | 221 days |
| Xavier Liguez | 132 days | 173 days |
| Franklin Lucy | 180 days | 262 days |
| Alfredo Medrano | 11 days | 91 days |
| Israel Molina | 94 days | 175 days |
| Charles Morgan | 28 days | 81 days |
| Nahum Moscot | 72 days | 221 days |
| Rolando Ramirez | 135 days | 278 days |
| Reynaldo Saenz | 68 days | 277 days |

| | | |
|---|---|---|
| Brent Slusser | 109 days | 199 days |
| Robert Smith | 80 days | 333 days |
| Harold Sparks | 327 days | 295 days |
| Kurt Spitzenberger | 127 days | 157 days |
| Brian Springer | 26 days | 65 days |
| Clarence Thomas | 51 days | 132 days |
| John Thomas | 62 days | 165 days |
| Marcus Tottenham | 89 days | 311 days |
| Donald Allen* | 62 days | 126 days |
| Alfredo Cantu* | 87 days | 216 days |
| Adam Crews* | 195 days | 229 days |
| Presley Branham* | 72 days | 223 days |
| Gary Henderson* | 23 days | 68 days |
| Steven Tankersley* | 45 days | 165 days |
| Donald Woodard* | 91 days | 117 days |
| Luis Escobedo** | 168 days | 257 days |
| Joey Perez** | 85 days | 236 days |

*Bellwether plaintiff

** CTS witness

Significantly, when working offshore or in the shop, the worker is not affecting the safety of a CMV in interstate commerce.

5.  In item 26 on pages 12 and 13, CTS suggests that any district services any well, anywhere it is located; the evidence proves that this theory is not what actually happens in practice;

    a.  Burchfield testified that each district is a profit center and the district manager receives a bonus based upon its performance; thus, there is economic incentive for each district to cover jobs in its own territory;[172] Burchfield testified that it is customary for his district to handle the jobs in its district;[173]

    b.  CTS has no central dispatch,[174] and the website lists specific telephone numbers to directly contact the various districts;[175]

    c.  None of the bellwether plaintiffs drove to or loaded for a job in Alabama, Colorado, Florida, Mississippi, New Mexico, or Utah.[176]

6.  In item 27 on page 13, CTS referenced "cab cards" (presumably the "mechanisms" mentioned at footnote 112 on page 25). CTS produced no evidence of a cab card for the Alice District. In addition, the Angleton District employed more than one "Senior Truck Driver" who hauled and transferred equipment;[177] so, despite any implication by CTS, cab cards were not necessary for the activities of the bellwether plaintiffs.

7.  In item 28 on page 13, CTS refers to IFTA reports. However, they do not show that any bellwether plaintiff drove to Alabama, Colorado, Florida, Mississippi, Nevada, New Mexico, Pennsylvania, Utah, or Wyoming. In addition, CTS' claim of driving a total of "thousands of miles" does not mean it drove thousands of miles in each state, nor does it mean that CTS serviced a job in each state. CTS repeats its claim on page 24 at footnote

---

[172] See Rec. 217, Section IV(F)(3)(d)(v) of Pls.' Master Brief at pp. 28–29.

[173] Ex. 91: Burchfield Dep. 28:15–18.

[174] See Rec. 217, Section II of Pls.' Master Brief at p. 2.

[175] See Pls.' Ex. 7: Printout of CTS' website.

[176] See Rec. 218, Section II(C)(2) of Pl. Cody Patin's Mot. For Summ. J. at pp. 3–7; Rec. 219, Section II(C)(2) of Pl. Billy Newman's Mot. For Summ. J. at pp. 4–9; Rec. 220, Section II(C)(2) of Pl. William Broussard's Mot. For Summ. J. at pp. 4–8; Rec. 221, Section II(C)(2) of Pl. Donald Woodard's Mot. For Summ. J. at pp. 3–6; Rec. 222, Section II(C)(2) of Pl. Steven Tankersley's Mot. For Summ. J. at pp. 4–8; Rec. 223, Section II(C)(2) of Pl. Adam Crews' Mot. For Summ. J. at pp. 4–8; Rec. 224, Section II(C)(2) of Pl. Alfredo Cantu's Mot. For Summ. J. at pp. 4–9; Rec. 225, Section II(C)(2) of Pl. Presley Branham's Mot. For Summ. J. pp. 4–9; Rec. 226, Section II(C)(2) of Pl. Byron Allen's Mot. For Summ. J. at pp. 3–7; Rec. 227, Section II(C)(2) of Pl. Donald Allen's Mot. For Summ. J. at pp. 3–8; Rec. 228, Section II(C)(2) of Pl. Jesus Hernandez's Mot. For Summ. J. at pp. 3–8; Rec. 229, Section II(C)(2) of Pl. Jose Pena's Mot. For Summ. J. at pp. 3–8; Rec. 230, Section II(C)(2) of Pl. Gary Henderson's Mot. For Summ. J. at pp. 5–10.

[177] Ex. 91: Burchfield Dep. 140:20–141:16.

110, but provided no evidence that the bellwether plaintiffs drove thousands of miles in states other than their districts.

8. Item 30 on page 14 potentially creates that impression that crews stay intact and are customarily recognized departments or subdivisions of CTS. The reality is different. Crews are transient collections of employees that do not stay intact.[178]

9. In item 36 on page 16, CTS claims that heavy "machinery" is transported by those within its term "Field Service Employees;" CTS defines this term to include SSs; however, SSs drive the pickup truck,[179] as even CTS concedes,[180] and do not haul heavy machinery.[181] In addition, others without a CDL do not transport the equipment.[182]

10. CTS claims in item 37 on page 16 that the operator inspects the vehicle to "ensure that the load is secure." (It makes a similar claim at footnote 188.) For offshore jobs from Broussard and Angleton, the "operator" is most likely not a bellwether plaintiff, or even an employee of CTS, since third-party vendors are regularly used to transport the equipment.[183] For land jobs, to the extent that this only means that the operator walks around the vehicle and goes through a visual inspection, it harmonizes with the evidence;[184] however, to the extent this implies that the operator is actually "securing the load," *i.e.*, building a balanced and secure load, it conflicts with the testimony.[185] Finally, even when a worker secures a load, for the action to be exempt under the MCA, the worker must exercise judgment and

---

[178] *See* Rec. 217, Section IV(E) of Pls.' Master Brief at pp. 14–16.

[179] *See* Rec. 230, Section II(C)(2)(a)(i) of Pl. Gary Henderson's Mot. For Summ. J. at p. 6.

[180] *See* Rec. 235, Section IV, No. 34 of Def.'s Primary Motion at p. 15.

[181] Ex. 108: Henderson Decl. ¶ 5.

[182] *See* Rec. 218, Section II(C)(2)(a)(ii) of Pl. Cody Patin's Mot. For Summ. J. at p. 4; Rec. 219, Section II(C)(2)(a)(ii) of Pl. Billy Newman's Mot. For Summ. J. at p. 5; Rec. 220, Section II(C)(2)(a) of Pl. William Broussard's Mot. For Summ. J. at pp. 4–5; Rec. 221, Section II(C)(2)(a)(ii) of Pl. Donald Woodard's Mot. For Summ. J. at p. 4; Rec. 230, Section II(C)(2)(a)(iii) of Pl. Gary Henderson's Mot. For Summ. J. at p. 6.

[183] *See* Rec. 217, Section IV(F)(3)(d)(iii) of Pls.' Master Brief at p. 26; *see also* Rec. 219, Section II(C)(2)(b) of Pl. Billy Newman's Mot. For Summ. J. at p. 7; Rec. 220, Section II(C)(2)(b) of Pl. William Broussard's Mot. For Summ. J. at p. 6; Rec. 222, Section II(C)(2)(a)(iii) of Pl. Steven Tankersley's Mot. For Summ. J. at p. 6; Rec. 223, Section II(C)(2)(b) of Pl. Adam Crews' Mot. For Summ. J. at p. 9; Rec. 230, Section II(C)(2)(a)(iv) of Pl. Gary Henderson's Mot. For Summ. J. at p. 7.

[184] Ex. 106: Crews Dep. 74:8–15; Ex. 104: Cantu Dep. 33:18–34:3; Ex. 123: Woodard Dep. 40:2–6; Ex. 99: B. Allen Dep. 124:9–22; Ex. 102: Branham Dep. 30:9–13; Ex. 115: Pena Dep. 21:2–8.

[185] *See* Pls.' Ex. 32: Patin Decl. ¶ 5; Pls.' Ex. 36: Newman Decl. ¶ 5; Pls.' Ex. 39: Broussard Decl. ¶ 5; Pls.' Ex. 42: Woodard Decl. ¶ 6; Pls.' Ex. 46: Tankersley Decl. ¶ 5; Pls.' Ex. 50: Crews Decl. ¶ 5; Pls.' Ex. 54: Cantu Decl. ¶ 5; Pls.' Ex. 58: Branham Decl. ¶ 5; Pls.' Ex. 62: B. Allen Decl. ¶ 5; Pls.' Ex. 65: D. Allen Decl. ¶ 5; Pls.' Ex. 69: Hernandez Decl. ¶ 5; Pls.' Ex. 72: Pena Decl. ¶ 5; Pls.' Ex. 75: Henderson Decl. ¶ 14.

discretion while the vehicle is being loaded,[186] the loading activities must not be trivial,[187] and the load most travel across state lines.[188]

11.     In item 38 on page 17, CTS claims that crewmembers sometimes load liquid nitrogen; for support, it directs the Court to ¶ 22 of the Declaration of Burchfield; however, that paragraph says nothing about loading.

12.     In item 39, CTS claims that typically an SC or SS signs a shipping document indicating that someone loaded; the documents, though, reveal a wide diversity of how these forms were handled in practice; for instance, Burchfield signed these documents, though he was not an SC or SS, and many indicate that Burchfield himself loaded.[189]  CTS simply did not have a sufficiently uniform procedure when completing these forms.[190] Lastly, at footnote 184 on page 39, CTS cites to this item 39 to prove that Gary Henderson loaded on several occasions; it does not state in item 39 that the vehicle went interstate, but more importantly, nowhere in the evidence adduced for item 39 does it show that Henderson loaded anything.

13.     On page 31, CTS claims, without citing any evidence whatsoever, that "interstate jobs are assigned indiscriminately;" it does the same thing on page 11 of its Secondary Motion; however, the evidence adduced by plaintiffs at point 11 on page 19, above, proves the opposite.

## VI.     DRIVERS' HELPERS

Realizing that the evidence does not show that plaintiffs were drivers or loaders, CTS now claims that they were "driver's helpers." 29 C.F.R. § 782.4 define a driver's helper as:

> "A Driver's 'helper,' . . . is an employee . . . who is required to ride on a motor vehicle when it is being operated in interstate or foreign commerce within the meaning of the Motor Carrier Act. (The term does not include . . . . assistants or relief drivers . . . .) This definition has classified all such employees, including armed guards on armored trucks and conductorettes on buses, as 'helpers' . . . because of their engagement in some or all of the

---

[186] 29 C.F.R. § 782.5(a); *see also Wirtz v. C & P Shoe Corp.,* 336 F.2d 21, 29 (5th Cir. 1964); *Marshall v. Thiele,* No. 76-38, 1978 U.S. Dist. LEXIS 14504, at *15 (M.D. Pa. Nov. 7, 1978).
[187] *Pyramid Motor Freight Corp. v. Ispass,* 330 U.S. 695, 708 (1947); *Troutt v. Stavola Bros., Inc.,* 107 F.3d 1104, 1108 (4th Cir. 1997).
[188] *Pyramid,* 330 U.S. at 706; *Opelika Royal Crown Bottling Co. v. Goldberg,* 299 F.2d 37, 42 (5th Cir. 1962).
[189] *See* Pls.' Ex. 12: Material Loading/Shipping Instructions.
[190] Ex. 108: Henderson Decl. ¶ 10.

> following activities which . . . directly affect the safety of operation of such motor vehicles in interstate or foreign commerce . . . :  Assist in loading the vehicles . . . ; dismount when the vehicle approaches a railroad crossing and flag the driver across the tracks, and perform a similar duty when the vehicle is being turned around on a busy highway or when it is entering or emerging from a driveway . . . ; in case of a breakdown:  (1) Place the flags, flares, and fuses as required by the safety regulations. (2) go for assistance while the driver protects the vehicle on the highway, or vice versa, or (3) assist the driver in changing tires or making minor repairs; and assist in putting on or removing chains."

Here, CTS has failed to prove that plaintiffs were drivers' helpers because there is no evidence that they were required to ride on a CMV in interstate commerce and perform the duties listed in the above regulation.

## VII.   GARY HENDERSON

CTS asserts four exemptions to avoid paying overtime to Henderson:  the MCA; the administrative exemption; the executive exemption; and the "highly compensated employee" exemption.[191] Plaintiffs elsewhere[192] have addressed the inapplicability of the MCA and the executive exemption. CTS urges the administrative exemption for the years when Henderson served as an SC; however, plaintiff does not seek overtime for his work during that time.

Regarding the "highly compensated employee" exemption, in item 47 on page 19 CTS says that the annual compensation of Henderson totaled $117,636.53. This figure is misleading because, for the first 4 ½ months of 2006, Henderson worked in the higher

---

[191] In its Primary Motion, defendant argues the MCA at page 20ff, the administrative exemption at page 41ff, the executive exemption at page 45ff, and the "highly compensated employee exemption at page 46ff.
[192] *See* Rec. 217, Sections IV(E) and (F) of Pls.' Master Brief at pp. 12–30; *see also* Rec. 230, Section II(C) of Pl. Gary Henderson's Mot. For Summ. J. at pp. 3–9.

position of SC; he only served as an SS for 7 ½ months during 2006.[193] In the last sentence

of item 47, CTS claimed his compensation "annualized" in 2007 to a figure exceeding

$100,000; but, because his compensation consisted of numerous elements, including per

diems, bonuses, and allowances (some of which were variable depending upon the

number of jobs he serviced), and because his "base salary" was not $100,000,[194] there is

no proof that he earned in excess of $100,000 in 2007.

Most importantly, the "highly compensated" employee exemption requires non-

manual work,[195] but Henderson performed manual work as an SS.[196] According to 29

C.F.R. § 541.601(d):

> "This section applies only to employees whose primary duty includes
> performing office or non-manual work. Thus, for example, non-
> management production-line workers and non-management employees in
> maintenance, construction and similar occupations such as carpenters,
> electricians, mechanics, plumbers, iron workers, craftsmen, operating
> engineers, longshoremen, construction workers, laborers and other
> employees who perform work involving repetitive operations with their
> hands, physical skill and energy are not exempt under this section no matter
> how highly paid they might be."

In the field, offshore, and in the shop, Henderson worked with his hands;[197] numerous

witnesses confirmed that an SS works with his hands, and will get tired and dirty.[198]

## VIII.    MAHMOUD SHEIKH

CTS says on page 47 that, in addition the MCA, it can avoid paying overtime to

Sheikh due to the professional exemption.

---

[193] *See* Rec. 230, Section II(A) of Pl. Gary Henderson's Mot. For Summ. J. at pp. 1–2.
[194] Ex. 108: Henderson Decl. ¶ 9.
[195] *Sarviss v. General Dynamics Info. Tech., Inc.,* 663 F. Supp. 2d 883, 896 (C.D. Cal. 2009).
[196] *See* Rec. 230, Section II(C)(1) of Pl. Gary Henderson's Mot. For Summ. J. at p. 4.
[197] *See* Pls.' Ex. 75: Henderson Decl. ¶¶ 15, 16.
[198] *See* Rec. 217, Section IV(E)(2) of Pls.' Master Brief at p. 15.

1. **Claim**:  In item 41 on page 17, CTS talks about the primary duty of the FEI position. In item 42 on page 18, CTS asserts that it is undisputed that the FEI position[199] held by Sheikh "requires advanced knowledge in the field of petroleum engineering."

   **Response**:  It does not.

   a. CTS cited two pages from Sheikh's deposition; in the first, Sheikh testified about the courses he took to obtain his degree;[200] the second cited page is the job description; there is no evidence that the job description was used when hiring Sheikh; even more importantly, in a portion of the deposition of Sheikh that CTS did not bring to the Court's attention, he stated that the job description did not accurately reflect his job duties;[201] Sheikh further testified that he performed duties like an STI or an STII approximately 98% to 99% of the time when he was out in the field;[202] also, when operating the computer system, he merely input data,[203] which did not require a degree; that is why Washington and Ramirez were able to do his job[204] before him even though they did not have degrees;[205] Sheikh plainly states that an advanced degree or knowledge of petroleum engineering was not necessary to perform his job;[206]

   b. Interestingly, Sheikh's testimony was confirmed in part by defense witness Gortmaker, who was an FEI; before being transferred to Bridgeport, he worked in Angleton as a trainee;[207] there, he did much of the same work as an STI and STII;[208] in fact, he did "job duties that [he] believes are similar to a Service Tech I or a Service Tech II" for 18 months[209] (the first nine months of which were in Angleton);[210]

   c. Thus, advanced knowledge in the field of petroleum engineering was not required to do the job of an FEI; of course, it is not undisputed that it was;

---

[199] According to page 9 of CTS' Primary Motion, a field engineer trainee is called an FEI, the position held by Sheikh.
[200] *See* Def.'s App. 10 at p. 351, Sheikh Dep.
[201] Ex. 117: Sheikh Dep. 39:21–40:2.
[202] Ex. 117: Sheikh Dep. 22:21–23:18.
[203] Ex. 117: Sheikh Dep. 17:14–17.
[204] Ex. 117: Sheikh Dep. 43:13–44:3.
[205] Ex. 98: Washington Dep. 8:1–3; Ex. 95: Ramirez Dep. 12:3–4.
[206] Ex. 118: Sheikh Decl. ¶ 3.
[207] Ex. 93: Gortmaker Dep. 22:13–20; 24:14–16.
[208] Ex. 93: Gortmaker Dep. 31:11–20.
[209] Ex. 93: Gortmaker Dep. 36:24–37:18.
[210] Ex. 93: Gortmaker Dep. 24:8–16.

d.   In other portions of the Primary Motion, CTS reiterated this untrue claim in various ways; for instance, on page 48 at footnote 210, it repeats the "advanced knowledge" argument; that footnote describes his education, but does not indicate that "advanced knowledge" was required for his job; likewise, at footnote 15 on page 16 CTS also makes this assertion; the deposition excerpts of Sheikh which CTS there cited again do not establish that advanced knowledge was required for his job; additional evidence from Gortmaker supports Sheikh's testimony that a degree is not required; Gortmaker admitted he did not need an engineering background to do the job in the field like the STI and STII, that it was manual labor,[211] and that his engineering background did not come in handy.[212]

**2.**   **Claim**: at footnote 84 on page 18, CTS says Sheikh drove a pickup.

**Response**:  While it is true that Sheikh drove a pickup, what CTS did not tell the Court is that the vehicle is not a CMV – it is a Ford-150;[213] Sheikh never held a CDL.[214]

Accordingly, CTS has failed to prove all of the elements necessary to establish that either the professional exemption or the MCA applies to Sheikh.

## IX.   LAW AND ARGUMENT

## A.   Interstate Safety of Operation of a CMV.

CTS propounds its "Law and Argument" on page 20ff. of its Primary Motion. There, it states that "drivers" and "loaders" are "among the classes of workers that affect

---

[211] The "professional . . . exemption[] [does] not apply to employees training for employment in [a] . . . professional . . . capacity who are not actually performing the duties of [a] . . . professional . . . ." *See* 29 C.F.R § 541.705.
[212] Ex. 93: Gortmaker Dep. 76:6–11.
[213] Ex. 117: Sheikh Dep. 24:4–5.
[214] Ex. 117: Sheikh Dep. 24:1–3.

safety." The key point under the law, however, is that they must "directly affect"[215] transportation in "interstate commerce."[216]  29 C.F.R. § 782.3(b) states:

> This does not mean that an employee of a carrier who drives a motor vehicle is exempted as a "driver" by virtue of that fact alone. He is not exempt if his job never involves transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act.

In many of the facts[217] that CTS wrongly claimed were "undisputed," there is no mention of interstate commerce. Driving and loading for transportation that is intrastate is not covered by the MCA. As § 782.7(b)(1) explains: "Of course, engagement in local transportation which is entirely in intrastate commerce provides no basis for exempting a motor carrier employee." Painting with a broad brush again, CTS asserts on page 27[218] that plaintiffs are "drivers . . . and/or loaders," ignoring not only those plaintiffs prohibited from driving a CMV because they had no CDL, but also ignoring the essential requirement of § 782.2(b)(2), where the MCA exemption is expressly limited to those "directly affecting the safety" of interstate commerce. In addition, merely traveling across a state line – as CTS repeatedly has stated[219] – does not invoke the MCA because it does not directly affect the safety of operation of a CMV.

---

[215] *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 669 (1947).

[216] "This does not mean that an employee of a carrier who drives a motor vehicle is exempted as a 'driver' by virtue of that fact alone.  He is not exempt if his job never involves transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.3(b).

[217] CTS mentioned "driving" or "loading" at least 13 times without also connecting those actions to interstate activity; *see, e.g.* items numbered 18, 22, and 34.

[218] Defendant's paragraph which carries over to page 27 is also defective because it is limited to land jobs; it does not address the substantial time various plaintiffs, such as Woodard, spent offshore or at the shop.

[219] *See, e.g.*, page 25 at footnote 115, and page 31 within footnote 133, and the last sentence of page 31.

**B.      Reasonable Expectation.**

When a driver never drives across state lines, he can still be exempt if he is "likely to be[] called upon"[220] to directly affect the safety of a motor vehicle in interstate commerce. There must be a "reasonable expectation" that he will drive interstate, not a "<u>possibility</u>"[221] as CTS wrongly and stubbornly has claimed.[222] A "reasonable expectation" requires more than a remote possibility.[223] And even Burchfield characterized the chance of going out-of-state as merely a "possibility."[224]

In this context, on page 29 CTS cites *Johnson v. HIX Wrecker Serv., Inc.*[225] However, CTS confuses the finding that employees "who never drove interstate" were exempt under the MCA with the bellwether plaintiffs' duties in this lawsuit. *Johnson* involved full-duty tow truck drivers whose only continuing duty was to drive a tow truck. Like *Songer*, there is no evidence in *Johnson* that the tow truck drivers working in Indiana performed any offshore work, performed numerous other non-safety affecting duties for weeks at a time, or worked differing jobs from "week-to-week." Specifically, there is no evidence in *Johnson* that all of the plaintiffs work offshore, as testified by Burchfield.[226] Furthermore, there is no evidence in *Johnson* that the employees worked,

---

[220] 29 C.F.R. § 782.2(b)(3).

[221] CTS underlined the word "possibility" in its brief, and stated "emphasis supplied" after citing *Songer*; but the word "possibility" does not appear in *Songer* at all.

[222] *See, e.g.*, the second paragraph on page 28, the last line on page 31, and the first line on page 32.

[223] "That does not mean, however, that the Secretary of Transportation has automatic jurisdiction over all drivers of an interstate carrier. Pursuant to a notice of interpretation . . . to which we defer, jurisdiction extends only to drivers who reasonably could be expected to make one of the carrier's interstate runs, and that means more than a remote possibility." *Garcia v. Pace Suburban Bus Serv.*, 955 F. Supp. 75, 77 (N.D. Ill. 1996); cited by *Johnson v. HIX Wrecker Serv., Inc.*, 1:08-cv-50-WTL-JMS, 2009 U.S. Dist. LEXIS 51298 at *4 (S.D. Ind. June 18, 2009).

[224] Ex. 91: Burchfield Dep. 147:19–148:15.

[225] 2009 U.S. Dist. LEXIS 51298.

[226] Burchfield testified that all of the STIs and STIIs worked offshore. Ex. 91 Burchfield Dep. 148:8–15.

as a group, approximately **5,966** days offshore and **12,029** days in the shop,[227] as the

plaintiffs in the Angleton District did during the relevant time period, when they did not

affect interstate motor safety. Because the exclusive duty of the employees in *Johnson*

was driving, the possible application of § 782.2(b)(4) to their claims was neither raised by

them nor discussed by the court. However, as proven, plaintiffs in this lawsuit did not

drive *at all* for weeks, worked several shifting job assignments, and performed numerous

other duties that did not affect the safety of operation of CMVs under any circumstances

(interstate or intrastate) for weeks at a time.[228] As a result, the facts in *Johnson* are

completely different from the case at bar.  CTS utterly fails to address these major

distinctions.

Lastly, since CTS' own rules prohibited an employee who did not have a CDL from

driving a CMV, there was no reasonable expectation that Broussard, Henderson, Newman,

Patin, Sheikh and Woodard would ever drive in interstate commerce.[229]

## C.   **Individual Analysis.**

On page 29, when discussing "reasonable expectation," CTS claims that "it is not

the Plaintiff's actual individual experience . . . that is determinative." In this way, its

argumentation of one topic has erroneously splashed over to another. With respect to

"reasonable expectation," courts may look to the interstate driving where plaintiff

---

[227] Ex. 121: Wimberly Decl. ¶ 4.
[228] Ex. 122: Grizzle Decl. ¶ 4.
[229] *See* Section V(A) at pp. 8–9 above.

works;[230] but that does not mean that the worker's reasonable expectation is supplanted, and it certainly does not mean that an "enterprise theory" replaces the individual analysis required by the law.  As in *Harshman*,[231] cited by CTS, other courts apply an individual analysis to determine whether a plaintiff was reasonably expected to drive interstate:

> "The activities of the enterprise as a whole are not controlling.  Rather, 'the exemption in the [FLSA] depends upon the activities of the individual employees.'"

> *         *         *

> Velocity Express is not entitled to summary judgment because it has failed to heed this Court's earlier directive that to show each plaintiff is exempt from the overtime provisions of the FLSA, it must come forth with evidence that each plaintiff was engaged in activities that are covered by the motor carrier exemption. Velocity Express has only provided the Court with evidence generalizing the activities of all drivers. This aggregate evidence is not sufficient to determine which plaintiffs, if any, fall under the motor carrier exemption . . . .[232]

The "activities of one or a few plaintiffs cannot justify a blanket exemption as to all plaintiff-employees."[233]

In the case at bar, CTS has violated this rule. On page 32ff, CTS parades a list of interstate jobs. There are two problems with this. First, only a tiny fraction of the employees listed for those jobs are bellwether plaintiffs, not all bellwether plaintiffs are named, and Patin and Woodard, who are mentioned, had no CDL. Second, by listing the

---

[230] Even Letchworth testified that defendant's own application of exemptions was done on a "division" [read: district] basis, not on a company-wide basis Ex. 94: Letchworth Dep. 211:18–214:21; that was CTS' justification for categorizing only the STIs in the Broussard District as non-exempt.

[231] *Harshman v. Well Serv., Inc.*, 248 F. Supp. 953, 958 (W.D. Pa. 1965).

[232] *McGee v. Corporate Express Delivery Systems*, No. 08-20717-CIV, 2009 U.S. Dist. LEXIS 2726, at *2, 3 (S.D. Fla. 2009).

[233] *Masson v. Ecolab, Inc.*, No. 04 Civ. 4488, 2005 U.S. Dist. LEXIS 18022, at *18 (S.D.N.Y. Aug. 18, 2005).

interstate jobs of four districts in isolation from the vast number (about 4,568[234]) of total jobs those districts handled, it creates the misleading picture of a high percentage of trips. Further, though CTS claims it had at least one interstate job each quarter, that requires the Court to aggregate the listed statistics; the list shows no interstate job for Bridgeport for the first 5 months of 2006, none for Angleton for the first 6 months of 2006, and none for Alice at all (though it did loan[235] "equipment and personnel" to another district in December 2006).  In 2007, Alice continued to loan resources in January for a job in the same county as the December job, but never again performed an interstate job; the list shows one job for Bridgeport, and none for Broussard; finally, at least two jobs for Angleton appear to be offshore jobs in which the crew simply "traveled" to Louisiana. In 2008, the list shows that Alice ended in April a drought of more than one year without any interstate activity; then, Alice went from mid-July through mid-October without an interstate job; Angleton went from mid-May[236] through mid-October without an interstate land job;[237] and, in the first quarter, the list shows no interstate job for Bridgeport.

**D.     Workweek-by-Workweek.**

On page 26 of its Primary Motion, CTS triggered the issue of a "workweek" analysis. The question is whether interstate driving in one week creates an exemption for an employee's entire tenure, which might last many years.  CTS refers to *Garza*[238] which

---

[234] Ex. 122: Grizzle Decl. ¶ 7. Pls.' review of Def.'s Resp. to Pls.' 30(B)(6) Interrogatories and Def.'s Supplemental Resp. to Pls.' 30(B)(6) Interrogatories indicates about 5,600 total jobs in these four districts during the relevant time period.  *See* Ex. 126 and 127
[235] There is no evidence that any member of the bellwether plaintiffs drove any CMV on this occasion, or for that matter, were involved in any manner.
[236] There is no evidence that bellwether plaintiff Adam Crews drove a CMV on the May 20, 2008 job.
[237] The August 22, 2008 job was offshore.
[238] No. C-10-100, 2011 U.S. Dist. LEXIS 22869 (S.D. Tex. Mar. 7, 2011).

cites one portion of the regulations. But, it is the wrong portion. The regulations in 29

C.F.R. § 782.2(b) provide three rules, the second with two alternatives:

> **First**, the "general rule" begins in the first sentence of § 782.2(b)(3), and applies to drivers or loaders who regularly or from time to time have safety-affecting activities in interstate commerce;[239]

> **Second**, there is the "on the other hand" rule which begins with the fourth sentence of § 782.2(b)(3); this rule has two alternatives:

>> -if employee does not have a "substantial direct effect" on interstate safety, or if the safety-affecting activities are *de minimis*, then the exemption never applies;

>> -but if in a "particular workweek" the employee does directly affect interstate safety, then the exemption only applies during that workweek;

> **Third**, § 782.2(b)(4) addresses shifting jobs; when that happens, the first sentence of § 782.2(b)(4) instructs that the exemption applies on the workweek basis to the job the employee has during that workweek; so, when he "sporadically or occasionally" affects interstate safety, then the exemption only applies in those workweeks, as the second sentence of provides.

From a practical point of view, both the second alternative of the "on the other hand" rule

of § 782.2(b)(3) and the § 782.2(b)(4) rule produce the same result: only in workweeks

during which the employee has a "substantial direct effect" on the safety of interstate

commerce will the exemption apply.

The proper portion of § 782.2(b) to apply to this case is the second rule, as the

Court of Appeals did in *Crooker v. Sexton Motors, Inc.*,[240] or the third rule, mentioned by

---

[239] Reference to "paragraph (b)(2)."

[240] 469 F.2d 206, 210 (1st Cir. 1972):  After quoting the fifth sentence of § 782.2(b)(3), the court remanded the case to the trial court for "consideration of the question of whether, under the principles stated above, there are some weeks as to which the transportation exemption does not stand in the way of applying the overtime compensation provisions" of the FLSA.

the court in *Hernandez v. Brink's, Inc.*[241] In either circumstance, the MCA applies only in weeks when bellwether plaintiffs directly affected the safety of interstate commerce, because of the vast periods of time when plaintiffs had no direct effect on interstate safety or were shifted among various jobs (*e.g.*, offshore, shop work, intrastate land jobs).

The bottom line under these regulations is that engagement in interstate safety-affecting activity in one week does not provide an exemption during the employee's entire tenure. *See, e.g., McGee v. Corporate Express Delivery Systems,*[242] and *Masson v. Ecolab, Inc.*[243]

**E.    Loading.**

CTS discusses loading on page 37ff. Plaintiffs dispute that they loaded CMVs that traveled interstate.[244] With respect to the law, the starting point is that the load must travel interstate.[245] CTS' claim on page 40 that "securing of a load alone" makes an employee a "loader" is simply wrong:  the load must travel interstate.[246] CTS is equally wrong when it claims on page 40 that the MCA exemption would apply to loading vehicles that were

---

[241] No. 08-20717-CIV, 2009 U.S. Dist. LEXIS 2726, at *18 (S.D. Fla. Jan. 15, 2009):  "[W]hen an employee's duties change so significantly that the change in duties constitutes a change from one job to another, the applicability of the FLSA's motor carrier exemption may vary from week to week," citing § 782.2(b)(4).  In *Hernandez*, this rule did not apply because plaintiffs were full duty drivers who drove non-CMVs during a short time of their tenure.

[242] No. 01 C 1245, 2003 U.S. Dist. LEXIS 20855 at *9, 10 (N.D. Ill. Nov. 26, 2003) ("the job activities of a plaintiff in one week do not determine the plaintiff's exempt status for his entire tenure").

[243] No. 04 Civ. 4488, 2005 U.S. Dist. LEXIS 18022 at *18 (S.D.N.Y. Aug. 18, 2005) (activities in one workweek do not always determine exempt status for entire tenure).

[244] *See* Section V(A)(1) above; *see also* Rec. 217, Section IV(F)(4)(a) of Pls.' Master Brief at p. 35 (documents show that, at most only two bellwether plaintiffs purportedly loaded a CMV that traveled interstate).

[245] 29 U.S.C. § 782.5(c):  "Thus the following activities have been held to provide no basis for exemption: . . . loading vehicles for trips which will not involve transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act."

[246] 29 C.F.R. § 782.7(b)(2).

"subject to" traveling interstate; the rule is that the load must go interstate.[247]

Next, the employee must exercise judgment and discretion.[248] In addition, the items loaded must be of the type that affect the safety of the vehicle.[249] Finally, the loading must be more than *de minimis*.[250]

## F.    Damages.

In item 44 on page 18, CTS asserts that plaintiffs were paid on a "salary basis." Plaintiffs contend that the salary CTS referred to is incomplete because there were many other aspects of the bellwether plaintiffs' compensation. As a result, the proper way to determine damages will be the default time-and-a-half methodology.[251] However, the Court has previously indicated that the purpose of this round of motions was to determine whether any overtime exemption applies to any bellwether plaintiff. The Court specifically held for a later date discovery[252] and briefing on damages. Accordingly, plaintiffs will not adduce evidence and briefing on this issue until requested by the Court.

---

[247] 29 C.F.R. § 782.7(b)(1):  "This policy does not extend to drivers . . . [or] loaders . . . whose transportation activities are 'in commerce' or 'in the production of goods for commerce' within the meaning of the act but are not a part of an interstate movement of the goods or persons carried."

[248] *Marshall v. Thiele*, No. 76-38, 1978 U.S. Dist. LEXIS 14504, at *15 (M.D. Pa. Nov. 7, 1978) (no judgment or discretion was needed); *see also* Rec. 217, Section IV(F)(4)(b) of Pls.' Master Brief at p. 37.

[249] *Wirtz v. C & P Shoe Corp.*, 336 F.2d 21, 29 (5th Cir. 1964):  "[T]his discretion was minimal because the pattern was simply to follow the rule of last out, first in. This operation, at most, only incidentally, and not substantially, related to the safety of vehicles in interstate commerce.  This is clearly so in view of the light weight of the cargo involved."  Accordingly, putting a placard on a vehicle does not make an employee a "loader," as defendant wrongly claims at footnote 179.  *See Marshall v. Union Pacific Motor Freight Co.*, 650 F.2d 1085, 1090 (9th Cir. 1981). Neither would placing a hammer or personal gear in a truck constitute loading that would affect the safe operation of a motor vehicle.

[250] *See* Rec. 217, Section IV(F)(4)(e) of Pls.' Master Brief at p. 39.

[251] *McCumber v. Eye Care Center of America, Inc.*, No. 09-1000, U.S. Dist. LEXIS 42647, at *37 (M.D. La. Apr. 20, 2011).

[252] *See* Pls.' Ex. 90: Telephonic Hr'g Tr. 36:5–13, May 21, 2010.

## G.     SAFETEA-LU TCA.

On page 40, CTS raised the application of the SAFETEA-LU TCA.[253] Since CTS also argues about this in its Secondary Motion, plaintiffs address it in their response to that motion at Section IV(F). Suffice it to say that the cases uniformly hold that the SAFETEA-LU TCA is not retroactive.

## H.     Cases Cited By Defendant.

In support of its claim that the bellwether plaintiffs are exempt, CTS has cited *Garza*,[254] *Gonzalez*,[255] and *Harshman*.[256] Plaintiffs have demonstrated why these cases differ from the case at bar, and therefore do not control it, in their Motion for Summary Judgment[257] at Section V(E), and adopt those arguments by reference.

CTS also cited *Songer*.[258] At page 30ff. in their Master Brief, plaintiffs showed how *Songer* supports their position in this suit. The *Songer* plaintiffs were full-duty truck drivers, unlike the bellwether plaintiffs. Thus, they did not have shifting job assignments to duties that did not affect safety, as did all of the bellwether plaintiffs. In fact, there was no evidence that the *Songer* plaintiffs had any non-safety-affecting duties. Also unlike the bellwether plaintiffs, the *Songer* plaintiffs were assigned indiscriminately. The percentage of interstate trips in *Songer* was higher than here, and numbered from about 20 interstate trips per week in the lowest year to almost 115 trips per week in the highest

---

[253] P.L. 110-244.
[254] *Garza v. Smith Int'l, Inc.,* No. C-10-100, 2011 U.S. Dist. LEXIS 22869 (S.D. Tex. Mar. 7, 2011).
[255] *Gonzalez v. Smith Int'l, Inc.,* No. C-08-311 (S.D. Tex. Jan. 29, 2010).
[256] *Harshman v. Well Serv., Inc.*, 248 F. Supp. 953 (W.D. Pa. 1965).
[257] *See* Rec. 246, Pls.' Mot. For Summ. J. Regarding Liquidated Damages and Resp. to Def.' Mot. For Summ. J. Regarding Liquidated Damages and the Statute of Limitations.
[258] *Songer v. Dillon Res., Inc.,* 618 F.3d 467 (5th Cir. 2010).

year.[259] By contrast, the sporadic nature of the interstate activity of CTS' four districts involved in this suit provide nothing close to this frequency and regularity of interstate trips;[260] there was only a remote possibility[261] that those bellwether plaintiffs who had a CDL would drive a CMV interstate. Finally, in contrast to this case, it was undisputed in *Songer* that the drivers were informed when they were hired "that they might have to make out-of-state trips during their employment."[262]

Defendant cites on page 41ff *Hernandez v. Brinks, Incorp*.[263] for the proposition that plaintiffs who were subject to being called on to drive CTS property across state lines in non-commercial motor vehicles are exempt, as a matter of law, for the entire relevant time period. However, CTS fails to mention that the *Hernandez* court discussed "meaningful" shifting job duties under 29 C.F.R. § 782.2(b)(4):

> "The regulations governing the FLSA's motor carrier exemption state that '[w]here the same employee of a carrier is shifted from one job to another periodically and on occasion, the application of the exemption to him in a particular workweek [depends] . . . on the job or jobs in which he is employed in that workweek.' 29 C.F.R. § 782.2(b)(4). It is thus evident that when an employee's duties change so significantly that the change in duties constitutes a change from one job to another, the applicability of the FLSA's motor carrier exemption may vary from week to week. However, even during the weeks in which plaintiffs worked a full week on a non-commercial motor vehicle, the nature of their duties did not meaningfully change to a degree that would constitute a change from one job to another. Therefore, plaintiffs were covered by the FLSA's motor carrier exception, even during the workweeks when they worked on non-commercial vehicles."[264]

---

[259] *Id.* at 476

[260] The Angleton District, which had a greater frequency than either the Alice District or the Bridgeport District, had only 1 interstate job in the last 2 months of 2005, 5 interstate jobs in 2006, 7 interstate jobs in 2007, and 6 interstate jobs in 2008 (*i.e.*, just one every two months).

[261] *Garcia v. Pace Suburban Bus Serv*., 955 F. Supp. 75, 77 (N.D. Ill. 1996).

[262] *Songer,* 618 F.3d at 475.

[263] No. 08-20717, 2009 U.S. Dist. LEXIS 2726 (S.D. Fla. Jan. 15, 2009).

[264] *Id.* at *18.

The court in *Hernandez* recognizes that "meaningful" shifting job duties requires the application of the MCA on a week-by-week basis. However, plaintiffs' job duties in *Hernandez* are distinguishable from the case at bar. Plaintiffs have submitted overwhelming evidence that they were required to perform several "meaningful" shifting job assignments for prolonged periods of time that did not involve the safety of the operation of *any vehicle* in interstate or intrastate commerce, such as required work in the shop, in the field, and offshore. Plaintiffs have demonstrated that the average land job was three to four days, 12 to 16 hours a day.[265] And, bellwether plaintiffs often performed non-safety-affecting duties operating oilfield equipment on private property for longer periods of time, up to a week or more.[266] For example, the MPUs show that Cantu worked a 10-day land job in Felicia, Texas in January, 2006; D. Allen and Crews worked an 11-day land job in Freestone County, Texas in October, 2006; while Cantu, Charles Morgan and Marcus Tottenham worked a 9-day land job in Port Bolivar, Texas, in June, 2007.[267]

Additionally, in *Hernandez*, the court found that from March 19, 2005 to March 19, 2008, "four plaintiffs reported periods of two to four weeks during which they worked on non-commercial motor vehicles."[268] This lack of meaningful shifting job duties is hardly comparable to Crews, who worked 195 days offshore and 229 days in the shop; Woodard, who worked 91 days offshore and 117 days in the shop; and Cantu, who worked 87 days offshore and 216 days in the shop.[269] There is no evidence that the

---

[265] *See* Rec. 217, Section IV(F)(3)(d)(iii) of Pls.' Master Brief at p. 26.
[266] *See* Rec. 217, Section IV(G)(2) of Pls.' Master Brief at p. 44.
[267] Ex. 122: Grizzle Decl. ¶ 4; *see also* Ex. 121: Wimberly Decl. ¶ 4.
[268] *Hernandez v. Brink's, Inc.* No. 08-20717, 2009 U.S. Dist. LEXIS 2726, at *17 (S.D. Fla. Jan. 15, 2009).
[269] Ex. 122: Grizzle Decl. ¶ 4; *see also* Ex. 121: Wimberly Decl. ¶ 4.

alleged job duties in *Hernandez* are remotely similar to the bellwether plaintiffs shifting job duties in this lawsuit. For the same reasons that *Hernandez* is inapplicable to plaintiffs, *Tidd v. Adecco USA, Inc.*[270] and *Collins v. Heritage Wine Cellars, Ltd.*[271] are likewise inapplicable.

## X.   CONCLUSION

Upon first viewing, defendant has created the impression that it is exempt from paying overtime to the bellwether plaintiffs. But upon closer inspection, the picture is seen for what it is: dabs of unspecific, indistinct, overly broad, or unsupported claims that defendant hopes will exonerate it. Facts are controverted, many are missing entirely, and the law is often not what supports defendant's claims. Though it hoped that strokes of facts related to other districts or workers would color the Court's view of the bellwether plaintiffs, a close analysis of the record reveals that defendant has failed to show that there is no genuine issue of material fact, nor that it is entitled to judgment as a matter of law regarding the bellwether plaintiffs. Its motion therefore must be denied.

---

[270] No. 07-11214, 2008 WL 4286512 (D. Mass. Sept. 17, 2008).
[271] 589 F.3d 895 (7th Cir. 2009).

Respectfully submitted,

**ABRAHAM, WATKINS, NICHOLS,
SORRELS, AGOSTO & FRIEND**

_____
Clyde J. "Jay" Jackson, III
Attorney-in-Charge for Plaintiffs
State Bar Number:  10502500
Southern District Bar Number: 1241
800 Commerce Street
Houston, Texas  77002
Telephone:  (713) 222-7211
Telecopier:  (713) 225-0827
E-mail: jjackson@abrahamwatkins.com

51

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of plaintiffs' response to defendant's motion for summary judgment on FLSA exemptions (Alice, Angleton, and Bridgeport) has been provided to counsel of record at the address listed below, via electronic filing on this 9th day of June, 2011.

> Mr. Christopher E. Moore
> COATS ROSE
> One Canal Place
> 365 Canal Street, Suite 800
> New Orleans, Louisiana 70130
> Telephone: (504) 299-3076
> Telecopier: (504) 299-3071

> *Attorney for defendant Coil Tubing Services, L.L.C.*

_____
Clyde J. "Jay" Jackson, III

Of Counsel:

Randall O. Sorrels
**ABRAHAM, WATKINS, NICHOLS,
    SORRELS, AGOSTO & FRIEND**
800 Commerce Street
Houston, Texas 77002
Telephone: (713) 222-7211
Telecopier: (713) 225-0827

Clark Woodson, III
Southern District Bar Number: 21481
Texas Bar Number: 00794880
601 E. Myrtle
Angleton, Texas 77515
Telephone: (979) 849-6080
Telecopier: (979) 849-7070