IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DONALD ALLEN, *et al.*, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-3370 |
| | § | |
| COIL TUBING SERVICES, L.L.C., | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

This Fair Labor Standards Act ("FLSA") case is before the Court on the parties' cross motions for summary judgment. Plaintiffs are 186 employees of Defendant Coil Tubing Services, L.L.C. ("Defendant" or "CTS"), who allege that they regularly worked over 40 hours per week and were wrongfully denied overtime wages. Defendant argues that various exemptions apply to Plaintiffs. To efficiently manage this case, which is not a collective action, the Court ordered the parties to conduct discovery on a "Bellwether group" of Plaintiffs (the "Bellwether Plaintiffs"). There are currently fourteen Bellwether Plaintiffs.[1]

---

[1] The Bellwether Plaintiffs are Byron Allen, Donald Allen, Presley Branham, William Broussard, Alfredo Cantu, Adam Crews, Sr., Gary Henderson, Jesus Hernandez, Jr., Billy Newman, Cody Patin, Jose Pena, Mahmoud Sheikh, Steven Tankersley, and Donald Woodard. The Bellwether Plaintiffs have changed during the pendency of this case.

The parties each have filed various summary judgment motions. All are ripe for decision.[2] Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court grants the summary judgment motions in part and denies them in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.  CTS's Business and Job Classifications

Defendant CTS is an oil well service company. As part of its operations, CTS owns certain chemicals, tools, and coil tubing equipment including coil tubing reels, fluid pumps, nitrogen, nitrogen pumps, nitrogen transports, friction reducers, and cranes, which it transports via public highways to its customers at the customers' well sites.

During the period from November 13, 2005 through November 13, 2008 (the "relevant period"), Bellwether Plaintiffs held various positions with CTS: Equipment Operator ("EO"), Service Technician I ("ST-I"), Service Technician II ("ST-II"), Service Supervisor Trainee ("SST"), Service Supervisor ("SS"), Service Coordinator

---

[2]  Defendant filed a Motion for Summary Judgment regarding all Plaintiffs employed in the Angleton, Alice, and Bridgeport Districts [Docs. # 232, # 235]. Defendant also filed a Motion for Summary Judgment regarding all Plaintiffs employed in the Broussard District [Docs. # 233, # 236]. Thirteen of the 14 Bellwether Plaintiffs filed Individual Motions for Summary Judgment [Docs. # 218 - # 230] with Plaintiffs' Master Brief in support [Doc. # 217]. Defendant has responded and Plaintiffs replied. *See* Docs. # 247, # 248, # 252, # 262. Plaintiffs have also filed a Motion for Summary Judgment Regarding Liquidated Damages [Doc. # 246], to which Defendant responded [Doc. # 250] and Plaintiffs replied [Doc. # 264]. Because Plaintiffs' Motions are essentially the converse of Defendants' Motions, the analysis in this Memorandum also applies to Plaintiffs' Motions.

[3]  Plaintiffs hotly dispute Defendant's characterization of many facts as "undisputed." The Court bases its decision on the evidence in the record, not on Defendant's characterization of facts.

("SC"), and/or Field Engineer I ("FE-I").  EOs, ST-Is, ST-IIs, SSTs, and SSs, but **not** FE-Is, or SCs, collectively, are referred to in this Memorandum as "Field Service Employees."[4]  Applicability of FLSA exemptions regarding FE-Is and SCs will be analyzed separately as needed.[5]

During the relevant period, CTS divided its business into six districts.  Plaintiffs currently in this case worked in four of those districts: Alice, Texas; Angleton, Texas; Bridgeport, Texas; and Broussard, Louisiana.[6]  Each district has a district manager, each is a profit center, and there is no central dispatch for the company.  The districts, however, interacted to a limited degree.  For example, on occasion, one district borrowed equipment from another district.  Field Service Employees were then required to transport the equipment between the district offices.  Field Service Employees in one district also were, on rare occasion, assigned to work on projects originating in another district.

As noted, CTS is an oil well service company.  At all relevant times, each CTS district offered its well services regardless of the location of the well. CTS serviced wells located on land ("land projects") and offshore ("offshore projects").  The general

---

[4]     The scope of the term "Field Service Employees" differs from CTS's suggested definition which varied to some extent in its briefing.

[5]     There is insufficient evidence about whether the FE-Is or the SCs engaged in safety-affecting transportation duties with any frequency and whether there was a reasonable expectation that their work would affect the safety of interstate transportation, and thus possibly warrant exemption from FLSA overtime under the Motor Carrier Act ("MCA").  To the extent the parties seek summary judgment for FE-Is and SCs under the Motor Carrier Act exemption, the motions are **denied**.

[6]     CTS also has districts centered in Bossier City, Louisiana, and Rock Springs, Wyoming.  While there is virtually no evidence about Bossier City, there is some argument about Rock Springs, which is discussed as necessary.

procedure for assigning projects was (and apparently still is) as follows.  An SC accepted a project from a customer and prepared a Load Out Ticket[7] to initiate the process of filling the project order (often referred to by the parties as the "job order").[8] It was up to the SC within a district to determine what equipment and which Field Service Employees to assign to each project.  This determination was made primarily on the basis of personnel availability, skill level, and occasionally customer requests.[9] The SC identified the crew and assigned equipment on the Load Out Ticket.  A CTS field service crew (for land and offshore projects) typically consisted of two or more ST-Is, ST-IIs, and/or SSTs and one or more SSs.  The SC gave the Load Out Ticket to the SS.  The land projects typically lasted several days, while the offshore projects were longer.

---

[7]     In the Alice District, this document is called a "Service Order Ticket."

[8]     The parties sometimes use the word "job" to refer to the positions held by Plaintiffs and other employees.  Applicable United States Department of Labor regulations also use the word "job" in this sense.  In certain contexts, the parties also use the term "job" to refer to a particular customer order or a project to which CTS employees were assigned (*i.e.*, a customer's request to CTS to work on a well).  To avoid confusion, the Court utilizes the word "project" for the latter circumstances and "job" refers to a work position at CTS.

[9]     *See* Burchfield Decl. [Doc. # 234-46], at 1399, ¶ 8; Burchfield Depo. [Doc. # 217-6], at 167 (page 37 of 44 on ECF); Dorsey Depo. [Doc. # 217-7], at 39 (page 29 of 55 on ECF).

CTS, generally using its Field Service Employees, transported its equipment,[10] chemicals,[11] and tools to each project site.  For land projects, CTS expected each member of the field service crew to load and secure the necessary equipment, chemicals, and tools on CTS 18-wheel tractor-trailers and other trucks at CTS's shop.[12]  For offshore projects serviced from the Angleton District, CTS Field Service Employees sometimes drove CTS's equipment, chemicals, and tools.  For certain Angleton District and all Broussard District offshore projects, third-party trucking companies were hired for the transport.[13]  Typically, for each project, the SC or SS completed and signed a document called a "Material Loading and Shipping Instruction" that identified the individuals who loaded the vehicles and the specific vehicles used for the project.  As noted, CTS or third-party drivers drove the loaded trucks to the departure dock for loading on vessels to be taken offshore.

Generally, the offshore Field Service Employees traveled in CTS pickup trucks to the shore loading dock.  The sizes of these pickup trucks is unclear from the record.

---

[10]  The coil tubing equipment Field Service Employees transported often consisted of pieces of heavy machinery that are loaded onto trailers with a forklift or crane.  A single piece of equipment often weighed more than 10,001 pounds.

[11]  Sometimes Field Service Employees were required to load a transport with liquid nitrogen, a chemical requiring hazardous material placarding under DOT regulations.

[12]  Some Plaintiffs claim they in fact did not perform any loading functions for transporting the equipment and chemicals for the projects.

[13]  According to CTS, but disputed by Plaintiffs, for offshore projects, the assigned Field Service Employees generally were to place CTS's equipment on skids in the shop.  The skids then were loaded onto 18-wheeler tractor-trailers or trucks by CTS personnel or by third-party employees unidentified in this record.

For land projects, SSs often operated larger pickup trucks, such as a Ford F-350 modified with a diesel fuel auxiliary tank affixed to the bed.[14]  SSs were expected to ensure that these 90-gallon auxiliary tanks were filled with diesel fuel before leaving the shop so that there was sufficient fuel to operate CTS's equipment in the field.  The rest of the Field Service Employees on the project crew (that is, the ST-Is, ST-IIs, and SSTs) generally had to operate (or be available to operate) the 18-wheel tractor trailer they were assigned to drive to and from the well-site.  All the Field Service Employees used the equipment, chemicals, and tools brought to the project site to service the customer's wells.  At each project's conclusion, Field Service Employees loaded onto trucks any CTS equipment that had been unloaded at the well site ("backloaded") for return to CTS's shops or other facilities.  There is a dispute about how much equipment is in fact removed from the trucks.[15]

Bellwether Plaintiffs all were CTS Field Service Employees, SCs, or FE-Is during the relevant period.  They each had multiple duties on the projects to which they were assigned.  According to CTS's written job descriptions for EO, ST-I, ST-II, SST, and SS positions, these employees were required to work in the shop, load equipment to go to and be returned from customer projects, drive or assist in driving to project sites, and service oil wells for CTS customers.  Plaintiffs state, however, that they in fact did not do many of these tasks.

Sometimes a Field Engineer was assigned to a service crew.  FE-Is were employed to monitor the pressure of coil tubing units, record their observations, input

---

[14]    The pickup trucks modified with the auxiliary tank have a gross combination weight rating ("GCWR") and/or gross combination weight greater than 10,001 pounds and are vehicles that CTS registers with the Department of Transportation. LeJeune Decl. [Doc. # 234-15], at 519, ¶ 8.

[15]    The parties' citations do not squarely support their assertions.

the data collected into a special computer program, and author a field report so the life of the coil tubing could be determined.[16]   To carry out their project duties, FE-Is were expected to travel to the project site in a CTS pickup truck.  Each FE-I was expected to bring CTS-issued protective gear as well as well-monitoring tools and equipment.

All Bellwether Plaintiffs were paid fixed salaries. CTS did not pay overtime although Plaintiffs claim they regularly worked in excess of 40 hours per week.

Bellwether Plaintiffs' job titles at CTS and dates of CTS employment are:

| Name | Title | District | Start Date[17] | End Date |
|---|---|---|---|---|
| Byron Allen | EO<br>ST-I | Broussard<br>Bridgeport | April 2005<br>December 2005 | December 2005<br>February 2007 |
| Donald Allen | ST-I | Angleton | February 2006 | December 2007 |
| Presley Branham | ST-I<br>ST-II | Angleton<br>Angleton | April 2006<br>December 2007 | December 2007<br>present |
| William Broussard | ST-I<br>ST-I<br>ST-II<br>ST-II | Broussard<br>Broussard<br>Broussard<br>Broussard | February 2007<br>July 2006<br>January 2008<br>July 2008 | June 2007<br>January 2008<br>June 2008<br>February 2009 |
| Alfredo Cantu | EO<br>ST-I<br>ST-II | Angleton<br>Angleton<br>Angleton | July 2004<br>February 2005<br>March 2006 | February 2005<br>March 2006<br>present |
| Adam Crews | ST-I<br>ST-II | Angleton<br>Angleton | April 2005<br>May 2006 | May 2006<br>March 2009 |
| Gary Henderson | SS<br>SC<br>SS | Angleton<br>Angleton<br>Angleton | November 2002<br>January 2005<br>May 2006 | January 2005<br>May 2006<br>March 2007 |

---

[16]     Sheikh Depo. and Exhibit 1 thereto [Doc. # 234-11], at 352-53, 355; Letchworth Depo. [Doc. # 234-8], at 255; Burchfield Decl. [Doc. # 234-46], at 1403, ¶¶ 31-33.

[17]     These "Start Dates" and "End Dates" are approximate.

| Jesus Hernandez | ST-II | Alice | July 2006 | present |
|---|---|---|---|---|
| Billy Newman | ST-I<br>ST-II | Broussard<br>Broussard | July 2005<br>July 2007 | July 2007<br>June 2009 |
| Cody Patin | ST-I | Angleton | September 2008 | March 2009 |
| Jose Pena | ST-II | Alice | September 2007 | present |
| Mahmoud Sheik | FE-I | Angleton | May 2008 | March 2009 |
| Steven Tankersely | ST-I | Angleton | December 2006 | September 2008 |
| Donald Woodard | ST-I | Angleton | January 2008 | March 2009 |

## B. **Procedural Background**

On November 13, 2008, eleven current or former CTS employees initiated this suit claiming violations of section 207 of the FLSA based on CTS's failure to pay overtime wages. Currently, a total of 186 Plaintiffs have filed consents to join the action and seek overtime benefits. To efficiently manage this case, which is not a collective action, the Court ordered the parties to conduct discovery on CTS's business practices generally, on each district's business, as well as on a "bellwether group" of Plaintiffs. *See* Hearing Minutes and Order, dated November 24, 2009 [Doc. # 70]. Some individuals initially designated by the parties as Bellwether Plaintiffs have settled their claims or been dismissed from the suit by agreement; other Plaintiffs have been substituted into the bellwether group. There are currently fourteen Bellwether Plaintiffs.

Defendant argues that various exemptions to the FLSA's overtime requirements apply to one or more of the Bellwether Plaintiffs, and that these exemptions

completely bar recovery for overtime wages.[18]  The parties filed cross-motions for summary judgment on whether Defendant's claimed FLSA exemptions apply to the Bellwether Plaintiffs, and on a couple of other issues.  Those motions have been fully briefed and are ripe for decision.

## II.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).   "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'"  *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d

---

[18]    Apparently, since this suit was filed, CTS has paid overtime wages to certain employees at the Broussard District.  The Court does not rely on this information in reaching its decision on the merits of the Motor Carrier Act Exemption.

308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted).   "An issue is material if its resolution could affect the outcome of the action.   A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party.   *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003) (internal citation omitted).   The Court may make no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe.   *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412-413).   However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'"   *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)).

The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.   *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994).   Likewise, "conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment."   *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th

Cir. 2010); *see also Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  "A party cannot defeat summary judgment with 'only a scintilla of evidence.'" *Delta & Pine Land Co.*, 530 F.3d at 399 (quoting *Little*, 37 F.3d at 1075).

Rather, a party must support any assertion that a fact cannot be or is genuinely disputed by "(a) citing to particular parts of materials in the record . . . ; or (b) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact."  FED. R. CIV. P. 56(c)(1).  Affidavits cannot defeat summary judgment unless they contain competent and otherwise admissible evidence.  FED. R. CIV. P. 56(c)(4).  A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.  *See In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000).

Further, "the court need consider only the cited materials, but it may consider other materials in the record."  FED. R. CIV. P. 56(c)(3).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).  "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."  *Id.*

In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).  Rather, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the court may, *inter alia,* "(2) consider the fact undisputed

for purposes of the motion; [or] (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it . . . ."  FED. R. CIV. P. 56(e).

Finally, when evaluating cross-motions for summary judgment, the "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."  *Shaw Constructors v. ICF Kaiser Eng'rs, Inc*., 395 F.3d 533, 538-39 (5th Cir. 2004) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998) ("WRIGHT")).  "But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  WRIGHT, § 2720.

## III.   STATUTORY ANALYSIS

The FLSA, enacted in 1938, requires employers to pay their employees for work in excess of forty hours per week at a rate not less than one and one-half times the employee's regular rate.  29 U.S.C. § 207(a)(1).  However, the FLSA specifically exempts certain employers and/or employees from its overtime requirements.  *Id.* § 213.  "Exemptions under the FLSA are construed narrowly against the employer, and the employer bears the burden to establish a claimed exemption."  *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 471 (5th Cir. 2010) (citing *Barefoot v. Mid-America Dairymen, Inc.*, 16 F.3d 1216, 1994 WL 57686, at *2 (5th Cir. Feb.18, 1994) (per curiam)); *see also Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

### A.   Interplay Between the MCA and FLSA

The Motor Carrier Act ("MCA") Exemption provides that the FLSA's overtime requirement "shall not apply . . . to . . . any employee with respect to whom the [United States] Secretary of Transportation has power to establish qualifications and

maximum hours of service . . . ." 29 U.S.C. § 213(b)(1). Congress enacted the MCA in 1935. *See United States v. Am. Trucking Ass'ns*, 310 U.S. 534 (1940) (discussing the purposes and policies of the MCA); *see Maurer v. Hamilton*, 309 U.S. 598, 606 (1940) (same). An important goal of the MCA was the safety of operations on the roads and highways of this country. *Am. Trucking*, 310 U.S. at 539. Congress empowered the Secretary of the Department of Transportation ("DOT")[19] to "prescribe requirements for . . . qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b)(2).[20] The Secretary of Transportation "'need only possess the power to regulate the employees at issue; it need not actually exercise that power for the [MCA] exemption to apply.'" *Songer*, 618 F.3d at 472 (quoting *Barefoot*, 16 F.3d 1216, 1994 WL 57686, at *2). *See Morris v. McComb*, 332 U.S. 422, 434 (1947); *Levinson v. Spector Motor Svc.*, 330 U.S. 649, 677 (1947). It is "'the

---

[19]　The MCA initially was enforced by the Interstate Commerce Commission ("ICC"), but these duties were shifted when Congress created the DOT in 1966. *See Rauenhorst v. U.S. Dep't of Transp., Fed. Highway Admin.*, 95 F.3d 715, 719 (1996).

[20]　A "motor private carrier" is defined as:

> a person, other than a motor carrier, transporting property by motor vehicle when—
>
> (A)　the transportation is [in interstate commerce];
>
> (B)　the person is the owner, lessee, or bailee of the property being transported; and
>
> (C)　the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102.

character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the [DOT's] power.'" *Morris*, 332 U.S. at 431 (quoting *Levinson*, 330 U.S. at 674-75).  It is only to the extent that the Secretary of Transportation does not have power to establish qualifications and maximum hours of service that the Fair Labor Standards Act applies.  *Levinson*, 330 U.S. at 677.  "This interpretation puts safety first . . .."  *Id.*  The hazard of continuous driving is not "eliminated by a law which entitles [the driver] merely to an increased rate of pay . . ."  *Id*. at 680.  Historically, when the DOT had jurisdiction over a motor carrier, the FLSA did not apply to certain transportation safety-related employees.  *See generally* 29 C.F.R. § 782.2 *et seq.*

Application of the MCA Exemption to an employee "depends both on the class to which his employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a).  The DOT has the power to establish maximum hours and qualifications to those classes of employees who:

(1)     [a]re employed by carriers whose transportation of passengers or property by motor vehicle is subject to his jurisdiction under section 204 of the Motor Carrier Act [codified at 49 U.S.C. § 31502] . . . , **and**

(2)     engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

*Id.* (emphasis added).  In sum, both the DOT and the Department of Labor ("DOL") implemented Congress's guidance that there was mutual exclusivity of the jurisdiction of the DOL and the DOT over motor carriers' employees hours and qualifications, *Levinson*, 330 U.S. at 678-79; *Morris*, 332 U.S. at 434, until statutory amendments in 2008.

### B.   SAFETEA-LU

On August 10, 2005, Congress enacted the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, 119 Stat. 1144.[21]  This act amended the definition of "motor carrier" by essentially inserting the word "commercial" to modify the term "motor vehicle."  A "motor carrier" became defined as "a person providing commercial motor vehicle (as defined in section 31132) transportation for compensation." 49 U.S.C. § 13102(14) (2005) (amended June 6, 2008).  More pertinently, the SAFETEA-LU amended the definition of "motor private carrier" to mean "a person, other than a motor carrier, transporting property by commercial motor vehicle . . .."  49 U.S.C. § 13102(15) (2005).  The term "commercial motor vehicle" was then defined in pertinent part as a "self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, *if* the vehicle has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds, whichever is greater." *Id.* § 31132(1)(A) (emphasis added).[22]

The parties agree that the SAFETEA-LU limited the DOT's regulatory power to those carriers using commercial motor vehicles.  With enactment of the SAFETEA-LU, vehicle weight became a key factor regarding whether an entity would be categorized as a DOT-regulated "motor carrier."  *See Albanil v. Coast 2 Coast Inc.*, 2010 WL 1404120, at *4-6 (S. D. Tex. Mar. 31, 2010) (Miller, J.); *Mayan v. Rydbom Express Inc.*, 2009 WL 3152136, at *4 (E.D. Pa. Sept. 30, 2009).  Companies that did

---

[21]   For purposes of this case, the SAFETEA-LU applies from the beginning of the relevant period, November 13, 2005, until June 6, 2008.

[22]   The definition of "commercial motor vehicle" also includes factors other than weight, but these factors are inapplicable to the case at bar.

not use **any** "commercial motor vehicles" were no longer considered "motor carriers" or "motor private carriers," and the MCA Exemption did not apply because the DOT no longer had regulatory authority over them.  Such a carrier's employees accordingly fell within the DOL's jurisdiction and the FLSA.

Plaintiffs contend that, after passage of the SAFETEA-LU, a motor private carrier's employee would not be covered by the MCA Exemption if his duties affected only (or mostly) non-commercial motor vehicles, *i.e.*, motor vehicles weighing 10,000 pounds or less.[23]   The threshold legal issue here is whether the SAFETEA-LU implicitly narrowed the MCA Exemption to only those specific employees or motor private carriers who worked with commercial motor vehicles.  The Court holds that the SAFETEA-LU did not alter the scope of motor private carriers' employees within the MCA Exemption.

The SAFETEA-LU amendatory language did not alter, or even address, the jurisdiction of the DOT over the range of employees who worked for motor carriers, or motor private carriers, within its jurisdiction.  In other words, the SAFETEA-LU did not say the DOT's jurisdiction regarding entities that qualified as motor carriers or motor private carriers was restricted to employees who used, drove or loaded the commercial motor vehicles.  The SAFETEA-LU did not expressly address or alter any

---

[23]   The Court notes that various district courts have agreed with Plaintiffs' argument that a motor carrier's employee is not exempt if his duties do not involve commercial motor vehicles as defined by the SAFETEA-LU. *See, e.g., Tews v. Renzenberger, Inc.*, 592 F. Supp. 2d 1331, 1343-46 (D. Kan. 2009) (stating that under the SAFETEA-LU amendment, only those motor carrier employees who had operated commercial motor vehicles could be exempted from the FLSA's overtime provisions); *Vidinliev v. Carey Int'l, Inc.,* 581 F. Supp 2d 1281, 1291-93 (N.D. Ga. 2008) (same); *Musarra v. Digital Dish, Inc.,* 454 F. Supp. 2d 692, 701 n. 19 (S.D. Ohio 2006) (stating the same in dicta ); *Veliz v. Cintas Corp.*, 2008 WL 4911238, at *3-4 (N.D. Cal. Nov. 13, 2008) (same).

provisions of the FLSA.  Nowhere did Congress evince an intent to amend the MCA Exemption to alter the range of employees exempted from the FLSA overtime provisions.  *See Mayan*, 2009 WL 3152136, at *5; *Collins v. Heritage Wine Cellars, Ltd.*, 2008 WL 5423550, at *19-20 (N.D. Ill. Dec. 29, 2008); *Tidd v. Adecco USA, Inc.*, 2008 WL 4286512, at *4 (D. Mass. Sept. 17, 2008).

This Court finds the reasoning and decision on this issue in *Mayan* to be persuasive.  The *Mayan* court recognized that this interpretation of the reach of SAFETEA-LU is consistent with "Congress' silence as to the well-developed judicial interpretations of the Motor Carrier Act and the overtime exemption."  *Mayan*, 2009 WL 3152136, at *5.  When amending a statute, Congress is presumed to be aware of the federal courts' intervening interpretations of a statute.  "If Congress' amendments convey no intent to alter those judicial interpretations, then the court must presume that Congress did not intend a change."  *Id.* (citing *Ankenbrandt v. Richards*, 504 U.S. 689, 700-01 (1992)).  Courts presume that "'the new statute has the same effect as the previous version.'"  *Id.* (quoting *Emerson Elec. Supply Co. v. Estes Express Lines Corp.*, 451 F.3d 179, 187 (3d Cir. 2006) (quoting *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 988 (7th Cir. 2001)); citing *Midlantic Nat'l Bank v. N.J. Dep't of Envt'l Prot.*, 474 U.S. 494, 501 (1986)); *see also In re Timbers of Inwood Forest Assoc., Ltd.*, 793 F.2d 1380, 1390 (5th Cir. 1986).

Before the SAFETEA-LU, determination of which employees of a motor carrier would be exempt from FLSA overtime pay turned on whether the employees' duties affected the safety of operations of motor vehicles in transport in interstate commerce.  This assessment was based on longstanding judicial and agency interpretations of the term "employees" as used in the MCA and the MCA Exemption to the FLSA.  The Supreme Court's focus was whether employees' duties affected the safety of

operations.  *See generally Am. Trucking*, 310 U.S. 534; *Levinson*, 330 U.S. 649.  Congress delegated authority to the DOT for the "regulation of transportation employees in matters of movement and safety only."  *Am. Trucking*, 310 U.S. at 544-45.

Congress presumably was aware of the well-established scope of the MCA Exemption.  When it altered the definition of motor carrier and motor private carrier in the MCA, Congress had an opportunity to change which employees of those carriers could be exempted from the FLSA.  Congress, however, did not do so.  There also is nothing to indicate that Congress intended the SAFETEA-LU to alter DOL regulations.  Finally, the DOL has not amended its formal regulations to support Plaintiffs' suggested interpretation, despite years of opportunity to do so.

Based on the foregoing, including the well-reasoned decision in *Mayan*, the Court concludes that the scope of the MCA Exemption remained unchanged for employers, under the SAFETEA-LU, that operate any commercial motor vehicles.

### C.    Technical Corrections Act ("TCA")

On June 6, 2008, Congress passed the SAFETEA-LU Technical Corrections Act of 2008, Pub. L. 110-244, 122 Stat. 1572 ("TCA").  The TCA amended the SAFETEA-LU in two ways pertinent to this case.  First, the pre-SAFETEA-LU definitions of "motor carrier" and "motor private carrier" were restored by essentially striking the modifier "commercial" before the phrase "motor vehicle."  *See id.* § 305(c), 122 Stat. 1572, 1620.  This change accordingly expanded the reach of the DOT's authority to cover again all employers that operated "motor vehicles" of any weight.  This amendment restored the DOT's regulatory jurisdiction to its pre-SAFETEA-LU scope.

The TCA provided also, however, that "section 7 of the [FLSA] shall apply to a covered employee notwithstanding section 13(b)(1) of that Act [the MCA Exemption]."  *Id.* § 306(a), 122 Stat. 1572, 1620 (referring to 29 U.S.C. §§ 207, 213(b)(1)).  This change thus narrowed the range of employees who were covered by the MCA Exemption.  *Mayan,* 2009 WL 3152136, at *9.  By this provision, Congress broke with its legislative tradition pursuant to which expansion of the DOT's jurisdiction concomitantly narrowed the reach of the DOL's authority and thus the applicability of FLSA overtime provisions.  Notwithstanding the MCA Exemption, under the TCA, the FLSA's overtime provisions now apply to any "covered employee" as defined in section 306.  Pub. L. 110-244, § 306(a), (c), 122 Stat. 1572, 1620-21; *Mayan*, 2009 WL 3152136, at *9.[24]  In substance, under the TCA, an employee of a motor carrier or motor private carrier (such as CTS) who works with

---

[24]     A "covered employee" under the TCA is defined as:

> [A]n individual–
>
> (1)     who is employed by a motor carrier or motor private carrier . . .;
>
> (2)     whose work, in whole or in part, is defined–
>
>> (A)     as that of a driver, driver's helper, loader, or mechanic; and
>>
>> (B)     as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce . . . . [; and]
>
> (3)     who performs duties on motor vehicles weighing 10,000 pounds or less.

*Id.* § 306(c), 122 Stat. 1572, 1621.

"non-commercial motor vehicles" defined as vehicles weighing 10,000 pounds or less may now be entitled to overtime compensation. *Id.* § 306 (a), (c), 122 Stat. 1572, 1620-21; *Mayan*, 2009 WL 3152136, at *9.

## IV.   ANALYSIS OF MCA EXEMPTION UNDER SAFETEA-LU

The MCA Exemption applies if the Secretary of Transportation has the power to "establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1) (2004). "The Secretary of Transportation has the power to establish qualifications and maximum hours of service for employees who (1) are employed by carriers whose transportation of passengers or property by motor vehicle is subject to the Secretary's jurisdiction under the Motor Carrier Act (MCA); and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the MCA." *Barefoot*, 16 F.3d 1216, 1994 WL 57686, at *2 (citing 29 C.F.R. § 782.2(a); *Baez v. Wells Fargo Armored Serv. Corp.*, 938 F.2d 180, 182 (11th Cir. 1991)). For Plaintiffs to qualify as exempt under the MCA Exemption, Defendant must show that Plaintiffs meet both requirements.

### A.   Employer Subject to DOT Jurisdiction

Neither party disputes, and the Court holds, that at all times pertinent to this suit, CTS met the definition of "motor private carrier" under the MCA because CTS has continuously operated commercial motor vehicles. Indeed, there appears to be no dispute that the DOT has classified CTS as a commercial motor carrier engaging in interstate operation carrying oilfield equipment.[25] CTS has registered its commercial

---

[25]   *See* LeJeune Decl. [Doc. # 234-15], at 519, ¶ 4.

motor vehicles with the DOT.[26]  Accordingly, there is no genuine issue of material fact that CTS satisfies the first prong of the MCA Exemption test.

**B.    Employees' Activities Affecting Safety in Interstate Transportation**

The parties dispute whether the Bellwether Plaintiffs "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate . . . commerce within the meaning of the Motor Carrier Act." *See* 29 C.F.R. § 782.2(a)(2).

**1.    Analytical Framework**

The legal standard governing the determinations regarding the employees' activities differs to some extent depending on whether the SAFETEA-LU or the TCA applies.  The Court accordingly analyzes the second prong of the MCA Exemption in light of each version.  More specifically, the Court first analyzes Plaintiffs' claims arising between November 13, 2005 and June 5, 2008 (the "SAFETEA-LU Claims") by assessing (i) whether Plaintiffs engaged in activities of a character that affected transportation safety, and (ii) whether those activities involved the transportation on the public highways of passengers or property in interstate commerce.

**a.    Individual Employee Analysis Not Appropriate**

Bellwether Plaintiffs argue that since passage of the SAFETEA-LU, the MCA Exemption applies only if CTS proves that the activities of each individual employee in issue directly affected the safety or operation of commercial motor vehicles in interstate transportation.[27]  The Fifth Circuit rejected Plaintiffs' individual analysis approach in *Songer*, 618 F.3d at 473-74.  In *Songer*, a post-SAFETEA-LU case, the

---

[26]    *Id.* at 520, ¶ 12.

[27]    Plaintiffs appear to argue also that CTS must make this showing for each workweek it claims the exemptions.

Fifth Circuit held that the MCA Exemption applied to the plaintiffs as a group and affirmed the district court's denial of overtime compensation.  The *Songer* plaintiffs were indisputably truck drivers and operated commercial vehicles to haul materials to and from mines and quarries.  *Id.* at 468.  After noting that the MCA Exemption depended "'both on the class to which his employer belongs and the class of work involved in the employee's job,'" *id.* at 472 (quoting 29 C.F.R. § 782.2(a)), the Court of Appeals evaluated the plaintiff drivers' duties and work requirements as a group.  The Court did not require proof that each individual employee regularly transported property by motor vehicle across state lines.  *Id.* at 474-75.  In deciding to address the MCA Exemption for the plaintiffs as a group, the Court focused on the facts that "drivers [were or] could have been called upon to drive in interstate commerce during their employment," that their assignments changed often (on a daily basis), and that "any driver could have been assigned to an interstate trip" and thus was "subject to DOT safety regulations affecting the operations of trucks."  *Id.* at 475.

The Fifth Circuit also applied a group analysis in *Barefoot*, 16 F.3d 1216, 1994 WL 57686.  In that case, there were twenty-six plaintiff drivers who made at least twenty trips driving across state lines.  *Id.* at *3.

Based on this authority, this Court similarly rejects Plaintiffs' argument that individualized analysis into each Bellwether Plaintiff's particular job experience is required to determine applicability of the MCA Exemption.  With the exception of the Broussard District, as explained in detail below, CTS has demonstrated without genuine material dispute that the Field Service Employees at the Alice, Bridgeport, and Angleton Districts serve as drivers of motor vehicles to and from projects serviced by CTS.  These employees have similar job duties, were or could have been called upon to drive in interstate commerce during their employment, and receive project

assignments that changed often.[28]   Any driver could have been assigned to an interstate project at any time.  Where, as here, employees' job duties and assignments are sufficiently similar to permit some grouping of the employees for analytical purposes, the applicability of the MCA Exemption should be determined as to that group as a whole.  These grouping decisions are necessarily case specific.

### b.   Company-Wide Analysis Not Appropriate.

The Court, however, is also unpersuaded by CTS's far-reaching argument urging a company-wide "enterprise" analysis by aggregating all the districts' projects in a unified group for all purposes.  CTS has not made a sufficient showing that its six districts operated as a single unit.  Indeed, the evidence demonstrates that CTS treated each district separately, including treating them as separate profit centers.  Districts separately solicited and performed their own projects, and borrowed equipment from other districts only in a minute number of instances.  Most Field Service Employees were assigned by the SC to projects within their home districts.  Indeed, cross-district assignments of Field Services Employees appear to have been infrequent, at best.  As a result, the Court concludes that it is factually unwarranted to combine CTS's four (or six) districts into a single unit for purposes of determining whether the Bellwether Plaintiffs engaged in interstate transportation.

In summary, the Court first will consider whether CTS's Field Services Employees as a single group meet the MCA Exemption's transportation safety-affecting criteria as "drivers," "drivers' helpers,'" or "loaders."  The Court then will

---

[28]    The Court does not mean here that Plaintiffs' "jobs" or "classifications of work" (as discussed in the DOL regulations, 29 C.F.R. § 782.2(b)(2)), changed often, as Plaintiffs contend.  Rather, as in *Songer*, the Court refers to employees' assignments to different projects.

evaluate, district by district, the likelihood of out-of-state projects to assess the interstate commerce aspect of the MCA Exemption test.

### 2.   Engaged in Activities of a Character Directly Affecting Transportation Safety

#### a.   Driving

A "driver" as defined for purposes of the MCA is "an individual who drives a motor vehicle in transportation . . . in interstate or foreign commerce."  29 C.F.R. § 782.3(a).  "This definition does not require that the individual be engaged in such work at all times; it is recognized that even full-duty drivers devote some of their working time to activities other than such driving."  *Id.*

Under DOL regulations "drivers" include "partial duty drivers" who "drive in interstate or foreign commerce as part of a job in which they are required also to engage in other types of driving or nondriving work," including: (1) "Individuals whose driving duties are concerned with transportation some of which is in intrastate commerce and some of which is in interstate or foreign commerce within the meaning of the Motor Carrier Act;" and (2) "individuals who ride on motor vehicles engaged in transportation in interstate or foreign commerce and act as assistant or relief drivers of the vehicles in addition to helping with loading, unloading, and similar work."  *Id.* The partial-duty driver's activities "are such that the exclusion of them from the [Secretary of Transportation's] safety program would have serious consequences." *Levinson*, 330 U.S. at 679.  Indeed, the DOT has not excluded partial-duty drivers – including those who "devote less than one-half of their time to driving" – from any of the required qualifications and safety regulations.  *Id.*  The DOT makes "active use of its powers of regulation in this field of part-time driving."  *Id.* at 680.

An employee who engages in activities that include driving affects safety of operation, even where it is unknown "what fraction of his time was spent in activities

affecting safety of operation." *See id.* at 681.  Indeed, "'[t]en minutes of driving by an unqualified driver may do more harm on the highway than a month or a year of constant driving by a qualified one.'" *Morris*, 332 U.S. at 432 n.11 (quoting *Levinson*, 330 U.S. at 687 (dissenting opinion)).  Consequently, the amount of time spent driving does not determine whether the employee's driving activities affect the safety of operation of a motor vehicle.

"[D]rivers subject to DOT requirements, are employed in positions that 'affect the operational safety of motor vehicles.'"  *Songer*, 618 F.3d at 473 (citing with approval *Barefoot v. Mid-America Dairymen, Inc.*, 826 F. Supp. 1046, 1050 (N.D. Tex. 1993), *aff'd*, 16 F.3d 1216, 1994 WL 57686 (5th Cir. Feb. 18, 1994) (per curiam)).  In *Songer*, the Fifth Circuit held that the employees were "drivers" for purposes of the MCA Exemption based in part on the fact that the drivers had to: meet DOT and Federal Motor Carrier Safety Regulations (FMCSR) requirements prior to assuming their driving duties, have a valid Class A commercial drivers license, meet regulatory driver qualification requirements, receive a compilation of relevant regulatory information (the FMCSR Pocketbook), and participate in "New Hire Safety Orientation" to review regulations and understand the difference between interstate and intrastate hours of service regulations.  The drivers also were required to record their hours of service and complete vehicle FMCSR inspection reports.  *Id.* at 470. Because this evidence, as a whole, indicated that the entire group of plaintiffs had been hired to drive motor vehicles across state lines, the *Songer* court held that plaintiffs were "drivers" under the MCA and that payment of overtime was not required.  *Id.* at 475-76.  The Court applies these factors to the Field Services Employee Plaintiffs.

***Land Projects.*** – Under the criteria in *Songer*, the evidence demonstrates that Field Service Employees who worked on land projects were "drivers" within the meaning of the MCA Exemption as fleshed out by DOL regulations. CTS District Managers in Angleton, Alice, Bridgeport, and Rock Springs each testified that "[f]ield service crew members are expected to transport coil tubing equipment, chemicals, and tools to provide coil tubing services at customer's wells wherever the customer well is located. This is true even if it requires the field crew members to travel across state lines."[29] Field Service Employees often operated large commercial motor vehicles such as pickup trucks weighing more than 10,001 pounds that were motor vehicles historically under the jurisdiction of the DOT. The testimony of several Plaintiffs supports these statements.[30] Also, significantly, there is no genuine dispute that the Field Service Employees drove CTS's motor vehicles (often commercial motor vehicles) loaded with equipment and leftover supplies back to CTS's shop at the conclusion of each project. It is clear that the driving activities were an integral, vital part of the Field Service Employees' duties. Indeed, the work could not take place if the personnel and equipment were not transported to the project site.

---

[29]   Burchfield Decl. [Doc. # 234-46], at 1400, ¶ 20; Reyna Decl. [Doc. # 234-27], at 645, ¶ 17; Boudreaux Decl. [Doc. # 234-40], at 1189, ¶ 16; Robison Decl. [Doc. # 234-33], at 925, ¶ 14.

[30]   *See, e.g.*, Hernandez Depo. [Doc. # 234-7], at 226 (testifying he spent 90% of his time driving "coil unit" versus other vehicles); Cantu Depo. [Doc. # 234-5], at 153-54 (testifying that, as an ST-I at CTS, driving 18-wheelers "to get equipment from Point A to Point B" was "part of my . . . employment"); *id.* at 155-57 (listing various vehicles driven by Bellwether Plaintiff Cantu while employed as an ST-I with CTS); Crews Depo. [Doc. # 234-6], at 178-81(listing various vehicles driven by Bellwether Plaintiff Crews while employed as an ST-I and ST-II with CTS); Tankersley Depo. [Doc. # 234-11], at 358, 360, 362, 375-76.

CTS asserts, although Plaintiffs dispute, that employees are required to have a Commercial Driver's License ("CDL") to work as an ST-I, ST-II, SST, or SS.[31]  Three CTS District Managers stated that "[a]ll employees who may be called upon to drive 18-wheel tractor-trailers, coiled tubing units, fluid pump trucks, nitrogen trucks, transports, or crane trucks are required to hold a valid CDL with hazardous material endorsement."[32]   The ST-I, ST-II, and SS job descriptions include as a job prerequisite: "Valid CDL with hazardous material endorsement (land districts only–required)."[33]   Senior Human Resources Manager Tiffany Letchworth ("Letchworth") states that "[o]f the thousands of employees CTS has employed over time, an insignificant number of Field Service Employees may have not yet obtained

---

[31]   Notably, a worker in Texas and Louisiana could drive "commercial motor vehicles" without a CDL, as those states' laws only require a CDL in order to operate vehicles with a gross vehicle weight rating or gross combination weight rating in excess of 26,000 pounds. *See* LA. R.S. 32:401(3), (5); TEX. TRANSP. CODE § 522.003(3), (5).

[32]   Burchfield Decl. [Doc. # 234-46], at 1402, ¶ 22; Reyna Decl. [Doc. # 234-27], at 645, ¶ 19; Boudreaux Decl. [Doc. # 234-40], at 1190, ¶ 18; Robison Decl. [Doc. # 234-33], at 926, ¶ 16.  Plaintiff argues that "[n]one of the District Managers or Operations Managers declared that a CDL was required in order to work as an STI, STII, SST, or SS," and that the CTS District Managers "merely stated that those 'who may be called upon to drive' 18-wheelers had to possess CDLs." Doc. # 261, at 7.  The Court disagrees with this interpretation of the declarations.  The preceding paragraph in each of the District Managers' declarations states: "Service Technician Is and IIs, as well as Service Supervisors and Service Supervisor Trainees holding a CDL, are expected to assist with the mobilization of equipment by driving 18-wheel tractor-trailers [and other vehicles] to the job [project] location." Burchfield Decl. [Doc. # 234-46], at 1401, ¶ 21.  *See* Reyna Decl. [Doc. # 234-27], at 644, ¶ 18; Boudreaux Decl. [Doc. # 234-40], at 1189-90, ¶ 17; Robison Decl. [Doc. # 234-33], at 925, ¶ 15.

[33]   *See* Exh. 23, 24, 26 to Letchworth Depo. [ Doc. # 234-8], at 258-63, 267-70.  The SST job description does not list any prerequisites and thus does not list that a CDL is required.  *See* Exh. 25 to Letchworth Depo. [Doc. # 234-8], at 264.

a CDL, or may have lost his CDL due to expiration or punishment for illegal activity."[34]

Plaintiffs argue that "[t]here is no proof that the undated job descriptions, which are expressly limited to 'land districts,' were ever enforced in the field."[35]   This conclusory contention does not establish a genuine fact issue in light of the summary judgment record.   Eight of the fourteen Bellwether Plaintiffs held a CDL during the relevant time period.[36]   In addition, Plaintiff Patin was in the process of obtaining a CDL.   Plaintiff Woodard (who obtained a CDL while employed at CTS) held a Class B license, which allowed him to operate smaller commercial motor vehicles. Additionally, Plaintiffs Woodard and Patin testified that if an individual is hired as a "service technician" but does not hold a CDL when hired, he is told that he will need to obtain a CDL in order to keep his job and that CTS will assist him in obtaining a

---

[34]   *See* Letchworth Decl. [Doc. # 234-52], at 1634, ¶ 24.   Plaintiffs object to this portion of Letchworth's declaration on the grounds that: (1) she does not qualify as an expert witness to offer opinion testimony; (2) she has not set forth any methodology to make this determination; (3) she has not provided the number of employees that defendant employed over time who did not possess a CDL; and (4) the word "yet" implies employees did ultimately obtain a CDL, for which there is no evidence.   *See* Doc. # 263.   These objections are not persuasive.   "[P]ersonal knowledge and competence to testify are reasonably inferred from [a declarant's] position[ ] and the nature of [her] participation in the matters to which [she] swore."   *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) (quotation marks and citation omitted).   Letchworth is the Senior Human Resources Manager at CTS.   She states she has personal knowledge of the licenses and certifications held by CTS employees, which are maintained in the employee personnel files, and Plaintiffs have not controverted this fact.

[35]   Plaintiffs rely on the fact that Patin, Henderson, and Woodard did not possess CDLs while employed as Field Service Employees during the relevant period.

[36]   Bellwether Plaintiffs B. Allen, Cantu, Crews, Hernandez, Pena, Tankersley, D. Allen, and Branham each held a CDL during the relevant time period.

CDL.  The evidence establishes that Field Service Employees were required to have a CDL, and only in unusual circumstances was the requirement waived.[37]

The evidence that a few Plaintiffs did not have these licenses does not create an exception sufficient to create a genuine fact issue that Bellwether Plaintiffs were not "drivers" subject to the MCA Exemption.  *See Garza v. Smith Int'l,  Inc.*, 2011 WL 835820, at *7-*8 (S.D. Tex. Mar. 7, 2011) (Jack, J.); *Gonzalez v. W-H Energy Serv., Inc.*, No. 2:08–CV–311 (S.D. Tex. Jan. 7, 2010) (Ellington, M.J.), *adopted by* Order Adopting Memorandum and Recommendation (S. D. Tex. Jan. 29, 2010) (Head, J.).

Another important factor in *Songer* was that, upon hire, Plaintiffs were issued a copy of the relevant regulatory information and were required to participate in a "New Hire Safety Orientation" to review the difference between interstate and intrastate hours of service regulations."  Additionally, they were required to record their hours of service and complete driver vehicle inspection reports. *See Songer*, 618 F.3d at 470.  The evidence in the case at bar similarly shows that pursuant to DOT regulations and CTS requirements, CTS Field Service Employees performed DOT inspections to ensure that the load was secure and the vehicle was fit for safe operation on the highways before traveling to and from project sites.  These DOT inspections require verification that, among other things, the truck's lights were working properly, the load was secure, and the tires were properly inflated.  The evidence also shows

---

[37]   Plaintiffs Broussard, Henderson, Newman, and Shiekh did not possess CDLs. Because the norm was that CDLs were required and that Field Service Employees drove CTS's vehicles, Bellwether Plaintiff Broussard was required to sign a document committing that he would *not* operate any CTS vehicles because his license had been suspended due to multiple criminal convictions for driving while intoxicated. Bellwether Plaintiff Henderson allowed his CDL to lapse during his tenure as a Service Coordinator, a position that was not within the Field Service Employees category.  Sheikh was a FE-I, also not within the Field Service Employees category. Finally, Newman worked only offshore in a position that did not require driving.

that Field Service Employees were expected to abide by DOT regulations specifically aimed at drivers, such as completing hours of service logs and passing DOT drug tests.  Additionally, at least one Bellwether Plaintiff admitted that he observed and abided by the 70-hour "hours of service" rule issued by the DOT.[38]

CTS accordingly has established without material contradiction that Bellwether Plaintiffs who were Field Service Employees in land projects satisfied the safety-affecting duties aspect of the definition of "partial-duty drivers" in the DOL regulations.  *See* 29 C.F.R. § 782.3; *Songer*, 618 F.3d at 473 (truck drivers subject to DOT requirements are "employed in positions that 'affect the operational safety of motor vehicles'" (citing *Barefoot*, 826 F. Supp. at 1050)).

***Offshore Projects.***–  Bellwether Plaintiffs contend they did not meet the safety-affecting requirement for "drivers" under the DOL regulations when they were assigned to offshore projects.  CTS contends that the offshore workers (referred to as "Service Workers") were "drivers" or "drivers' helpers" under DOL regulations regarding the MCA Exemption.

Only the Broussard and Angleton Districts serviced offshore projects during the relevant period.  At the Angleton District, Field Service Employees were assigned land and offshore projects indiscriminately.  For the reasons explained in the preceding section, the Angleton District's Field Service Employees met the safety-affecting aspect of the DOL definition of "partial duty drivers" by virtue of their land based assignments, irrespective of whether those employees also worked offshore.

---

[38]     Cantu Depo. [Doc. # 252-3], at 1877 ("[W]e can't go over 70 hours in the course of a workweek as far as drive time and work time.  I mean, not work time, but – how is it? – useable hours, is the best way to say it."). Presley Branham testified that he was required to fill out driver's logs and track his driving hours for safety purposes and that these logs were still required even if he was working on an offshore project and not driving.  Branham Depo. [Doc. # 250-1], at 82-83, 86.

The Broussard District, in contrast, employed certain Field Service Employees for land based projects and other Service Employees for offshore projects exclusively. The land-based project Field Service Employees are covered by the analysis above, and they met the safety-affecting aspect of the DOL definition of "partial duty drivers."

In regard to the Broussard District employees who worked exclusively on offshore projects, the factual record is conflicting and there remain open legal issues. Plaintiffs Broussard and Newman worked only on offshore projects.  CTS has demonstrated that Newman and other offshore Service Employees (but not Broussard[39]) drove CTS pickup trucks (of unspecified sizes) from the shop to the load out dock where the employees met a vessel to go offshore.  The Broussard offshore projects did not generally require CTS employees to drive commercial vehicles loaded with equipment and chemicals to the load out docks.  CTS primarily used a third-party trucking company to transport the equipment.[40]   At least some of the job descriptions for various titles differed between the land and offshore assignments.  The ST-II job

---

[39]   CTS *prohibited* Broussard from driving any CTS vehicle because he had been charged criminally with Driving While Intoxicated.  Broussard was required to sign a "Non-Driving Acknowledgment" form in July 2007 and July 2008.  *See* CTS documents of W. Broussard  [Doc. # 217-10], at CTS 105684, CTS 105696.  The form stated that he was "**NOT** authorized to [o]perate a [CTS] vehicle under any circumstances until authorization has been agreed to by [CTS] automobile insurance company," and "[a]s a condition of employment, [Plaintiff] agree[s] to abide by this policy until [his] driving record is in compliance with the [CTS] Driving Safety Policy."  *Id.*  The record is not clear what date this prohibition from driving began.

[40]   Comeaux Decl. [Doc. # 234-29], at 737, ¶ 17.  Plaintiffs contend that Comeaux testified in his deposition (contrary to a more ambiguous statement in his Declaration) that the Broussard District used only third-party trucking companies to transport equipment to the load out docks, citing Comeaux Depo. [Doc. # 253-3], at 37-38. Plaintiffs do not provide the deposition excerpts.

description prerequisite of a "Valid CDL with hazardous material endorsement" was limited to "land districts only." The requirement of "mobilization of equipment by driving" also was restricted to "land districts only." Thus, CTS has not shown entitlement to summary judgment in its favor regarding the safety-affecting transportation duties of its Broussard District Service Employees, such as Newman.

CTS argues that offshore Service Employees performed safety-affecting duties because Service Workers traveled to the offshore project loading docks with their CTS-issued personal safety gear.[41] The record is unclear as to what gear was transported. The Court cannot determine on this record whether either of these activities rise to the level of a "safety-affecting duty" for Broussard District Service Employees with offshore assignments. The evidence raises a genuine fact dispute on the issue.

### b.    Driver's Helpers

Plaintiff Broussard did not have a driver's license at all and was prohibited by CTS from driving their vehicles because of multiple criminal charges. He, therefore, cannot meet the safety-affecting aspect of the DOL's "driver" definition. CTS contends that Broussard was a "driver's helper." "A Driver's 'helper,' as defined for Motor Carrier Act jurisdiction . . . is an employee other than a driver, who is required to ride on a motor vehicle when it is being operated in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.4. This definition includes all employees who: (a) "Assist in loading the vehicles (they may also assist in unloading), an activity which has been held not to affect 'safety of operation'; (b) "dismount when the vehicle approaches a railroad crossing and flag the driver across the tracks, and perform a similar duty when the vehicle is being turned around on a

---

[41]    Comeaux Decl. [Doc. # 234-29], at 741, ¶ 31.

busy highway or when it is entering or emerging from a driveway;" and (c) "in case of a breakdown: (1) Place the flags, flares, and fuses as required by the safety regulations. (2) go for assistance while the driver protects the vehicle on the highway, or vice versa, or (3) assist the driver in changing tires or making minor repairs; and assist in putting on or removing chains."  29 C.F.R. § 782.4(a) (citations omitted). The Court denies summary judgment on this issue.  There is a fact issue whether Broussard (and/or other Service Employees at the Broussard and other districts) met the definition of "driver's helper."  There is little, if any, evidence presented about these possible services.

### c.    Loading

CTS argues also that Field Service Employees are "loaders," and thus exempt under the MCA Exemption.  The Court concludes that there are fact issues that preclude summary judgment for any party regarding whether or not Bellwether Plaintiffs were loaders.  A "loader," as defined for purposes of the MCA, is an employee of a carrier subject to the MCA "whose duties include, among other things, the proper loading of his employer's motor vehicles so that they may be safely operated on the highways of the country."  29 C.F.R. § 782.5(a).  A loader's duties "will usually also include unloading and the transfer of freight between the vehicles and the warehouse, but he engages, as a 'loader,' in work directly affecting 'safety of operation' so long as he has responsibility[,] when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized."  *Id.*

Neither CTS nor Plaintiffs has provided uncontradicted evidence regarding whether and to what extent the Field Service Employees engaged in loading activities at the districts' shops and whether those employees exercised discretion in building a load or in securing freight "in such manner that the safe operation of the vehicles on the highways in interstate . . . commerce will not be jeopardized," as required by the MCA exemption.  29 C.F.R. § 782.5(a).  Indeed, the evidence is conflicting as to whether Field Service Employees generally or Bellwether Plaintiffs actually loaded trucks and, if so, whether they merely followed the instructions of their superiors.[42] There is evidence that CTS Field Service Employees at the Broussard District were not allowed to operate the forklifts and, at other locations, Plaintiffs did not in fact load despite management's desire they do so and management's belief that Field Service Employees in fact were helping in this regard.

There is further dispute about whether Field Service Employees backloaded some equipment at project sites for return to the shop at the conclusion of each project.  There, accordingly, remain genuine fact issues concerning whether the Bellwether Plaintiffs or CTS Field Service Employees (and offshore Service Employees) qualified as "loaders" under the DOL regulations for purposes of the MCA Exemption.  Summary judgment is denied to both sides on this issue.

### 3.    Activities Involved Interstate Transport

Because CTS Field Service Employees assigned to land based projects, and possibly, offshore projects, are employed in positions that affect the operational safety of motor vehicles, the Court must address the question of whether Bellwether Plaintiffs' "activities directly affected motor vehicle safety '*in the transport of*

---

[42]    *See*, *e.g.*, Defendants' Memorandum in Response to Plaintiffs' Individual Motions for Summary Judgment [Doc. # 252], at 26-27 & n. 73 (citing depositions); Plaintiffs' Reply [Doc. # 262], at 33 & n. 143 (citing depositions).

*property in interstate commerce*.'"   *Songer*, 618 F.3d at 473 (emphasis added) (quoting 29 C.F.R. § 782.2(a)(2)); *see Barefoot*, 16 F.3d 1216, 1994 WL 57686 at *3. As noted, the Fifth Circuit has squarely rejected Plaintiffs' argument that each employee, here, Bellwether Plaintiffs, must be shown to have actually driven a commercial motor vehicle across state lines before the MCA Exemption can apply. The pertinent inquiry is whether the employer establishes that the employee can be "reasonably expected" to engage in safety-affecting duties in connection with interstate transport of property "in the ordinary course of his work," at least "from time to time."  *Songer*, 618 F.3d at 474; *see* 29 C.F.R. § 782.2(b)(3).

The issue here, therefore, is whether objectively there can be said to be a "reasonable expectation" that an interstate trip could be assigned to members of a group, not whether a particular employee subjectively thought he was likely to receive an interstate assignment.   The *Songer* court relied in part on the Supreme Court's rationale in *Morris v. McComb*, 332 U.S. 422 (1947), which held that full-time drivers who as a group spent approximately 4% of their time transporting goods in interstate commerce and the remainder driving intrastate were subject to the MCA Exemption. The Supreme Court reasoned that

> apparently in the normal operation of the business, these strictly interstate commerce trips were distributed generally throughout the year and their performance was shared indiscriminately by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce. These trips were thus a natural, integral and apparently inseparable part of the common carrier service of the petitioner and of his drivers.

*Morris*, 332 U.S. at 433.[43]  In *Songer*, the Court of Appeals held that truck drivers could reasonably be expected to engage in interstate transport where the percentage of loads transported across state lines was approximately 2.75%.  *See Songer*, 618 F.3d at 476.[44]

There is no dispute in this case that interstate trips were distributed generally throughout the year, and there is no evidence that an employee could routinely reject interstate assignments.  Plaintiffs argue, however, that the interstate assignments were not "shared indiscriminately by the drivers" because CTS considered workers' skill levels and would occasionally honor a customer's request for a particular worker. Plaintiffs' proposed interpretation of "indiscriminate" assignments is too restrictive. There is no evidence that CTS reserved interstate trips for specific employees.  There is no suggestion that CTS required that customer requests be honored.  There were multiple individuals in each district at each Field Service Employee job level.  The employer's use of some discretion does not preclude an assignment procedure from being "indiscriminate," so long as the interstate projects were not reserved for certain workers.  The interstate trips in this case were the "natural, integral and apparently inseparable part" of CTS's service and the work of its employees who engaged in

---

[43]     In *Morris*, the Supreme Court noted in concluding that the DOT had jurisdiction over the plaintiffs' employer that, in practical terms, the safety concerns facing a carrier who sent every driver on an interstate trip would be the same if the carrier sent only some or most of its drivers on interstate trips.  *See Morris*, 332 U.S. at 434.  The Supreme Court concluded that the ICC had the power to regulate all of defendant's drivers, and the existence — rather than the exercise — of that power was the test of whether the employees were entitled to overtime pay under the FLSA. *Id.*; *see Barefoot*, 16 F.3d 1216, 1994 WL 57686, at *2 ("The Secretary ... need only possess the power to regulate the employees at issue; it need not actually exercise that power for the [MCA] exemption to apply.") (citing *Levinson*, 330 U.S. at 678).

[44]     This figure was calculated from the yearly figures set forth in *Songer*, 618 F. 3d at 476.

driving activities such that the MCA Exemption would apply.  *See Morris*, 332 U.S. at 433.

Nonetheless, there is a point at which the chances of driving interstate are so low that as a matter of law the Court cannot say there was a "reasonable expectation" that the employees will be called upon to make such a trip.  "While plainly, there is no requirement that an employer's interstate business be substantial or that its employees engage in a substantial volume of interstate activity in order that the employees come under the jurisdiction of the Secretary of Transportation," *Flowers v. Regency Transp., Inc.*, 535 F. Supp. 2d 765, 769 (S. D. Miss. 2008), the interstate travel must be such that a reasonable expectation of making an interstate trip exists. *See Coleman v. Jiffy June Farms, Inc.*, 324 F. Supp. 664, 670 (S. D. Ala. 1970), *aff'd*, 458 F.2d 1139 (5th Cir. 1971) (finding that MCA Exemption did not apply where employer's out-of-state deliveries constituted a mere 0.23% of all deliveries); *Kimball v. Goodyear Tire & Rubber Co.*, 504 F. Supp. 544, 548 (E. D. Tex. 1980) (denying MCA Exemption where only 0.17% of trips were interstate); *but see Starrett v. Bruce*, 391 F.2d 320, 323-324 (10th Cir. 1968) (MCA Exemption applied to truck driver working for an employer who derived no income from transportation of goods in interstate commerce during period of driver's employment, but which employer held itself out to the general public as being available for interstate hauls during such period, actively solicited interstate business during such period, and would have had driver drive in interstate commerce if employer had obtained such business; ICC did not in fact exercise jurisdiction); *Barefoot*, 16 F.3d 1216, 1994 WL 57686 at *3

(drivers engaged in interstate transportation sufficient for MCA Exemption where twenty-six drivers made a combined total of at least twenty interstate trips).[45]

CTS presents evidence that it serviced a not insignificant number of projects that required its Field Service Employees to travel and transport CTS property across state lines.  CTS presents evidence that in all five districts originally in issue, Alice, Angleton, Bridgeport, Broussard, and Rock Springs, a total of approximately 7% of all land projects and over 11% of offshore projects in the three-year relevant period required one or more service crews to mobilize coil tubing equipment across state lines.[46]  Plaintiffs object to these aggregate percentages in part because they are

---

[45]   Plaintiffs rely primarily on authority that is not binding on this Court and which is materially distinguishable from the facts of this case.  For example, Plaintiffs rely on *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232 (7th Cir. 1961), which held that the rationale in *Morris* did not apply to "scrap drivers," who drove specified routes, where the evidence did not show a single instance where those drivers assigned to an intrastate route ever handled an interstate route.  That case is materially different from this case, where the evidence shows that many Field Service Employees were, and again could be, assigned to an out-of-state project indiscriminately.  The Court is bound by and elects to follow the reasoning in the Fifth Circuit's decisions in *Songer* and *Barefoot* interpreting the Supreme Court's ruling in *Morris*.

Plaintiffs also rely on *Troutt v. Stavola Brothers, Inc.*, 107 F.3d 1104, 1108 (4th Cir. 1997).  That case is not binding authority on this Court and is factually distinguishable from the circumstances at bar.  The Bellwether Plaintiffs who are Field Service Employees have duties, as a group, that require the transport of heavy specialized oil field equipment to and from well sites, generally using large trucks or 18-wheel tractor-trailers.  Such job classifications have been held by other courts to be exempt under the MCA using persuasive reasoning.  *See Harshman v. Well Serv., Inc.*, 248 F. Supp. 953 (W. D. Pa. 1964); Memorandum and Recommendations, *Gonzalez v. W-H Energy Services, Inc.*, No. 2:08–cv–311 (S. D. Tex. Jan. 7, 2010) (Ellington, M.J.), *adopted by* Order Adopting Memorandum and Recommendation (S. D. Tex. Jan. 29, 2010) (Head, J.); *Garza v. Smith International, Inc.*, 2011 WL 835820, *6.

[46]   Frazier Decl. [Doc. # 234-29], at 732, ¶ 12.  Frazier notes that approximately 5.28% (continued...)

skewed by the extremely large number of interstate projects handled by the Rock Springs District. More than 56% of the Rock Springs projects were out-of-state, while the other districts had far fewer interstate projects. As was discussed above, the Court will consider the applicability of the MCA Exemption for each district separately.

Plaintiffs argue also that the Court should not consider offshore projects at all in determining whether Bellwether Plaintiffs were reasonably expected to travel

---

[46]    (...continued)
of the land-based projects were performed in states in which CTS does not have a service district. *Id.*

Plaintiffs object to these percentages arguing that Frazier refers to the "District Manager's records," without sufficiently identifying such records, without confirming that they have been produced in this suit, and without establishing that they satisfy the business records requirement under the Federal Rules of Evidence or otherwise demonstrating that they are admissible. Plaintiffs further object that Frazier has not disclosed any personal knowledge of the data preparation or whether the percentages are accurate. Plaintiffs further object that Frazier has failed to demonstrate his methodology, the basis of the percentages he claims, and whether the percentages are a fair and accurate representation of documents that are admissible and have been produced in this lawsuit to Plaintiffs.

Federal Rule of Evidence 1006 provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." FED. R. EVID. 1006. In its response [Doc. # 265], CTS explains that "District Manager's records" refers to "load out and service order documents" that Frazier declares are maintained by CTS District Managers, and which are attached to the CTS District Managers' Declarations. These documents are "Bates labeled" indicating they were produced by CTS during discovery. Moreover, the District Managers each explain how they calculated the percentages summarized by Frazier. *See* Reyna Decl. [Doc. # 234-27], at 647, ¶¶ 29-30; Exhibit A to Reyna Decl., *id*. at 653-55; Robison Decl. [Doc. # 234-33], at 927, ¶¶ 22-24; Exhibit A to Robison Decl. [Docs. # 234-34 – # 234-38], at 930-1133; Boudreaux Decl. [Doc. # 234-40], at 1192-93, ¶¶ 28-29, 39; Exhibit A to Boudreaux Decl. [Doc. # 234-41], at 1201-19; Burchfield Decl. [Doc. # 234-46], at 1404-06, ¶¶ 38-39, 47; Exhibit A to Burchfield Decl. [Docs. # 234-46 – # 234-48], at 1414-78. These documents are business records and the summaries are admissible in evidence. Plaintiffs' objections are **overruled**.

across state lines.   Only the Angleton and Broussard Districts serviced offshore projects during the relevant period.   Regarding Angleton, the Court is unpersuaded that offshore projects are materially different from land projects to warrant segregation of data on out-of-state projects for interstate commerce purposes.   The evidence shows that Field Service Employees were assigned to offshore and land based projects on an as-needed basis.   Thus, both types of projects will be considered for that district in determining the likelihood of interstate travel by the Field Service Employees.   In the Broussard District, however, the offshore and land-based projects will be considered separately because the employees that serviced land projects were completely different from those who handled offshore projects.

The Court turns to an analysis of the data regarding frequency of out-of-state projects for each district.   The parties submitted declarations proffering interstate project calculations allegedly derived from the voluminous CTS project and other business records.   The percentage of out-of-state trips taken in each CTS district is disputed.[47]   Nevertheless, the discrepancies are not material.

The calculations by Plaintiffs and Defendant CTS reveal the following percentages of out-of-state projects:

| District | Percentage of Out-of-State Projects (by party) |
|----------|-----------------------------------------------|
| **Alice** | CTS: 0.3% or under 1%; Plaintiffs:  0.3%[48] |

---

[47]   It appears that the out-of-state projects' percentages may not reflect travel by multiple crews assigned to a single project or multiple trips by the same crew to the project location.

[48]   It appears that during the relevant period, between December 2007 and October 2008, the Alice District in Texas serviced nine (and possibly more) projects outside Texas, including three projects for which the Alice District lent equipment and personnel out of state to a district in another state.   *See* Reyna Decl.[Doc. # 234-27], at 648-51,

(continued...)

| Bridgeport | CTS: 1.26%; Plaintiffs: 0.57%[49] |
| Angleton | CTS: 6.1% (1.66% land; 29.8% offshore); Plaintiffs: 1.47% (land only)[50] |

---

[48]    (...continued)

¶¶ 37-48.  Somewhat inconsistently, however, Reyna testifies that "at least 3 of the 903 projects serviced by the Alice District were located outside Texas."  *See id.* at 651 (Reyna Decl., ¶ 48).  At most, CTS shows that less than 1% of the projects in which Alice District Field Service Employees were involved had an interstate component. Plaintiffs' calculations show three out-of-state land projects among 903 projects serviced by the Alice District, constituting 0.3% of the total.  *See* Exh. 122, Part C to Plaintiffs' Response [Doc. # 253-46].  There is a discrepancy between CTS's and Plaintiffs' calculations, but it appears immaterial if the entire 2005-2008 period is considered. However, it is noted that, were the data limited to 2008, the percentage might be higher, as most of the out-of-state projects listed by CTS for the Alice District were in that year.  The Court does not reach any conclusion regarding the data for a shorter period.

[49]    Bridgeport District Manager Barry Boudreaux testified that during the relevant period, the Bridgeport District serviced 13 projects outside Texas.  *See* Boudreaux Decl., [Doc. # 234-40], at 1193-99, ¶¶ 40-52.  Boudreaux then testifies that "at least 14 of the 1108 projects serviced by the Alice District were located outside the state of Texas."  *See id.* at 1193, ¶ 39.  Plaintiffs' calculations show 7 out-of-state land projects out of a total of 1220 projects (which is 0.57%) serviced by the Bridgeport District.  *See* Exh. 122, Part C to Plaintiffs' Response [Doc. # 253-46].  The Court concludes the discrepancy is immaterial.

[50]    Angleton District Manager Edward Burchfield testified that his district serviced 16 of 966 land projects and 54 of a total of 181 offshore projects out-of-state during the relevant period (for a total of 1147 projects in the relevant period, of which 70, or 6.1%, were interstate projects).  Burchfield Decl. [Doc. # 234-46], at 1406, ¶ 47. Burchfield lists some, but not all of these out of state projects in his declaration.  *See id.* at 1406-12, ¶¶ 48-67.  Plaintiffs' calculations, on the other hand, show 17 out-of-state land projects out of a total of 1159 projects (which is 1.47%) serviced by the Angleton District.  *See* Exh. 122, Part C to Plaintiffs' Response [Doc. # 253-46]. Offshore projects at Angleton were assigned indiscriminately, and the evidence suggests that Field Service employees were required to drive to the load out docks on offshore projects.  Under SAFETEA-LU, there is no reason for not including offshore projects in this calculation since there was no requirement of driving a *commercial*

(continued...)

| Broussard | CTS:  22% (14.5% land; 7.5% offshore); Plaintiffs:  5.6%[51] |

The evidence therefore demonstrates under both sides' calculations that, during the relevant period, as a matter of law, out-of-state land and offshore projects together at the Angleton District, and land and offshore projects (together and independently) at the Broussard District, were of sufficient frequency that there was a "reasonable expectation" that Field Service Employees at those districts were likely to be called upon from time to time to engage in interstate commerce for purposes of the MCA Exemption by transporting property or crew members between states.[52]  *See Songer*, 618 F.3d at 473-74.

The fact that certain Bellwether Plaintiffs personally may not have worked on any out-of-state projects during the relevant period or express now the subjective opinion that they were not likely to be involved in an out-of-state project, is not material.  *See id.* at 474; 29 C.F.R. § 782.2(b)(3).  Plaintiffs' driving activities, in

---

[50]     (...continued)
         vehicle.

[51]     CTS provides evidence that 14.5% of land projects and 7.5% of offshore projects serviced by the Broussard District required one or more CTS service crew to travel across state lines during the relevant period. *See* Comeaux Decl. [Doc. # 234-29], at 738-39, ¶¶ 21-22 (CTS did not provide the raw numbers of projects and out-of-state projects). Comeaux also listed two projects for which the Broussard District borrowed personnel and equipment from the Alice and Bridgeport Districts, respectively. *See id.* at 736-37, ¶¶ 12-13. Plaintiffs' calculations show 72 out-of-state land projects out of a total of 1,286 projects (5.60%) serviced by the Broussard District. *See* Exh. 122, Part C to Plaintiffs' Response [Doc. # 253-46].

[52]     This is also true of Field Service Employees in the Rock Springs District, although none of the current Bellwether Plaintiffs were assigned there during the relevant time. CTS's evidence establishes that 160 of Rock Springs District's 284 projects during the relevant time, or approximately 56.3%, were performed out-of-state.  Robison Decl. [Doc. # 234-33], at 927, ¶ 24.

general, affected directly the safety of operations of motor vehicles on the public highways in transportation in interstate commerce, and the rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to interstate safety-affecting work in a particular workweek.  The exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting safety of operation.  It is "the character of the activities, rather than the proportion of the employee's time or activities" that determines the DOT jurisdiction to regulate employees under the exemption.  *Songer*, 618 F.3d at 473 (internal quotation marks and citations omitted).

Insofar as the interstate commerce aspect of the MCA Exemption is concerned, the Field Service Employees in the Angleton and Broussard Districts fall within the MCA Exemption.

Therefore summary judgment is granted in CTS's favor regarding the Angleton District.  The Field Service Employees in that district were not entitled to overtime during the relevant period under the MCA Exemption.  *See* 29 C.F.R. § 782.2(b)(2).[53] Plaintiffs' summary judgment motion is denied regarding the Angleton District. Regarding the Broussard District, summary judgment is granted in CTS's favor for Field Service Employees assigned to land based projects on the same grounds as the Angleton District.[54]

---

[53]    This is consistent with the DOL regulation that states that an entire class of employees may be "exempt even though the interstate driving [of] particular employees was sporadic and occasional, and in practice some drivers would not be called upon for long periods to perform any such work."  29 C.F.R. § 782.2(c)(1) (citing *Morris*, 332 U.S. 422).

[54]    Although the percentages for the Broussard District adequately establish a "reasonable expectation of interstate transportation, summary judgment is denied in regard to Broussard District Service Employees that worked offshore because, as

(continued...)

The Court concludes, on the other hand, that for the relevant period the percentage of interstate projects for the Alice and Bridgeport Districts was so low that CTS has failed to establish that there was objectively a reasonable expectation that the Field Service Employees, including the Bellwether Plaintiffs, assigned to those offices would drive to and from any out-of-state projects. *See Songer*, 618 F.3d at 474.[55] CTS has not shown that the employees from these districts during the relevant period were "'likely to be[ ] called upon in the ordinary course of [their] work to perform, either regularly or from time to time, safety-affecting activities.'" *See id.* (quoting 29 C.F.R. § 782.2(b)(3)). Accordingly, on the record before this Court,[56] as a general rule, the MCA Exemption does not apply to Field Service Employees employed at the Alice or Bridgeport Districts, and Plaintiffs are entitled to summary judgment in this regard.

## V.    TCA CLAIMS (POST-JUNE 6, 2008 CLAIMS)

The Court denies both motions for summary judgment as to any claims for overtime payments arising after June 6, 2008.[57] On that date, Congress passed the

---

[54]    (...continued)
discussed above, there are fact issues whether the Broussard District Service Employees that handled offshore projects were drivers (part-time or otherwise), driver's helpers, or possibly loaders.

[55]    In *Songer*, the Court held that under the MCA Exemption, it was sufficient that 2.75% of the loads transported by the company were interstate. *See Songer,* 618 F.3d 476 (setting forth yearly figures).

[56]    As noted, the Court has only done a three-year analysis. Moreover, this ruling does not apply to Sheikh. There is a genuine fact issue regarding application of the MCA Exemption because his duties driving and carrying CTS equipment are not sufficiently developed in this record. To the extent CTS seeks summary judgment that it is exempt under the MCA from paying Sheikh overtime, the motion is **denied**.

[57]    The TCA became effective on June 8, 2008, the date it was enacted. *See Miller v. Professional Transp., Inc.*, 2010 WL 3398935, *4 (S.D. Ind. 2010).

SAFETEA-LU Technical Corrections Act of 2008 (TCA), Pub. L. 110-244, 122 Stat. 1572. The TCA corrected the SAFETEA-LU in two pertinent ways. First, the pre-SAFETEA-LU definition of "motor carrier" in the Motor Carrier Act was restored in section 13102(15) of the MCA, the provision that defined "motor private carrier." TCA § 305(c) 122 Stat. 1572, 1620. This change thus expanded the scope of the DOT's authority to entities that operated any kind of vehicle, *see* 49 U.S.C. § 13102(16), not merely entities that operated commercial motor vehicles. As noted, neither party disputes that CTS meets the definition of "motor private carrier" under the TCA.

The second change as a result of the TCA, however, altered longstanding legislative policy. Specifically, the TCA narrowed the category of employees who were covered by the MCA Exemption. Section 306 of the TCA made section 7 of FLSA, 29 U.S.C. § 207, applicable to "a covered employee ***notwithstanding*** section 13(b)(1) of that Act [*i.e.*, the MCA Exemption, 29 U.S.C. § 213(b)(1)]." TCA § 306(a), 122 Stat. 1572, 1620 (emphasis added). Accordingly, the TCA made the FLSA's overtime provisions applicable to any "covered employee," which term was defined, for present purposes, as an individual employed by a motor private carrier whose work, in whole or in part, is defined "(A) as that of a driver, driver's helper, loader, or mechanic"; and "(B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less [a non-commercial motor vehicle] in transportation on public highways in interstate or foreign commerce"; and "(3) who performs duties on motor vehicles weighing 10,000 pounds or less [a non-commercial vehicle]." *Id.* § 306(c) 122 Stat. 1572, 1621.

Thus, under the TCA, an employee who works for a DOT-regulated motor carrier or motor private carrier (such as CTS) and works on or with non-commercial motor vehicles (*i.e.*, vehicles weighing 10,000 pounds or less) may now be entitled to

overtime compensation.  *See Mayan*, 2009 WL 3152136, at *9.  To be entitled to overtime pay, an employee must perform some meaningful work for more than an insubstantial time with vehicles weighing 10,000 pounds or less.  The parties have not provided sufficient evidence concerning the Bellwether Plaintiffs' use (or non-use) of non-commercial vehicles.  There remain fact issues precluding summary judgment for this time period.[58]

The parties have not provided sufficient evidence or argument regarding the effect of the TCA on the Bellwether Plaintiffs' entitlement to overtime benefits after June 6, 2008.  It appears the Court must determine for the period after June 6, 2008 (the TCA period), when and how often each Plaintiff individually performed duties with non-commercial vehicles so as to qualify as a "covered employee."  This inquiry may also implicate the DOT's "4-month rule," another issue the Court cannot determine on the current record.[59]  When these issues are ripe, the Court will determine whether grouping of Plaintiffs (by job title, by district, or in any other way) is appropriate.  Summary judgment accordingly is denied to all parties on the application of the MCA Exemption under the TCA.

---

[58]    Some of the other fact issues mentioned earlier also are present here, such as whether the Bellwether Plaintiffs engaged in loading or whether Broussard and Angleton District offshore Service Employees met the driver or driver's helper definitions.

[59]    The DOL has promulgated interpretive regulations which are consistent with those of the DOT, providing that "in the case of an employee of a private carrier whose job does not require him to engage regularly in exempt . . . activities . . . and whose engagement in such activities occurs sporadically or occasionally ... the exemption will apply to him only in those workweeks when he engages in such activities."  29 C.F.R. § 782.2(b)(4); *see also Johnson v. Hix Wrecker Serv., Inc.*, ___ F.3d ___, 2011 WL 2586284, endnote 3 (7th Cir. 2011).

## VI.    OTHER EXEMPTIONS UNDER THE FLSA

### A.    Administrative Exemption

Bellwether Plaintiff Henderson served as a Service Coordinator ("SC") from May 2004 to May 2006 in the Angleton District. CTS contends that the job duties of Service Coordinator ("SC") qualify for the Administrative Exemption.[60]

Bellwether Plaintiff Henderson indicates that he does not seek overtime during the time he was employed as an SC.[61]  That claim is deemed abandoned with prejudice. Accordingly, the Court need not address at this time the question of whether the administrative exemption applies to individuals employed as SCs.

### B.    Executive Exemption

CTS Service Supervisors (SSs) qualify for the Executive Exemption under the FLSA.  Bellwether Plaintiff Henderson was employed as an SS from May 15, 2006,

---

[60]    The Administrative Exemption exempts from the FLSA's overtime requirements "any employee employed in a bona fide . . . administrative . . . capacity . . ." 29 U.S.C. § 213(a).  The Code of Federal Regulations states that:

> The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1)    Compensated on a salary or fee basis at a rate of not less than $455 per week . . .;
>
> (2)    Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3)    Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

[61]    *See* Plaintiffs' Response [Doc. # 261], at 35.

to March 13, 2007, at the Angleton District.  The Court concludes that CTS has shown that Bellwether Plaintiff Henderson qualifies as an exempt executive under the FLSA when he performed his duties as an SS.[62]

The Executive Exemption exempts from the FLSA's overtime requirements "any employee employed in a bona fide executive . . . capacity . . . ."  29 U.S.C. § 213(a). The Code of Federal Regulations states that:

> The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1)  Compensated on a salary basis at a rate of not less than $455 per week . . . , exclusive of board, lodging or other facilities;
>
> (2)  Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3)  Who customarily and regularly directs the work of two or more other employees; and
>
> (4)  Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).  CTS has presented evidence, and Plaintiff does not appear to dispute, that as an SS, Henderson was paid on a salary basis that exceeded $455.00 per week.

Plaintiffs argue that Henderson as an SS did not satisfy the second requirement for the Executive Exemption because his "primary duty" was not to manage "a customarily recognized department or subdivision" of CTS.  *See* 29 C.F.R.

---

[62]   The Court has concluded that as an SS in the Angleton District, Henderson is covered by the MCA Exemption.

§ 541.100(a)(2).  The Code of Federal Regulations defines an employee's "primary duty" as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  To determine an employee's primary duty, the Court looks to the job responsibilities that are "of principal value to the employer." *Dalheim v. KDFW-TV,* 918 F.2d 1220, 1227 (5th Cir. 1990).  Factors to consider when determining the primary duty of an employee "include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  29 C.F.R. § 541.700(a).  Although time alone is not the sole test, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." *Id.* § 541.700(b).  Management of the enterprise includes

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The evidence in the record establishes that Henderson's managerial responsibilities while in the field performing CTS's projects for customers were

extensive and of primary importance to CTS.  For instance, as an SS, he was the senior CTS employee on all projects to which he was assigned in the field, whether on land or offshore, and Henderson planned, assigned, and managed the work of the STs at the project sites to which he was assigned.[63]   As a result, the Court concludes that, as an SS, Henderson's primary duty from CTS's perspective was managerial.[64]

---

[63]   *See* Employee Handbook, Exhibit O to Letchworth Decl. [Doc. # 234-55], at 1775 ("Field Supervisors will direct work activity throughout the day"; "While out working in the field, follow your supervisor's instruction for he is there to teach and to protect you.  If there is something you don't understand please bring it to his attention.").  *See generally* B. Allen Depo. [Doc. # 234-2], at 8-9; Crews Depo. [Doc. # 234-6], at 190-91; J. Hernandez Depo. [Doc. # 234-7], at 219; Branham Depo. [Doc. # 234-4], at 115-16; Newman Depo. [Doc. # 234-7], at 212; W. Broussard Depo. [Doc. # 234-5], at 145-46; Woodard Depo. [Doc. # 252-2], at 1848-49; J. Hernandez Depo. [Doc. # 252-3], at 1869; Cantu Depo. [Doc. # 252-3], at 1881-82.  Henderson acknowledged he (1) made sure the job was done according to the customer's instructions; (2) report mechanical problems with the equipment; (3) completed safety "near miss" reports for jobs he oversaw; and (4) completed the field tickets used to bill customers for the field jobs.  Henderson Depo. [Doc. # 252-2], at 1841-44.

[64]   It appears that Henderson also performed manual labor along side the STs he supervised while in the field.  The evidence is conflicting on whether, as an SS, Henderson spent more than fifty percent (50%) of his total time managing other employees.  Henderson testified that he engaged in various non-exempt tasks in the shop.  This mixture of duties is not disqualifying, however.  *See Villegas*, 2008 WL 5137321, at *19 ("an employee may perform exempt and non-exempt work and still qualify for the exemption").  DOL regulations provide that "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion."  29 C.F.R. § 541.700.  Other factors may include management and delegation of work flow, evaluating work of the STs in the field, training, ability to discipline if necessary, and having input on performance reviews.  *See Darosa v. Florida Default Law Group, P.L.*, 2011 WL 3715118, at *6 (M.D. Fla. Aug. 24, 2011).  Henderson's field oversight duties as an SS were crucial to the business of CTS.  His non-executive tasks while in the shop between projects do not destroy the fundamental fact that he was hired and performed in the field as the senior CTS employee who was in charge of the others on his crew.

The next issue on the Executive Exemption is whether Henderson managed a "recognized department or subdivision," rather than a varying group of employees. The management of "a customarily recognized department or subdivision" is intended to distinguish between a "collection of employees assigned from time to time to a specific job or series of projects and a unit with permanent status and function." 29 C.F.R. § 541.103(a). "A customarily recognized department or subdivision must have a permanent status and a continuing function." *Id.*[65] "A recognized department or subdivision may move from place to place and the subordinate personnel may change, as long as the 'unit' has a continuing function." *Villegas v. Dependable Const. Servs., Inc.*, 2008 WL 5137321, at *17 (S. D. Tex. Dec. 8, 2008) (Ellison, J.) (citing 29 C.F.R. § 541.103(c), (d)).

Field Service Employees worked on different projects every few days or weeks as parts of "field service units." However, CTS consistently and continuously relied on its field service units to perform the customer projects, which were CTS's revenue generating business. CTS's services, by definition, were rendered outside the company's own facilities[66] and were supervised by an SS without superiors' direct oversight. Thus, at CTS, field service units in concept had a permanent status and a continuing function. *See Darosa v. Florida Default Law Group, P.L.*, __ F. Supp. 2d

---

[65] "For example, a large employer's human resources department might have subdivisions for labor relations, pensions and other benefits, equal employment opportunity, and personnel management, each of which has a permanent status and function." 29 C.F.R. § 541.103(a).

[66] The DOL regulations provide that a "recognized department or subdivision need not be physically within the employer's establishment and may move from place to place." 29 C.F.R. § 541.103(c). Also, "[t]he mere fact that the employee [manager] works in more than one location does not invalidate the exemption if other factors show that the employee is actually in charge of a recognized unit with a continuing function in the organization." *Id.*

__, 2011 WL 3715118, *6 (M.D. Fla. Aug. 24, 2011) (noting that a sales team is a "customarily recognized department").

Contrary to Plaintiffs' contentions, the DOL recognizes that "[c]ontinuity of the same subordinate personnel is not essential to the existence of a recognized unit with a continuing function." 29 C.F.R. § 541.103(d). CTS's business model is contemplated by the DOL's further explanation in § 541.103(d): "An otherwise exempt employee [here, an SS such as Henderson] will not lose the exemption merely because the employee draws and supervises workers from a pool or supervises a team of workers drawn from other recognized units, if other factors are present that indicate that the employee is in charge of a recognized unit with a continuing function." *Id.*; *see* 29 C.F.R. § 541.104(b). The DOL elaborates that the Executive Exemption may apply when the supervision is "distributed among two, three or more employees, but each such employee must customarily and regularly direct the work of two or more other full-time employees or the equivalent if a pool of employees is involved in a workplace. 29 C.F.R. § 541.104(b). CTS has met its burden to show that field service units had a permanent status and served a continuing function such that they were a "recognized department or subdivision" of the company.[67]

CTS also has shown that Henderson as an SS satisfies the third requirement for the Executive Exemption because he customarily and regularly directed the work of two or more other employees. Henderson was the highest ranking CTS employee in the field at his projects. He was required to supervise "all coil tubing, pumping, nitrogen and carbon dioxide operation at the job site" and "all Company Personnel

---

[67]    Section 541.104(b) goes on to explain: "Thus, for example, a department with five full-time nonexempt workers may have up to two exempt supervisors if each such supervisor customarily and regularly directs the work of two of those workers."

assigned to the job [project] site."[68]  It is uncontroverted that Henderson as an SS supervised two or more other CTS Field Service Employees on the projects to which he was assigned and he directed the STs' work.[69]  *See* 29 C.F.R. § 541.104(a) ("To qualify as an exempt executive under § 541.100, the employee must customarily and regularly direct the work of two or more other employees.")

Henderson also satisfies the fourth requirement for the Executive Exemption. Henderson as an SS was the CTS employee who typically observed his field unit members' performance during performance of their projects.  He was a person with whom his District Manager consulted for suggestions and recommendations regarding those employees' performance, and his information was then used in decisions on advancement, promotion and other status changes for CTS field employees.[70]

---

[68]  *See* Service Supervisor Job Description [Doc. # 234-8], at p. 34.

[69]  Henderson Depo. [Doc. # 234-7], at 205 (as a SS, Henderson went out with "more than one other crew member" more than 50% of the time). *See* Letchworth Depo. and Exhibit 26 thereto [Doc. # 234-8], at 248, 267-70 (Service Supervisor Job Description); Wise Decl. [Doc. # 234-13], at 458, ¶¶ 21-23 (as an SS, Wise "customarily and regularly directed the work of two or more full-time CTS employees"); B. Allen Depo. [Doc. # 234-2], at 9 (for a CTS crew in the field, a service supervisor was the highest ranking employee); D. Allen Depo. [Doc. # 234-4], at 81-82 (supervisor for field job was responsible for directing the work of all CTS workers in the field); Crews Depo. [Doc. # 234-6], at 190-91(supervisor was in charge on the well site); Pena Depo. [Doc. # 234-9], at 302 (number in crew varies from three to six).

[70]  *See* Burchfield Decl. [Doc. # 234-46], at 1398, ¶¶ 6-7 (as District Manager, Burchfield had final authority on employment-related decisions and, because he did not typically observe employees in the field, he "rel[ied] upon and [gave] significant weight to the suggestions, observations, recommendations, and assessments of the Service Supervisors or Service Supervisor Trainees" when making employment-related decisions); Wise Decl. [Doc. # 234-13], at 458-59, ¶ 24 (as an SS, Wise had "authority to make recommendations regarding the hiring, firing, advancement, and promotion of other CTS employees" and "performed job evaluations of [his] crew
(continued...)

Henderson as an SS had the authority to discipline STs if the need arose, and could even fire an ST who engaged in gross misconduct in the field.[71]  Although Henderson states that he never fired anyone, CTS's evidence is uncontroverted that Henderson had that authority under limited circumstances.

CTS has met its burden to show that Henderson, when working as an SS, satisfied the requirements for the Executive Exemption.

### C.    Highly Compensated Employee Exemption

CTS argues also that Henderson satisfied the requirements for the Highly Compensated Employee Exemption.  The Highly Compensated Employee Exemption applies to employees who have a "total annual compensation of at least $100,000.00" (which must include at least $455.00 per week paid on a salary or fee basis) and who regularly and customarily perform at least one of the duties of an executive administrative, or professional employee.  29 C.F.R. § 541.601(a), (b)(1); *see also In re Novartis Wage and Hour Litigation*, 611 F.3d 141, 146-47 (2d Cir. 2010).[72]  "An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for

---

70    (...continued)
members"); Letchworth Deposition and Exhibit 26 thereto [Doc. # 234-8], at 242 (SS reports on employee behavior, attendance, and performance to District Manager).  *See also* Henderson Depo. and Exhibit 2 thereto [Doc. # 234-7], at 200-03, 207.

71    Letchworth Depo. [Doc. # 234-8], at 243 (ST-II or SS has authority to fire a ST-I on the job site if gross misconduct occurs); *see also* Burchfield Decl. [Doc. # 234-46], at 1398, ¶ 7.

72    The DOL states: "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties."  29 C.F.R. § 541.601(c).

the executive exemption under § 541.100." 29 C.F.R. § 541.601(c).  As was discussed above, as an SS, Henderson customarily and regularly directed the work of two or more employees.  Additionally, Henderson had the authority to fire STs under limited circumstances and in fact provided input into the discipline, promotion, and firing decisions made by his superiors.  *See supra* for discussion of Henderson's duties.[73]  Consequently, if Henderson earned more than $100,000 per year, CTS meets its burden to show that Henderson satisfied the requirements of the Highly Compensated Employee Exemption when he worked as an SS.

Regarding Henderson's pay, it is undisputed that Henderson earned more than $100,000.00 in 2006, but during that year he worked as both an SC and later as an SS, and apparently SCs earned more than SSs.  From May 2006 to March 2007, when he resigned, Henderson was on pace to exceed $100,000.00 in annual compensation.[74]  "Total annual compensation" may include "commissions, nondiscretionary bonuses

---

[73]   Henderson argues that he performed manual duties while serving as an SS and that therefore the Highly Compensated Exemption is inapplicable.  The regulation provides:

> This section applies only to employees whose primary duty includes performing office or non-manual work.  Thus, for example, non-management production-line workers and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees who perform work involving repetitive operations with their hands, physical skill and energy are not exempt under this section no matter how highly paid they might be.

29 C.F.R. § 541.601(d).  For reasons explained above, Henderson has failed to establish a genuine fact issue that his primary duties were manual labor as described in this regulation.

[74]   Letchworth Decl. [Doc. # 234-52], at 1631, ¶ 18(b).

and other nondiscretionary compensation earned during a 52-week period," but does not include board, lodging, payments for medical insurance and life insurance, contributions to retirement plans, or the cost of other fringe benefits.  29 C.F.R. § 541.601(b)(1).  The exemption applies if the employee receives "total annual compensation" of at least $100,000.00 "during a 52-week period."  29 C.F.R. § 541.601(a), (b)(1).  If an employee has not worked a full 52-week period, he still may qualify for the Highly Paid Employee Exemption if his annualized compensation equals in excess of $100,000.  *See Sarviss v. Gen'l Dynamics Info. Tech., Inc*., 663 F. Supp. 2d 883, 892 (C.D. Cal. 2009) (holding that a plaintiff's "average weekly salary [that] would have led to an annual compensation" in excess of $100,000 met the salary level element of the exemption (citation omitted)); 29 C.F.R. § 541.601(b)(3) (if an employee works for the employer only part of a year, the employee may qualify for the exemption if the employee "receives a pro rata portion" of $100,000 "based upon the number of weeks that employee will be or has been employed.").  Henderson worked as an SS for approximately ten months, from May 2006 through March 2007.  To the extent he was on track as an SS to earn at least $100,000.00 had he worked a full 52-week period as an SS before he resigned, the Highly Compensated Employee Exemption applies for that work period.

### D.    Professional Exemption

CTS argues that Plaintiff Mahmoud Sheikh, a Field Engineer I (FE-I), satisfied the requirements of the Learned Professional Exemption because he was employed in a bona fide professional capacity.[75]  The Learned Professional Exemption applies to an employee "[c]ompensated on a salary or fee basis at a rate of not less than $455 per

---

[75]    The Court has held that there is a genuine material fact issue concerning whether Sheikh as an FE-I is exempt under the MCA Exemption.  *See* note 60 *supra*.

week" and whose primary duty requires the performance of work demanding "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a)(2)(i). It is undisputed that Sheikh satisfies the salary portion of the Learned Professional Exemption.

To satisfy the duties test for the Learned Professional Exemption, an employee's primary duty must consist of the following three elements:

(1)    The employee must perform work requiring advanced knowledge;

(2)    The advanced knowledge must be in a field of science or learning; and

(3)    The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

29 C.F.R. § 541.301(a). CTS asserts that Sheikh performed work requiring advanced knowledge in the field of engineering, including petroleum engineering. There is no dispute that petroleum engineering is in a field of science and that advanced knowledge in that field is customarily acquired by a prolonged course of specialized intellectual instruction. It is also undisputed that Sheikh has a Bachelor of Science degree with a major in petroleum engineering and that CTS required that a FE-I have an engineering degree.[76] The duties of a FE-I include making observations regarding the use of coil tubing equipment in the field, recording those observations, inputting the data into a computer system, and producing a field report so that the life of the coil tubing unit can be determined.[77] Sheikh counters, however, that he and other FE-Is did not actually perform work that required advanced knowledge in petroleum engineering and that

---

[76]    Sheikh Depo. and Exhibit 1 thereto [Doc. # 234-11], at 350, 355.

[77]    Sheikh Depo. [Doc. # 234-11], at 352-53.

other CTS employees without an engineering degree performed his job before he did.[78] Indeed Sheikh testified that 98% of his time was spent doing the same work as the STs.[79]   That the duties of an FE-I included many manual tasks like the STs was corroborated by CTS's witness.[80]

> The phrase "work requiring advanced knowledge" means
>
> work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work.  An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances.

*Id.* § 541.301(b).  The Court concludes that, on the available record, there is a genuine material fact question regarding the duties expected of and actually performed by Sheikh as an FE-I on CTS projects.   CTS has not demonstrated without material contradiction that the data gathering and computer input tasks entail intellectual functions that require the "consistent exercise of discretion and judgment, as distinguished from performance of routine mental and manual . . . work."  *Id.*   It simply is unclear what advanced knowledge is required for an FE-I's performance of his duties. CTS has not met its burden to demonstrate entitlement to the Professional

---

[78]   Sheikh Depo. [Doc. # 253-29], at 39-41, 43-44 (pages 6-7 of 7 on ECF); Washington Depo. [Doc. # 253-9], at 8 (page 2 of 7 on ECF); Ramirez Depo. [Doc. # 253-6], at 12 (page 2 of 7 on ECF).

[79]   Sheikh Depo. [Doc. # 253-29], at 22-23 (page 5 of 7 on ECF).

[80]   Gortmaker Depo. [Doc. # 253-4], at 22, 24, 31 (pages 2-4 of 7 on ECF).

Exemption to the overtime requirements of the FLSA for Sheikh.[81]   Accordingly, summary judgment is denied on the Professional Exemption as applied to Sheikh.

## VII.   STATUTE OF LIMITATIONS

The statute of limitations governing recovery of unpaid wages under the FLSA is two years unless the violation is willful, in which case the period is three years from the violation. 29 U.S.C. § 255(a).  A violation of the FLSA is considered willful if the defendant either knew its conduct violated the statute or showed reckless disregard for whether its actions complied with the Act.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  "Under the FLSA, a violation is 'willful' if the employer either "'knew or showed reckless disregard for . . . whether its conduct was prohibited by the statute.'"  *Singer v. City of Waco, Tex.,* 324 F. 3d 813, 821 (5th Cir. 2003)(quoting *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994) (quoting *McLaughlin,* 486 U.S. at 133 )).  "The burden of showing that an FLSA violation was 'willful' falls on the plaintiffs."  *Stokes v. BWXT Pantex, L.L.C.*, 424 F. App'x 324, 326 (5th Cir. 2011).

"In common usage the word 'willful' is considered synonymous with 'voluntary' 'deliberate,' and 'intentional.'"  *McLaughlin*, 486 U.S. at 133.  "'Willful' . . . is generally understood to refer to conduct that is not merely negligent." *Id.*  The Supreme Court added: "If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful . . . under the standard we set forth." *Id.* at 135 n.13.  "Because willfulness is a question of fact, summary judgment in favor of the employer is inappropriate if the plaintiff has introduced evidence sufficient to

---

[81]    *See* Letchworth Depo. [Doc. # 234-8], at 255 (Sheikh's job duties included collecting data, overseeing operations, assisting in troubleshooting, and giving recommendations to management); Burchfield Decl. [Doc. # 234-46], at 1403, ¶¶ 31-33 (FE-Is are expected to monitor operation of coil tubing equipment, make recommendations to field service crew personnel, investigate equipment malfunctions, and assess preventative action).

support a finding of willfulness." *Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.,* 579 F.3d 546, 552 (5th Cir. 2009) (citation omitted).

Evidence of willfulness includes "admissions from management that they knew they were violating FLSA prior to the lawsuit" and "continu[ing] a practice without further investigation after it was informed by the Wage and Hour office that its payment method violated FLSA." *Villegas*, 2008 WL 5137321 (citing *Singer*, 324 F.3d at 821-22, *Reich*, 23 F.3d at 117). "[W]here the Secretary was unable to produce records of prior investigations with substantially similar facts to the violations asserted, employer's violations were not willful." *Id.* (citing *Reich v. Tiller Helicopter Serv., Inc.*, 8 F.3d 1018, 1036 (5th Cir. 1993)). "An employer is not acting willfully even if he fails to seek legal advice on his payment method or acted unreasonably in violating FLSA." *Id.* (citing *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990) (citing *McLaughlin*, 486 U.S. 128 (finding that where employer discussed payment with the employment commission and consulted brochures, the employer did not act in reckless disregard of the law))).

The Court has carefully considered the extensive summary judgment record and the parties' arguments in this case. The Court finds that the Bellwether Plaintiffs have not introduced evidence sufficient to support a finding of willfulness. The fact that certain individual Plaintiffs asked their managers why they were not receiving overtime is insufficient to raise a genuine fact question as to whether CTS knew or recklessly disregarded that its pay structure violated the FLSA. *See Ikossi*, 579 F.3d at 553. Plaintiffs point out that Letchworth acknowledged that "an employee is not affecting the safety of a vehicle in commerce when he is working offshore" and argue this is an admission that CTS knew it was violating the FLSA prior to this lawsuit. The Court is not persuaded. CTS has asserted the viable position throughout this lawsuit that an employee individually need not be affecting the safety of a vehicle in commerce at all

times in order to fall under the MCA Exemption.  That position has support in applicable regulations, which state that "if the bona fide *duties* of the job performed by the employee are in fact such that he is (or, . . . is likely to be) called upon in the ordinary course of his work to perform, either regularly or *from time to time*, safety-affecting activities . . . , he comes within the exemption in all workweeks when he is employed at such job."  29 C.F.R. § 782.2(b)(3) (emphasis added).  Indeed, CTS's interpretation of the MCA Exemption in the Relevant Period was not unreasonable in light of then-existing legal precedent, including *Morris*, 332 U.S. 422, and *Harshman*, 248 F. Supp. 953 (finding oil well service workers exempt from FLSA under MCA Exemption).  Moreover, CTS's decisions were not reckless in light of Courts' confusion regarding the meaning and scope of the SAFETEA-LU (and TCA) during the Relevant Period (and at present).[82]

Plaintiffs also assert that CTS's failure to seek legal advice regarding its payment method supports a finding of willfulness in this case.  This contention is not consistent with circuit precedent.  *See Mireles*, 899 F.2d at 1416; *accord Villegas*, 2008 WL 5137321, at *26.  Indeed, that CTS in 2008 changed its payment structure in part, by paying overtime wages to ST-Is in the Broussard District where ST-Is are assigned work in a manner different from other Districts, suggests that CTS is not recklessly disregarding whether there is a violation of the FLSA, and engages in continuing efforts to comply with the FLSA.

Plaintiff has not produced sufficient evidence to create a genuine issue of material fact that CTS knew or showed reckless disregard for whether its payment

---

[82]     Furthermore, even if a weekly analysis were necessary, the impact of the "4-month rule" (which the parties did not brief on the merits of Plaintiffs' claims) may well support CTS's view that overtime was not warranted for all or most Bellwether Plaintiffs and others.

structure violated the FLSA during the relevant period.  CTS therefore is entitled to summary judgment that any violations of the FLSA in this case were not willful.  The applicable statute of limitations in this case is two years.  29 U.S.C. § 255(a).[83]

## VIII.  LIQUIDATED DAMAGES

Under section 16 of the FLSA, 29 U.S.C. § 216, liquidated damages are mandatory for violations of 29 U.S.C. § 206 (minimum wage) and § 207 (maximum hours).  Under section 11 of the Portal-to-Portal Act, 29 U.S.C. § 260, however, a judge is empowered to exercise discretion to eliminate the employer's liability for liquidated damages if the employer shows that the action or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the FLSA.  29 U.S.C. § 260; *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 357 (5th Cir. 1990).

An employer can satisfy the "reasonable grounds" element to excuse it from liquidated damages if the employer acted under a reasonable belief that its acts conformed with the law.  *Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259, 267 & n.34 (5th Cir. 1999).  "'The purpose of [§ 260] was to mitigate the harshness of the then-strict liability offense of violating Section 216, with its attendant double-damage assessment.'"  *Id.* at 267 (quoting *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1263 (5th Cir. 1986)).  The employer faces a "substantial burden" to prove good faith and a reasonable belief that its actions did not violate the FLSA.  *Id.* (citing *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir. 1990)).  "[T]he award of liquidated damages remains within the discretion of the trial court; 'even if the district court determines that the employer's actions were in good faith and based on reasonable

---

[83]     Each Plaintiff "commenced" his action for purposes of the statute of limitations on the date he signed a consent form.

grounds, the court has discretion to award liquidated damages.'" *Id.* (quoting *Lee v. Coahoma Cty*, 937 F.2d 220, 226 (5th Cir. 1991)).

The Court declines, in an exercise of its discretion, to award Plaintiffs liquidated damages at this time.  As discussed above, some of CTS's decisions were correct, while the Court has rejected others.  To the extent CTS has prevailed, liquidated damages of course are not warranted.  There remain various fact issues on several claimed exemptions as applied to certain districts and certain time periods.  To the extent the Court has ruled against CTS regarding Field Service Employees at two of the four districts in issue, the issues are complex and the Court will reach the issue of liquidated damages to prevailing Plaintiffs once the case is otherwise concluded.[84] Any ruling on Plaintiffs' entitlement to liquidated damages is premature.

It is noted, contrary to Plaintiffs' argument, however, that *Harshman v. Well Serv., Inc.*, 248 F. Supp. 953 (W.D. Pa. 1964), a longstanding district court decision holding that the MCA Exemption applied to oilfield service operators, served as some basis for CTS's decisions despite the distinctions between CTS's employees and those in *Harshman*.[85] On the other hand, the testimony of CTS founder and former President Glen Ritter and Founder, General Manager and Vice President David Hebert that the

---

[84]    Notably, the Court disagrees with Plaintiffs' analysis as well as CTS's on the application of the MCA Exemption.

[85]    Further, although decided after the events in issue, other courts in this district have upheld the MCA Exemption asserted by certain CTS affiliates for employees with somewhat comparable duties to the Field Service Employees before this Court. *See, e.g, Garza v. Smith Int'l, Inc.*, No. C-10-100, 2011 U.S. Dist. LEXIS 22869, 2011 WL 835820 (S.D. Tex. Mar. 7, 2011) (Jack, J.); Memorandum and Recommendation [Doc. # 77], *Gonzalez v. W-H Energy Servs., Inc.*, No. 2:08–CV–311 (S.D. Tex. Jan. 7, 2010) (Ellington, M.J.), *adopted by* Order Adopting Memorandum and Recommendation (S. D. Tex. Jan. 29, 2010) (Head, J.).  Thus, as to the application of the MCA Exemption to many of its employees, CTS's assessment of the law was not unreasonable.

overtime policies were "mostly accidental," the unexplained change in policy from payment of overtime to withholding that wage, the inability to point to other specific companies which CTS purported to emulate, the acknowledgment that these executives did not have experience to make an informed decision about overtime policies, and the lack of research or consultation into the law in light of the job descriptions suggests the company prior to being sued did not pay meaningful attention to the FLSA's mandates.[86]

## IX.   CONCLUSION AND ORDER

For the foregoing reasons, the Court concludes that the pending Motions for Summary Judgment [Docs. # 218-230, # 232, # 233, and # 246] are **GRANTED in part** and **DENIED in part**.  Specifically, it is hereby

**ORDERED** that summary judgment in Plaintiffs' favor is **GRANTED** that Field Service Employees at the Alice and Bridgeport Districts are not barred from overtime compensation under the Motor Carrier Act exemption for claims from November 2006 through June 6, 2008. It is further

**ORDERED** that summary judgment is **GRANTED** in favor of Defendant CTS that the Motor Carrier Act exemption applies to all Field Service Employees at the Angleton District for the period from November 13, 2006 to June 6, 2008.  It is further

**ORDERED** that summary judgment is **GRANTED** in favor of Defendant CTS that the Motor Carrier Act exemption applies to Field Service Employees at the Broussard District assigned to land-based projects for the period from November 13, 2006 to June 6, 2008.  It is further

---

[86]   *See* Plaintiffs' Motion for Summary Judgment Regarding Liquidated Damages [Doc. # 246], at 16-17 & nn. 86-102.

**ORDERED** that summary judgment is **DENIED** as to both parties regarding application of the Motor Carrier Act Exemption to all Field Service Employees on offshore projects at the Broussard District for the period from November 13, 2006 to June 6, 2008.  It is further

**ORDERED** that summary judgment is **GRANTED** in CTS's favor that Henderson is within the Executive Exemption and the Highly Compensated Exemption.  It is further

**ORDERED** that summary judgment is **DENIED** to CTS on whether Sheikh is within the Professional Exemption.  It is further

**ORDERED** that summary judgment is **GRANTED** in favor of Defendant CTS that any violation of the FLSA in failing to pay overtime as described above was not willful and a two-year limitations period applies to this case.  It is further

**ORDERED** that summary judgment is **GRANTED in part and DENIED as premature in part** on the issue of liquidated damages.  It is further

**ORDERED** that all parties' summary judgment motions are **DENIED** on the following issues:

1.      Whether and to what extent any Plaintiff is entitled to overtime after June 6, 2008.

2.      Whether any Bellwether Plaintiff qualifies as a drivers' helper or as a loader under the Motor Carrier Act exemption; and

3.      Whether Sheikh qualified for either the MCA Exemption or the Professional Exemption.  It is further

**ORDERED** that counsel must appear for a status conference on **October 27, 2011, at 10:00 a.m**.

SIGNED at Houston, Texas this **17th** day of **October, 2011**.

Nancy F. Atlas
United States District Judge